D. James Pak (SBN 194331)
d.james.pak@bakernet.com
April M. Wurster (SBN 228038)
april.m.wurster@bakernet.com
**Baker & McKenzie LLP**
12544 High Bluff Drive, Third Floor
San Diego, California
92130-3051  USA
Telephone: +1  858 523 6236
Facsimile: +1 858 259 8290

Attorneys for Defendant
Union Community Co. Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| SecuGen Corporation, a Delaware corporation<br><br>Plaintiff,<br><br>v.<br><br>Union Community Co. Ltd., a Korean corporation,<br><br>Defendant. | Case No.  C08-01306 (JL)<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT TO STAY PROCEEDINGS PENDING REEXAMINATION**<br><br>**Hearing Date: September 26, 2008**<br>**at 9:00 a.m.**<br><br>**Location: Courtroom #6** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

CASE NO C08-01306 (JL)
NOTICE OF MOTION AND MOTION OF DEFENDANT TO STAY PROCEEDINGS PENDING REEXAMINATION

SDODMS1/692345.1

1    TO PLAINTIFF AND THEIR COUNSEL FO RECORD:

2    PLEASE TAKE NOTICE that on September 26, 2008 at 9:00 a.m. or as soon thereafter as

3    counsel may be heard, in Courtroom 6 of the United States District Court for the Northern District of

4    California, San Jose Division, Defendant Union Community Co. Ltd. ("Union Community") will

5    and hereby does move the Court for an order staying the proceedings pending reexamination of U.S.

6    Patent No. 6,324,020.

7    Union Community bases its motion on this Notice of Motion and Motion, the Memorandum

8    of Points and Authorities filed herewith, the Declaration of D. James Pak and Declaration of

9    Myeong-Hun Lee, and on such other evidence and augment as may properly come before the Court.

10

11   Dated:    August 6, 2008                    BAKER & McKENZIE LLP

12

13                                              By: /s/ April Wurster
                                                    April Wurster
14                                                  Attorney for Defendant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1

CASE NO C08-01306 (JL)
NOTICE OF MOTION AND MOTION OF DEFENDANT TO STAY PROCEEDINGS PENDING REEXAMINATION

SDODMS1/692345.1

D. James Pak (SBN 194331)
d.james.pak@bakernet.com
April M. Wurster (SBN 228038)
april.m.wurster@bakernet.com
**Baker & McKenzie LLP**
12544 High Bluff Drive, Third Floor
San Diego, California
92130-3051  USA
Telephone: +1  858 523 6236
Facsimile: +1 858 259 8290

Attorneys for Defendant
Union Community Co. Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| SecuGen Corporation, a Delaware corporation<br><br>Plaintiff,<br><br>v.<br><br>Union Community Co. Ltd., a Korean corporation,<br><br>Defendant. | Case No.  C08-01306 (JL)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION**<br><br>**Hearing Date: September 26, 2008<br>at 9:00 a.m.<br>Location: Courtroom #6** |

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051  USA

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    The Status of the Current Litigation ................................................. 2

    B.    Reexamination ................................................................................... 3

    C.    Union Community's Sales of the Accused Products in the United States ....................................................................................... 4

ARGUMENT ....................................................................................................................... 4

    I.    STAYS ARE LIBERALLY GRANTED PENDING THE OUTCOME OF PTO REEXAMINATION PROCEEDINGS ................................................ 4

    II.    NO DISCOVERY HAS YET TAKEN PLACE, WEIGHING IN FAVOR OF A STAY ....................................................................................... 5

    III.    STAYING THIS CASE WILL SIMPLIFY ISSUES AND CONSERVE JUDICIAL AND PARTY RESOURCES .................................................. 6

        A.    There Are Substantial Questions of Validity Regarding the '020 Patent ........ 6

        B.    The PTO Has Special Expertise In Patent Examination and Patentability .................................................................................... 8

        C.    The PTO Reexamination Will Clarify or Eliminate Validity Issues For Trial .................................................................................. 9

    IV.    A STAY OF LITIGATION WOULD NOT UNDULY PREJUDICE SECUGEN NOR PROVIDE AN UNFAIR TACTICAL ADVANTAGE TO UNION COMMUNITY IN VIEW OF MINIMAL PAST SALES AND NO ON-GOING OR FUTURE SALES OF THE ACCUSED PRODUCTS .................. 10

    V.    CONCLUSION ................................................................................ 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Agar Corp., Inc. v. Multi-Fluid. Inc.*, 983 F.Supp. 1126 (S.D. Tex. 1997) ........................................ 7

*ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994) ..................................... 5

*Bausch & Lomb, Inc. v. Alcon Lab., Inc.*, 914 F. Supp. 951 (W.D.N.Y. 1996) ................................. 7

*Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988) ..................................................... 4, 5

*Gladish v. Tyco Toys*, 29 U.S.P.Q.2d 1718 (E.D. Cal. 1993) .................................................... 5

*Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed. Cir. 1983) ................................................ 6

*GPAC, Inc. v. D.W.W. Enterprises, Inc.*, 144 F.R.D. 60 (D.N.J. 1992) ........................................... 8

*Intermotive, Inc. v. Inpower, LLC*, 2007 WL 46052 (E.D. Cal. 2007) ............................................ 5

*KLA-Tencor Corp. v. Nanometrics, Inc.*, 2006 WL 708661 (N.D. Cal. 2006) ....................................... 6

*Methode Elecs., Inc. v. Infineon Techs. Corp.*, 2000 U.S. Dist. LEXIS 20689 (N.D. Cal. 2000) ................................................................................ 5

*Patlex Corp. v. Mossinghoff*, 758 F.2d 594 (Fed. Cir.1985) ................................................. 5, 8

*Slip Track Sys., Inc. v. Metal Lite, Inc.*, 159 F.3d 1337 (Fed. Cir. 1998) .................................... 6

*Soverain Software LLC v. Amazon.com, Inc.*, 356 F.Supp.2d 660 (E.D. Tex. 2005) ............................... 7

*United Sweetener USA, Inc. v. Nutraszueet Co.*, 766 F.Supp. 212 (D. Del. 1991) ............................... 6

*Xerox Corp. v. 3Com Corp.*, 69 F.Supp.2d 404 (W.D.N.Y. 1999) ................................................. 7

*Zilog, Inc. v. Quicklogic Corp.*, 2004 WL 2452850 (N.D. Cal. 2004) ........................................... 6

Baker & McKenzie LLP
12544 High Bluff Drive
Third Floor
San Diego, California
92130-3051 USA

ii

SDODMS1/692207.1

1    Defendant Union Community Co. Ltd., ("Union Community") submits this memorandum in

2    support of its motion to stay all proceedings in this matter pending reexamination by the Patent and

3    Trademark Office of the single patent-in-suit, U.S. Patent No. 6,324,020 (the "'020 patent")(attached

4    as Exhibit A to the accompanying Declaration of D. James Pak, Esq. ("Pak Decl.")).

5    **INTRODUCTION**

6    Union Community moves this Court for a stay of all proceedings in this case, including fact

7    discovery in view of the request for *ex parte* reexamination of the '020 patent filed in the United

8    States Patent and Trademark Office ("PTO") on August 6, 2008 pursuant to 35 U.S.C. §§ 302-307.

9    (Pak Decl. Exhibit B, Request for Reexamination of U.S. Patent No. 6,324,020, filed August 6,

10    2008).

11    A stay of the current proceedings pending the outcome of the reexamination in this case is

12    appropriate for the following reasons:

13    • The litigation is still at its early stages, and no significant discovery has taken place.

14    This Court will hold its Case Management Conference on August 8, 2008, and has

15    not yet issued a Scheduling Order. To date, the only discovery that has taken place

16    (other than initial disclosures) is the service by Plaintiff of its first set of document

17    requests. Neither party has yet served any Interrogatory Requests or Requests for

18    Admission or produced any documents. Defendant has not yet responded to

19    Plaintiff's document requests. Thus, a stay will not result in wasted efforts or

20    resources.

21    • A stay of the litigation will simplify the issues in question and will facilitate the trial

22    of this case (if one is even needed at all). As discussed below, statistics indicate that

23    97% of all reexamination requests are granted and that, once granted, some or all of

24    the claims of the reexamined patent will be either amended or cancelled. Such a

25    result is likley especially in this case given the fact that the Korean counterpart to the

26    '020 patent has been invalidated by the Korean Intellectual Property Office for lack

27    of novelty and obviousness, and the Japanese Patent Office rejected claims similar to

28    the claims of the '020 patent.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1    • Staying the current litigation pending the outcome of the reexamination proceeding is
2    efficient. A stay will (i) avoid wasteful duplication of the efforts, (ii) avoid having
3    the Court needlessly expend resources on items that will be obviated or changed due
4    to the outcome of the reexamination, such as construing claims that are canceled or
5    amended during reexamination, (iii) narrow the scope of discovery, and (iv) reduce
6    the complexity, length and costs of the litigation.

7    • A stay will not unduly prejudice Plaintiff. Union Community currently does not
8    make, sell, or offers to sell in the United States or import into the United States any of
9    the accused products at issue and does not plan to do so in the future. Further,
10    Plaintiff's damages are likely to be zero because Union Community has not sold any
11    accused products in the United States since the filing of the lawsuit and SecuGen
12    failed to give notice of the '020 Patent when Union Community was selling accused
13    product in the United States. By contrast, if this case were to continue pending
14    reexamination, Union Community would be unfairly subjected to the undue expense
15    of litigating allegations based upon rights which are uncertain and subject to
16    cancellation or change during reexamination. Thus, SecuGen's recoverable damages
17    pale in comparison to the costs that Union Community will have to incur.

18    For the reasons set forth more fully below, this action should be stayed pending the outcome of
19    Union Community's reexamination request by the PTO.

20    **FACTUAL BACKGROUND**

21    **A.    The Status of the Current Litigation**

22    SecuGen, the owner of the '020 patent, began the current action against Union Community
23    on March 6, 2008 by filing in this Court a complaint alleging infringement of the '020 patent and
24    U.S. Patent No. 6,381,347 ("the '347 patent"). On March 27, 2008, SecuGen filed its First Amended
25    Complaint withdrawing the '347 Patent. The Amended Complaint seeks, *inter alia,* a judgment that
26    the '020 patent is valid, enforceable, and infringed, as well as injunctive relief and damages. Union
27    Community filed an Answer to the Complaint on May 22, 2008.

28    On July 3, 2008, the parties entered into a stipulation permitting SecuGen to file a Second

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

2

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1   Amended Complaint. SecuGen filed the Stipulation and [Proposed] Order Granting Leave to File

2   Second Amended Complaint on July 3, 2008 and is awaiting Court approval of the stipulation. The

3   proposed Second Amended Complaint adds causes of action for copyright infringement and unfair

4   competition. Union Community has not yet answered the Second Amended Complaint.

5   On July 15, 2008, SecuGen served its first set of discovery requests on Union Community.

6   Responses are due on August 15, 2008. Neither party has served Interrogatory Requests or Requests

7   for Admission. Defendant has not yet responded to Plaintiff's document requests nor has either

8   party produced any documents.

9   On August 6, 2008, Union Community filed the attached Reexamination Request for the

10  '020 patent in the PTO pursuant to 35 U.S.C. §§ 302-307. The Request relies, in part, on prior art

11  uncovered by Union Community, which was not considered by the PTO when the PTO granted the

12  '020 Patent.

13  Union Community requests that this Court stay this litigation pending the PTO's decision

14  whether to reexamine the '020 patent, and if reexamination is granted, then pending the

15  reexamination outcome.

16  **B.    Reexamination**

17  The Patent Statute permits a third patty to request the PTO to reexamine an issued patent.

18  See 35 U.S.C. §302. The intent of a reexamination procedure "is to 'start over' in the PTO . . . and

19  to re-examine the [original] claims, and to *examine* new or amended claims, as they would have been

20  considered if they had been originally examined in light of all the prior art of record in the

21  reexamination proceeding." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988) (citations

22  omitted; emphasis in original). *Ex parte* reexamination is initiated by filing a "request for

23  reexamination" that will be granted if the request raises a "substantial new question of patentability"

24  based on published prior art references. 35 U.S.C. at §303(a). During reexamination, the PTO

25  reexamines the patent in view of printed publications and issued patents. *Id.* Patent owners may

26  amend the patent claims or add new claims, as long as they do not broaden the scope of the original

27  claims. *Id.*, at §307(a).

28  Reexamination requests are routinely granted. In fiscal year 2007, the PTO made 392

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1  determinations on *ex parte* reexamination requests and granted 381, or 97% of the requests. Pak

2  Decl., Exhibit C, USPTO Performance and Accountability Report for Fiscal Year 2007 (2007),

3  http://www.uspto.gov/web/offices/com/annual/2007/2007annualreport-2.pdf, at p. 121. Thus, there

4  is a very high probability that Union Community's *ex parte* request for reexamination will be

5  granted and the PTO will undertake the examination of the '020 patent. Once granted, there is a

6  high likelihood that at least some of the claims of the '020 patent will be amended or cancelled

7  during the reexamination proceedings. See O'Dell *et al.,* The Use of *Inter Partes* and *Ex Parte*

8  Reexamination in Patent Litigation, at 4 (2006) (Pak Declaration Exhibit D) (reporting that 71% of

9  *ex parte* reexaminations requested by third party resulted in at least some of the claims of the

10  reexamined patent being amended or cancelled.)

11  **C.**     **Union Community's Sales of the Accused Products in the United States**

12     To date, Union Community's sales of the accused products in the United States amount to

13  approximately $128,000. Declaration of Myeong-Hun Lee In Support of Motion to Stay ("Lee

14  Decl.") ¶ 3. Further, since the filing of this lawsuit in March of 2008, there have been no sales of

15  any of the accused products in the United States. *Id.* ¶ 4. Moreover, there will not be any more sales

16  of the accused products in the future, because any future US sales of Union Community products

17  will be using a supplier (NitGen) who is believed to be fully licensed under the '020 patent. *Id.* ¶ 5.

18  **ARGUMENT**

19  **I.**     **STAYS ARE LIBERALLY GRANTED PENDING THE OUTCOME OF PTO**

20           **REEXAMINATION PROCEEDINGS**

21     "Courts have inherent power to manage their dockets and stay proceedings, including the

22  authority to order a stay pending conclusion of a PTO examination." *Ethicon, Inc. v. Quigg,* 849

23  F.2d 1422, 1426-27 (Fed. Cir. 1988) (citation omitted); *see also Intermotive, Inc. v. Inpower, LLC,*

24  No. CIV. S-05-0844 FCD GGH, 2007 WL 46052, at *1 (E.D. Cal. Jan. 5, 2007). While courts are

25  not required to stay judicial proceedings pending reexamination of a patent, there is "a liberal policy

26  in favor of granting motions to stay proceedings, pending the outcome of reexamination or re-

27  issuance proceedings, especially in cases that are still in the initial stages of litigation and where

28  there has been little or no discovery." *ASCII Corp. v. STD Entm't USA, Inc.,* 844 F. Supp. 1378,

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

4

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1  1381 (N.D. Cal. 1994).  Reexamination by the PTO furthers the goal of judicial economy by

2  eliminating the need for discovery and trial of certain issues, and by helping the court focus on

3  pertinent issues.  *See Intermotive,* 2007 WL 46052, at *1; *Gladish v. Tyco Toys,* 29 U.S.P.Q.2d 1718,

4  1719 (E.D. Cal. 1993); *Methode Elecs., Inc. v. Infineon Techs. Corp.,* No. 99-21142, 2000 U.S. Dist.

5  LEXIS 20689, at *5-6 (N.D. Cal. Aug. 7, 2000).

6          In determining whether to grant a stay request, courts weigh the competing interests

7  presented by a specific set of facts.  *See Intermotive,* 2007 WL 46052, at *1.  A stay is particularly

8  justified where the outcome of the reexamination would be likely to assist the court in determining

9  patent validity or, if the claims were cancelled in the reexamination, would eliminate the need to try

10 infringement issues.  *See In re Cygnus Telecomm. Tech., LLC Patent Litig.,* 385 F. Supp. 2d 1022,

11 1023 (N.D. Cal. 2005); *cf. Slip Track Sys., Inc. v. Metal Lite, Inc.,* 159 F.3d 1337, 1341 (Fed. Cir.

12 1998).

13         Courts generally look to the following three factors in ruling on a motion to stay pending

14 reexamination of the asserted patent: (1) whether discovery is complete and whether a trial date has

15 been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether

16 a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party.  *See*

17 *KLA-Tencor Corp. v. Nanometrics, Inc.,* No. C 05-03116 JSW, 2006 WL 708661, at *2 (N.D. Cal.

18 Mar. 16, 2006); *In re Cygnus Telecomm. Tech.,* 385 F. Supp. 2d at 1023; *Zilog, Inc. v. Quicklogic*

19 *Corp.,* No. C 03-03725 JW, 2004 WL 2452850, at *2 (N.D. Cal. Mar. 31, 2004); *Methode Elecs.,*

20 2000 U.S. Dist. LEXIS 20689, at *5-6; *ASCII Corp.,* 844 F. Supp. at 1381.  All of these factors favor

21 a stay of this case with respect to the '020 Patent.

22 **II.    NO DISCOVERY HAS YET TAKEN PLACE, WEIGHING IN FAVOR OF A STAY**

23         Generally, courts are willing to stay a case when the motion to stay is made early in the

24 litigation before the parties and the Court have expended significant efforts. See e.g., *In re Cygnus*

25 *Telecommunications Technology, LLC, Patent Litigation,* 385 F.Supp.2d 1022 (N.D. Cal. 2005)

26 (stay granted where discovery not yet completed); *United Sweetener USA, Inc. v. Nutraszueet Co.,*

27 766 F.Supp. 212, 216 (D. Del. 1991) (stay granted where "little discovery has occurred").

28         In fact, the most common reason that district courts have refused to stay a case is because the

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1    motion to stay was not made until after substantial discovery had taken place.  See e.g., *Xerox Corp.*

2    *v. 3Com Corp.*, 69 F.Supp.2d 404, 407 (W.D.N.Y. 1999) (stay denied where parties engaged in

3    substantial discovery and dispositive motions and case nearly ready for trial); *Agar Corp., Inc. v.*

4    *Multi-Fluid. Inc.*, 983 F.Supp. 1126, 1128 (S.D. Tex. 1997) (stay denied where case set for trial and

5    discovery nearly completed); *Soverain Software LLC v. Amazon.com, Inc.*, 356 F.Supp.2d 660, 663

6    (E.D. Tex. 2005) (stay denied where "thousands of pages of documents and millions of lines of

7    source code" produced in discovery and claim construction issues fully briefed and argued).

8    　　　As indicated above, this case is still in its earlier stages, with no discovery (other than the

9    service of initial document requests by Plaintiff) having occurred.  Dispositive motions on the issues

10   of claim construction, infringement, validity, or enforceability have not been filed and are not likely

11   for some time and after at least some discovery has taken place.  The Court has not yet set a date for

12   trial, and neither party has expended significant resources on the litigation.  Thus, because of the

13   estoppel attendant upon *ex parte* reexamination, the posture of this case is such that a stay would

14   *necessarily* conserve the resources of both the Court and the parties.

15   **III.    STAYING THIS CASE WILL SIMPLIFY ISSUES AND CONSERVE JUDICIAL**

16   　　　　　**AND PARTY RESOURCES**

17   　　　In the present case, the factor of judicial economy weighs in favor of granting the motion to

18   stay.  Staying patent litigation pending conclusion of PTO reexamination proceedings conserves

19   judicial resources, simplifies issues for trial and avoids the potential of duplicate proceedings in the

20   event the claims are revised in the reexamination certificate.  *See Bausch & Lomb, Inc. v. Alcon*

21   *Lab., Inc.*, 914 F. Supp. 951, 953 (W.D.N.Y. 1996) ("If this Court were to deny the stay and proceed

22   to trial, it is possible that the time, resources, and significant efforts of all those involved in such a

23   trial would be wasted.").

24   **A.    There Are Substantial Questions of Validity Regarding the '020 Patent**

25   　　　Union Community is aware of at least four prior art references that raise substantial new

26   questions of patentability for the '020 Patent: the US '347 Patent, Korean Patent No. 1994-0007344

27   ("the KR '344 Patent"), Japanese Publication No. 63-301,368 ("the JP '368 Publication"), and

28   British Patent No. 1520483 ("the GB '483 Patent").  Each of these references discloses an "optical

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

6

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1   acquisition apparatus for reducing or substantially eliminating trapezoidal distortion in images of

2   patterned objects and allowing such images to be more sharply focused." Pak Decl., Exhibit A, at

3   1:10-14. Each of the prior art references eliminate trapezoidal distortion in the same way as claimed

4   in the '020 Patent (*i.e.*, by fixing the angles γ and δ such that the path length of light traveling from

5   the apparent image is substantially parallel and equal in length to the path length of a light ray

6   traveling from another part of the apparent image of the fingerprint to the lens plane).

7        The JP '368 Publication and the GB '483 Patent were not considered by or cited to the

8   Examiner during the prosecution of the application for the '020 Patent. Only the English-language

9   Abstract of the Korean Patent No. 1994-0007344 ("the KR '344 Patent") was cited to the Examiner

10   during prosecution of the application for the '020 Patent; the specification and drawings were not

11   submitted. While the US '347 Patent was disclosed to the PTO, the examiner reviewed it before the

12   Applicant, SecuGen, filed an office action amending the claims such that they claim the same

13   invention, or an obvious variation thereof, of what is claimed in the '020 Patent. Consequently, the

14   PTO did not meaningfully review the '347 Patent for double patenting issues. Thus, the Court will

15   receive the benefit of the PTO's expert examination of these new prior art references and references

16   that were not meaningfully reviewed that may well invalidate the claims of the '020 patent and

17   potentially eliminate infringement and validity issues from trial.

18           **a.**    **The Korean PTO Held the Korean Counterpart Invalid**

19        SecuGen filed a Korean patent infringement lawsuit against Union Community in Korea on

20   June 27, 2007, asserting Korean Patent No. 469,571 ("the KR '571 Patent"), which SecuGen has

21   purported to be a foreign counterpart to the '020 Patent. On August 28, 2007, Union Community

22   countered with a patent invalidity proceeding in Korea, seeking invalidation of the KR '571 Patent.

23   The Korean Intellectual Property Office issued a formal Opinion on July 15, 2008, holding the KR

24   '571 Patent to be invalid for obviousness. Pak Decl. Exhibit E. The Examiner(s) from the Korean

25   Intellectual Property Office invalidated the counterpart Korean application to the '020 Patent based

26   on some of the same prior art cited herein including the KR '344 Patent, the JP '368 Publication, and

27   the GB '483 Patent. *Id.*

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

7

SDODMS1/692207.1

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION

b.    **The Japanese PTO Rejected Claims That Mirror the '020 Patent Claims**

In addition, when the Japanese Patent Office examined what is believed to be the Japanese counterpart to the '020 Patent, it ruled the independent Claims which are substantially similar if not identical to the '020 Patent are unpatentable in view of the prior art cited in the reexamination request. SecuGen substantially modified the originally submitted Japanese Patent Claims in order to obtain allowance. Thus, the Claims issued in the Japanese counterpart to the '020 Patent have a narrower scope, i.e., more Claim elements, than the Claims issued in the '020 Patent. Pak Decl., Exhibit F.

**B.    The PTO Has Special Expertise In Patent Examination and Patentability**

By staying the instant litigation, the Court would benefit from the shift to the PTO of the significant, and often times technical issue of patent claim validity. Because the PTO is considered to have expertise in deciding issues of patentability, many courts have preferred to postpone making final decisions on infringement until the PTO rules on issues before it in reexamination. *Bausch & Lomb*, at 953. Courts have emphasized the benefit of the PTO's expertise when issues relevant to prior art are involved, stating that the PTO may be in a better position than courts to evaluate the validity of a patent in view of prior art references. Indeed, the patent reexamination procedure was intended to provide the federal courts with the expertise of the PTO:

> The bill's proponents foresaw three principle benefits. First, the new procedure could settle validity disputes more quickly and less expensively than the often-protracted litigation involved in such cases. Second, the procedure will allow courts to refer patent validity questions to the expertise of the Patent Office. See Senate Hearings at 1, wherein Senator Bayh said that re-examination would be 'an aid' to the trial court' in making an informed decision on the patent's validity. Third, reexamination would reinforce 'investor confidence in the certainty of patent rights' by affording the PTO a broader opportunity to review 'doubtful patents.'

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1  *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602 (Fed. Cir.1985), modified on other grounds, 771

2  F.2d 480 (Fed. Cir. 1985).

3  Further, as evident from the reexamination request, the subject matter of the '020 patent is

4  highly technical, and the PTO's technical expertise will be helpful in dealing with the substantial

5  questions regarding the validity of the '020 patent.

6  **C.    The PTO Reexamination Will Clarify or Eliminate Validity Issues For Trial**

7  Awaiting the PTO's determination of the validity of the '020 patent will benefit both the

8  parties and the Court by simplifying the issues pending before the Court, narrowing the scope of

9  discovery, and facilitating the trial of this case, thereby promoting judicial economy.  Courts have

10  recognized that

11  [if] the reexamination proceeding invalidates or narrows the claims,

12  the issues at trial will be simplified.  Similarly, if the reexamination

13  proceeding reaffirms all the claims as issued, the Court will then have

14  the benefit of the PTO's expert analysis of the prior art that allegedly

15  invalidates or limits the claims.

16  Softview Computer Products Corp., 2000 U.S. Dist. LEXIS, at *9-10 (S.D. N.Y. 2000).

17  In view of the relevance of the new prior art, and prior are which was not meaningfully

18  examined by the PTO, there is a high likelihood that Union Community's request for reexamination

19  will be granted.  In view of the relevance of this prior art, it is highly likely that at least some of the

20  relevant claims of the '020 patent, if not all, will be amended or cancelled during reexamination.  *Id.*

21  If the claims of the '020 patent are cancelled during reexamination, the need to litigate the

22  patent infringement allegations will be mooted altogether.  If the claims are amended in any way

23  during the reexamination, any effort expended in construing or otherwise litigating those claims may

24  have been wasted.

25  In addition to the avoidance of wasteful and duplicative efforts, additional benefits that

26  would likely result should this Court order a stay include:  (1) the availability of additional

27  prosecution history; (2) the outcome of the reexamination may prompt settlement of the dispute

28  between the parties without the need for further involvement by the Court; (3) the record of the

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

9

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692207.1

1   reexamination proceedings will likely be entered at trial, thereby potentially reducing the complexity

2   of the issues and the length of the litigation; (4) issues, defenses, and evidence will be more easily

3   limited in pre-trial conferences after reexamination is complete; and (5) the cost of litigation will

4   almost certainly be reduced.  See *Snyder Seed*, 1999 U.S. Dist. Lexis, at *8-9.

5       In light of the numerous benefits to the parties and to the Court that would result from a stay,

6   Union Community respectfully requests that this Court order a stay of all proceedings in this case

7   pending the outcome of the reexamination proceedings in the PTO.

8   **IV.    A STAY OF LITIGATION WOULD NOT UNDULY PREJUDICE SECUGEN NOR**

9   **PROVIDE AN UNFAIR TACTICAL ADVANTAGE TO UNION COMMUNITY IN**

10  **VIEW OF MINIMAL PAST SALES AND NO ON-GOING OR FUTURE SALES OF**

11  **THE ACCUSED PRODUCTS**

12      Granting a stay will not unduly prejudice SecuGen by delaying the disposition of this case.

13  SecuGen has not sought a preliminary injunction in this case.  It is not seeking immediate relief to

14  avoid irreparable harm.  Moreover, a stay may even encourage a settlement of the new allegations

15  raised in the Second Amended Complaint without further intervention by the Court.

16      Furthermore, with no on-going or future sales of the accused products, Lee Decl. ¶¶ 4-5, a

17  stay would not be unduly prejudicial to SecuGen.  On the other hand, a stay could save Union

18  Community personnel from wasting hundreds or thousands of hours responding to discovery

19  requests, including collecting paper and electronic documents, preparing for depositions and an

20  overseas trial, and from paying hundreds of thousands of dollars, or more, in legal fees and expenses

21  relating to discovery and trial.  Union Community's interests are especially relevant here given the

22  fact that Union Community stopped importing the allegedly infringing product before SecuGen gave

23  notice of the '020 Patent.  Thus, even if SecuGen were to prevail, it would not be entitled to any

24  monetary damages in this action.  Even if SecuGen were entitled to monetary damages that remedy

25  is available to SecuGen regardless of whether the Court grants this requested stay.  Hence,

26  SecuGen's recoverable damages pale in comparison to the costs that Union Community will have to

27  incur if Union Community's personnel and attorneys must work on this case during the

28  reexamination proceeding.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1  **V.    CONCLUSION**

2        Staying this litigation until the PTO determines whether to grant reexamination of the '020

3  patent is plainly warranted.  If the PTO grants Union Community's request for reexamination, then

4  the stay should continue until the conclusion of the reexamination.  The litigation is still at its early

5  stages, a stay would *necessarily* conserve the resources of the parties and of the Court.  Additionally,

6  a stay of litigation to allow the PTO to consider the validity of the '020 patent will certainly serve to

7  simplify the issues for determination by this Court and to facilitate the trial of this case.  Finally, a

8  stay of litigation will not unduly prejudice SecuGen.  For the foregoing reasons, Union Community

9  requests this Court to exercise its discretion and grant Defendant's Motion to Stay All Proceedings

10  in this Action pending reexamination of the '020 patent by the PTO.

11

12  Dated:      August 6, 2008                              BAKER & McKENZIE LLP

13

14                                                          By: /s/ April Wurster
                                                               April Wurster
15                                                             Attorney for Defendant

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

11

SDODMS1/692207.1

CASE NO C08-01306 (JL)
MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION

1   D. James Pak (SBN 194331)
    d.james.pak@bakernet.com
2   April M. Wurster (SBN 228038)
    april.m.wurster@bakernet.com
3   **BAKER & McKENZIE LLP**
    12544 High Bluff Drive, Third Floor
4   San Diego, CA 92130
    Telephone:   +1 858 523 6236
5   Facsimile:   +1 858 259 8290

6   Attorneys for Defendant
    Union Community Co. Ltd.

7

8                 UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10

11  SecuGen Corporation, a Delaware      | Case No.  C08-01306 (JL)
    corporation,                         |
12                                       | **DECLARATION OF MR. MYUNG-HOON
                                         | LEE IN SUPPORT OF DEFENDANTS'
13             Plaintiff,                | MOTION TO STAY PROCEEDINGS
                                         | PENDING REEXAMINATION**
14       v.

15  Union Community Co. Ltd., a Korean
    corporation,
16
               Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

1    I, Myung-Hoon Lee, the undersigned, declare as follows:

2    I am Manager of the Marketing and Planning Department at Union Community. I have

3    personal knowledge of all facts contained herein and, if called to testify, could and would

4    competently testify thereto.

5    1. I have direct knowledge regarding Union Community's sales in the United States.

6    2. I understand that SecuGen has alleged that the following products ("the Accused Products")

7        infringe U.S. Patent No. 6,324,020 (the "'020 patent"):

8            VIRDI FOH01 USB Fingerprint Reader, VIRDI RF700 USB Fingerprint

9            Reader, VIRDI FSH01 and FSH01RF Fingerprint Readers, VIRDI FOM01

10           Fingerprint Mouse, VIRDI 3000 series (including the VIRDI 3000,

11           3000SC and 3000RF) and VIRDI 200N Fingerprint Terminals, the VIRDI

12           400FP series (including the VIRDI 400FP, 430FP and 450FP) Fingerprint

13           Authentication Door Locks, the VIRDI 4000 series (including the VIRDI

14           4000, 4000SC and 4000RF) Fingerprint Terminals, the VIRDI 600FP

15           series Fingerprint Panel, the VIRDI Safe200, Safe300, Safe400 and

16           Safe500 and the VIRDI 10BU and 20BU Fingerprint Recognition OEM

17           Modules.

18   3. The total sales of these Accused Products in the United States to date amount to

19       approximately $128,000 USD.

20   4. Since March of 2008, there has been no sale of the Accused Products in the United States.

21   5. Further, Union Community does not plan to sell any of the Accused Products in the United

22       States in the future. Union Community's products will instead incorporate NitGen sensors

23       which Union Community believes are fully licensed under the '020 patent.

24   ///

25   ///

26   ///

27   ///

28   ///

1

Case No. C08-01306 (JL)
DECLARATION OF MR. MYEONG-HUN LEE
ISO DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION

SDODMS1/692234.1

1      I declare under penalty of perjury under the laws of the United States and the State of

2   California that the foregoing is true and correct.  Executed this 5th day of August, 2008, at Seoul,

3   South Korea.

4   Dated:     August 5, 2008

5

6   By: _____

7          Myung-Hoon Lee

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    2

Baker & McKenzie LLP
12544 High Bluff Drive,
Suite 150
San Diego, CA  92130
+1 858 523 6200

SDODMS1/692234.1

Case No.  C08-01306 (JL)
DECLARATION OF MR. MYEONG-HUN LEE
ISO DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION

D. James Pak (SBN 194331)
d.james.pak@bakernet.com
April M. Wurster (SBN 228038)
april.m.wurster@bakernet.com
**Baker & McKenzie LLP**
12544 High Bluff Drive, Third Floor
San Diego, California
92130-3051  USA
Telephone: +1  858 523 6236
Facsimile: +1 858 259 8290

Attorneys for Defendant
Union Community Co. Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA -- SAN FRANCISCO DIVISION

| | |
|---|---|
| SecuGen Corporation, a Delaware corporation | Case No.  C08-01306 (JL) |
| Plaintiff, | **DECLARATION OF D. JAMES PAK IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION** |
| v. | |
| Union Community Co. Ltd., a Korean corporation, | **Hearing Date: September 26, 2008** at 9:00 a.m. |
| Defendant. | **Location: Courtroom #6** |

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051  USA

CASE NO C08-01306 (JL)
DECLARATION OF D. JAMES PAK IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692351.1

1    I, D. James Pak, the undersigned, declare as follows:

2    I am a partner at the law firm of Baker & McKenzie LLP, attorneys of record for Defendant,

3    Union Community Co. Ltd. ("Union Community") in the above-referenced matter. I have personal

knowledge of all facts contained herein and, if called to testify, could and would competently testify

4    thereto.

5              1.    Attached hereto as Exhibit A is a true and correct copy of U.S. Patent No. 6,324,020.

6

7              2.    Attached hereto as Exhibit B is a true and correct copy of the Request for

8                    Reexamination of U.S. Patent 6,324,020 filed August 6, 2008.

9              3.    Attached hereto as Exhibit C is a true and correct copy of U.S. Patent and Trademark

10                   Office Performance and Accountability Report for Fiscal Year 2007.

11             4.    Attached hereto as Exhibit D is a true and correct copy of David M. O'Dell et al.,

12                   "The Use of Inter Partes and Ex Parte Reexamination in Patent Litigation (2006).

13             5.    Attached hereto as Exhibit E is a true and correct copy of Korean Intellectual

14                   Property Office Opinion regarding Korean Patent No. 469,571, issued on July 15,

15                   2008, a translation and a verification.

16             6.    Attached hereto as Exhibit F is a true and correct copy of Japanese counterpart of the

17                   '020 Patent, a translation and a verification.

18

19    I declare under penalty of perjury under the laws of the United States and the State of

20    California that the foregoing is true and correct. Executed this 6th day of August, 2008, at San

21    Diego, California.

22

23    Dated:    August 6, 2008              BAKER & McKENZIE LLP

24

25                                          By: /s/ D. James Pak

26                                              D. James Pak
                                                Attorney for Defendant

27

28

1

**Exhibit A**

US006324020B1

(12) **United States Patent**           (10) **Patent No.:**     **US 6,324,020 B1**
Teng et al.                              (45) **Date of Patent:**     *Nov. 27, 2001

(54) **METHOD AND APPARATUS FOR REDUCTION OF TRAPEZOIDAL DISTORTION AND IMPROVEMENT OF IMAGE SHARPNESS IN AN OPTICAL IMAGE CAPTURING SYSTEM**

(75) Inventors: **Harry H. Teng**, Stanford, CA (US); **Sung-Chan Jo**, Seoul (KR)

(73) Assignee: **SecuGen Corporation**, Milpitas, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/368,442**

(22) Filed:     **Aug. 4, 1999**

(51) Int. Cl.[7] ............................. **G02B 17/00; G06K 9/00**
(52) U.S. Cl. .......................... **359/726**; 359/737; 359/798; 359/831; 356/71; 382/127
(58) Field of Search ..................................... 359/726, 737, 359/798, 831, 837; 356/71; 382/124–127, 116; 340/5.53, 5.83

(56)           **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,527,535 | * 9/1970 | Monroe | 382/127 |
| 3,864,042 | * 2/1975 | Leventhal | 382/127 |
| 3,975,711 | 8/1976 | McMahon | 382/126 |
| 4,120,585 | 10/1978 | DePalma et al. | 356/71 |
| 4,135,147 | 1/1979 | Riganati et al. | 382/125 |
| 4,210,899 | 7/1980 | Swonger et al. | 382/124 |
| 4,340,300 | 7/1982 | Ruell | 356/71 |
| 4,414,684 | 11/1983 | Blonder | 382/127 |
| 4,668,995 | * 5/1987 | Chen et al. | 382/52 |
| 4,681,435 | 7/1987 | Kubota et al. | 356/71 |

| | | | |
|---|---|---|---|
| 4,832,485 | 5/1989 | Bowles | 356/71 |
| 4,872,203 | 10/1989 | Asai et al. | 382/124 |
| 4,983,415 | 1/1991 | Arndt et al. | 427/1 |
| 5,051,576 | 9/1991 | Schiller | 250/227.11 |
| 5,096,290 | 3/1992 | Ohta | 356/71 |
| 5,177,435 | 1/1993 | Kiyokawa et al. | 324/755 |
| 5,177,802 | 1/1993 | Fujimoto et al. | 382/124 |
| 5,189,482 | * 2/1993 | Yang | 382/127 |
| 5,210,588 | 5/1993 | Lee | 356/71 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1286032 | 9/1991 | (CA) . |
| 19509751 | 9/1996 | (DE) . |
| 0 308 162 A2 | 3/1989 | (EP) . |
| 0 308 162 A3 | 3/1989 | (EP) . |

(List continued on next page.)

OTHER PUBLICATIONS

Seigo Igaki et al. (Jan. 1990). "Holographic Fingerprint Sensor," *Fujitsu Sci. Tech. J.,* JP, Fujitsu Limited. Kawasaki, 25(4): 287–296.

*Primary Examiner*—Evelyn A Lester
(74) *Attorney, Agent, or Firm*—Morrison & Foerster LLP

(57)           **ABSTRACT**

An apparatus and method for acquiring an image of a patterned object such as a fingerprint including a light refracting device, a focusing lens, and a light source. The light refracting device can, for example, be a prism and includes an imaging surface, a light receiving surface and a viewing surface. Incident light from the light source is projected through the light receiving surface and reflected off a surface other than the imaging surface. This reflected light is then projected onto the imaging surface to create an image of the patterned object from substantially all scattered light through the viewing surface. The lens is placed adjacent to the viewing surface to focus the light on an image sensor. The apparatus is configured to reduce or substantially eliminate trapezoidal distortion and improve overall image sharpness in an image of an object created by the apparatus.

**19 Claims, 7 Drawing Sheets**



US 6,324,020 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,222,153 | 6/1993 | Beiswenger | 382/127 |
| 5,233,404 | 8/1993 | Lougheed et al. | 356/71 |
| 5,416,573 | 5/1995 | Sartor, Jr. | 356/71 |
| 5,548,394 | 8/1996 | Giles et al. | 356/71 |
| 5,623,553 * | 4/1997 | Sekiya | 382/127 |
| 5,635,723 | 6/1997 | Fujieda et al. | 250/556 |
| 5,680,205 | 10/1997 | Borza | 356/71 |
| 5,732,148 | 3/1998 | Keagy et al. | 382/124 |
| 5,737,071 | 4/1998 | Arndt | 356/71 |
| 5,740,276 | 4/1998 | Tomko et al. | 382/210 |
| 5,796,858 * | 8/1998 | Zhou et al. | 382/127 |
| 5,812,252 * | 9/1998 | Bowker et al. | 356/71 |
| 5,822,445 | 10/1998 | Wong | 382/127 |
| 5,875,025 * | 2/1999 | Toyoda et al. | 356/71 |
| 5,963,657 * | 10/1999 | Bowker et al. | 382/127 |
| 6,154,285 * | 11/2000 | Teng et al. | 356/71 |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 617 919 A2 | 10/1994 | (EP) . | |
| 0 617 919 A3 | 10/1994 | (EP) . | |
| 0 847 024 A2 | 6/1998 | (EP) . | |
| 0 847 024 A3 | 6/1998 | (EP) . | |
| 0 867 828 A2 | 9/1998 | (EP) . | |
| 0 867 828 A3 | 9/1998 | (EP) . | |
| 0 867 829 A2 | 9/1998 | (EP) . | |
| 0 867 829 A3 | 9/1998 | (EP) . | |
| 0847024 A | 10/1998 | (EP) . | |
| 5216981 | 8/1993 | (JP) . | |
| 7131322 | 5/1995 | (JP) . | |
| 11102432 | 4/1999 | (JP) . | |
| 61-145686 A * | 7/1986 | (JP) | 382/127 |
| 61-221883 A * | 10/1986 | (JP) | 382/127 |
| 62-74177 A * | 4/1987 | (JP) | 382/127 |
| 2-133892 A * | 5/1990 | (JP) | 382/127 |
| 2-188888 A * | 7/1990 | (JP) | 382/127 |
| 3-95693 A * | 4/1991 | (JP) | 382/127 |
| 3-246693 A * | 11/1991 | (JP) | 382/127 |
| 3-292578 A * | 12/1991 | (JP) | 382/127 |
| 9407344 | 8/1994 | (KR) . | |
| WO 97/14111 | 4/1997 | (WO) . | |
| WO 98/11478 | 3/1998 | (WO) . | |
| WO 98/11501 A2 | 3/1998 | (WO) . | |
| WO 98/11501 A3 | 3/1998 | (WO) . | |
| WO 98/11750 | 3/1998 | (WO) . | |
| WO 98/35118 | 8/1998 | (WO) . | |

* cited by examiner



**FIG._1**
**(PRIOR ART)**

**FIG._2**
**(PRIOR ART)**



**FIG._3**
**(PRIOR ART)**

**FIG._5**



**FIG._4**



*FIG._6*



*FIG._7*



*FIG._8*



FIG._9



*FIG._ 10*

US 6,324,020 B1

1

# METHOD AND APPARATUS FOR REDUCTION OF TRAPEZOIDAL DISTORTION AND IMPROVEMENT OF IMAGE SHARPNESS IN AN OPTICAL IMAGE CAPTURING SYSTEM

## FIELD OF THE INVENTION

The present invention relates to an optical acquisition apparatus for use with an image capturing and recognition system. In particular, the present invention includes an optical acquisition apparatus for reducing or substantially eliminating trapezoidal distortion in images of patterned objects and allowing such images to be more sharply focused.

## BACKGROUND

Patterned object recognition systems are becoming common in industrial and commercial settings and have a variety of uses. For example, such systems can be used in scanners for the scanning of text, drawings, and photographs. Recently, manufacturers have been attempting to reduce costs associated with pattern recognition systems to make them more viable for consumer use. One such consumer application for pattern recognition systems includes fingerprint acquisition and recognition. Such a system is useful, for example, to enhance computer security by reading a potential user's fingerprint to compare with the fingerprints of users authorized to use the computer or access certain files or functions of the computer. Such a system could, for example, take the place of a security system that uses a login name and password.

The first thing such a fingerprint recognition system, or any pattern recognition system, must be able to do is to accurately acquire the fingerprint, or other pattern, for analysis. A number of mechanisms exist for such acquisition of pattern data. For example, U.S. Pat. Nos. 3,975,711; 4,681,435; 5,051,576; 5,177,435 and 5,233,404 all disclose apparatuses for acquiring an image of a patterned object.

FIG. 1 shows a schematic diagram of one such prior art optical fingerprint capturing and recognition system. In FIG. 1, an optical recognition system 108 includes a light source 112, an optical triangular prism 110, a lens assembly 114, an image sensor 116, and a storage and processing unit 125. The prism 110 includes an imaging surface 118, a light receiving surface 120, and a viewing surface 122. Imaging surface 118 is the surface against which a patterned object, such as a fingerprint, is placed for imaging. The light source 112, which may, for example, be a light emitting diode (LED), is placed adjacent to light receiving surface 120 and generates incident light 124 that is transmitted to the optical prism 110. The optical prism 110 is an isosceles right triangle, with the angle opposite the imaging surface 118 being approximately 90 degrees and the other two "base" angles (that is, the two angles of an isosceles prism that are equal) each being approximately 45 degrees.

Generally, incident light 124 strikes imaging surface 118 at an angle 126 with the incident surface normal line 115. Angle 126 is greater than the critical angle 128. In general, a critical angle is measured between an incident light ray and a normal line to a surface. If incident light strikes a surface at an angle greater than the critical angle, the incident light will undergo total internal reflection off the surface, if the incident light strikes the surface at an angle less than the critical angle, the incident light will substantially pass through the surface. Accordingly, critical angle 128 is the angle with the normal line to the imaging surface 118 above

2

which incident light will totally internally reflect from imaging surface 118 and pass out of prism 110 as reflected light 130 through viewing surface 122.

Reflected light 130 passes through lens assembly 114 located adjacent to viewing surface 122. Lens assembly 114 may contain one or more optical lenses. Thereafter, light from lens assembly 114 is captured by image sensor 116. Image sensor 116, which may, for example, be a charge coupled device (CCD) or a complementary metal oxide semiconductor (CMOS) device, captures optical light images and converts them to electrical signals. Such image sensors are well known to those skilled in the art. The electrical signals are then transmitted to the storage and processing unit 125.

Storage and processing unit 125 may include a memory unit, a processor and an analog to digital converter (not shown). The analog to digital converter converts the analog electrical signals from the image sensor 116 into digital data. The memory is used to store the digital data and algorithms for comparing a captured fingerprint image with a stored fingerprint image. The processor compares the captured digital data with data previously stored in memory based on an algorithm for comparing such data. The processor may also analyze the captured digital data for purposes different from comparison with stored data. Such storage and processing units are known to those skilled in the art and can include standard personal computers equipped with appropriate software. Algorithms for processing and comparison of image data are disclosed, for example, in U.S. Pat. Ser. Nos. 4,135,147 and 4,668,995 each of which is incorporated in its entirety by reference.

When a fingerprint is placed on the optical prism's imaging surface 118, ridges 111 of the fingerprint contact imaging surface 118, and valleys 109 of the fingerprint remain out of contact with imaging surface 118. Thus, in fingerprint valleys 109 incident light 124 entering optical prism 110 from light source 112 undergoes total internal reflection at imaging surface 118 if the incidence angle of the incoming light exceeds the critical angle of the optical prism 110. However, at ridges 111 of a fingerprint some of incident light 124 is absorbed and scattered off the fingerprint ridge. As used herein, the term "scattered" indicates light which, after striking an irregular surface, is radiated or irregularly reflected off the irregular surface in multiple directions.

As a result of this scattering and/or absorption, there is less than total internal reflection of incident light 124 at fingerprint ridges 111. Thus, the intensity of reflected light 130 leaving prism 110 from the valleys 109 of a fingerprint is of greater intensity than reflected light 130 leaving prism 110 from ridges 111. The lower intensity reflected light 130 from ridges 111 translate into darker regions to indicate the presence of an object at the point of incidence between the light beam and the fingerprinting surface. Conversely, higher intensity reflected light 130, such as that which undergoes total internal reflection, translates into brighter regions to indicate the absence of an object at the point of incidence between the incident light 124 and the imaging surface 118. This allows distinguishing the darker fingerprint ridges 111 from the relatively brighter fingerprint valleys 109. Because absorption of incident light at fingerprint ridges 111 is primarily responsible for creating a fingerprint image, system 108 is referred to as an "absorption" imaging system.

The above described system allows capturing an optical fingerprint image and processing the electrical representation of the optical fingerprint image. However, in regions of fingerprint ridges 111, incident light 124 still undergoes

US 6,324,020 B1

3

some total internal reflection and some scattering in a direction parallel to reflected light 130. Thus, the difference in intensity between reflected light 130 from fingerprint valleys 109 and fingerprint ridges 111 can be relatively low. That is, the contrast between fingerprint ridges 111 and valleys 109 in the fingerprint image can be relatively low. This can make image acquisition, processing, and comparison relatively difficult.

Additionally, in optical recognition system such as optical recognition system 108 it can be desirable that the diameter of the first lens in lens assembly 114 be smaller than the image of a fingerprint on viewing surface 122. This both allows optical recognition system 108 to be relatively small and can be less expensive to manufacture.

However, as shown in FIG. 2, in an absorption type system such as system 108, if the diameter of the first lens of lens assembly 114 is smaller than the fingerprint on imaging surface 118, then the lens assembly 114 must generally be placed relatively far from viewing surface 122. This allows the image of a fingerprint captured by system 108 to be relatively sharp all the way to the edges of the fingerprint image. That is, if lens assembly 114 is placed too close to viewing surface 122, the edges of a fingerprint image could be lost or distorted near the edges of the image. This is because in an absorption system such as system 108, the light rays which generate the image of the fingerprint must be substantially parallel for the image to be in focus. And, if the first lens in lens assembly 114 is smaller than the fingerprint in imaging surface 118, then the light rays from the edges of the fingerprint image that are parallel to light rays from areas closer to the center of a fingerprint image may not be able to enter lens assembly 114. This can cause the edges of a fingerprint image to be out of focus or lost.

Thus, as shown in FIG. 2, if the lens assembly for optical recognition system 108 were placed where lens assembly 114' is shown (in phantom), then substantially parallel rays of reflected light 130 and 130' would not enter lens assembly 114'. For this reason, system 108 would not produce a sharp image of a fingerprint placed on imaging surface 118 at points A and B if the lens assembly were placed at the location of lens assembly 114'.

Thus, as shown in FIG. 2, in an absorption system, the reduction in size gained by manufacturing a relatively small first lens of lens assembly 114 can be lost because lens assembly 114 must be placed at a relatively large distance from viewing surface 122 in order to capture the entire fingerprint image using light rays that are substantially parallel. For this reason, making optical recognition system 108 relatively compact can be problematic. Additionally, a relatively large distance between viewing surface 122 and lens assembly 114 can cause loss of contrast in the fingerprint image due to light interference.

Further, when the first lens in lens assembly 114 is smaller than an image of a fingerprint at viewing surface 122, a phenomenon known as trapezoidal distortion can occur in optical recognition system 108. Trapezoidal distortion in an imaging system has the effect of making the image of a square created by the system appear as a trapezoid.

FIG. 2 is a schematic illustration showing why trapezoidal distortion arises in optical recognition system 108. Incident light 124 from light source 112 enters prism 110 and reflects off imaging surface 118, imaging object AB. Reflected light 130 then passes out of viewing surface 122 and to lens assembly 114 at points A' and B' to form object A'B'. Viewing object AB through viewing surface 122, object AB would appear to be located at an "apparent image" object ab.

4

Specifically, point A appears to be at point a, a distance aa' from viewing surface 122 and point B appears to be at point b, a distance bb' from viewing surface 122. The distance that an apparent image of an object appears from viewing surface 122 is given by the actual distance the object is from viewing surface 122 divided by the index of refraction n of prism 110. Specifically, the distance aa' is given by:

$$aa'=Aa'/n,$$

where n is the index of refraction of prism 110. Similarly,

$$bb'=Bb'/n.$$

Trapezoidal distortion occurs when the light path length from the apparent image of an object to the lens plane 107 of lens assembly 114 is different for different parts of the imaged object and the object lens of the lens assembly 114 is smaller than the image of the fingerprint through viewing surface 122. Specifically, trapezoidal distortion occurs in system 108 because the distance aA' is longer than the distance bB' and lens assembly 114 has a smaller diameter than the distance a'b' on viewing surface 122.

Another consequence of distance aA' being larger than distance bB' is that an image of an object which is sharply focused at each part of the image can be difficult to obtain. More generally, whenever the light path length from the apparent image of an object to the lens plane, and ultimately image sensor, of a lens assembly is different for different parts of the imaged object, parts of the image of the object at the lens plane may be in relatively sharp focus and parts of the image may be out of focus.

To correct both the problems of trapezoidal distortion and having a portion of an image of an object which is out of focus, prior art manufacturers have tilted the lens plane 107 of lens assembly 114 and image sensor 116 to increase the distance bB' and decrease the distance aA' to a point where the two distances are approximately equal. However, it is a property of isosceles right prism (that is, a triangular prism in which the base angles measure approximately 45 degrees and the non-base angle, or apex angle, measures approximately 90 degrees), that reflected light 130 exits prism 110 substantially normal to viewing surface 122. That is, no refraction of reflected light 130 occurs as it exits viewing surface 122. Further, generally, the larger the angle of incidence on a surface of a transparent object, the greater the portion of incident light that is reflected from the surface. Thus, while tilting lens assembly 114 and the sensor can reduce trapezoidal distortion and increase image sharpness, it also causes greater reflection of reflected light 130 off the surface of lens assembly 114, and the surface of image sensor 116, because reflected light 130 strikes lens assembly 114 at a greater angle of incidence. This reduces the intensity of light entering image sensor 116, making image processing and comparison more difficult.

Additionally, the relative placement of light source 112 and lens assembly 114 make it possible for stray light 113 emitted by light source 112 to enter lens assembly 114. This can generate additional background "noise" light which can further reduce the quality of a captured image and make image processing more difficult.

To overcome some of the difficulties associated with the type of absorption image acquisition system described above, acquisition systems have been designed which are based primarily on "scattering" mechanisms rather than absorption mechanisms. One such acquisition system is disclosed by U.S. Pat. No. 5,233,404 issued to J. Lougheed et al. on Aug. 3, 1993 (Lougheed et al.). FIG. 3 is a schematic diagram illustrating the image acquisition portion of the apparatus disclosed by Lougheed et al. As shown in FIG. 3, a prior art image acquisition system 208 includes a

US 6,324,020 B1

5

trapezoidal prism 210, a light source 212, a lens assembly 214 and an image sensor 216. The trapezoidal prism 210 includes at least an imaging surface 218, a light receiving surface 220, and a viewing surface 222.

The imaging surface 218 is the surface against which an object to be imaged, such as a fingerprint, is placed. The light source 212 is located adjacent to and facing the light receiving surface 220 which is substantially parallel to imaging surface 218. Thus, incident light 224 emitted by light source 212 projects light through prism 210 and onto imaging surface 218 at an angle which is generally less than the critical angle 228 of prism 210. Therefore, in the valleys 209 of a fingerprint placed against imaging surface 218 where the fingerprint is not in contact with imaging surface, total internal reflection does not occur and incident light 224 passes through imaging surface 218. At points where fingerprint ridges 211 are in contact with imaging surface 218, incident light 224 strikes the fingerprint ridge to generate scattered (or equivalently, irregularly reflected) light 230. Scattered light 230 propagates back into prism 210 in substantially all directions including the direction of lens assembly 214, located adjacent to viewing surface 222. Scattered light passes through viewing surface 222 and into lens assembly 214 to be detected by image sensor 216, which, as above, can be a CCD, CMOS or other type of detector.

In the region of a fingerprint valley 209, incident light 224 passes through imaging surface 218. And, in the area of a fingerprint ridge 211, incident light 224 scatters off imaging surface 218 to be picked up by lens assembly 214 and image sensor 216. Accordingly, the image of the fingerprint is relatively bright at fingerprint ridges 211 and relatively dark at fingerprint valleys 209. Because scattered light 230 is picked up by the image sensor 216, this type of system is referred to as a "scattering" system.

The difference in intensity, or ratio of intensity, between the ridges and valleys in a fingerprint image created by such a scattering system can be greater than the difference in intensity, or ratio of intensity, between the ridges and valleys of a fingerprint image created in an absorption system as shown in FIG. 1. As a result, the fingerprint image created by such a scattering system can display higher contrast between fingerprint ridges and valleys than an image created by an absorption system. Thus, the image can be more accurately acquired by the image sensor 216. This can reduce errors in subsequent fingerprint comparisons performed by the system.

Additionally, it is a property of a scattering system that the rays of light which enter lens assembly 214 to produce an image of a fingerprint in a scattering system do not need to be parallel to produce a sharp image. Thus, if the first lens in lens assembly 214 is smaller than the image of the fingerprint in viewing surface 222, lens assembly 214 can still be placed relatively close to viewing surface 222 without loss of image sharpness near the edges of the image.

However, a trapezoidal prism such as prism 210 can be more expensive to manufacture than a triangular prism such as prism 110, shown in FIG. 1. This is because, among other reasons, there is an extra surface to polish. This can increase the price of an imaging system such as imaging system 208, making it less viable for consumer use.

Additionally, because of differences in scattered light path lengths from different portions of the apparent image of the fingerprint in prism 210 to lens assembly 214, image acquisition system 208 can cause portions of a fingerprint image to be out of focus in a manner similar to that of optical recognition system 108. Additionally, though not shown in

6

FIG. 3, if the first lens in lens assembly 214 of image acquisition system 208 is smaller than a fingerprint image on viewing surface 222 the differences in scattered light path lengths from different portions of the apparent image of the fingerprint in prism 210 to lens assembly 214 and image sensor 216 can also cause trapezoidal distortion.

As the above discussion makes clear, there is a need for improved image acquisition apparatus for use with patterned object recognition systems. Specifically, an image acquisition apparatus which produces an image having reduced or substantially eliminated trapezoidal distortion would be desirable. Additionally, an image acquisition system which generates an image in which substantially the entire image is in focus is also desirable. The image acquisition system should also be relatively compact and inexpensive to manufacture.

## SUMMARY OF THE INVENTION

The present invention includes a compact image acquisition apparatus which produces a high contrast, low distortion image which has reduced or substantially no trapezoidal distortion. Additionally, the image acquisition system of the present invention can be relatively low cost to manufacture. The apparatus includes a light refractor having an imaging surface against which a patterned object is to be placed to form an apparent image of the patterned object in the light refractor, a further surface, and a viewing surface. The viewing surface is adjacent to the imaging surface and forms an angle y therewith. An image of the patterned object is projected through the viewing surface. The apparatus also includes a lens adjacent to the viewing surface for receiving and focusing an image of a patterned object. The lens has a lens plane which is perpendicular to an optical axis of the lens and which forms an angle δ with the viewing surface. The angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane, and ultimately, to the image sensor, with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane, and ultimately, the image sensor. Preferably, this is achieved by fixing angles γ and δ to conform to the equation:

$$0.7 \leq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leq 1.30.$$

In another aspect of the present invention, preferably, every point of the portion of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered therefrom such that the intersection of the light ray and the viewing surface form an angle, adjacent to the intersection of the viewing surface and the imaging surface, which is less than 90 degrees.

In yet another aspect of the present invention, a method of generating an image of a patterned object includes providing a light refractor having an imaging surface, a viewing surface, and a further surface. An angle γ is formed between a plane defined by the viewing surface and a plane defined by the imaging surface. A patterned object is placed against the imaging surface and incident light is projected into the light refractor. The incident light is scattered off the imaging surface and patterned object and through the viewing surface. A lens is provided adjacent to the viewing surface and an angle δ is formed between the focal plane of the lens and the plane defined by the viewing surface. The angles γ and δ are fixed to substantially equalize a path length of a first light ray traveling from one part of an apparent image of the

US 6,324,020 B1

7                                                          8

patterned object formed in the light refractor to the lens plane, and ultimately the image sensor, with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane and image sensor. Preferably, the angles γ and δ are fixed so that they are related by the equation:

$$0.75 \leq (n^2 \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leq 1.30$$

Additionally, it is preferable that the portions of the imaging surface to be used for imaging are each able to have at least one light ray scattered therefrom such that the intersection of the light ray and the viewing surface form a first angle, adjacent to the intersection of the viewing surface and the imaging surface, which is less than 90 degrees.

The apparatus and method discussed above allow forming an image of a patterned object which has reduced, or is substantially free of, trapezoidal distortion and which can generate an image the entirety of which is in relatively sharp focus. This advantageously facilitates more accurate processing and comparison of patterned object images.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic of a prior art image acquisition apparatus which utilizes an absorption image acquisition technique.

FIG. 2 is a schematic of the image acquisition apparatus of FIG. 1 illustrating trapezoidal distortion.

FIG. 3 is a schematic of a second prior art image acquisition apparatus which utilizes a scattering image acquisition technique.

FIG. 4 is a schematic diagram of an image acquisition system including a prism, light source, lens assembly, and image sensor, in accordance with the present invention.

FIG. 5 is a perspective view of the prism and light source shown in FIG. 4.

FIG. 6 is a schematic diagram of the image acquisition system shown in FIG. 4 illustrating how trapezoidal distortion is reduced.

FIG. 7 is a schematic diagram showing a lens assembly which can be used with the image acquisition system shown in FIG. 4.

FIG. 8 is a schematic diagram of the image acquisition system shown in FIG. 4 illustrating preferred prism and lens assembly configuration.

FIG. 9 is a schematic diagram showing an alternate embodiment of a prism which can be used with the image acquisition system of the present invention illustrating a scattered light ray path.

FIG. 10 is a schematic diagram of the prism shown in FIG. 9 illustrating an alternate scattered light ray path.

DETAILED DESCRIPTION

FIGS. 4 and 5 show a patterned object image acquisition system 308 in accordance with the present invention. Acquisition system 308 preferably includes a triangular prism 310, a light source 312, a lens assembly 314, and an image sensor 316. Prism 310 is a five faced triangular prism the length of which extends into the plane of FIG. 4. Prism 310 includes a rectangular, planar, imaging surface 318 against which an object to be imaged, such as a fingerprint 335, is placed. Prism 310 also includes a rectangular, planar, viewing surface 320 through which an image of a fingerprint 335 placed against imaging surface 318 passes out of prism 310.

In the embodiment of FIGS. 4 and 5, viewing surface 320 also serves as a light receiving surface for allowing light to pass into prism 310. A light scattering surface 322 comprises a third, or further, rectangular, planar, surface of prism 310. For reasons detailed below, light scattering surface 322 is preferably a diffusive.

Light source 312 is preferably an elongated LED array consisting of a single row of light emitting diodes (LEDs) extending the length (into the plane of FIG. 4) of prism 310. If such LEDs are used as light source 312, a diffusive cover can be placed between the LEDs and viewing surface 320 to provide more even illumination of imaging surface 318. It is also within the ambit of the present invention, however, for light source 312 to be any other type of light source to provide incident light into prism 310. Preferably, light source 312 is placed along an edge 338 of prism 310 which is opposite imaging surface 318. However, it is also within the ambit of the present invention to configure and locate a light source for acquisition system 308 in any other way. For example, other configurations for light sources which can be used with the present invention are disclosed in commonly assigned, co-pending U.S. patent application Ser. No. 09/191,428 for "High Contrast, Low Distortion Optical Acquisition System for Image Capturing" filed Nov. 12, 1998, still pending, which is hereby incorporated by reference in its entirety. This includes placing light source 312 against viewing surface 320 anywhere between edge 338 and the line 360 along viewing surface 320 formed by the intersection of viewing surface 320 and a perpendicular line to viewing surface 320 which intersects edges 365.

Lens assembly 314 is for receiving scattered light 330 from fingerprint 335 and focusing scattered light 330 onto image sensor 316. Lens assembly 314 can be a single lens or, preferably, can consist of multiple lenses. Most preferably, lens assembly 314 has a focal length of approximately 13.48 mm and is located approximately 13.5 mm from viewing surface 320. Additionally, as shown in FIG. 7 which is a schematic diagram of one embodiment of lens assembly 314, lens assembly most preferably consists of three lenses 904, 906, and 908 whose respective optical axes are aligned on a common optical axis 902. Lens 904 most preferably has a diameter of approximately 17.8 mm, and both lenses 906 and 908 most preferably have a diameter of approximately 6 mm. It is considered that any number of lenses be included in lens assembly 314.

Image sensor 316 captures optical light images from lens assembly 314 and converts them to electrical signals. Image sensor 316 can be a charge couple device ("CCD") or any other means of converting a light signal into either an analog or digital electrical signal. Preferably, image sensor 316 is a complementary metal oxide semiconductor device. CCD and CMOS image sensors are well known by those skilled in the art. The electrical signals generated by image sensor 316 can be processed using known means and used to compare input patterns, such as fingerprints. As noted in the Background section, such signal processing means are disclosed, for example, in U.S. Pat. Nos. 4,135,147 and 4,668,995, which have been incorporated by reference.

To create an optical image of fingerprint 335 on image sensor 316, fingerprint 335 is placed against imaging surface 318. Incident light 324 from light source 312 passes through viewing surface 320 and into prism 310. Because light source 312 is located adjacent to edge 338, incident light 324 strikes scattering surface 322. As noted above, scattering surface 322 is preferably diffusive. As such, a relatively high portion of incident light 334 striking scattering surface 322 is internally scattered in prism 310. This scattered light then

US 6,324,020 B1

9

strikes imaging surface 318. Even if light scattering surface 322 is not diffusive, substantially all of incident light 324 will strike scattering surface 322 at an angle 323 which is greater than the critical angle for scattering surface 322. Thus, incident light will reflect off scattering surface 322 and strike imaging surface 318. To enhance reflection of incident light off scattering surface 322 it is contemplated to place a mirrored face of a reflecting surface 381 towards scattering surface 322.

Because incident light 324 has been scattered or directly reflected off scattering surface 322, a relatively large percentage of incident light 324 will strike imaging surface 318 at an angle 327 less than the critical angle 328 of prism 310. Accordingly, incident light 324 which strikes imaging surface 318 at a region thereof where there is a fingerprint valley 309 will not undergo total internal reflection and will substantially pass through imaging surface 318. Thus, substantially no light hitting an area of imaging surface 318 where there is a fingerprint valley 309 will be directed into the sensor 316. However, incident light 324 that strikes a region of imaging surface 318 where there is a fingerprint ridge 311 touching imaging surface 318 will substantially scatter, producing scattered light 330. A portion of scattered light 330 will exit prism 310 via viewing surface 320. Upon exiting prism 310, scattered light 330 will refract into lens assembly 314 which will focus scattered light 330 into image sensor 316.

Because incident light 324 can be scattered by scattering surface 322, incident light 324 provides relatively uniform illumination over imaging surface 318 which produces a relatively uniform image. Such uniform image is desirable because it is easier to process and compare with other stored fingerprint data. To further increase the uniformity of illumination over imaging surface 318, the portion of viewing surface 320 facing light source 312 can be streaked by etching lines 370, shown in FIG. 5, on viewing surface 320. Lines 370 run the length of prism 310 and parallel to apex 338. Lines 370 act to diffuse light emitted from light source 312 as it passes through viewing surface 320.

In addition to the components discussed above, image acquisition system 308 preferably also includes a light blocking shield 350 on a portion of light receiving surface adjacent to light source 312. Preferably, light blocking shield runs the entire length of prism 310 (into the plane of FIG. 4). Light blocking shield 350 is to reduce the amount of stray light from light source 312 which might enter lens assembly 314 and interfere with or cloud a fingerprint image. It is also considered that the surface of light blocking shield 350 facing the interior of prism 310 be mirrored. This mirroring can act to desirably increase the intensity of scattered light incident on imaging surface 318. In addition to, or instead of, light blocking surface 350, a second light blocking surface 352 can be placed between light source 312 and lens assembly 314. Light shield 352 preferably extends from viewing surface 320 at an angle to block stray light from light source 312 from entering lens assembly 314.

Because light source 312 is relatively narrow and located adjacent to edge 338 opposite imaging surface 318, substantially all incident light 324 reaching imaging surface 318 is reflected or scattered into the lens assembly 314. That is, almost no incident light 324 can be captured by the image sensor 316 without scattering off the imaging surface 318 at the points of contact with fingerprint ridges 311. To further reduce the likelihood of incident light 324 which falls into the fingerprint valleys 309 reaching image sensor 316 through lens assembly 314, light source 312 is preferably configured not to extend past a line 360, shown in FIG. 5,

10

extending the length of prism 310 and defined by the intersection of a plane normal to viewing surface 320 and intersecting with edge 365, adjacent to imaging surface 318. If light source 312 is kept on the same side of this line as apex 338, then substantially no incident light 324 emitted perpendicularly from light source 312 will reach image sensor 316 without scattering off of the fingerprint ridges 311.

By minimizing the incident light 324 from light source 312 that is directly incident on imaging surface, there is substantially no total internal reflection of incident light 324 from regions of imaging surface 318 where there are fingerprint valleys 309. This means that substantially no light from these valley regions passes through viewing surface 320 and into lens assembly 314. Rather, substantially all the light passing into lens assembly 314 from imaging surface 318 is scattered from fingerprint ridges 311 on imaging surface 318. This provides a fingerprint image having relatively high contrast between fingerprint ridges 311 and valleys 309. Such a high contrast fingerprint image is relatively easy to process and compare with other fingerprint images and can, therefore, advantageously increase processing accuracy.

Further, use of this scattering technique for image acquisition is achieved with a triangular prism, as opposed to a trapezoidal prism as disclosed in Lougheed, discussed in the Background section. Because triangular prisms can be more efficient to manufacture than trapezoidal prisms, image acquisition system 308 can advantageously be relatively less expensive to manufacture.

Moreover, scattered light generally scatters from an object in many directions, as opposed to substantially one direction. And, as noted in the Background, nonparallel scattered light can be used by a lens assembly to form a focused image of an object. Thus, as shown in optical recognition system 318 in FIG. 6, if the first lens of lens assembly 314 has a smaller diameter than the diagonal of fingerprint 335 in viewing surface 320, non-parallel scattered light rays can be used to produce a focused image of fingerprint 335. Accordingly, lens assembly 314 can be, but does not necessarily need to be, placed relatively close to viewing surface 320 without loss of image quality near the edges of a fingerprint image generated by system 308. This advantageously allows the image acquisition system 308 to be relatively compact and allows lens assembly 314 to be relatively low cost to manufacture.

Because, as shown in FIG. 6, the diameter of a first lens of lens assembly 314 is smaller than the size of the fingerprint on imaging surface 318, trapezoidal distortion could result in a generated image. However, the image acquisition system of the current invention can reduce trapezoidal distortion in, and increase the overall sharpness of, a produced image. As discussed in the Background section, trapezoidal distortion is manifested in an image having dimensions distorted from those of the actual object being imaged. Both trapezoidal distortion and portions of an image being out of focus can be caused by variation in path length of light from the apparent image of an object to lens assembly 314, and ultimately image sensor 316, from one part of the imaged object to another. As shown in FIG. 6, however, in image acquisition system 308, the path length of scattered light 330 from different points on the apparent image 335' of fingerprint 335 to lens assembly 314 and image sensor 316 is substantially the same. Specifically, path AA' is substantially equal to path BB' and path CC'. Thus, trapezoidal distortion can advantageously be reduced and overall image sharpness can be increased. As shown in FIG.

US 6,324,020 B1

11

6, substantial equalization of paths AA', BB' and CC' is facilitated by tilting lens assembly 314 with respect to viewing surface 320.

However, unlike optical recognition system 108, shown in FIG. 1, such tilting of lens assembly 314 does not severely reduce the intensity of the image reaching image sensor 316. As noted in the background section with respect to optical recognition system 108, tilting lens assembly 114 causes reflected light 130 to strike the first element of lens assembly 314 at an angle to normal line thereof. This causes greater reflection of reflected light 130 from the surface of lens assembly 114, thereby undesirably reducing image intensity at image sensor 116.

However, prism 310 preferably has an index of refraction higher than 1. Thus, scattered light 330 which strikes viewing surface 320 refracts away from the normal to viewing surface 320 as it exits prism 310. As such, by tilting lens plane 307 of lens assembly 314, scattered light 330 strikes lens assembly 314 at substantially 90 degrees. Thus, there is little or no loss in image intensity due to undue reflection of scattered light at the surface of lens assembly 314, and trapezoidal distortion can be reduced, and overall image sharpness can be increased, without losing image intensity at image sensor 316.

Referring to FIG. 8, the appropriate angle at which to tilt lens assembly 314 can be determined. In FIG. 8, light rays 410 and 412 are scattered from imaging surface edge 414 and opposite imaging surface edge 416, respectively. Lens plane 307 is a theoretical representation of lens assembly 314 as the thickness of the lens assembly goes to zero. Distance Aa is the distance from the apparent image of an object in prism 310 to lens plane 307 along light ray 410 and distance B'b is the distance from the apparent image of an object in prism 310 along light ray 412. In order to substantially eliminate trapezoidal distortion, distance Aa must be substantially equal to distance B'b. Because B'b is the apparent depth of an object at edge B in prism 310, then, as discussed in the Background section:

$$B'b=Bb/n$$

where Bb is the distance from point B, at edge 416, to point b on prism 310. The requirement for substantial elimination of trapezoidal distortion and improvement in overall image sharpness can be expressed as:

$$Aa=Bb/n \qquad (Eq. 1)$$

The angle of incidence of light ray 412 on viewing surface 320, that is, the angle between a normal line to viewing surface 320 and light ray 412 inside prism 310, is shown in FIG. 8 as $\theta_1$. The angle of refraction of light ray 412 after it passes out of prism 310 is shown as $\theta_2$. Thus, by Snell's law:

$$n=\sin\theta_2/\sin\theta_1 \qquad (Eq. 2)$$

Also, using fundamental trigonometric relationships, it can be shown that:

$$ABcos\gamma+Bbcos\alpha'=Ab \qquad (Eq. 3)$$

where AB is the length of the imaging surface of prism 310 from point A to point B; Ab is the length of segment Ab on viewing surface 320; $\alpha'$ is the angle between light ray 412 and viewing surface 320, which equals $90°-\theta_1$; and $\gamma$ is the angle between imaging surface 318 and viewing surface 320 (also shown as angle 342 in FIG. 8).

Finally, using the law of sines, it can be shown that:

$$AB/Bb=cos\theta_1/sin\gamma \qquad (Eq. 4)$$

12

Using equations 1, 2, 3, and 4 above, it can be shown that in order for trapezoidal distortion to be substantially eliminated, and overall image sharpness increased, the following condition relating the angles of prism 310 with the angle which lens plane 307 forms with viewing surface 320 must be met:

$$(n^2-\sin^2\delta)^{1/2}(cot\gamma)(\sin\delta)+\sin^2\delta=1 \qquad (Eq. 5)$$

Where, as shown in FIG. 8, $\delta$ is the angle that lens plane 307 of lens assembly 314 forms with viewing surface 320. Thus, imaging system 308, in accordance with the present invention, is preferably configured in accordance with equation 5 to substantially eliminate trapezoidal distortion and improve overall image sharpness.

However, in manufacturing imaging system 308, achieving precise tolerances for angles $\gamma$ and $\delta$ can be difficult and expensive. Therefore, an imaging system in accordance with the present invention and allowing for a 30% manufacturing tolerance is preferably configured in accordance with equation 6 below:

$$0.7\leq(n^2-\sin^2\delta)^{1/2}(cot\gamma)(\sin\delta)+\sin^2\delta\leq1.3 \qquad (Eq. 6)$$

More preferably, an imaging system in accordance with the present invention and allowing for a 15% manufacturing tolerance is configured in accordance with equation 7 below:

$$0.85\leq(n^2-\sin^2\delta)^{1/2}(cot\gamma)(\sin\delta)+\sin^2\delta\leq1.15 \qquad (Eq. 7)$$

Most preferably, an imaging system in accordance with the present invention and allowing for a 7.5% manufacturing tolerance is configured in accordance with equation 8 below:

$$0.925\leq(n^2-\sin^2\delta)^{1/2}(cot\gamma)(\sin\delta)+\sin^2\delta\leq1.075 \qquad (Eq. 8)$$

As noted above, by configuring imaging system 308 in accordance with one of equations 5–8 above, trapezoidal distortion can be substantially reduced or eliminated and overall image sharpness can be improved. This advantageously facilitates more accurate image processing and comparison by an image acquisition system.

Prism 310 can be made of glass, acrylic or any other transparent material having an index of refraction higher than 1 (that of air). Prisms having the preferred index of refraction and angles are commercially available from Shinkwang Ltd. of Seoul, Korea and are fabricated of glass having the designation LaK-7 or LaK-8.

Lens assemblies such as lens assembly 314 are commercially available from Woorim Optical Systems Ltd. of Seoul, Korea and are preferably fabricated from a glass having the commercial designation of BK7. If more than one element is used in lens assembly 314, as shown in FIG. 6, the individual elements can be aligned and spaced by placing them in a frame fabricated by plastic molding or any other fabrication means as is known in the art.

Light source 312 preferably consists of four standard LEDs positioned in a straight array on a circuit board. Powering of LEDs is well known by those skilled in the art. Image sensor 316 is preferably a CMOS type sensor and is commercially available from Hyundai Electronics of Seoul, Korea, VLSI Vision, Ltd. of San Jose, Calif., or Omnivision Technologies Inc. of Sunnyvale, Calif.

To secure the components of image acquisition into the relative positions as shown in FIG. 4, a frame having holding slots for each component can be plastic molded or otherwise fabricated. Light source 312 can be either placed in a holding slot adjacent to viewing surface 320 or attached directly to viewing surface 320 using adhesive as known in the art.

US 6,324,020 B1

13

Equations 5–8 were derived assuming that the entire width AB of imaging surface 318 would be used in capturing an image. However, less than the entire imaging surface of a prism can be used to capture an image. This may be the case, for example, if a triangular prism having an angle greater than or equal to 90 degrees is used as a light refractor. However, if the entire imaging surface of a prism is not used to image an object, a requirement in addition to being configured according to equations 5–8 above is preferably met by the configuration of such an imaging system. To illustrate this additional requirement, FIG. 9 shows a triangular prism 510 having an obtuse angle 541. Triangular prism 510 includes a planar imaging surface 518, a planar viewing surface 520 and a planar further surface 522. FIG. 9 also shows a light source 512 which can be substantially the same as light source 312, and lens plane 507 of a lens assembly (not shown). A lens assembly used with prism 510 can be substantially the same as lens assembly 314.

As shown in FIG. 9, a light ray 612 is scattered from point D on imaging surface 518 and a light ray 610 is scattered from imaging surface 518 at point A. Prism 510 and lens plane 507 are configured in accordance with equation 5 above. Additionally, segment a'd' is parallel to lens plane 507. And, length D'd' is the apparent depth in prism 510 of the image of an object at point D on imaging surface 518. Thus, the length of segments Aa' and D'd' are the equal. Because the index of refraction of prism 510 is greater than 1, as light ray 612 leaves prism 510 at point d', it will refract away from a normal line 620 to viewing surface 520.

Angle 545, labeled as α' in FIG. 9, which is the angle formed by the intersection of light ray 612 and viewing surface 520, and is adjacent to the intersection of the viewing surface and the imaging surface, is less than 90 degrees. Thus, as light ray 612 passes out of prism 510 and refracts away from normal line 620, it will travel in a path parallel to that of light ray 610 outside of prism 510. Therefore, the lengths of segments a'a and d'd are also equal. Accordingly, the total path lengths from the apparent image in prism 510 to the lens plane 507, and ultimately the an image sensor (not shown) will be the same for an object on imaging surface 518 at both point A and point D. In this way overall image sharpness can be increased.

Referring now to FIG. 10, which also shows prism 510, the path length from the apparent image in prism 510 of an object placed at point E on imaging surface 518 will not be equal to the path length from the apparent image in prism 510 of an object placed at point A on prism 510. Light ray 612 is a scattered light ray from an object placed at point E on imaging surface 518. As above, because prism 510 has an index of refraction which is greater than 1, as light ray 612 exits prism 510 at point e', it will refract away from normal line 620 to viewing surface 520. Therefore, because angle 545, labeled α', is greater than 90 degrees, the path of light ray 612 outside of prism 510 is not parallel to the path of light ray 610 outside of prism 510. Because light rays 610 and 612 are not parallel, the length of segment e'e will be different from the length of segment a'a. This means that the total path length from the apparent image in prism 510 to lens plane 507 will be different for an object at point E on imaging surface 318 than for an object at point A thereon. Thus, relatively large trapezoidal distortion and/or a relatively out of focus image will result.

As noted above, in order to avoid this, when a prism having a 90 degree or greater angle is used in an imaging system in accordance with the present invention, preferably, less than the entire width of the imaging surface is used to image an object. As shown above, when α' is less than 90

14

degrees, and the image capturing system is configured according to equations (5) through (8) above, trapezoidal distortion can be substantially eliminated. And, when α' is greater or equal to 90 degrees trapezoidal distortion can result. Thus, if less than the entire width of the imaging surface 518 of a prism is to be used to place an object to be imaged against, each portion of the imaging surface 518 to be used for imaging must be able to have at least one light ray scattered therefrom such that the intersection of the one light ray and the viewing surface 520 form an angle, α' in FIGS. 9 and 10, adjacent to the intersection of the viewing surface and the imaging surface, which is less than 90 degrees. This criteria advantageously facilitates reduction or substantial elimination of trapezoidal distortion and increase in overall image sharpness in an imaging system configured in accordance with one of equations 5–8 above.

Prism 510, and light source 512 can be manufactured in substantially the same way and of the same materials as discussed above with respect to prism 310 and light source 312.

Many widely different embodiments of the present invention may be constructed without departing from the spirit and scope of the present invention. It should be understood that the present invention is not limited to the specific embodiments described in the specification. For example, though the above disclosed embodiment of the present invention are described with reference to imaging a fingerprint, any other type of patterned object is contemplated to be imaged with the present invention.

What is claimed is:

1. A compact apparatus for forming a high contrast, low distortion image of a patterned object including:

a light refractor for reflecting and refracting light, the light refractor including:

an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor;

a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface; and

a further surface adjacent to the imaging surface

at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface;

wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.

2. The apparatus of claim 1 wherein the angles γ and δ are related by the equation:

$$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3.$$

3. The apparatus of claim 1 wherein the angles γ and δ are related by the equation:

$$0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15.$$

4. The apparatus of claim 1 wherein the angles γ and δ are related by the equation:

$$0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075.$$

US 6,324,020 B1

15

**5.** The apparatus of claim **1** wherein the part of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

**6.** The apparatus of claim **1** further including at least one light source located adjacent to the light refractor and for emitting incident light which enters the light refractor to create an image of the patterned object at the viewing surface.

**7.** The apparatus of claim **6** wherein:

the light refractor includes:

a first edge opposite the imaging surface and adjacent to the viewing surface; and

the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface and adjacent to the first edge.

**8.** The apparatus of claim **1** wherein:

the at least one lens has a diameter; the object to be imaged has a length dimension; and

the diameter of the at least one lens is smaller than the length dimension of the object to be imaged.

**9.** The apparatus of claim **2** wherein the part of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle, the first being interior to a triangle area formed by the viewing surface, the imaging surface and the at least one light ray which is less than 90 degrees.

**10.** The apparatus of claim **3** wherein the part of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle, the first being interior to a triangle area formed by the viewing surface, the imaging surface and the at least one light ray which is less than 90 degrees.

**11.** The apparatus of claim **4** wherein the part of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

**12.** A method of imaging a patterned object comprising:

providing a light refractor having an imaging surface, a viewing surface and a further surface;

forming an angle γ between a plane defined by the viewing surface and a plane defined by the imaging surface;

placing the patterned object against the imaging surface of the light refractor;

projecting incident light into the light refractor;

scattering the incident light off the imaging surface and patterned object and through the viewing surface;

providing a lens adjacent to the viewing surface;

16

forming an angle δ between the plane defined by the viewing surface and a lens plane of the lens;

fixing angles δ and angle γ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.

**13.** The method of claim **12** wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3.$$

**14.** The method of claim **13** wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15.$$

**15.** The method of claim **12** wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075.$$

**16.** The method of claim **12** wherein the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

**17.** The method of claim **13** wherein the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

**18.** The method of claim **14** wherein the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

**19.** The method of claim **15** wherein the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees.

*  *  *  *  *

**Exhibit B**

UNION COMMUNITY CO., LTD'S REQUEST FOR

REEXAMINATION OF

U.S. PATENT NO. 6,324,020

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTORY COMMENTS ................................................................ 1

II.   COMPLIANCE WITH 37 C.F.R. § 1.510 AND MPEP §2214 ........................................ 3

III.  IDENTIFICATION OF CLAIMS FOR WHICH REEXAMINATION IS REQUESTED ................................................................ 4

IV.   CITATION OF PRIOR ART ................................................................ 4

V.    GENERAL EXPLANATION OF PERTINENCY OF PRIOR ART TO THE CLAIMS ................................................................ 4

VI.   SUMMARY OF U.S. PATENT NO. 6,324,020 ................................................................ 5

      A.   Brief Overview ................................................................ 5

      B.   The Prosecution History Of The '020 Patent ................................................................ 10

      C.   The Co-Pending Litigation Of The '020 Patent ................................................................ 11

      D.   Prior Known Litigations Involving The '020 Patent ................................................................ 11

      E.   The '020 Patent's Korean Counterpart Has Been Invalidated by the Korean Intellectual Property Office ................................................................ 12

VII.  DETAILED EXPLANATION OF PERTINENCY OF PRIOR ART TO THE CLAIMS ................................................................ 12

      A.   Claims 1, 6, 7, and 12 of the '020 Patent Are Invalid For Double Patenting In View Of U.S. Patent No. 6,381,347 ................................................................ 13

           1.   The US '347 Patent (Exhibit 2) ................................................................ 13

           2.   The '020 Patent Is Invalid For Statutory Double Patenting ................................................................ 15

           3.   Dependent Claim 8 of The '020 Patent Cannot Be Rewritten As An Independent Claim To Achieve Novelty ................................................................ 27

      B.   Claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 Are Anticipated By The KR '344 Patent ................................................................ 28

           1.   KR '344 Patent (Exhibit 3) ................................................................ 28

           2.   Claim 1 Of The '020 Patent Is Anticipated By The KR '344 Patent ....... 30

           3.   Claim 12 of The '020 Patent Is Anticipated By The KR '344 Patent ...... 39

**TABLE OF CONTENTS**
(continued)

Page

4.      Dependent Claims 2-4 And 13-15 of The '020 Patent Are Anticipated By The KR '344 Patent ........................................ 42

5.      Dependent Claims 5, 9-11, and 16-19 of The '020 Patent Are Anticipated By The KR '344 Patent ........................................ 44

6.      Dependent Claim 6 of The '020 Patent Is Anticipated By The KR '344 Patent ................................................................... 47

7.      Dependent Claim 7 of The '020 Patent Is Anticipated By The KR '344 Patent ................................................................... 48

C.    Claims 1 And 12 of The '020 Patent Are Anticipated By The JP '368 Patent ................................................................................. 49

1.      The JP '368 Publication (Exhibit 4) ........................................ 49

2.      Claim 1 of The '020 Patent Is Anticipated By The JP '368 Publication ............................................................................. 50

3.      Dependent Claim 7 of The '020 Patent Is Anticipated By The JP '386 Publication ................................................................... 54

4.      Claim 12 of The '020 Patent Is Anticipated By The JP '368 Publication ............................................................................. 55

D.    Claims 1 and 12 Are Obvious Over the JP '368 Publication in View of the GB '483 Patent ..................................................... 58

1.      Claim 1 of The '020 Patent Is Obvious Over the JP '368 Publication in View of the GB '483 Patent ............................ 58

2.      Claim 12 of The '020 Patent Is Obvious Over The JP '368 Publication In View of The GB '483 Patent ........................... 61

VIII.    SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY ..................... 61

IX.    CONCLUSION ................................................................................ 62

SDODMS1/692319.1

## I.    INTRODUCTORY COMMENTS

Union Community Co., Ltd ("Union Community") requests reexamination of U.S. Patent No. 6,324,020 ("the '020 Patent") under 35 U.S.C. §§ 302-307 and 37 C.F.R. § 1.510. The '020 Patent issued on November 27, 2001, to the current Patent Owner, SecuGen Corporation ("SecuGen"). Union Community is a named defendant in *SecuGen Corporation v. Union Community Co., Ltd.*, Case No. C-08-01306- RMW (N.D. Cal.), initiated by SecuGen for alleged infringement of the '020 Patent. In the co-pending litigation, SecuGen has accused Union Community of infringing the '020 Patent. A copy of the '020 Patent for which reexamination is requested is attached as Exhibit 1.

SecuGen has not limited the pending litigation to any specific Claims. Therefore, Union Community hereby requests reexamination of independent Claims 1 and 12 and dependent Claims 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, and 19. These Claims are generally directed to "a compact image acquisition apparatus which produces a high contrast, low distortion image which has reduced or substantially no trapezoidal distortion." [The '020 Patent at 6:19-22.] The '020 Patent has two independent Claims, Claims 1 and 12. Claims 2-11 depend from Claim 1 and Claims 13-19 depend from Claim 12. In order to solve the identified problem of trapezoidal distortion, each of the independent Claims refer to angles γ and δ. The angles γ and δ are set such that the path length of light traveling from the apparent image is substantially (1) parallel and (2) equal in length to the path length of a light ray traveling from another part of the apparent image of the fingerprint to the lens plane. [Claim 1 of the '020 Patent.] The Examiner allowed the '020 Patent Claims over the cited prior art because of the recitation of angles γ and δ.

Union Community is aware of at least four prior art references that raise substantial new questions of patentability for independent Claims 1 and 12 of the '020 Patent. Each of these

references discloses an "optical acquisition apparatus for reducing or substantially eliminating trapezoidal distortion in images of patterned objects and allowing such images to be more sharply focused." [The '020 Patent at 1:10-14.] Each of the prior art references eliminate trapezoidal distortion in the same way as claimed in the '020 Patent (*i.e.,* by fixing the angles $\gamma$ and $\delta$ such that the path length of light traveling from the apparent image is substantially parallel and equal in length to the path length of a light ray traveling from another part of the apparent image of the fingerprint to the lens plane). Thus, each of the prior art references clearly discloses the limitation directed to the $\gamma$ and $\delta$ angles that led the Examiner to allow the Claims during prosecution of the application for the '020 Patent. Two of these four prior art references were not considered by or cited to the Examiner during the prosecution of the application for the '020 Patent. One prior art reference cited to the Examiner during prosecution of the application for the '020 Patent was a Korean patent whose English-language Abstract was provided to the Examiner only, without its corresponding specification and drawings. [*See* Section IV below.]. The other prior art reference cited to the Examiner during prosecution was a patent application which was considered and reviewed by the Examiner before the applicant, SecuGen, amended the claims to claim the same invention, or an obvious variation thereof, as the '020 Patent.

It is notable that the Korean Intellectual Property Office has recently ruled that the Korean patent which SecuGen has claimed as corresponding to the '020 Patent is invalid for lack of novelty. [Exhibit 17.] In addition, when the Japanese Patent Office examined what is believed to be the Japanese counterpart to the '020 Patent, it ruled the independent Claims which are substantially similar if not identical to the '020 Patent are unpatentable in view of the prior art cited in this reexamination request. SecuGen substantially modified the originally submitted Japanese Patent Claims in order to obtain allowance, and the Claims issued in the Japanese

counterpart to the '020 Patent have a narrower scope, i.e., more Claim elements, than the Claims issued in the '020 Patent. [Exhibit 20.]

Accordingly, in view of the listed prior art references, Union Community respectfully requests issuance of an Order for Reexamination for the '020 Patent..

## II.    COMPLIANCE WITH 37 C.F.R. § 1.510 AND MPEP §2214

In accordance with 37 C.F.R. § 1.510(b)(1), a statement pointing out each substantial new question of patentability based on the below cited prior patents is provided in section VIII below.

In accordance with 37 C.F.R. § 1.510(b)(2), an identification of every Claim for which reexamination is requested is provided below in section III, a detailed explanation of the pertinency and manner of applying the cited prior art to every Claim for which reexamination is requested is provided below in section VII.

In accordance with 37 C.F.R. § 1.510(b)(3), a copy of every patent relied upon or referred to in 37 C.F.R. § 1.510(b)(1) and (2), accompanied by an English-language translation of all the necessary and pertinent parts of any non-English language patent, is provided as Exhibits 2, 5, 22-23 with translations and verifications as Exhibits 3-4.

In accordance with 37 C.F.R. § 1.510(b)(4), a copy of the entire '020 Patent including the front face, drawings, and specification/claims (in double column format) is attached as Exhibit 1.

In accordance with 37 C.F.R. § 1.510(b)(5), attached as Exhibit 19 is a certification that a copy of the Request for Reexamination has been served in its entirety on SecuGen at the following address, 2356 Walsh Avenue, Santa Clara, California 95051, provided for in § 1.33(c) via first class mail on August 6, 2008. A courtesy copy of each of the above listed documents was also served on the Patent Owner's litigation counsel at the following address, Ruby M. Wayne, GOODWIN PROCTER LLP, 135 Commonwealth Drive, Menlo Park, CA 94025, via first class mail on August 6, 2008.

III.    **IDENTIFICATION OF CLAIMS FOR WHICH REEXAMINATION IS REQUESTED**

This Request for Reexamination raises the following substantial new questions of patentability with respect to independent Claims 1 and 12 and dependent Claims 2-11 and 13-19 of the '020 Patent.

IV.    **CITATION OF PRIOR ART**

In compliance with the requirements of the reexamination statutes, the patent rules, and the Manual of Patent Examination Procedure (MPEP), Union Community identifies the following prior art:

U.S. Patent No. 6,381,347 ("the US '347 Patent") submitted herewith as Exhibit 2. The US '347 Patent was cited during the prosecution of the '020 Patent. However, the Examiner reviewed the US '347 Patent before the Applicant, SecuGen, filed an office action amending the claims such that they claim the same invention, or an obvious variation thereof, of what is claimed in the '020 Patent. Consequently, the PTO did not meaningfully review the '347 Patent for double patenting issues.

Korean Patent No. 1994-0007344 ("the KR '344 Patent") submitted herewith as Exhibit 22 with an English translation and verification as Exhibit 3. Only the Abstract of the KR '344 Patent was cited during the prosecution of the '020 Patent. The corresponding specification and drawing figures of the KR '344 Patent were not provided to the Examiner during the prosecution of the '020 Patent.

Japanese Publication No. 63-301,368 ("the JP '368 Publication") submitted herewith as Exhibit 23 with an English translation and verification as Exhibit 4. The JP '368 Publication was not cited during the prosecution of the '020 Patent.

British Patent No. 1520483 ("the GB '483 Patent") submitted herewith as Exhibit 5. The GB '483 Patent was not cited during the prosecution of the '020 Patent.

## V.    GENERAL EXPLANATION OF PERTINENCY OF PRIOR ART TO THE CLAIMS

Claims 1, 6, 7 and 12 are invalid for double patenting in view of the US '347 Patent. The US '347 Patent was filed on November 12, 1998, and, thus, qualifies as prior art based upon the filing date of the '020 Patent, (*i.e.*, August 4, 1999).

Claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 are anticipated under 35 U.S.C. § 102(b) by the KR '344 Patent. The KR '344 Patent was published in the Korean Patent Gazette on April 13, 1992, and published on November 23, 1993, and, thus, qualifies as prior art under 35 U.S.C. § 102(b) based upon the August 4, 1999 filing date of the '020 Patent.

Claims 1, 7, and 12 are anticipated under 35 U.S.C. § 102(b) by the JP '368 Publication. The JP '368 Publication was published in the Japanese Patent Gazette on December 8, 1998 and, thus, qualifies as prior art under 35 U.S.C. § 102(b) based upon the August 4, 1999 filing date of the '020 Patent.

Claims 1 and 12 are rendered obvious under 35 U.S.C. § 103(a) over JP '368 Publication in view of the GB '483 Patent. The GB '483 Patent was filed in 1974 and published in the British Patent Gazette on August 9, 1978 and, thus, qualifies as prior art under § 103 based upon the August 4, 1999 filing date of the '020 Patent.

A detailed explanation of the pertinence of each of the above cited prior art is provided below and Claim charts comparing the Claim limitations of the '020 Patent to the above cited prior art are attached as Exhibits 6-9.

## VI.    SUMMARY OF U.S. PATENT NO. 6,324,020

### A.    Brief Overview

The '020 Patent is directed to an "apparatus to reduce or substantially eliminate

trapezoidal distortion and improve overall image sharpness in an image of an object created by

the apparatus." [the '020 Patent in the Abstract.]  In the "Background" section of the

specification, the '020 Patent explains that trapezoidal distortion "has the effect of making the

image of a square created by the system appear as a trapezoid." [the '020 Patent at 3:58-59.]

Trapezoidal distortion occurs when (1) the lens assembly is "smaller than an image of a

fingerprint at [the] viewing surface" [the '020 Patent at 3:56-58] or, (2) when "the distance aA'

is longer than the distance bB' and the lens assembly has a smaller diameter than the distance

a'b' on the viewing surface." [The '020 Patent at 4:16-19; *see also,* Figure 2 from the '020

Patent reproduced below.][1]



---

[1] As the applicant admits in the specification, trapezoidal distortion is caused whether the system is a scattering or absorption system. [The '020 patent at 4:58-5:4; 5:62-6:6.]  The claims of the '020 Patent are not limited to a scattering or absorption type fingerprint recognition system.  The KR '344 Patent discloses an absorption type system, JP '386 discloses an absorption type system, GP '483 describes the scattering type system, and EP '024 discloses both of the absorption and scattering type systems. In each of the above cited references, (whether the system is a scattering or absorption type system) the solutions for trapezoidal distortion are same as the solution disclosed in the '020 Patent i.e., trapezoidal distortion is solved by fixing the angles γ and δ such that the path length of light traveling from the apparent image is substantially parallel and equal in length to the path length of a light ray traveling from another part of the apparent image of the fingerprint to the lens plane.  Moreover, in light of the fact that trapezoidal distortion occurs due to the difference in the length of light rays after they are reflected from the imaging surface, whether the light ray is scattered or absorbed, does not have any relation to how the problem of trapezoidal distortion is solved.

> Figure 2 from the '020 Patent showing trapezoidal
> distortion because distance aA' is longer than the
> distance bB'

Thus, trapezoidal distortion occurs when the light path lengths of parallel light rays traveling from 2 different points of the apparent image (point A and B in FIG. 2 from the '020 Patent above) to the lens plane are not equal. [*See* the '020 Patent, Col. 4:10-18 and FIG. 2.]

In the "Background" section of the '020 Patent, the applicant admits that the prior art addresses the trapezoidal distortion problem by (1) "[tilting] the lens plane of the lens assembly and image sensor to increase the distance bB' and decrease the distance aA' to a point where the two distances are approximately equal." [The '020 Patent at 4:29-34.]

During arbitration proceedings, SecuGen admitted that the '020 Patent solves the trapezoidal distortion problem in the same way as the prior art, *i.e.*, by tilting the lens plane of the lens assembly to substantially equalize the path lengths of parallel light rays. [Exhibit 10, Expert Report of Dr. Anthony Siegman filed on behalf of SecuGen at ¶ 28.] Specifically, the '020 Patent sets forth the amount of tilt necessary to solve the trapezoidal distortion problem as a function of (1) the geometry of the prism- *i.e.*, the angle between the imaging surface and the viewing surface ($\gamma$); and (2) the angle between the lens assembly and the viewing surface ($\delta$). [Exhibit 10, Siegman Expert Report at ¶ 29.]



Figure 8 from the '020 Patent showing angles γ and δ

As shown in FIG. 8 of the '020 Patent, angles γ and β are the base angles of the isosceles

triangular prism and γ is the angle between the imaging surface (318) and the viewing surface

(320). The angle between the viewing surface and the lens is the tilt angle, δ. To reduce

trapezoidal distortion to a minimum, the refractive index n, and the angles γ and δ are related by

the following relationship:

$$(n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta = 1$$

If some amount of trapezoidal distortion can be tolerated, the above condition can be relaxed as

shown by Equations 6, 7, and 8 of the '020 Patent. [The '020 Patent, col. 12, lines 23-33.]

In operation, the invention claimed in the '020 Patent can best be understood by reference

to FIG. 4:



Figure 4 from the '020 Patent

In operation, the finger (or patterned object) is placed against the imaging surface of the light refractor (310). Incident light is then projected into the light refractor (310). The light scattered off the finger forms an apparent image inside the glass and is inclined with respect to the viewing surface (320). In order to minimize trapezoidal distortion, the apparent image is captured by a lens (314) which is tilted with respect to the viewing surface (320) as shown in FIG. 4. The tilt of the lens equalizes the path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.

Independent Claim 1 of the '020 Patent is reproduced below in its entirety:

> 1.      A compact apparatus for forming a high contrast, low distortion image of a patterned object including:
>
> a light refractor for reflecting and refracting light, the light refractor including:

an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor;

a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface; and

a further surface adjacent to the imaging surface

at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface;

wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.[2]

Independent Claim 12 is reproduced below in its entirety:

12. A method of imaging a patterned object comprising:

providing a light refractor having an imaging surface, a viewing surface and a further surface;

forming an angle γ between a plane defined by the viewing surface and a plane defined by the imaging surface;

placing the patterned object against the imaging surface of the light refractor;

projecting incident light into the light refractor;

scattering the incident light off the imaging surface and patterned object and through the viewing surface;

providing a lens adjacent to the viewing surface;

---

[2] The independent Claims do not require that the imaging apparatus be a scattering or absorption type imaging system.

forming an angle δ between the plane defined by the viewing surface and a lens plane of the lens;

fixing angles δ and angle γ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.

Thus, the apparatus and method claimed in independent Claims 1 and 12 allow an image of a patterned object to form "which has reduced, or is substantially free of, trapezoidal distortion and which can generate an image the entirety of which is in relatively sharp focus." [The '020 Patent at 7:16-21.]

## B.    The Prosecution History Of The '020 Patent

The '020 Patent was filed on August 4, 1999, and assigned Application No. 09/386,442 ("the '442 Application"). The '442 Application identifies Harry H. Teng and Sung-Chan Jo as co-inventors. The '442 Application was assigned to SecuGen. The '442 Application was assigned to Examiner Evelyn Lester. As originally filed, each of the independent Claims included a limitation directed toward angles γ (the angle between the imaging surface and the viewing surface) and δ (the angle between the lens assembly and the viewing surface). Examiner Lester did not raise any rejections against the '442 Application. However, Examiner Lester noted in her Notice of Allowance dated September 27, 2000, that none of the prior art disclosed the angles γ and δ (*i.e.* the angle between the imaging surface and the viewing surface and the angle between the lens assembly and the viewing surface). Exhibit 11, Notice of Allowance page 3. This reason for allowance was reconfirmed in Examiner Lester's second Notice of Allowance dated March 26, 2001. [Exhibit 12.]

During examination, Examiner Lester did not consider the JP '368 Publication, and the GB '483 Patent. Each of these prior art references were not cited to the Examiner in Applicants'

Information Disclosure Statements filed on June 30, 2000 [Exhibit 13], November 15, 2000 [Exhibit 14], December 13, 2000 [Exhibit 15] and March 24, 2001 [Exhibit 16]. During examination, Examiner Lester considered the US '347 Patent on March 24, 2001. [Exhibit 15]. However, on August 24, 2001, the Applicant, SecuGen, amended the claims such that the US '347 Patent claims the same invention in the '020 Patent, or an obvious variation thereof. [Exhibit 24]. There is no indication in the prosecution history of the '020 Patent that the Examiner considered the '020 Patent in light of the amendments made to the claims in the US '347 Patent. Thus, the Examiner did not meaningfully review the US '347 Patent for double patenting. The Examiner was only provided with an English-language Abstract of the KR '344 Patent, but not a full English-language translation of the entire KR '344 Patent. [Exhibit 13.] The '020 Patent issued on November 27, 2001, to SecuGen.

### C.    The Co-Pending Litigation Of The '020 Patent

In the co-pending litigation filed March 6, 2008, SecuGen claims to have invented the optical image capturing system underlying Union Community's Fingerprint Recognition Devices ("FRD"). SecuGen alleges at least 10 of Union Communities' products – the VIRDI FOHO 1 USB Fingerprint Reader, the VIRDI FSHOI and FSHOIRF Fingerprint Readers, the VIRDI FOMOI Fingerprint Mouse, the VIRDI 3000 series (including the VIRDI 3000, 3000SC and 3000RF) and VIRDI 200N Fingerprint Terminals, the VIRDI 400FP series (including the VIRDI 400FP and 450FP), Fingerprint Authentication Door Locks, the VIRDI 4000 series (including the VIRDI 4000, 4000SC and 4000RF) Fingerprint Terminals, the VIRDI 600FP series Fingerprint Panel, the VIRDI Safe200, Safe300, Safe400 and Safe500 and the VIRDI IOBU and 20BU Fingerprint Recognition OEM Modules– infringe the Claims for which the present Request for Reexamination is sought.

**D.    Prior Known Litigations Involving The '020 Patent**

Union Community is aware of no federal district court case involving the '020 Patent

other than the co-pending United States litigation specifically identified above.  The '020 Patent

was previously involved in an Arbitration Proceeding involving SecuGen and a company called

NitGen Co. LTD ("NitGen").  The Arbitration appeared to have been focused on the relationship

between the two companies and also addressed invalidity issues of the '020 Patent.  Without

addressing the substantive merits of the validity of the '020 Patent and the asserted prior art, the

arbitrator ruled that NitGen did not meet its burden of proving invalidity by the "heavy burden"

required to show invalidity.  [Ex. 15 at 10.]  A California Superior Court judgment affirmed the

Arbitration decision.

**E.    The '020 Patent's Korean Counterpart Has Been Invalidated by the Korean Intellectual Property Office**

Prior to the co-pending United States litigation specifically identified above, SecuGen

filed a Korean patent infringement lawsuit against Union Community in Korea on June 27, 2007,

asserting Korean Patent No. 469,571 ("the KR '571 Patent"), which SecuGen has purported to be

a foreign counterpart to the '020 Patent.  On August 28, 2007, Union Community countered with

a patent invalidity proceeding in Korea, seeking invalidation of the KR '571 Patent.  The Korean

Intellectual Property Office issued a formal Opinion on July 15, 2008, holding the KR '571

Patent to be invalid for obviousness.  [Exhibit 21 with an English translation and verification as

Exhibit 17.]  The Examiner(s) from the Korean Intellectual Property Office invalidated the

counterpart Korean application to the '020 Patent based on some of the same prior art cited

herein including the KR '344 Patent, the JP '368 Publication, and the GB '483 Patent.  [*Id.*]

**VII.   DETAILED EXPLANATION OF PERTINENCY OF PRIOR ART TO THE CLAIMS**

Union Community respectfully submits that Claims 1, 6, 7, and 12 of the '020 Patent are

anticipated by or obvious in view of U.S. Patent No. 6,381,347, discussed below.

**A.    Claims 1, 6, 7, and 12 of the '020 Patent Are Invalid For Double Patenting In View Of U.S. Patent No. 6,381,347**

The Claims of the '020 Patent are invalid for "statutory" and/or "obviousness-type" double patenting. Specifically, Claim 1 of the '020 Patent claims the same invention, or an obvious variation thereof, of what is claimed in Claims 1 and 12 (which depends from Claim 1) of the US '347 Patent. Claim 6 of the '020 Patent claims the same invention, or an obvious variation thereof, of what is claimed in Claim 5 of the US '347 Patent. Claim 7 of the '020 Patent claims the same invention, or an obvious variation thereof, of what is claimed in Claim 5 of the US '347 Patent. Further, Claim 12 of the '020 Patent claims the same invention, or an obvious variation thereof, of what is claimed in Claim 24 and its dependent Claims 25-28 of the US '347 Patent. Thus, Claims 1, 6, 7 and 12 of the '020 Patent are not patentably distinct from the claims of the US '347 Patent. Moreover, dependent Claim 8 of the '020 Patent cannot be rewritten as an independent Claim in order to achieve novelty.

A concise explanation of the US '347 Patent is provided below and then followed by its application to the claims of the '020 Patent. A corresponding claim chart is submitted herewith as Exhibit 6.

**1.    The US '347 Patent (Exhibit 2)**

The US '347 Patent was filed on November 12, 1998 and assigned Serial No. 09/191,428 ("the '428 Application"). On August 24, 2001, the applicant amended the claims to include limitations found in the '020 Patent. Specifically, the '428 Application was amended to include "a further surface" adjacent to the imaging surface, a claim limitation of the '020 Patent, on August 24, 2001. [Exhibit 24.] The US '347 Patent identifies Harry H. Teng and Sung-Chan Jo

as co-inventors (the '020 Patent identifies the same inventors). The US '347 Patent is also

assigned to SecuGen.

The US '347 Patent describes "an apparatus and method for acquiring an image of a

patterned object such as a fingerprint including a light refracting device, a focusing lens, and a

light source." [The US '347 Patent at the Abstract]. The operation of the system is described

using the same figure as FIG. 4 from the '020 Patent:



Figure 4 from the US '347 Patent or Figure 4 from the '020 Patent

Just as in the '020 Patent, in operation, the US '347 Patent discloses that a finger (or

patterned object) is placed against the imaging surface of the light refractor (310). Incident light

is then projected into the light refractor (310). The light scattered off the finger forms an

apparent image inside the glass and is inclined with respect to the viewing surface (320). In

order to minimize trapezoidal distortion, the apparent image is captured by a lens (314) which is

tilted with respect to the viewing surface (320) as shown in the figure. The tilt of the lens

equalizes the path length of a first light ray traveling from one part of an apparent image of the

patterned object in the light refractor to the lens plane with a path length of any other light ray
substantially parallel to the first light ray and traveling from another part of the apparent image
of the patterned object to the lens plane.

### 2.    The '020 Patent Is Invalid For Statutory Double Patenting

The '020 Patent is invalid for statutory double patenting under 35 U.S.C. § 101. In
determining whether a statutory basis for a double patenting rejection exists, the question to be
asked is: Is the same invention being claimed twice? 35 U.S.C. § 101 prevents two patents from
issuing on the same invention. "Same invention" means identical subject matter. *Miller v. Eagle
Mfg. Co.,* 151 U.S. 186 (1984); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In
re Ockert*, 245 F.2d 467, 114 USPQ 330 (CCPA 1957).

A reliable test for double patenting under 35 U.S.C. § 101 is whether a Claim in the '020
Patent could be literally infringed without literally infringing a corresponding Claim in the US
'347 Patent. *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970). That is, "is there an
embodiment of the invention that falls within the scope of one claim, but not the other?" Just
because claims are differently worded, they can still define the same invention.

### a.    Claim 1 of The '020 Patent Is Not Patentably Distinct From The Invention Claimed In Claims 1, 6, 7, and 12 Of The US '347 Patent

The US '347 Patent claims the same invention or an obvious variation thereof as claimed
in Claim 1 of the '020 Patent.

With respect to the first component of Claim 1 of the '020 Patent, the US '347 Patent
discloses "a compact apparatus for forming a high contrast, low distortion image of a patterned
object" *see, e.g.,*:

> Compact apparatus for forming a high contrast, low distortion
> image of a patterned object including. [Claim 1 of the US '347
> Patent.]

The next component of Claim 1 of the '020 Patent – "a light refractor for reflecting and refracting light" – is also disclosed by the US '347 Patent, *see, e.g.,*

> A light refractor for reflecting and refracting light. [Claim 1 of the
> US '347 Patent.]

The next limitation of Claim 1 of the '020 Patent is "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor." This limitation is disclosed in the US '347 Patent, *see, e.g.,*

> An imaging surface against which a patterned object to be imaged
> is to be placed. [Claim 1 of the US '347 Patent.]

Moreover, it is well known in optics that an apparent image is always formed when imaging through a piece of glass. [Exhibit 18, Expert Report of Ramen Bahuguna in support of NitGen at ¶ 30.] An apparatus which has "an imaging surface against which a patterned object to be imaged is to be placed" (Claim 1 of the US '347 Patent) forms an apparent image (Claim 1 of the '020 Patent). Thus, for this limitation there is no embodiment of the invention that falls within the scope of Claim 1 of the '020 Patent, but not Claim 1 of the US '347 Patent. Thus, the US '347 Patent claims the same invention or an obvious variation of "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor."

The next component of Claim 1 of the '020 Patent – "a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle .gamma. with the imaging surface" – is also disclosed by the US '347 Patent, *see, e.g.,*

> A viewing surface adjacent to the imaging surface and through
> which an image of the object to be imaged is projected and which
> is the same surface as the light entrance surface. [Claim 1].

It can also be seen from FIG. 4 of the US '347 Patent that the viewing surface forms an angle

(here "gamma") with the imaging surface. All prisms have an angle (herein called γ) between

the viewing surface and the imaging surface. Thus, the angle γ is inherent in Claim 1 of the US

'347 Patent. An apparatus which has "a viewing surface adjacent to the imaging surface" (Claim

1 of the US '347 Patent) forms an angle "gamma" with the imaging surface (Claim 1 of the '020

Patent). Thus, for this limitation there is no embodiment of the invention that falls within the

scope of Claim 1 of the '020 Patent, but not Claim 1 of the US '347 Patent. As a result, the US

'347 Patent claims the same invention or an obvious variation of "a viewing surface adjacent to

the imaging surface and through which an image of the object to be imaged is projected, the

viewing surface forming an angle γ with the imaging surface."

The next component of Claim 1 of the '020 Patent – "a further surface adjacent to the

imaging surface" – is also disclosed by the US '347 Patent, *see, e.g.,*

> A further surface positioned between and different from the
> imaging surface and the light entrance surface. [Claim 1.]

This limitation was added to the US '347 Patent after the Examiner considered the US '347

Patent on March 24, 2001. [Exhibit 15 and Exhibit 24]. Thus, the Examiner could have believed

that a double patenting rejection was not appropriate because at least the "further surface"

limitation was absent from the US '347 Patent. There is no indication in the '020 Patent's

prosecution history that the Examiner reconsidered the US '347 Patent after the "further surface"

limitation was added. Therefore, the Examiner did not meaningfully review the US '347 Patent

for double patenting.

The next component of Claim 1 of the '020 Patent – "at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle .delta. with the viewing surface" – is also disclosed by the US '347 Patent, *see, e.g.,*

> At least one focusing lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface. [Claim 1.]

It can also be seen from FIG. 4 of the US '347 Patent that the lens is perpendicular to an optical axis of the lens, and that the lens plane forms an angle (here "delta") with the viewing surface. All lens planes have an angle (herein called δ) between the lens plane and the viewing surface. Thus, the angle δ is inherent in Claim 1 of the US '347 Patent. An apparatus which has "at least one focusing lens adjacent to the viewing surface" (Claim 1 of the US '347 Patent) also has a lens plane that forms an angle δ with the viewing surface (Claim 1 of the '020 Patent). Thus, for this limitation there is no embodiment of the invention that falls within the scope of Claim 1 of the '020 Patent, but not Claim 1 of the US '347 Patent. As a result, the US '347 Patent discloses "at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface."

The final limitation of Claim 1 of the '020 Patent is that "wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane." The US '347 Patent discloses, *see, e.g.,*

The apparatus of Claim 11 wherein:

a lens plane of the focusing lens is tilted with respect to a plane
defined by the viewing surface so as to reduce a difference in
image light path lengths between different portions of an object to
be imaged; and the base angles of the isosceles triangular prism are
greater than 45 degrees, such that trapezoidal distortion of an
image is reduced. [Claim 12 of the US '347 Patent.]

Here, Claim 1 of the US '347 Patent Claims that the lens is tilted so that the inherent angles

(herein called $\gamma$ and $\delta$ which are present in every image acquisition apparatus that has an imaging

surface, viewing surface and lens plane) reduce the difference in the light path lengths from

different portions of the object. This means that the lens is tilted to "equalize a path length of a

first light ray traveling from one part of the apparent image of the patterned object to the lens

plane with a path length of any other light ray substantially parallel to the first light ray and

traveling from another part of the apparent image of the patterned object to the lens plane."

[Claim 1 of the '020 Patent.] Thus, for this limitation there is no embodiment of the invention

that falls within the scope of Claim 1 of the '020 Patent, but not Claim 1 of the US '347 Patent.

Thus, the US '347 Patent discloses "wherein the angles $\gamma$ and $\delta$ are formed to substantially

equalize a path length of a first light ray traveling from one part of the apparent image of the

patterned object to the lens plane with a path length of any other light ray substantially parallel to

the first light ray and traveling from another part of the apparent image of the patterned object to

the lens plane."

Because the US '347 Patent and the '020 Patent have the same inventive entity (Harry H.

Teng and Sung-Chan Jo) and are assigned to the same company (SecuGen) and because the US

'347 Patent discloses the preamble and every limitation of Claim 1 of the '020 Patent, Claim 1 of

the '020 Patent is invalid for double patenting. Thus, Claim 1 of the '020 Patent should be

rejected under 35 U.S.C. § 101 as claiming the same invention as that of Claims 1 and 12 of the

US '347 Patent. SecuGen cannot file a Terminal Disclaimer to overcome a statutory double patenting rejection.

### b.    The '020 Patent Is Invalid For Non-Statutory Double Patenting

A nonstatutory obviousness-type double patenting rejection is appropriate where the conflicting Claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s).  See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); and *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985).  In determining whether a nonstatutory basis exists for a double patenting rejection, the first question to be asked is - does any claim in the application define an invention that is anticipated by, or is merely an obvious variation of, an invention claimed in the patent?  If the answer is yes, then an "obviousness-type" nonstatutory double patenting rejection may be appropriate.

Obviousness-type double patenting requires rejection of an application Claim when the claimed subject matter is not patentably distinct from the subject matter claimed in a commonly owned patent, and when the issuance of a second patent would provide unjustified extension of the term of the right to exclude granted by a patent. *See Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 58 USPQ2d 1869 (Fed. Cir. 2001); *Ex parte Davis*, 56 USPQ2d 1434, 1435-36 (Bd. Pat. App. & Inter. 2000).

Since the analysis employed in an obviousness-type double patenting determination parallels the guidelines for a 35 U.S.C. § 103(a) rejection, the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103 are employed when making an obvious-type double patenting analysis.

As outlined above, there are no differences between the inventions defined by Claim 1 of the '020 Patent and Claims 1 and 12 of the US '347 Patent. Any differences that allegedly do

exist are inherent in the US '347 Patent and would have been obvious to one of skill in the art. Thus, Claim 1 of the '020 Patent should be rejected under nonstatutory obviousness-type double patenting as not patentably distinct from Claims 1 and 12 of the US '347 Patent.

      **c.**      **Dependent Claim 6 Of The '020 Patent Is Not Patentably Distinct From The Invention Claimed In Claim 5 Of The US '347**

The US '347 Patent claims the same invention or an obvious variation of Claim 6 of the '020 Patent.

Claim 6 of the '020 Patent discloses "The apparatus of Claim 1 further including at least one light source located adjacent to the light refractor and for emitting incident light which enters the light refractor to create an image of the patterned object at the viewing surface." This limitation is disclosed in the US '347 Patent, *see, e.g.,*

> The apparatus of Claim 4 wherein: the triangular prism includes: a first edge opposite the imaging surface and adjacent to the light entrance surface; and a second edge adjacent to the imaging surface; and the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the light entrance surface and adjacent to the first edge such that the LED strip does not pass through a plane normal to the light entrance surface and intersecting with the second edge. [Claim 5 of the US '347 Patent.]

The "at least one light source" limitation of the '020 Patent is anticipated by the "a strip of light emitting diodes (LEDs)" in the US '347 Patent.

The "adjacent to the light refractor" limitation of the '020 Patent is anticipated by the "adjacent to the light entrance surface" where one skilled in the art would understand that the light entrance surface is part of the light refractor in the US '347 Patent.

The "emitting incident light" limitation of the '020 Patent is anticipated by the "light emitting diodes (LEDs)" where one skilled in the art would understand that LEDs emit incident light in the US '347 Patent.

The "to create an image of the patterned object at the viewing surface" limitation of the

'020 Patent is inherent in the US '347 Patent because it is well known in optics that an apparent

image is always formed when imaging through a piece of glass. [Exhibit 18, Bahuguna Expert

Report at ¶ 30.]

Because the US '347 Patent and the '020 Patent have the same inventive entity (Harry H.

Teng and Sung-Chan Jo) and are assigned to the same company (SecuGen) and because the US

'347 Patent discloses every limitation of Claim 6, Claim 6 is invalid for statutory double

patenting.  Thus, Claim 6 of the '020 Patent should be rejected under 35 U.S.C. § 101 as

claiming the same invention as that of Claim 5 of the US '347 Patent.  SecuGen cannot file a

Terminal Disclaimer to overcome a statutory double patenting rejection.

As outlined above, there are no differences between the inventions defined by Claim 6 of

the '020 Patent and Claim 5 of the US '347 Patent.  Any differences that allegedly do exist are

inherent in the US '347 Patent and would have been obvious to one of skill in the art.  Thus,

Claim 6 of the '020 Patent should be rejected under nonstatutory obviousness-type double

patenting as not patentably distinct from Claim 5 of the US '347 Patent.

> **d.    Dependent Claim 7 of The '020 Patent Is Not Patentably Distinct From The Invention Claimed In Claim 5 of The US '347**

The US '347 Patent claims the same invention or an obvious variation of every limitation

of Claim 7 of the '020 Patent.

With respect to the first component of Claim 7, the US '347 Patent discloses "wherein:

the light refractor includes: a first edge opposite the imaging surface and adjacent to the viewing

surface." Claim 5 of the US '347 Patent is virtually identical to Claim 7 of the '020 Patent:

> The apparatus of Claim 4 wherein: the triangular prism includes: a
> first edge opposite the imaging surface and adjacent to the light

entrance surface; and a second edge adjacent to the imaging surface. [Claim 5 of the US '347 Patent.]

With respect to the second component of Claim 7, the US '347 Patent discloses "and the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface and adjacent to the first edge." For example, Claim 5 of the US '347 Patent is virtually identical to Claim 7 of the '020 Patent:

> And the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the light entrance surface and adjacent to the first edge such that the LED strip does not pass through a plane normal to the light entrance surface and intersecting with the second edge. (Claim 5 of the US '347 Patent).

Because the US '347 Patent and the '020 Patent have the same inventive entity (Harry H. Teng and Sung-Chan Jo) and are assigned to the same company (SecuGen) and because the US '347 Patent discloses every limitation of Claim 7, Claim 7 is invalid for statutory double patenting. Thus, Claim 7 of the '020 Patent should be rejected under 35 U.S.C. § 101 as claiming the same invention as that of Claim 5 of the US '347 Patent. SecuGen cannot file a Terminal Disclaimer to overcome a statutory double patenting rejection.

As outlined above, there are no differences between the inventions defined by Claim 7 of the '020 Patent and Claim 5 of the US '347 Patent. Any differences that allegedly do exist are inherent in the US '347 Patent and would have been obvious to one of skill in the art. Thus, Claim 7 of the '020 Patent should be rejected under nonstatutory obviousness-type double patenting as not patentably distinct from Claim 5 of the US '347 Patent.

e.    **Independent Claim 12 of The '020 Patent Is Not Patentably Distinct From The Invention of Claims 24-28 of The US '347 Patent**

The US '347 Patent claims the same invention or an obvious variation of the preamble and every limitation of the '020 Patent.

As described above with respect to the apparatus described in Claim 1, the US '347 Patent describes a method for "imaging a patterned object."

The US '347 Patent discloses this first step, "providing a light refractor having an imaging surface, a viewing surface and a further surface," *see, e.g.,*

> 24. A method of imaging a patterned object comprising:
>
> providing a light refractor having an imaging surface, a light receiving surface, a viewing surface which is the same as the light receiving surface and a further surface different from and between the light receiving surface and the imaging surface. [Claim 24 of the US '347 Patent.]

The next step also is disclosed in the US '347 Patent, "forming an angle γ between a plane defined by the viewing surface and a plane defined by the imaging surface." As can be seen from FIG. 4 of the US '347 Patent, the viewing surface forms an angle (here called "gamma") with the imaging surface. All prisms have an angle (herein called γ) between the viewing surface and the imaging surface. Thus, the angle γ is inherent in Claim 1 of the US '347 Patent. An apparatus which has "a viewing surface adjacent to the imaging surface" (Claim 1 of the US '347 Patent) forms an angle "gamma" with the imaging surface (Claim 12 of the '020 Patent). Thus, for this limitation there is no embodiment of the invention that falls within the scope of Claim 12 of the '020 Patent, but not Claim 24 of the US '347 Patent.

The next step also is disclosed in the US '347 Patent, "placing the patterned object against the imaging surface of the light refractor," *see, e.g.,*

> 24. A method of imaging a patterned object comprising:
>
> providing a light refractor having an imaging surface, a light receiving surface, a viewing surface which is the same as the light receiving surface and a further surface different from and between the light receiving surface and the imaging surface;
>
> placing the patterned object against the imaging surface of the light refractor... [Claim 24 of the US '347 Patent.]

The next step also is disclosed in the US '347 Patent, "projecting incident light into the light refractor," *see, e.g.,*

> 24. A method of imaging a patterned object comprising:
> providing a light refractor having an imaging surface, a light receiving surface, a viewing surface which is the same as the light receiving surface and a further surface different from and between the light receiving surface and the imaging surface;
>
> placing the patterned object against the imaging surface of the light refractor;
>
> projecting incident light from a light source through the light receiving surface of the light refractor... [Claim 24 of the US '347 Patent.]

The next step also is disclosed in the US '347 Patent, "scattering the incident light off the imaging surface and patterned object and through the viewing surface," *see, e.g.,*

> 24. A method of imaging a patterned object comprising:
> providing a light refractor having an imaging surface, a light receiving surface, a viewing surface which is the same as the light receiving surface and a further surface different from and between the light receiving surface and the imaging surface;
>
> placing the patterned object against the imaging surface of the light refractor;
>
> projecting incident light from a light source through the light receiving surface of the light refractor;
>
> reflecting the incident light off at least the further surface at an angle greater than the critical angle of the further surface before the incident light strikes the imaging surface at an angle less than the critical angle of the imaging surface and
>
> scattering the incident light off the imaging surface and patterned object and through the viewing surface. [Claim 24 of the US '347 Patent.]

The next step also is disclosed in the US '347 Patent, "providing a lens adjacent to the viewing surface," *see, e.g.,*

25. The method of Claim 24 further including the steps of:
providing a lens adjacent to the viewing surface. [Claim 25 of the
US '347 Patent.]

The next step also is disclosed in the US '347 Patent, "forming an angle δ between the

plane defined by the viewing surface and a lens plane of the lens," *see, e.g.,*

The method of Claim 27 wherein the step of providing a lens
includes tilting the lens plane of the lens with respect to a plane of
the viewing surface to reduce trapezoidal distortion in the image of
the patterned object. [Claim 28 of the US '347 Patent.]

It can also be seen from FIG. 4 of the US '347 Patent that the lens plane forms an angle (here

"delta") between the plane defined by the viewing surface and a lens plane of the lens. All

prisms have an angle (herein called δ) formed between the plane defined by the viewing surface

and the lens plane of the lens. Thus, the angle δ is inherent in Claim 28 of the US '347 Patent.

An apparatus which "tilt[s] the lens plane of the lens with respect to a plane of the viewing

surface to reduce trapezoidal distortion" (Claim 28 of the '347 Patent) forms an angle "delta"

with the lens plane of the lens (Claim 12 of the '020 Patent). Thus, for this limitation there is no

embodiment of the invention that falls within the scope of Claim 12 of the '020 Patent, but not

Claim 28 of the US '347 Patent.

The next step also is disclosed in the US '347 Patent, "fixing angles δ and angle γ to

equalize a path length of a first light ray traveling from one part of an apparent image of the

patterned object in the light refractor to the lens plane with a path length of any other light ray

substantially parallel to the first light ray and traveling from another part of the apparent image

of the patterned object to the lens plane," *see, e.g.,*

The method of Claim 25 wherein providing a light refractor
includes providing an isosceles triangular prism having base angles
which measure greater than 45 degrees. [Claim 26 of the US '347
Patent.]

According to Claim 26 of the US '347 Patent, having base angles greater than 45° requires that γ is a variable which has to be selected. Once selected, the lens is tilted, as stated in Claim 28 of the US '347 Patent, to reduce trapezoidal distortion. The only way that trapezoidal distortion is reduced in the US '347 Patent is by equalizing a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane. Thus, the US '347 Patent Claims fixing angles δ and angle γ to equalize path length from different parts of the image. Thus, for this limitation there is no embodiment of the invention that falls within the scope of Claim 1 of the '020 Patent, but not Claim 1 of the US '347 Patent.

Because the US '347 Patent and the '020 Patent have the same inventive entity (Harry H. Teng and Sung-Chan Jo) and are assigned to the same company (SecuGen) and because the US '347 Patent discloses the preamble and every limitation of Claim 12, Claim 12 is invalid for statutory double patenting. Thus, Claim 12 of the '020 Patent should be rejected under 35 U.S.C. § 101 as claiming the same invention as that of Claims 24-28 of the US '347 Patent. SecuGen cannot file a Terminal Disclaimer to overcome a statutory double patenting rejection.

As outlined above, there are no differences between the inventions defined by Claim 12 of the '020 Patent and Claims 24-28 of the US '347 Patent. Any differences that allegedly do exist are inherent in the US '347 Patent and would have been obvious to one of skill in the art. Thus, Claim 12 of the '020 Patent should be rejected under nonstatutory obviousness-type double patenting as not patentably distinct from Claims 24-28 of the US '347 Patent.

### 3.    Dependent Claim 8 of The '020 Patent Cannot Be Rewritten As An Independent Claim To Achieve Novelty

Dependent Claim 8 of the '020 Patent is not novel and therefore cannot be rewritten in independent form in order to overcome a double patenting rejection.  Claim 8 reads as follows:

> The apparatus of Claim 1 wherein:
>
> the at least one lens has a diameter; the object to be imaged has a length dimension; and
>
> the diameter of the at least one lens is smaller than the length dimension of the object to be imaged.  [Claim 8 of the '020 Patent.]

Making a diameter of the lens less than a length of the object to be imaged is disclosed in "Background" section of the '020 Patent at 5:48-55:

> Thus, if the first lens in lens assembly 214 is smaller than the image of the fingerprint in viewing surface 222, lens assembly 214 can still be placed relatively close to viewing surface 222 without loss of image sharpness near the edges of the image.

Thus, the '020 Patent itself discloses that making the diameter of the lens less than the length of the object to be imaged was widely used prior to the time the '020 Patent was filed. Therefore, Claim 8 of '020 Patent cannot be rewritten as an independent Claim to achieve novelty.

### B.    Claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 Are Anticipated By The KR '344 Patent

A concise explanation of the KR '344 Patent is provided below and then followed by its application to the '020 Patent claims.  A corresponding Claim chart is submitted herewith as Exhibit 7.

### 1.    KR '344 Patent (Exhibit 3)

The KR '344 Patent describes a fingerprint recognition apparatus which solves the trapezoidal distortion problem by tilting the lens plane of the lens assembly such that the

distances bB' and aA' are approximately equal. The KR '344 Patent discloses that "it is an object of the present invention to reduce an error occurring in a fingerprint input process by … applying equation values that are not affected by a magnification of a lens so that a fingerprint image is perpendicular to an optical axis, and setting a vertex angle θ of a prism within a predetermined range of the prior art ..." [Exhibit 3, the KR '344 Patent at 5:7-17.]

The system in operation can best be understood by reference to FIG. 3 shown below:



Figure 3 from the KR '344 Patent

As can be seen in FIG. 3, the optical system for the fingerprint recognition apparatus claimed in the KR '344 Patent has all of the same features as the optical system claimed in the '020 Patent. For example, in the figure above, 8' is the fingerprint contact surface (called the imaging surface in the '020 Patent). 8" is the semi-transmission surface (called the viewing surface in the '020 Patent). C is the bottom of the prism (called the further surface in the '020 Patent). 6 is the light source and 9 is the lens system.

Figure 4 from the KR '344 Patent illustrates that the KR '344 Patent discloses angles γ and δ (which, as discussed above, was the basis for novelty in the Examiner's Notice of Allowance):



Figure 4 from the KR '344 Patent.

As can be seen from FIG. 4 from the KR '344 Patent, angle θ is the same as angle γ in the

'020 Patent because both angle θ and γ define the angle between the imaging surface (item 318

in the '020 Patent or item 8' in the KR '344 Patent) and the viewing surface (item 320 in the

'020 Patent or item 8" in the KR '344 Patent). Thus, angle γ is disclosed in the prior art and

cannot serve as the basis for novelty for the '020 Patent.

Angle δ is also disclosed in the KR '344 Patent via angle "C" and using standard

geometry. Using standard geometry, one skilled in the art can determine angle δ (the angle

between the viewing surface and the lens, i.e., the tilt angle):



Geometric Relation of Angle C and δ in Figure 4 of The KR '344
Patent

As can be seen from the geometric relation of angle C in FIG. 4 of the KR '344 Patent,

angle C is the same as angle δ in the '020 Patent because both define the angle between the

viewing surface and the lens- the tilt angle. Thus, angle δ is disclosed in the prior art and cannot

serve as the basis for novelty for the '020 Patent.

### 2.    Claim 1 Of The '020 Patent Is Anticipated By The KR '344 Patent

The KR '344 Patent discloses the preamble and every limitation of Claim 1 of the '020

Patent.

With respect to the first component of Claim 1, the KR '344 Patent discloses "a compact

apparatus for forming a high contrast, low distortion image of a patterned object" *see, e.g.,*:

> The present invention relates to a fingerprint recognition apparatus
> that is designed to reduce a fingerprint input error by allowing a
> fingerprint to be accurately input by accurately forming a
> fingerprint image that is input during a fingerprint input process.
> [The KR '344 Patent at 2:8-12.]

> In addition, since the image forming optical system is designed by
> applying predetermined equation values and parameters to the
> prior prism, the clear fingerprint image can be formed without
> increasing a size of the optical system. [The KR '344 Patent at
> 8:23-9:2.]

> A clear fingerprint image that is not distorted as shown in FIG. 5
> can be vertically formed without being affected by the
> magnification or refractive index of the lenses. [The KR '344
> Patent at 8:17-19.]

Thus, the KR '344 Patent discloses "A compact apparatus for forming a high contrast, low

distortion image of a patterned object."

The next component of Claim 1 of the '020 Patent – "a light refractor for reflecting and

refracting light" – is also disclosed by the KR '344 Patent, *see, e.g.,*

> Setting a vertex angle θ of a prism within a predetermined range of
> the prior art. [The KR '344 Patent at 5:12-13.]

> A light emitted from a diode array 6 is incident on a prism 8. [The
> KR '344 Patent at 5:23-24.]

See also FIG. 3, which shows a light refractor at 8. One of skill in the art understands that a light

refractor/prism reflects and refracts light. Thus, the KR '344 Patent discloses "a light refractor

for reflecting and refracting light."

The next component of Claim 1 of the '020 Patent – "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor" – is also disclosed by the KR '344 Patent, *see, e.g.*,

> When the fingerprint contacts the prism 2, the light emitted from the light source 1 passes through or is reflected from the fingerprint. [The KR '344 Patent at 2:22-23.]

> A fingerprint contacting surface 8'. [The KR '344 Patent at 6:1.]

> A fingerprint recognition apparatus comprising a light source 1, a prism 8 having a fingerprint contacting surface 8'. [The KR '344 Patent at Claim 1.]

> The light reflected to the semi-transmission surface 8" is reflected at the semi-transmission surface 8" so that a fingerprint inputting person can identify the input fingerprint through a mirror 11. [The KR '344 Patent at 6:7-10.]

It can also be seen from FIG. 3 that the KR '344 Patent discloses an imaging surface ('8) against which a patterned object to be imaged is to be placed. Moreover, it is well known in optics that an apparent image is always formed when imaging through a piece of glass. [Exhibit 18, Expert report of Bahuguna at ¶ 30.] Thus, the KR '344 Patent discloses "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor."

The next component of Claim 1 of the '020 Patent – "a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface" – is also disclosed by the KR '344 Patent, *see, e.g.*,

> A fingerprint image is formed on an inclined surface of the prism. [The KR '344 Patent at 3:3-4.]

It can also be seen from FIG. 3 of the KR '344 Patent that the viewing surface (8") forms an angle θ (a.k.a., "gamma") with the imaging surface (8'). Thus, the KR '344 Patent discloses " a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface."

The next component of Claim 1 of the '020 Patent – "a further surface adjacent to the imaging surface" – is also disclosed by the KR '344 Patent *see, e.g.*, item "C" in Figure 3:



Figure 3 from the KR '344 Patent

Thus, the KR '344 Patent discloses "a further surface adjacent to the imaging surface."

The next component of Claim 1 of the '020 Patent is "at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface." This limitation can be better understood by reference to FIG. 6 of the '020 Patent:



Figure 6 from the '020 Patent depicting the limitations of Claim 1.

From FIG. 6 of the '020 Patent, it can be seen that the lens (314) is adjacent to the viewing surface (320) for receiving and focusing an image of a patterned object projected through the viewing surface (320), the lens having a lens plane which is perpendicular to an optical axis of the lens (circled above), the lens plane forming an angle δ with the viewing surface."

This limitation is disclosed by the KR '344 Patent, *see, e.g.,*

> An image forming lens system 3 for forming an image of the fingerprint. [The KR '344 Patent at 2:17-18.]

> A fingerprint recognition apparatus comprising a light source 1, a prism 8 having a fingerprint contacting surface 8', an image forming lens system 9. [The KR '344 Patent at Claim 1.]

It can also be seen from FIG. 4 of the KR '344 Patent that the lens (9) is perpendicular to an optical axis of the lens and the lens plane forms an angle (here called "delta") with the viewing surface (8")":



Figure 4 of the KR '344 Patent disclosing δ and ⊥

Here, FIG. 4 of the KR '344 Patent discloses that that the lens (9) is perpendicular to an optical

axis of the lens. As can be seen in FIG. 3 of the KR '344 Patent, the light ray forms a 90° angle

with the lens (9). Further, as discussed above, the KR '344 Patent discloses angle C. The KR

'344 Patent discloses that angle C≠0, therefore, using simple geometry it can be established that

angle C is the same as angle δ in the '020 Patent. Thus, angle C in the KR '344 Patent defines

the angle between the viewing surface and the lens, i.e., the tilt angle, δ. Thus, the KR '344

Patent discloses "at least one lens adjacent to the viewing surface and for receiving and focusing

an image of a patterned object projected through the viewing surface, the lens having a lens

plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with

the viewing surface."

The final limitation of Claim 1 of the '020 Patent is "wherein the angles γ and δ are

formed to substantially equalize a path length of a first light ray traveling from one part of the

apparent image of the patterned object to the lens plane with a path length of any other light ray

substantially parallel to the first light ray and traveling from another part of the apparent image

of the patterned object to the lens plane." That is, the values of γ and δ are set such that lengths of light rays which are substantially parallel to each other are equalized. These substantially parallel and equalized light rays solve the trapezoidal distortion problem. This limitation can best be understood by reference to FIG. 6 of the '020 Patent:



Figure 6 of the '020 Patent

From FIG. 6 of the '020 Patent, it can be seen that angles γ and δ are formed to substantially equalize the path length of light ray traveling from different parts of the apparent image.

The KR '344 Patent discloses that the trapezoidal distortion problem is solved by adjusting angles θ (angle γ in the '020 Patent ) and c (angle δ in the '020 Patent).

The KR '344 Patent discloses *see, e.g.,*:

> Here, the range 52°<θ<72° is a minimum angle that can form a triangle and can be determined by the equation ((sinθ)/n=sin b•sin c) since there are a variety of different glass materials having a refractive index of 1.5-1.8, which are used for forming the prism.

That is, the vertex angle θ may vary within the range in accordance with the glass material. [The KR '344 Patent at 6:19-24.]

As described above, according to the present invention, when the vertex angle between the fingerprint contacting surface and the semi-transmission surface of the prism is properly set within a predetermined range and the incident angle and refractive index in the prism are set in accordance with proper equations, a clear fingerprint image that is not distorted as shown in FIG. 5 can be vertically formed without being affected by the magnification or refractive index of the lenses. [The KR '344 Patent at 8:12-18.]

Characterized in that light emitted from a diode array 6 that is the light source is incident on the prism 8, which is designed to have a stable angle, through a diffusing lens 7 and is reflected to a semi-transmission surface 8" at the fingerprint contacting surface 8'. [The KR '344 Patent at Claim 1.]

So that a fingerprint image is perpendicular to an optical axis, and setting a vertex angle θ of a prism within a predetermined range of the prior art and by allowing a fingerprint inputting person to input his/her fingerprint in a more perfect state by enabling the fingerprint inputting person to identify a fingerprint inputting state such as a finger pressing state or a finger touching position. [The KR '344 Patent at 5:11-17.]

Based on the disclosure of the KR '344 Patent at 5:11-17 of "fingerprint image is perpendicular to an optical axis," one of skill in the art understands that (1) the optical axis of the lens coincides with the light path direction and (2) the lengths from the fingerprint image to the lens plane are equalized. This is because, the only way for the fingerprint image to be perpendicular to the optical axis is if "the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane."

The angles θ (angle γ in the '020 Patent) and c (angle δ in the '020 Patent) are derived by the fact that the length of the light rays from the fingerprint image to the lens plane are substantially equalized.

The prism 8 is designed such that it can satisfy an equation ((sinθ)/n=sin b•sin c) when the light passes there through and satisfy an equation (d+e-f= θ) when the light passes there through after being reflected. In addition, the prism 8 is designed such that a vertex angle θ of the fingerprint contacting surface 8' and the semi-transmission surface 8" can satisfy 52°<θ<72° and C ≠0.
[The KR '344 Patent at 6:12-18.]

One of skill in the art would also understand that the angles γ and δ must be set to "substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane" based on the KR '344 Patent's disclosure of the equation ((sinθ)/n=sin b•sin c).



When a radius of a circumscribed circle of a triangle ABD is R, the following equation is derived.

$$\frac{BD}{\sin A} = \frac{AD}{\sin B} = \frac{AB}{\sin D} = 2R$$

From this equation, the following equations are obtained.

$$\sin A = \sin \theta = \frac{BD}{2R}$$

$$\sin B = \sin b = \frac{AD}{2R}$$

When describing the equation ((sinθ)/n=sin b•sin c),

The left side becomes

① $\sin \theta / n = \dfrac{BD}{2R} \cdot \dfrac{1}{n}$ ($n$: refractive index),

and the right side becomes

② $\sin b \cdot \sin c = \dfrac{AD}{2R} \cdot \dfrac{AE}{AD} = \dfrac{AE}{2R}$.

From the above, the following equation is derived.

③ $\dfrac{BD}{2R} \cdot \dfrac{1}{n} = \dfrac{AE}{2R}$.

When the 2R is removed, $\dfrac{BD}{n} = AE$. The $\dfrac{BD}{n}$ is a value obtained by dividing a value BD by the refractive index. That is, the $\dfrac{BD}{n}$ indicates lengths (B'D) from the apparent image to the location where the image is generated and the AE indicates a length from the imaging surface contacting the viewing surface to the lens plane. From this, it can be noted that the lengths of light rays from different points on the apparent imaging surface to the lens plane are substantially equalized (B'D=AE).

The method for resolving trapezoidal distortion in the KR '344 Patent is not limited to absorption type fingerprint recognition apparatuses. Trapezoidal distortion can be solved by eliminating the differences in the length of light rays, regardless of whether the fingerprint recognition system is a scattering or absorption type system because trapezoidal distortion is eliminated by equalizing the length of light rays from the apparent image; whether light is incident on an imaging surface at an incidence angle greater or less than the critical angel has nothing to do with resolving trapezoidal distortion.[3] [Exhibit 17, pg 31.] Although the KR '344 Patent exemplifies an absorption type system, the variables θ, b and c, in the cited equation, $(\sin\theta)/n = \sin b \cdot \sin c$, are irrespective of the light entering the fingerprint contacting surface, or whether or not the angle of incidence is greater or smaller than the critical angle. Therefore, the

---

[3] When light is incident on an imaging surface contacting a fingerprint at an angle less than a critical angle, the light is scattered (reflected) and the system is called a scattering type fingerprint recognition system. When light is incident on an imaging surface contacting a fingerprint at an incidence angle greater than a critical angle the system is called an absorption type fingerprint recognition system.

equation, $(\sin\theta)/n = \sin b \cdot \sin c$, applies whether the system is an absorption or scattering type system.

Thus, the final limitation of Claim 1 of the '020 Patent "wherein the angles $\gamma$ and $\delta$ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane" is disclosed in the KR '344 Patent.

Because the KR '344 Patent discloses the preamble and every limitation of Claim 1 of the '020 Patent, Claim 1 of the '020 Patent is anticipated by the KR '344 Patent.

### 3.    Claim 12 of The '020 Patent Is Anticipated By The KR '344 Patent

Claim 12 of the '020 Patent is anticipated by the KR '344 Patent.

As described above with respect to the apparatus described in Claim 1 of the '020 Patent, the KR '344 Patent describes a method for "imaging a patterned object."

The KR '344 Patent discloses this first step, "providing a light refractor having an imaging surface, a viewing surface and a further surface," *see, e.g.,*

> When the fingerprint contacts the prism 2, the light emitted from
> the light source 1 passes through or is reflected from the
> fingerprint.  [The KR '344 Patent at 2:22-23.]
>
> A fingerprint contacting surface 8'.  [The KR '344 Patent at 6:1.]
>
> The light reflected to the semi-transmission surface 8" partly
> passes through the semi-transmission surface 8".  [The KR '344
> Patent at 6:1-3.]

Further, as can be seen from FIG. 3 of the KR '344 Patent, item 8' is a imaging surface, item 8" is a viewing surface and item C is a "further surface."

The next step is also disclosed in the KR '344 Patent, "forming an angle $\gamma$ between a plane defined by the viewing surface and a plane defined by the imaging surface," *see, e.g.,*

> In addition, the prism 8 is designed such that a vertex angle $\theta$ of
> the fingerprint contacting surface 8' and the semi-transmission

surface 8" can satisfy 52°<θ<72° and C ≠0. [The KR '344 Patent
at 6:15-18.]

It can also be seen from FIG. 3 of the KR '344 Patent that the viewing surface forms an angle

(here called "gamma") with the imaging surface.

The next step also is disclosed in the KR '344 Patent, "placing the patterned object

against the imaging surface of the light refractor," *see, e.g.,*

> A fingerprint image is formed on an inclined surface of the prism.
> [The KR '344 Patent at 3:3-4.]
>
> When the fingerprint contacts the prism 2, the light emitted from
> the light source 1 passes through or is reflected from the
> fingerprint. [The KR '344 Patent at 2:22-23.]

The next step also is disclosed in the KR '344 Patent, "projecting incident light into the

light refractor," *see, e.g.,*

> A light emitted from a diode array 6 is incident on a prism 8
> through a diffusion lens 7 and is reflected to a semi-transmission
> surface 8" by a fingerprint contacting surface 8'. [The KR '344
> Patent at 5:23-6:1.]

The next step also is disclosed in the KR '344 Patent, "scattering the incident light off the

imaging surface and patterned object and through the viewing surface," *see, e.g.,*

> The light passing through the bottom C of the prism 8 is incident
> on the fingerprint contacting surface 8' of the prism 8 and is
> scattered by the valley-ridge shape of the fingerprint. [The KR
> '344 Patent at 7:8-11.]

The next step also is disclosed in the KR '344 Patent, "providing a lens adjacent to the

viewing surface," *see, e.g.,*

> A light emitted from a diode array 6 is incident on a prism 8
> through a diffusion lens 7 and is reflected to a semi-transmission
> surface 8". [The KR '344 Patent at 5:23-25.]

The next step also is disclosed in the KR '344 Patent, "forming an angle δ between the plane defined by the viewing surface and a lens plane of the lens." As can be seen from FIG, 4 of the KR '344 Patent, angle C is the same as angle δ in the '020 Patent. Thus, KR '344 Patent discloses "forming an angle δ between the plane defined by the viewing surface and a lens plane of the lens."

The next step also is disclosed in the KR '344 Patent, "fixing angles δ and angle γ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane," *see, e.g.,*

> In addition, the prism 8 is designed such that a vertex angle θ of the fingerprint contacting surface 8' and the semi-transmission surface 8" can satisfy $52°<θ<72°$ and C $\neq$ 0. [The KR '344 Patent at 6:15-18.)

> The prism 8 is installed such that a bottom C thereof is in parallel with the diode array 6 that is a light source and the light diffusing lens 7, thereby enhancing light diffusing effect. [The KR '344 Patent at 6:25-7:2.]

It can also be seen from FIGs. 3 and 4 of the KR '344 Patent that the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane. Accordingly, Union Community respectfully submits that Claim 12 of the '020 Patent is anticipated by the KR '344 Patent.

Because the KR '344 Patent discloses the preamble and every limitation of Claim 12 of the '020 Patent, Claim 12 of the '020 Patent is anticipated by the KR '344 Patent.

**4.    Dependent Claims 2-4 And 13-15 of The '020 Patent Are Anticipated By The KR '344 Patent**

Claims 2-4 and 13-15 of the '020 Patent are anticipated by the KR '344 Patent. Each of Claims 2-4 and 13-15 of the '020 Patent rely upon Equation 5 $((n^2 - \sin^2\delta)^{1/2}(\cos\gamma)(\sin\delta) + \sin^2\delta) = 1)$ within an error range of 0.3, 0.15, and 0.075:

$$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3 \quad \text{[Equation 6 in Claim 2 and 13]}$$

$$0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15 \quad \text{[Equation 7 in Claim 3 and 14]}$$

$$0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075 \quad \text{[Equation 8 in Claim 4 and}$$

15]

That is, the inventions of Claims 2, 3, 4, 13, 14, and 15 limits the values of $\gamma$ and $\delta$ in Equation 5 $((n^2 - \sin^2\delta)^{1/2}(\cos\gamma)(\sin\delta) + \sin^2\delta)$ to within an error range of 0.7 to 1.3, 0.85 to 1.5, and 0.925 to 1.075 with respect to the value 1.

**Relationship Between Equations of The KR '344 Patent And The '020 Patent**

The equation $((\sin\theta)/n = \sin b \cdot \sin c)$ disclosed in the KR '344 Patent is the same as Equation 5 $((n^2 - \sin^2\delta)^{1/2}(\cos\gamma)(\sin\delta) + \sin^2\delta = 1)$ disclosed in the '020 Patent; these two equations are mathematically and mutually identical to each other.



The KR '344 Patent    → '020 patent
Θ → γ
c → δ

**Snell's law**

$n = \dfrac{\sin c}{\sin w} = \dfrac{\sin \delta}{\sin w}$

$\sin w = \dfrac{\sin \delta}{n}$

**Geometry**

w = 90−(180−Θ−b)
= Θ+b−90
→ b=w+90−Θ
=w+(90−Θ)
=w+(90− γ)

Each parameter of the KR '344 Patent and the '020 Patent has the above-described relationship.  By utilizing Equation 5 ((n² −sin²δ)^{1/2}( cos γ) (sinδ)+sin ²δ= 1) of the '020 Patent, one can derive the Equation of the KR '344 Patent ( (sinθ)/n=sin b•sin c) as follows:

$$\frac{\sin \theta}{n} = \sin b \cdot \sin c \qquad \text{(Equation of the KR '344 Patent)}$$

$$\frac{\sin\gamma}{n} = \sin \{w + (90 - \gamma)\} \cdot \sin\delta$$

$$\frac{\sin\gamma}{n} = \{\sin w \cdot \cos (90 - \gamma) + \cos w \cdot \sin (90 - \gamma)\} \cdot \sin\delta$$

$$\frac{\sin\gamma}{n} = \{\sin w \cdot \sin\gamma + \cos w \cdot \cos\gamma\} \cdot \sin\delta$$

$$\frac{\sin\gamma}{n} = \{\frac{\sin\delta}{n} \cdot \sin\gamma + \cos w \cdot \cos\gamma\} \cdot \sin\delta$$

$$1 = \frac{n}{\sin\gamma} \{\frac{\sin\delta}{n} \cdot \sin\gamma + \cos w \cdot \cos\gamma\} \cdot \sin\delta$$

$$1 = \frac{1}{\sin\gamma} \{\sin\delta \cdot \sin\gamma + n \cdot \cos w \cdot \cos\gamma\} \cdot \sin\delta$$

$$1 = \frac{1}{\sin\gamma} \{\sin^2\delta \cdot \sin\gamma + n \cdot \cos w \cdot \sin\delta \cdot \cos\gamma\}$$

$$1 = sin^2\delta + n \cdot cos w \cdot sin\delta \cdot \frac{cos\gamma}{sin\gamma}$$

$$1 = sin^2\delta + n \cdot cos w \cdot sin\delta \cdot cot\gamma$$

$$1 = sin^2\delta + n \cdot \sqrt{1 - sin^2 w} \cdot sin\delta \cdot cot\gamma$$

$$1 = sin^2\delta + n \cdot \sqrt{1 - \frac{sin^2\delta}{n^2}} \cdot sin\delta \cdot cot\gamma$$

$$1 = sin^2\delta + \sqrt{n^2 - sin^2\delta} \cdot sin\delta \cdot cot\gamma$$

$$\sqrt{n^2 - sin^2\delta} \cdot sin\delta \cdot cot\gamma + sin^2\delta = 1$$

$$(n^2 - sin^2\delta)^{1/2} \cdot cot\gamma \cdot sin\delta + sin^2\delta = 1$$

(Equation 5 of the '020 Patent)

In the end, it can be noted that Equation 5 of the '020 Patent is simply another expression of the equation ((sinθ)/n=sin b•sin c) of the 'KR '344 Patent. That is, Equation 5 of the '020 Patent is mathematically identical as the equation ((sinθ)/n=sin b•sin c) of the KR '344 Patent. The equation ((sinθ)/n=sin b•sin c) of the KR '344 Patent is not limited by error ranges and is therefore broader than the disclosure in the '020 Patent. Moreover, the simple numeric limitations in the '020 Patent fall within the range of simple modification of design applicable by those of skill in the art.

Since the equation ((sinθ)/n=sin b•sin c) from the KR '344 Patent is mathematically identical to Equation 5 of the '020 Patent, it can be understood that all of the solutions satisfying the equation ((sinθ)/n=sin b•sin c) of the KR '344 Patent also satisfy Equation 5 of the '020 Patent. Thus, the inventions of Claims 2-4 and 13-15 of the '020 Patent are anticipated or rendered obvious in view of the KR '344 Patent.

5.    **Dependent Claims 5, 9-11, and 16-19 of The '020 Patent Are Anticipated By The KR '344 Patent**

The KR '344 Patent discloses every limitation of Claims 5 and 16-19 of the '020 Patent.

Claim 5 of the KR '344 Patent discloses "The apparatus of Claim 1 wherein the part of the imaging surface against which an object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle, the first angle being interior to a triangular area formed by the viewing surface, the imaging surface and the at least one light ray, which is less than 90 degrees."[4]  This limitation can be better understood by reference to 13:43-14:16 and FIGs. 9 and 10 of the '020 Patent:



Figure 9 of '020 Patent

FIG. 9 of the '020 Patent shows that when α' is less than 90 degrees, and the image capturing system is configured according to equations (5) through (8) above, trapezoidal distortion can be substantially eliminated because the path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane is substantially equal to a path length of any other light ray substantially parallel to the first light ray and traveling from another part of

---

[4] Claim 9 is essentially identical to Claim 5 except that it depends from Claim 2 instead of to Claim 1. Claim 10 is essentially identical to Claim 5 except that it depends from Claim 3 instead of to Claim 1. Claim 11 is essentially identical to Claim 5 except that it depends from Claim 4 instead of to Claim 1. Claim 16 is essentially identical to Claim 5 except that it depends from Claim 12 instead of to Claim 1. Claim 17 is essentially identical to Claim 5 except that it depends from Claim 13 instead of to Claim 1. Claim 18 is essentially identical to Claim 5 except that it depends from Claim 14 instead of to Claim 1. Claim 19 is essentially identical to Claim 5 except that it depends from Claim 15 instead of to Claim 1.

the apparent image of the patterned object to the lens plane. However, as shown in FIG. 10 below, when α' is greater than 90º, trapezoidal distortion occurs because the path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane is not substantially equal to a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane:



Figure 10 of the '020 Patent

This limitation of Claim 5 is disclosed in the KR '344 Patent. This limitation can best be understood by reference to FIG. 4 of the KR '344 Patent. FIG. 4 shows that light refracted from the imaging surface to the viewing surface has an angle of less than 90° (*i.e.* an acute angle) and thus an angle between the light ray scattered on the imaging surface and the viewing surface is essentially less than 90° (*i.e.* an acute angle):



Figure 4 of the KR '344 Patent

Therefore, the invention of Claims 5, 9-11, and 16-19 of '020 are anticipated by the KR '344 Patent.

### 6. Dependent Claim 6 of The '020 Patent Is Anticipated By The KR '344 Patent

The KR '344 Patent discloses every limitation of Claim 6 of the '020 Patent.

Claim 6 of the '020 Patent discloses "The apparatus of Claim 1 further including at least one light source located adjacent to the light refractor and for emitting incident light which enters the light refractor to create an image of the patterned object at the viewing surface." This limitation can be better understood by reference to FIG. 3 of the KR '344 Patent:



Figure 3 of The KR '344 Patent

In FIG. 3 of the KR '344 Patent, item 6 is the light source and it is adjacent to the light refractor/prism (8). The light source from the KR '344 patent emits incident light which is "projected through the light receiving surface and reflected off a surface other than the imaging surface" as can be seen from the disclosure in the abstract:

> Incident light from the light source is projected through the light
> receiving surface and reflected off a surface other than the imaging
> surface. This reflected light is then projected onto the imaging
> surface to create an image of the patterned object from

substantially all scattered light through the viewing surface. [The KR '344 Patent at the Abstract.]

Thus, the KR '344 Patent discloses every limitation of Claim 6 of the '020 Patent and the '020 Patent is anticipated by KR '344.

**7.    Dependent Claim 7 of The '020 Patent Is Anticipated By The KR '344 Patent**

The KR '344 Patent discloses every limitation of Claim 7 of the '020 Patent.

With respect to the first component of Claim 7 of the '020 Patent, the KR '344 Patent discloses "wherein: the light refractor includes: a first edge opposite the imaging surface and adjacent to the viewing surface." For example Claim 5 of the KR '344 Patent is virtually identical to Claim 7 of the '020 Patent:

> The apparatus of Claim 4 wherein: the triangular prism includes: a first edge opposite the imaging surface and adjacent to the light entrance surface; and a second edge adjacent to the imaging surface. [Claim 5 of the KR '344 Patent.]

This limitation can be better understood by reference to FIG. 3 of the KR '344 Patent:



Figure 3 of The KR '344 Patent

FIG. 3 of the KR '344 Patent shows a first edge opposite the imaging surface (8') and adjacent to the viewing surface (8").

With respect to the second component of Claim 7 of the '020 Patent, the KR '344 Patent discloses "and the light source is a strip of light emitting diodes (LEDs) oriented towards and

parallel with the viewing surface and adjacent to the first edge." For example, Claim 5 of the KR '344 Patent is virtually identical to Claim 7 of the '020 Patent:

> And the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the light entrance surface and adjacent to the first edge such that the LED strip does not pass through a plane normal to the light entrance surface and intersecting with the second edge. [Claim 5 of the KR '344 Patent.]

Thus, the KR '344 Patent discloses every limitation of Claim 7 of the '020 Patent.

### C.    Claims 1 And 12 of The '020 Patent Are Anticipated By The JP '368 Patent

A concise explanation of the JP '368 Patent is provided below and then followed by its application to Claims 1 and 12 of the '020 Patent. A corresponding Claim chart is submitted herewith as Exhibit 8.

### 1.    The JP '368 Publication (Exhibit 4)

The JP '368 Publication is directed to a figure print recognition apparatus using a 1-dimensional image sensor. The JP '368 Publication uses a "1-dimensional image sensor as a light-receiving device and moves the 1-dimensional image sensor and a lens in parallel with an apparent location of a fingerprint-contacting surface." [The JP '368 Publication at 3:12-15.]

The system in operation can best be understood by reference to FIG. 1 shown below:



Figure 1 from the JP '368 Patent

As can be seen in FIG. 1, the optical system for the fingerprint recognition apparatus claimed in the JP '368 Publication has all of the same features as the optical system claimed in the '020 Patent. For example, in the diagram above, 22 is the fingerprint contact surface (called the imaging surface in the '020 Patent). Item 24 is the prism surface (called the viewing surface in the '020 Patent). C is the bottom of the prism (called the further surface in the '020 Patent). 11 is the light source and 32 is the lens system.

FIG. 1 from the JP '368 Publication illustrates that the JP '368 Publication discloses angles $\gamma$ and $\delta$ (which was identified as being the basis for novelty in the Examiner's Notice of Allowance). As can be seen from FIG. 1 from the JP '368 Publication, angle B is the same as angle $\gamma$ in the '020 Patent because both angle at B and $\gamma$ define the angle between the imaging surface (item 318 in the '020 Patent or item 22 in the JP '368 Publication) and the viewing surface (item 320 in the '020 Patent or item 24 in the JP '368 Publication). Using standard geometry, based on the disclosure of X-Y in the JP '368 Publication, one skilled in the art can determine angle $\delta$ (The angle between the viewing surface and the lens, i.e., the tilt angle).

### 2.    Claim 1 of The '020 Patent Is Anticipated By The JP '368 Publication

The JP '368 Publication discloses the preamble and every limitation of Claim 1 of the '020 Patent.

With respect to the first component of Claim 1, the JP '368 Publication discloses "a compact apparatus for forming a high contrast, low distortion image of a patterned object," *see, e.g.,*

> It is an object of the present invention to provide a fingerprint recognition apparatus that can be designed to be small and obtain data of an image having a focused state at any point. [The JP '368 Publication at 3:6.]

Thus, the JP '368 Publication discloses "A compact apparatus for forming a high contrast, low distortion image of a patterned object."

The next component of Claim 1 of the '020 patent – "a light refractor for reflecting and refracting light" – is also disclosed by the JP '368 Publication, *see, e.g.,*

> The reference number 1 indicates a finger having a fingerprint that will be captured and the reference number 21 denotes a right triangular prism. [The JP '368 Publication at 4:12-14.]
>
> A first surface 22 of the right triangular prism 21… [The JP '368 Publication at 4:14-15.]

One skilled in the art knows that a prism reflects and refracts light. Thus, the JP '368 Publication discloses "a light refractor for reflecting and refracting light."

The next limitation of Claim 1 of the '020 Patent is "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor." This limitation is disclosed in the JP '368 Publication, *see, e.g.,*

> A first surface 22 of the right triangular prism 21 constitutes a fingerprint-contacting surface. [The JP '368 Publication at 4:14-16.]
>
> The fingerprint-contacting surface. [The JP '368 Publication at 5:3.] A fingerprint recognition apparatus of the present invention uses a 1-dimensional image sensor as a light-receiving device and moves the 1-dimensional image sensor and a lens in parallel with an apparent location of a fingerprint-contacting surface. [The JP '368 Publication at 3:12-15.]

As can be seen from FIG. 3 of the JP '368 Publication, an apparent image (A'-B') is formed in the light refractor (23):



Figure 1 from the JP '368 Publication

Thus, the JP '368 Publication discloses "an imaging surface against which a patterned object to be imaged is to be placed to form an apparent image of the patterned object in the light refractor."

The next component of Claim 1 of the '020 Patent – "a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface" – is also disclosed by the JP '368 Publication *see, e.g.,*:

> The light is totally reflected at a curved portion of the fingerprint and is projected almost perpendicularly on a third surface 24 (the other of the surfaces that are formed at a right angle to each other). [The JP '368 Publication at 4:23-5:1.]

As can be seen from FIG. 3 of the JP '368 Publication, that the viewing surface (24) forms an angle (here called "gamma") with the imaging surface (22). Thus, the JP '368 Publication discloses "a viewing surface adjacent to the imaging surface and through which an image of the object to be imaged is projected, the viewing surface forming an angle γ with the imaging surface."

The next component of Claim 1 of the '020 Patent – "a further surface adjacent to the imaging surface" – is also disclosed by the JP '368 Publication, *see, e.g.*, item c in FIG. 1. Thus, the JP '368 Publication discloses "a further surface adjacent to the imaging surface."

The next component of Claim 1 of the '020 Patent – "at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface" – is also disclosed by the JP '368 Publication, *see, e.g.*,

> The image sensor 31 is perpendicular to an optical axis of a ray of light at the fingerprint-contacting surface. [The JP '368 Publication at 5:7-9.]
>
> The image sensor 31 is disposed such that a direction (a vertical direction to a paper surface in FIG. 1) in parallel with the fingerprint-contacting surface 22 becomes a length direction of the image sensor 31. [The JP '368 Publication at 5:9-12.]

It can also be seen from FIG. 1 of the JP '368 Publication that the lens (32) is perpendicular to an optical axis of the lens and the lens plane forms an angle (here called "delta") with the viewing surface (24). Thus, the JP '368 Publication discloses "at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface, the lens having a lens plane which is perpendicular to an optical axis of the lens, the lens plane forming an angle δ with the viewing surface."

The final limitation of Claim 1 of the '020 Patent is that "wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane." The JP '368 Publication discloses, *see, e.g.*,

> The line X-Y is in parallel with line A'-B' indicating an apparent
> location (i.e., a virtual image location) of the fingerprint contact
> surface 22 (illustrated by line A-B). [The JP '368 Publication at
> 5:16-18.]

Because lines X-Y and A-B are parallel, they substantially equalize a path length of a first light

ray traveling from one part of the apparent image of the patterned object to the lens plane with a

path length of any other light ray substantially parallel to the first light ray and traveling from

another part of the apparent image of the patterned object to the lens plane. In order to achieve

this result, angles $\gamma$ and $\delta$ must be formed to substantially equalize a path length of a first light

ray traveling from one part of the apparent image of the patterned object to the lens plane with a

path length of any other light ray substantially parallel to the first light ray and traveling from

another part of the apparent image of the patterned object to the lens plane. Thus, the JP '368

Publication discloses "wherein the angles $\gamma$ and $\delta$ are formed to substantially equalize a path

length of a first light ray traveling from one part of the apparent image of the patterned object to

the lens plane with a path length of any other light ray substantially parallel to the first light ray

and traveling from another part of the apparent image of the patterned object to the lens plane."

Because the JP '368 Publication discloses the preamble and every limitation of Claim 1

of the '020 Patent, Claim 1 of the '020 Patent is anticipated by the JP '368 Publication.

### 3.  Dependent Claim 7 of The '020 Patent Is Anticipated By The JP '386 Publication

The JP '386 Publication discloses every limitation of Claim 7 of the '020 Patent.

With respect to the first component of Claim 7 of the '020 Patent, the JP '386 Publication

discloses "wherein: the light refractor includes: a first edge opposite the imaging surface and

adjacent to the viewing surface." This limitation can be better understood by reference to FIG. 1

of the JP '386 Publication:



Figure 1 of The JP '386 Publication

FIG. 1 of the JP '398 Publication shows a first edge opposite the imaging surface (24) and

adjacent to the viewing surface.

    With respect to the second component of Claim 7 of the '020 Patent, the JP '386

Publication discloses "and the light source is a strip of light emitting diodes (LEDs) oriented

towards and parallel with the viewing surface and adjacent to the first edge." For example, the

JP '386 Publication discloses:

> The reference number 11 is a light source including light emitting
> diodes (LEDs) arranged in a line. [The JP '386 Publication at
> 4:16-17.]

Thus, the JP '386 Publication discloses every limitation of Claim 7 of the '020

Patent.

### 4.    Claim 12 of The '020 Patent Is Anticipated By The JP '368 Publication

    Claim 12 of the '020 Patent is anticipated by the JP '368 Publication. As described

above with respect to the apparatus described in Claim 1 of the '020 Patent, the JP '368

Publication describes a method for "imaging a patterned object." The JP '368 Publication

discloses this first step, "providing a light refractor having an imaging surface, a viewing surface

and a further surface," *see, e.g.,*

> The reference number 1 indicates a finger having a fingerprint that
> will be captured and the reference number 21 denotes a right
> triangular prism. [The JP '368 Publication at 4:12-14.]

> A first surface 22 of the right triangular prism 21 constitutes a
> fingerprint-contacting surface. [The JP '368 Publication at 4:14-
> 16.]

> The fingerprint-contacting surface. [The JP '368 Publication at
> 5:3.]

> A fingerprint recognition apparatus of the present invention uses a
> 1-dimensional image sensor as a light-receiving device and moves
> the 1-dimensional image sensor and a lens in parallel with an
> apparent location of a fingerprint-contacting surface. [The JP '368
> Publication at 3:12-15.]

> The light is totally reflected at a curved portion of the fingerprint
> and is projected almost perpendicularly on a third surface 24 (the
> other of the surfaces that are formed at a right angle to each other).
> [The JP '368 Publication at 4:23-5:1.]

It can also be seen from FIG. 1 of the JP '368 Publication that item C is a disclosure of a

further surface as described and claimed in the '020 Patent.

The next step also is disclosed in the JP '368 Publication, "forming an angle δ between a

plane defined by the viewing surface and a plane defined by the imaging surface." It can be seen

from FIG. 1 of the JP '368 Publication that the viewing surface (24) forms an angle (here called

"gamma") with the imaging surface (22).

The next step also is disclosed in the JP '368 Publication, "placing the patterned object

against the imaging surface of the light refractor," *see, e.g.,*

> The reference number 1 indicates a finger having a fingerprint that
> will be captured and the reference number 21 denotes a right
> triangular prism. A first surface 22 of the right triangular prism 21

> constitutes a fingerprint-contacting surface. [The JP '368
> Publication at 12-16.]

The next step also is disclosed in the JP '368 Publication, "projecting incident light into

the light refractor," *see, e.g.*,

> The reference number 11 is a light source including light emitting
> diodes (LEDs) arranged in a line. [The JP '368 Publication at
> 4:16-17.]

The next step also is disclosed in the JP '368 Publication, "scattering the incident light off

the imaging surface and patterned object and through the viewing surface," *see, e.g.*,

> The light emitted from the light source 11 is projected almost
> perpendicularly on a second surface 23 (one of surfaces that are
> formed at a right angle to each other) of the prism 21 and is
> obliquely incident on the fingerprint-contacting surface 22. The
> light travels out of the prism at a ridge portion of the fingerprint.
> The light is totally reflected at a curved portion of the fingerprint
> and is projected almost perpendicularly on a third surface 24 (the
> other of the surfaces that are formed at a right angle to each other).
> [The JP '368 Publication at 4:17-5:1.]

The next step also is disclosed in the JP '368 Publication, "providing a lens adjacent to

the viewing surface," *see, e.g.*,

> A lens for forming an image on the fingerprint-contacting surface
> by collecting light reflected from the fingerprint-contacting
> surface. [Claim 2 of the JP '386 Publication.]

> The reference number 32 indicates a lens for forming an image of
> the fingerprint-contacting surface by collecting the light passing
> through the third surface. [The JP '386 Publication at 5:2-4.]

The next step also is disclosed in the JP '368 Publication, "forming an angle δ between

the plane defined by the viewing surface and a lens plane of the lens." It can also be seen from

FIG. 1 of the JP '368 Publication that an angle δ is formed between the plane defined by the

viewing surface and a lens plane of the lens.

The next step also is disclosed in the JP '368 Publication, "fixing angles δ and angle γ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane," *see, e.g.,*

> The line X-Y is in parallel with line A'-B' indicating an apparent
> location (i.e., a virtual image location) of the fingerprint contact
> surface 22 (illustrated by line A-B). [The JP '368 Publication at
> 5:16-18.]

It can also be seen from FIG. 1of the JP '368 Publication that the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane.

Accordingly, Union Community respectfully submits that Claim 12 of the '020 Patent is anticipated by the JP '368 Publication.

### D.    Claims 1 and 12 Are Obvious Over the JP '368 Publication in View of the GB '483 Patent

#### 1.    Claim 1 of The '020 Patent Is Obvious Over the JP '368 Publication in View of the GB '483 Patent

Claim 1 of the '020 Patent is obvious over the JP '368 Publication in view of the GB '483 Patent. Both the JP '368 Publication and the GB '483 Patent were published more than one year before the '020 Patent was filed and together disclose every element of Claim 1 of the '020 Patent.[5] It would have been obvious to one of skill in the art to combine the JP '368 Publication with the teachings of the GB '483 Patent to arrive at Claim 1 of the '020 Patent. The Examiner

---

[5] The JP '368 Patent was published in the Japanese Patent Gazette on December 8, 1998 and the 'GB '483 Patent published in the British Patent Gazette on August 9, 1978.

that allowed the '020 Patent to issue did not have either of the JP '368 Publication or the GB '483 Patent before her when she made her decision regarding allowability of claim 1 of the '020 Patent.

The JP '368 Publication is another example of a reference, filed well before the '020 Patent, which teaches every element of Claim 1 of the '020 Patent -- with the possible exception of "wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane." However, based on the teachings of the GB '483 Patent, one of ordinary skill in the art would have been motivated to use angles γ and δ to substantially equalize path lengths of light rays traveling from different parts of the apparent image.

The GB '483 Patent describes "an apparatus for forming an image of a fingerprint pattern for comparison with a stored patent." [The GB '483 Patent at 49-52.] The GB '483 Patent recognizes that trapezoidal distortion occurs is the light rays traveling from different parts of the apparent image are different lengths. To solve the problem of trapezoidal distortion, the GB '483 Patent discloses tilting the optical pick off device 12:



Figure 1 from the GB'483 Patent

At page 3 lines 47-49, the GB '483 patent describes that every point of an effective object 6 (corresponding to the "apparent image" of the '020 Patent) forms an image on an optical pick-off input plane 13 of an optical pick-off device 12 to focus the image. By inclining the optical pick-off device 12 in response to the effective object 6, lengths of light paths from all points of the effective object 6 to the image 13 of the optical pick-off device 12 are equalized, thereby focusing the image at all points.

Based on this disclosure, one of skill in the art understands that (1) the optical axis of the lens coincides with the light path direction and (2) the lengths from the fingerprint image to the lens plane are equalized. This is because, when the optical pick-off device is inclined "the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane."

Thus, "wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane," has been well known to a person of ordinary skill in the art prior to the time the '020 Patent was filed.

Accordingly, the combination of the JP '368 Publication and the GB '483 Patent teaches each limitation of Claim 1 of the '020 Patent and renders Claim 1 of the '020 Patent invalid as obvious under 35 U.S.C. § 103. Exhibit 9, details the unpatentability of Claim 1 of the '020 Patent over the JP '368 Publication further in view of the GB '483 Patent in the form of a claim chart.

2.    **Claim 12 of The '020 Patent Is Obvious Over The JP '368 Publication In View of The GB '483 Patent**

Claim 12 of the '020 Patent is obvious over the JP '368 Publication in view of the GB '483 Patent.

Based on the teachings of the GB '483 Patent, one of ordinary skill in the art would have been motivated to use angles γ and δ to substantially equalize path lengths of light rays traveling from different parts of the apparent image.

The GB '483 Patent describes "an apparatus for forming an image of a fingerprint pattern for comparison with a stored patent." [The GB '483 Patent at 49-52.] To solve the problem of trapezoidal distortion, the GB '483 Patent discloses tilting the optical pick off device 12. By inclining the optical pick-off device 12 in response to the effective object 6, lengths of light paths from all points of the effective object 6 to the image 13 of the optical pick-off device 12 are equalized, thereby focusing the image at all points.

Thus, "fixing angles δ and angle γ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane" has been well known to a person of ordinary skill in the art prior at the time the application for the '020 Patent was filed.

Accordingly, the combination of the JP '368 Publication and the GB '483 Patent teaches each limitation of Claim 12 of the '020 Patent and renders Claim 12 of the '020 Patent invalid as obvious under 35 U.S.C. § 103. Exhibit 9, details the unpatentability of Claim 12 of the '020 Patent in view of the JP '368 Patent further in view of the GB '483 Patent in the form of a claim chart.

## VIII.   SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

As detailed in Section VII, the US '347 Patent renders Claims 1, 6, 7, and 12 of the '020 Patent invalid for double patenting.

The KR '344 Patent anticipates Claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the '020 Patent.

The JP '368 Publication anticipates Claims 1, 7, and 12 of the '020 Patent.

Claims 1 and 12 of the '020 Patent are rendered obvious over the JP '368 Publication in view of the GB '483 Patent.

The JP '368 Publication and GB '483 Patent were not considered during the original examination and a reasonable Examiner would consider their teachings important in determining the patentability of these Claims.

The US '347 Patent was considered during the original examination but the Examiner considered the US '347 Patent before SecuGen amended the claims such that the US '347 Patent and the '020 Patent claim the same invention or an obvious variation thereof. Thus, the Examiner did not meaningfully review the US '347 Patent for double patenting on March 24, 2001 because the Examiner did not have the amendments that were made on August 24, 2001. [Exhibit 15 and Exhibit 24]. A reasonable Examiner would consider the US '347 Patent's teachings important in determining the patentability of these Claims.

The US '347 Patent, JP '368 Publication, and GB '483 Patent raise substantial new questions of patentability with respect to at least Claims 1, 6, 7, and 12 of the '020 Patent.

Because the Examiner only considered the English-language Abstract for the KR '344 Patent, the KR '344 Patent also raises substantial new questions of patentability with respect to at least Claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the '020 Patent.

## IX.    CONCLUSION

For the reasons set forth above, Union Community respectfully requests reexamination of Claims 1-19 of the '020 Patent.

In the unlikely event that the transmittal letter is separated from this document and the Patent Office determines that relief is required, Union Community authorizes the Commissioner to charge the cost of such petitions and/or other fees due in connection with the filing of this document to **Deposit Account No. 130480** referencing docket no. 95215968.2000001.


Dated:  August 6, 2008          Respectfully submitted:/s/April Wurster       
                                           April Wurster (Reg. No. 59623)

**Exhibit C**



# United States Patent and Trademark Office
## Performance and Accountability Report
## Fiscal Year 2007



accountability



results

innovation



creativity





global

*Transforming for the Future Today*

| TABLE 13A | EX PARTE REEXAMINATION (FY 2003 - FY 2007) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2003** | **2004** | **2005** | **2006** | **2007** |
| **Requests filed, total** | **392** | **441** | **524** | **511** | **643** |
| By patent owner | 136 | 166 | 166 | 129 | 124 |
| By third party | 239 | 268 | 358 | 382 | 519 |
| Commissioner ordered | 17 | 7 | - | - | - |
| **Determinations on requests, total[1]** | **381** | **419** | **537** | **458** | **594** |
| Requests granted: | | | | | |
| By examiner | 360 | 408 | 509 | 422 | 575 |
| By petition | 1 | - | 2 | 5 | 2 |
| Requests denied | 20 | 11 | 26 | 31 | 17 |
| **Requests known to have related litigation** | **109** | **138** | **176** | **229** | **369** |
| **Filings by discipline, total** | **392** | **441** | **524** | **511** | **643** |
| Chemical | 124 | 130 | 138 | 118 | 133 |
| Electrical | 118 | 156 | 188 | 228 | 275 |
| Mechanical | 150 | 155 | 198 | 165 | 235 |

[1] *Past years' data have been revised from prior year reports.*

| TABLE 13B | INTER PARTES REEXAMINATION (FY 2003 - FY 2007) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **2003** | **2004** | **2005** | **2006** | **2007** |
| **Requests filed, total** | **21** | **27** | **59** | **70** | **126** |
| **Determinations on requests, total** | **20** | **25** | **57** | **47** | **119** |
| Requests granted: | 18 | 25 | 54 | 43 | 118 |
| By examiner | 18 | 25 | 54 | 43 | 118 |
| By petition | - | - | - | - | - |
| Requests denied | 2 | - | 3 | 4 | 1 |
| **Requests known to have related litigation** | **7** | **5** | **29** | **32** | **81** |
| **Filings by discipline, total** | **21** | **27** | **59** | **70** | **126** |
| Chemical | 3 | 6 | 17 | 17 | 30 |
| Electrical | 7 | 7 | 20 | 27 | 53 |
| Mechanical | 11 | 14 | 22 | 26 | 43 |

**Exhibit D**

February 8, 2006

# THE USE OF *INTER PARTES* AND *EX PARTE* REEXAMINATION IN PATENT LITIGATION

**David M. O'Dell**
**David L. McCombs**
**Haynes and Boone, LLP**
**901 Main Street, Suite 3100**
**Dallas, TX 75202**

David M. O'Dell
David.ODell@haynesboone.com
(972) 739-8635

David L. McCombs
David.McCombs@haynesboone.com
(214) 651-5533

**TABLE OF CONTENTS**

I.  INRODUCTION ........................................................................................................ 1

II.  THE REEXAMINATION PROCESS ...................................................................... 2
    A.  *Ex Parte* Reexamination .................................................................................. 2
    B.  *Inter Partes* Reexamination ............................................................................ 3
    C.  Substantial New Question of Patentability .................................................... 3
    D.  Reexamination Statistical Analysis ................................................................ 4

III.  REEXAMINATION COINCIDENT WITH PATENT LITIGATION .................... 5
    A.  Reexamination Can Stay Litigation ................................................................ 5
    B.  Reasons to Request Reexamination ................................................................ 5
    C.  Reasons Not to Request Reexamination ......................................................... 6

IV.  REEXAMINATION STRATEGIES ......................................................................... 7
    A.  Choosing Between *Ex Parte* and *Inter Partes* Reexamination ................ 7
    B.  When to File ..................................................................................................... 8
    C.  What to Include With Your Request(s) ........................................................... 9
    D.  Potential Changes That May Affect the Reexamination Process .................. 9

V.  CONCLUSION ...................................................................................................... 10

**The Use of *Inter Partes* and *Ex Parte* Reexamination in Patent Litigation**[1]

## I. INTRODUCTION

Without question, corporate America bears substantial cost associated with ever-increasing accusations of patent infringement and defense of patent infringement law suits. Typical defenses to an allegation of patent infringement include noninfringement and invalidity. However, the latter defense suffers from a relatively poor track record—courts and juries are reluctant to second guess the Patent Office to find a patent invalid. In fact, to avoid inconsistent themes at trial, some litigants choose to deemphasize the invalidity portion of their case and focus their energy primarily on noninfringement.

There is another avenue outside of the district court setting by which an alleged infringer can challenge the validity of a patent. Over the last few decades, Congress has enacted legislation that allows the alleged infringer, or any third party, to request a reexamination of a patent through an administrative procedure in the Patent Office. This legislation includes the Patent Act of 1980, in which the *ex parte* reexamination procedure was established, and the American Inventor's Protection Act of 1999, in which the *inter partes* reexamination procedure was established.

Our experience has shown that under the right circumstances, patent reexamination can be used effectively as part of a defendant's litigation strategy. It opens up a new front in the case that can create many new levels of uncertainty for the plaintiff-patentee in terms of time to trial, estoppels and claim construction, intervening rights, and the overall likelihood that the claims in the patent will be found invalid. It also creates a separate opportunity for preservation of rights on appeal.[2]

But reexamination is not without risk. As for *ex parte* reexamination, it is often regarded as insufficient because after a reexamination is ordered, the third party's participation is limited to one statutory reply prior to the examination process, which may only be filed if the patent owner files a pre-examination

optional statement. The *inter partes* reexamination procedure was intended to address this apparent defect as to third-party requester participation and to provide an inexpensive way, as compared with litigation, for a third party who discovers new prior art to challenge the patent in the Patent Office and then participate in both the examination and appeal stages of the proceeding. But *inter partes* reexamination has not been pursued routinely for fear it will backfire with an affirmation of the patent claims by the Patent Office, creating estoppel in the litigation.[3] As a result, neither *ex parte* nor *inter partes* reexamination has been utilized to the degree envisioned when enacted by Congress.

Recently though, an increasing number of litigants are giving serious consideration to use of the reexamination procedure. This is especially true in hyper-technical cases that may not play well to a jury, or in circumstances where invalidity is particularly blatant and based on prior art that was not available during the original prosecution of the patent.

A new look at reexamination as a potentially attractive option is further being fueled by shifts at the Patent Office to improve patent quality (and avoid publicity for poorly examined patents). In the summer of 2005, the Patent Office formed a Central Reexamination Unit for the purpose of improving quality and efficiency of the reexamination process, and there are an enormously high percentage of reexamination requests now being granted.[4] Although the *inter partes* reexamination procedure is too new to provide meaningful statistics on ultimate outcomes, circumstances suggest that the Patent Office is taking clear steps to make both forms of reexamination an attractive option for challenging patents in today's

---

[1]    January 24, 2006. Authored by David M. O'Dell and David L. McCombs of Haynes and Boone, LLP.

[2]    In 2002, in order to make the optional *inter partes* reexamination procedures a more attractive alternative to litigation, the *inter partes* reexamination practice was expanded to provide third parties the right to appeal to the U.S. Court of Appeals for the Federal Circuit and to participate in the patent owner's appeal to the Court. *See*, 21st Century Department of Justice Appropriations Authorization Act, Pub. L. 107-273, 116 Stat. 1758, 1899-1906 § 13202 (2002).

[3]    An estoppel adverse to a third-party requester (which does not exist in *ex parte* reexamination) will attach in the case of an *inter partes* reexamination, if the requester is unsuccessful in the *inter partes* reexamination proceeding. The requester would be estopped from later asserting in any civil action, or in a subsequent *inter partes* reexamination, the invalidity of any claim finally determined to be valid and patentable on any ground the third-party requester raised or could have raised in the *inter partes* reexamination. 35 U.S.C. § 315(c) (2006). Also, the requester would be estopped from later challenging in a civil action any "fact" determined in the *inter partes* reexamination. Optional *Inter Partes* Reexamination Procedure Act of 1999 § 4607 (uncodified).

[4]    *See*, http://www.uspto.gov/web/offices/pac/ dapp/patentlegaladminmain.html. Ninety-one percent and ninety-five percent of requests for *ex parte* and *inter partes* reexaminations, respectively, are granted according to recent government statistics. *See also, infra*, Appendix A.

environment. More parties are now testing these waters as part of their defense of patent assertions.[5]

When reexamination is pursued, it is important to go into reexamination with a significant amount of procedural knowledge and in a manner that is a well coordinated part of the litigation strategy. Fundamental questions should be addressed early in the litigation that begin with the threshold inquiry of whether or not a reexamination should be filed. If so, the analysis proceeds with what type or types of reexamination to file, how to prepare a request with the highest chances of success, how to craft the request to best drive important claim construction issues in the case, and when to file the request. Also for consideration is the impact the reexamination might have on the development of other defenses including inequitable conduct, on-sale bar, prior public use, and how to best maximize such parallel defenses. Additionally, worst case scenarios need to be addressed, including how to reduce the effect of a reexamination not being granted for a particular claim, or the claims being amended to improve their likelihood of being found valid while maintaining their likelihood of being found infringed.

## II. THE REEXAMINATION PROCESS

Reexamination is one of four ways by which a patent can be "corrected" or amended.[6] Reexamination is unique in that it can be requested by anyone, and not just the patent owner.[7] There are two types of reexamination: *Ex parte* reexamination and *inter partes* reexamination. *Ex parte* reexamination is available for all pending patents, while *inter partes* reexamination is only available for patents that were filed after November 29, 1999.[8]

### A.   *Ex Parte* Reexamination

Congress enacted *ex parte* reexamination in 1980 by the creation of 35 U.S.C. §§ 301-307. The Rules of

Practice governing *ex parte* reexamination are provided in 37 C.F.R. 1.510 - 1.570. The Manual of Patent Examining Procedure (MEPP) provides additional detail in Chapter 2200, titled "Citation of Prior Art and *Ex Parte* Reexamination of Patents."

An *ex parte* reexamination is initiated by filing a "Request for Reexamination." The request must identify a "substantially new question of patentability" based on published prior art references.[9] Multiple requests for *ex parte* reexamination can be filed, as long as each request has a substantial new question of patentability.[10] Issues such as inventorship, inequitable conduct, enablement, written description, and best mode cannot be raised in reexamination.[11]

Upon filing a request for *ex parte* reexamination, the Patent Office will reply with either a "grant" or "denial" within 90 days.[12] The grant will identify which claims are subject to reexamination, and at least one reference supporting the grant of the reexamination. If the reexamination has been granted, the patent owner optionally may file a response, or "statement", to the grant, that can include the canceling or amending of any claims, or a correction of inventorship.[13] If and only if the patent owner files a response, the requester may then file a reply to this response.[14] Otherwise, the requester is no longer able to participate in the reexamination, nor any appeals therefrom. Following the grant and any responses or replies, the examiner will issue an Office Action.[15] Subsequent prosecution of an *ex parte* reexamination by the patent owner is similar to that of a utility patent application, with some differences in amendment formats and timing.[16]

---

[5]   While only 53 *inter partes* reexamination requests were filed in the first five years that the procedure was available, within the last year alone more than 50 new *inter partes* requests have been filed. *See*, United States Patent And Trademark Office Report To Congress On Inter Partes Reexamination available at http://www.uspto.gov/web/offices/dcom/olia/reports/reexam_report.htm and Appendix B.

[6]   The four ways are: 1) reexamination; 2) reissue; 3) certificate of correction; and 4) disclaimer. *See generally*, Patent & Trademark Office, Manual of Patent Examining Procedure, Ch. 1400 (8th Ed. 2004) ("MEPP").

[7]   An interference proceedings can also be initiated by a third party, but this proceeding has a different set of requirements that is beyond the scope of the present paper. 35 U.S.C. § 135. *See also*, MEPP Ch. 2300.

[8]   37 C.F.R. § 1.913 (2004).

[9]   35 U.S.C. § 303 (2006).

[10]   *See*, 37 C.F.R. § 1.565(e) (2004). Note, however, that the same prior art reference may be used to start a second reexamination during the pendency of the first reexamination "only if the prior art cited raises a substantial new question of patentability which is different than that raised in the pending reexamination proceeding." MEPP § 2240.

[11]   *See*, MEPP § 2217. The requirements of 35 U.S.C. § 112 can be addressed for the purpose of determining a priority date of a claim, if the application is a continuation, divisional, or continuation-in-part of another application. Id. Also, the patent owner can make corrections to inventorship during the reexamination. 37 C.F.R. § 1.530(l) (2004).

[12]   *See*, 35 U.S.C. § 303(a) (2006) and 37 C.F.R. § 1.515(a) (2004).

[13]   37 C.F.R. § 1.530 (2004).

[14]   35 C.F.R. § 1.535 (2004).

[15]   Office Actions should be produced with "special dispatch". 35 U.S.C. § 305 (2006).

[16]   *See*, 37 C.F.R. §§ 1.111, 1.550 (2004), and MEPP § 2266.

Arguably, the biggest drawback of *ex parte* reexamination is the inability of a third party requester to remain involved in the process. This drawback is squarely addressed by the creation of the *inter partes* reexamination process, discussed below.

## B.    *Inter Partes* Reexamination

Congress enacted the *inter partes* reexamination procedure in 1999 as set forth in 35 U.S.C. §§ 311-318. The Rules of Practice governing *inter partes* reexamination are provided in 37 C.F.R. 1.902-1.997. The Manual of Patent Examining Procedure (MPEP) provides additional detail in Chapter 2600, entitled "Optional *Inter Partes* Reexamination."

*Inter partes* reexamination includes many similarities to an *ex parte* reexamination but, as its name implies, allows for participation by the requester throughout the process.    Similar to *ex parte* reexamination, an *inter partes* reexamination is initiated by filing a "Request for Reexamination" that will be granted if the request raises a "substantial new question of patentability" based on published prior art references.[17]    Issues of inventorship, inequitable conduct, enablement, written description, and best mode cannot be raised.[18]

In addition to the continued involvement of the third party requester, which will be discussed in greater detail below, there are several other differences between *ex parte* and *inter partes* reexamination. Most significantly, a requester can only file one request for *inter partes* reexamination, unless it can be shown that the requester could not have raised the issue at the time of filing the prior request.[19]    Also, the requester is estopped from asserting at a later time in litigation the invalidity of any claim finally determined to be valid on any ground raised or that could have been raised during the reexamination proceedings.[20]

Another difference between *ex parte* and *inter partes* reexamination is that in *inter partes* reexamination, the first Office Action is usually provided at the same time as the grant, at 90 days following the filing of the request.[21]    As compared with

*ex parte* reexamination, the result is a much faster initial rejection of the claims.[22]

Throughout the *inter partes* reexamination process, the requester remains involved with substantive communications between the patent owner and the Patent Office.    Specifically, 35 U.S.C. § 314 states:

> Each time that the patent owner files a response to an action on the merits from the Patent and Trademark Office, the third-party requester shall have one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto, if those written comments are received by the Office within 30 days after the date of service of the patent owner's response.

It is noted that the third party can comment on the Office Action, the patent owner's response, or both. This involvement continues through the appeal process, and even includes the ability of the third party requester to file appeals to the board of patent appeals and interferences (BPAI) and to the Court of Appeals for the Federal Circuit.[23]    Note, however, that for some filings and Patent Office actions, such as requests for extensions of time by the patent owner or their grant, the third party requester is not entitled to comment.[24]

## C.    Substantial New Question of Patentability

The primary requirement for obtaining a grant for reexamination is to prove that a "substantial new question of patentability" exists.[25]    Exactly what constitutes a substantial new question of patentability is determined on a case-by-case basis, but the following guidelines provide some indication:

1.    A patent or printed publication that applies to at least one claim of the patent will be sufficient to warrant the reexamination of all claims in the patent. MPEP §§ 2216, 2258.

2.    "The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office." 35 U.S.C. § 303(a) (amended Nov. 2, 2002).

---

[17]    35 U.S.C. § 312 (2006).

[18]    *See*, MPEP §§ 2616, 2617. However, the requirements of 35 U.S.C. § 112 can be addressed for the purpose of determining a priority date of a claim, if the application is a continuation, divisional, or continuation-in-part of another application. *See*, MPEP § 2617. Also, it is noted that the patent owner can make corrections to inventorship during the reexamination. 37 C.F.R. § 1.530(I) (2004).

[19]    37 C.F.R. § 1.907 (2004).

[20]    35 U.S.C. § 315. Note however, the references can be used at trial for other reasons, such as to support an allegation of inequitable conduct. *Id.*

[21]    See 37 C.F.R. § 1.935 (2004) and MPEP § 2660.

[22]    In an *ex parte* reexamination, it is not unusual for an Office Action to be provided more than 6-11 months after the grant is issued. *See, e.g.*, the transaction histories of Reexam Ser. Nos. 90/007,300 and 90/007,310, which are publicly available on the Public Patent Application Information Retrieval ("Public PAIR") website at http://portal.uspto.gov/external/portal/pair.

[23]    35 U.S.C. § 315.

[24]    *See, e.g.*, MPEP § 2665.

[25]    35 U.S.C. § 304.

3.      A new reference being submitted in a § 103 combination with a prior reference that has previously been before the Patent Office may present a substantial new question of patentability. *In re Hiniker*, 150 F.3d 1362 (Fed. Cir. 1998).

4.      Affidavits or declarations of an expert, in conjunction with a prior art patent or printed publication, may be used to determine if a substantial new question of patentability exists. MPEP §§ 2217, 2258.

5.      Admissions of the patent owner, in conjunction with a prior art patent or printed publication, may be used to determine if a substantial new question of patentability exists. MPEP § 2217.

6.      Prior art that serves only to provide evidence of prior public use is not sufficient to warrant reexamination. MPEP § 2217.

7.      Mere citation of a prior art reference, without explanation, is not sufficient to warrant reexamination. MPEP § 2217.

### D.      Reexamination Statistical Analysis

The Patent Office provides statistical information for both *ex parte* and *inter partes* reexaminations, reproduced in the Appendix A for the period through September 30, 2005.   Selected information is summarized as follows:

### *Ex Parte* Reexamination (Third Party Requester)

| 91% | Percentage of requests for reexamination granted |
|-----|-----|
| 29% | Percentage of reexaminations with all claims confirmed as valid |
| 12% | Percentage of reexaminations completed with all claims canceled |
| 59% | Percentage of reexaminations completed with claims amended |
| 22 mos. | Average pendency from filing to certificate being issued |
| 6-11 mos. | Recent average delay between filing and first Office Action[26] |

### *Inter Partes* Reexamination[27]

| 95% | Percentage of requests for reexamination granted |
|-----|-----|
| 0% | Percentage of reexaminations with all claims confirmed as valid |
| 100% | Percentage of reexaminations completed with all claims canceled |
| 0% | Percentage of reexaminations completed with claims amended |
| 30 mos. | Average pendency from filing to certificate being issued |

### Litigation Statistics[28]

| 38% | Percentage of claims ruled invalid over prior art patents and publications |
|-----|-----|

One caveat when comparing the litigation statistics to the reexamination statistics is that the patent owner is allowed to amend the claims in reexamination, but not in litigation.[29] With this caveat in mind, the above-listed statistics can be summarized as follows:

---

[26]   This data point is not directly reported by the Patent Office, but represents an estimate based upon the length of time for the last 10 *ex parte* reexaminations recently granted to receive their first Office Action.

[27]   Per the statistical information provided by the Patent Office, as of September 30, 2005, a total of 104 *inter partes* reexaminations requests had been filed, with just 3 having proceeded to completion.

[28]   *See,* http://www.patstats.org.  The data is for the 5 year period of 2000-2004.  This includes the combined results from summary judgments, jury verdicts, and appeals, and therefore there may be duplication of some data where a district court ruling is upheld on appeal, and vice versa.

It is noted that the standards of review of patent validity are different in litigation than for reexamination.  In litigation, the standard is clear and convincing evidence, while in reexamination, the standard is merely a preponderance of the evidence.  *See,* MPEP § 2684.04.

[29]   Of course whether or not the amended claims have the same potential for infringement as before the reexamination is determined on a case-by-case basis.  However, if the claims are amended, intervening rights may be created and additional arguments of prosecution history estoppel may have been created by the amendment.

**Chart Comparing Reexamination To Litigation**

| | |
|---|---|
| 71% | Percentage of claims that were either amended or canceled in reexamination |
| 12% | Percentage of claims that were canceled in reexamination |
| 38% | Percentage of claims ruled invalid in litigation over prior art patents and publications |

## III. REEXAMINATION COINCIDENT WITH PATENT LITIGATION

### A.    Reexamination Can Stay Litigation

"Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination."[30]    Several courts have used the following four factors to determine if a request to stay litigation should be granted:[31]

1.    Whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party.

2.    Whether a stay will simplify the issues in question and trial of the case;.

3.    Whether discovery is complete and whether a trial date has been set.

4.    Whether the request for reexamination was filed relatively early at trial.

### B.    Reasons to Request Reexamination

There are many reasons why it would be advantageous to file an *ex parte* or *inter partes* request for reexamination by an accused infringer (either in a patent litigation, or as an alternative to a declaratory action). Some of these reasons are discussed below.

1.    To invalidate one or more claims of the patent. Reexamination provides the opportunity to invalidate the claims of a patent through a proceeding in which invalidity need only be established by a preponderance of the evidence. Successful reexamination may cause complete cancellation of the patent in view of the prior art or result in the claims being amended in such a way that they can no longer be infringed.[32]

2.    To obtain additional prosecution history estoppel. Remarks by the patentee during reexamination may provide valuable prosecution history estoppels that significantly narrow the claim scope assertable under the doctrine of equivalence.

3.    To obtain additional evidence for use during claim construction. Remarks constituting prosecution history estoppel during reexamination, as well as statements made by the examiner during reexamination, may be submitted as evidence for consideration by the judge in a Markman proceeding.[33]

4.    To obtain intervening rights. Intervening rights occur when claims have been amended during reissue or reexamination. In summary, intervening rights permit a certain level of infringement to occur without the liability of damages.[34]

5.    To put a "cloud" on the validity of a patent. In litigation, a patent has the presumption of validity.[35] While a pending reexamination does not remove the presumption of validity, it may be influential on the trier of fact to know that the Patent Office considers that a "substantial new question of patentability" indeed exists. However, this information may ultimately be kept from the jury by a motion in limine.

6.    To stay the litigation. As discussed above, reexaminations can stay litigation. For an accused infringer, it may be advantageous to stay the litigation for various reasons, including promoting settlement or providing time to implement a design-around.

---

[30]    *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988). *See also*, 35 U.S.C. § 318, once an order for *inter partes* reexamination has been issued, "the patent owner may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent[.]"

[31]    *See, e.g.*, *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999); *Motson v. Franklin Covey Co.*, 2005 U.S. Dist. LEXIS 34067 (D.N.J. 2005); *Target Therapeutics, Inc. v. Scimed Life Systems, Inc.*, 1995 WL 20470 (N.D. Cal. 1995); *GPAC, Inc. v. DWW Enterprises, Inc.*, 144 F.R.D. 60, 66 (D.N.J. 1992); *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D.Del. 1991).

[32]    Broadly sweeping infringement contentions are often filed in litigation by the patentee, which can be used as admissions in reexamination to establish invalidity of the claims.

[33]    *But see*, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318 (Fed. Cir. 2003) in which comments made during deposition and reexamination were not influential on the Markman ruling.

[34]    35 U.S.C. §§ 307(b), 316(b) (2006). *See also*, MPEP §§ 2293, 2693.

[35]    35 U.S.C. § 282 (2006).

The Use of *Inter Partes* and *Ex Parte* Reexamination in Patent Litigation

7.    The patent examiner may better appreciate the prior art.    For some patents, the technology involved may be difficult to understand by a judge and jury.    If an invalidity argument is strong, but the technology is relatively difficult to understand or appreciate, it may be more desirable to have the validity issues resolved by an examiner who is already considered to be technically competent.[36]

8.    To overturn litigation results.    If a court finds that a patent is valid over the prior art, and the Patent Office finds that a patent is invalid over the same or different art, the patent will be deemed invalid.[37] Likewise, if a court finds that a patent is invalid over the prior art, and the Patent Office finds that a patent is valid over the same or different art, the patent will also be deemed invalid.[38]  In effect, the accused infringer has two chances to invalidate the patent (not including appeals).[39]

9.    In some courts, the odds of invalidating a patent are relatively low.    District courts exist in which the validity of patents are almost consistently upheld. In these districts, reexamination may be a more likely mechanism with which to invalidate a patent.

C.    **Reasons Not to Request Reexamination**

There are many reasons militating against the filing of an *ex parte* or *inter partes* request for reexamination by an accused infringer (either in a patent litigation, or as an alternative to a declaratory action).    Some of these reasons are listed and discussed below.

1.    Enhanced presumption of validity.    Patents are presumed valid, but a strong hypothetical argument can often be made that, had the examiner seen this "new" prior art reference, the patent would not have been allowed.    Reexamination effectively removes this

hypothetical argument, if the reexamination examiner still allows the claims over the prior art.  In this case the imprimatur of the Patent Office will be extremely difficult to overcome.

A way to counter this potential result is with a multi-pronged approach in which certain references are asserted in reexamination and others are reserved for the litigation.    If only *ex parte* reexaminations are being requested, then it may be desirable to limit the requests for reexamination to specific pieces of prior art, and hold other prior art for trial.  This approach may not be permissible where *inter partes* reexamination is involved.[40]

2.    For *inter partes* reexamination, the requester is not able to assert invalidity based on patents and printed publications in a later civil action.  In *inter partes* reexamination, the requester is "estopped from asserting at a later time, in any civil action . . . the invalidity of any claim finally determined to be valid and patentable on any ground which the third party requester raised or could have raised during the *inter partes* reexamination proceedings.    This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the *inter partes* reexamination proceedings."[41]

There are at least two ways to counter this result. One way is to file the *inter partes* reexamination *after* asserting invalidity in a civil action.    Arguably, this prohibition to assert invalidity at a later time only occurs after the closure of the *inter partes* reexamination process, so that the third party could potentially assert the invalidity of a claim in a civil action any time prior to the closure of the reexamination process.[42]

The second way to counter this result is to assert publications in the reexamination, and to instead rely upon assertions of public knowledge, public use, or on-sale bar evidence concerning the same technology at the trial.  This type of evidence to support an allegation of invalidity is still available in a later-filed civil action.

[36]    *See,*
http://www.uspto.gov/web/offices/ac/ahrpa/ohr/jobs/qualific ations.htm. Examiners are required to have either a technical degree or a combination of technical education and work experience in the art.
[37]    "[T]he existence of a final court decision of claim validity in view of the same or different prior art does not necessarily mean that no new question [of patentability] is present. This is true because of the different standards of proof and claim interpretation employed by the District Courts and the Office."  MPEP § 2286(II) (citing *In re Zletz,* 893 F.2d 319, 322 (Fed. Cir. 1989)).
[38]    "A final holding of claim invalidity or unenforceability (after all appeals), however, is controlling on the Office." MPEP § 2286(II) (citing *Ethicon v. Quigg,* 849 F.2d 1422 (Fed. Cir. 1988)).
[39]    *See also, Grayzel v. St. Jude Med., Inc.,* 2005 U.S. App. LEXIS 28690 (Fed Cir. Dec. 23, 2005).

[40]    37 C.F.R. § 1.907.
[41]    35 U.S.C. § 315.
[42]    Caution is warranted for this strategy. Judicial interpretation of 35 U.S.C. § 315 may differ from the interpretation being herein proposed. Also, the final determination of the reexamination process can occur relatively quickly. For example, the decision to deny a request for reexamination is a "final holding" (subject, of course, to petition). See MPEP 2640.

3.    The requester can only file one request for *inter partes* reexamination. Unless the requester can show that a prior art reference was unavailable prior to the filing of the prior request, a third party requester can only file one request for *inter partes* reexamination.[43]    This means that all prior art searching and analysis must be completed before filing the request. Also, although a later filed reexamination (either *inter partes* or *ex parte*) can be combined with an earlier filed request for *ex parte* reexamination, the same is not true for an earlier filed request for *inter partes* reexamination by the same third party requester.[44]

One way to counter this result is to diligently perform searches and analysis before the filing of the request. Since multiple *ex parte* reexaminations can be filed by the same third party, it may be desirable to request an *ex parte* reexamination at first, and when the searching and analysis are completed, to then file an *inter partes* reexamination presenting different arguments.    The    initially    filed    *ex    parte* reexamination(s) can be used to support various trial aspects, such as a motion to stay the litigation. The later-filed *inter partes* reexamination can then be used to allow the requester to become more involved in the reexamination process.[45]

4.    The patent owner may potentially add limitations to the claims by amendment that enhance the claim validity yet still read on the accused infringer.    In reexamination, the patent owner can amend the claims to make them more narrow, thereby potentially making the claims patentable over the prior art.[46]    In this case it may be possible for the patent owner to add limitations that still result in the claims covering the accused device.    This provides an opportunity for the patent owner that they would not normally have in litigation.[47]

It is a general rule that by narrowing its scope by amendment, a claim cannot be interpreted to cover something that it did not previously cover.[48]    In other words, if a party did not infringe before the amendment, it will not infringe after the amendment. Therefore    the    requester's    arguments    for noninfringement in the litigation cannot get worse, but they may improve.

If the amended claims are later found to be valid and infringed, the accused infringer may have intervening rights to use existing products without payment of any type of monetary damage.[49]

5.    There is a perception that patent examiners are more inclined to allow claims than to maintain a rejection.    Although this perception cannot be quantified, it is prevalent and therefore should be addressed.    The statistics provided above show that while it is rare that reexamination results in full cancellation of all claims, in the majority of cases the claims are initially rejected and then amended. (70% of *ex parte* reexams result in claim amendments; 12% result in all claims being canceled.  See section II, D, above.)    It is noted that the increased involvement of the third party requester in *inter partes* reexamination is likely to improve these statistics once meaningful data for *inter partes* reexaminations becomes available.

## IV.  REEXAMINATION STRATEGIES

Reexamination in the context of patent litigation involves several key, primary considerations. First of all, a choice must be made between *ex parte* and *inter partes* reexamination.  Next, a decision must be made as to when to file the request(s). Also, the request must be properly written to achieve the maximum probability of obtaining the desired results.

### A.    Choosing Between *Ex Parte* and *Inter Partes* Reexamination

As discussed above, there are many procedural differences between *ex parte* and *inter partes* reexamination that may effectively dictate which type of reexamination should or must be used.  If the patent at issue was filed after November 29, 1999, *inter partes* reexamination an available choice.

*Inter partes* reexamination is often a preferred mechanism due to the involvement of the third party requester throughout the reexamination and throughout appeal.  This comes with a price, however, with the

---

[43]    37 C.F.R. § 1.907.
[44]    *Id.* Note that unlike an *ex parte* reexamination, in an *inter partes* reexamination the requester must identify the real party in interest. 35 U.S.C. § 311(b)(1) (2006).
[45]    MPEP § 2686.01. Note that when multiple reexaminations are merged by the Patent Office, the examiner can combine the separately submitted references for a single rejection. *See, In re Bass*, 314 F.3d 575 (Fed. Cir. 2002).
[46]    "[T]he patent owner shall be permitted to propose any amendment to the patent and a new claim or claims, except that no proposed amended or new claim enlarging the scope of the claims of the patent shall be permitted." 35 U.S.C. §§ 305, 314(a) (2006).
[47]    Although the patent owner can request reissue or reexamination of their own patent, it is likely that any litigation will be stayed or dismissed in response to such an

action. That may not be the case if the third party is the one to request reexamination.
[48]    35 U.S.C. §§ 305, 314(a).
[49]    *See also, Honeywell Int'l v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1140 (Fed. Cir. 2004).

filing fee for inter partes reexamination being $8800, as compared $2520 for *ex parte* reexamination.[50] It should be noted that all prior art searching and analysis needs to be effectively completed at the time of filing the request—inter partes reexamination is one-shot opportunity.

If searching and/or prior art analysis has not been completed, then filing one or more requests for *ex parte* reexamination may be a good first step. An early request for reexamination may, in some instances, be sufficient to support the stay of the litigation if this is desired.

Also, the filing of an *ex parte* reexamination can be targeted to a particular issue. For example, if inequitable conduct is being asserted, filing an *ex parte* reexamination request directed to the particular prior art reference(s) that were known by the patentee, but that were not before the Patent Office, can be used to bolster the inequitable conduct allegation. Specifically, if the prior art creates a "substantially new question of patentability" such that the reexamination is granted, then it can more easily be concluded in the litigation that the prior art was indeed material.

Filing an *inter partes* reexamination request is often desirable because the Office Action is produced at the 90 day mark—the same time period when the grant or denial is due. In *ex parte* reexamination, the grant or denial is typically a 1-3 page document that states whether a substantially new question of patentability exists, but it does not go into a detailed examination of each and every claim. To the contrary, if the *inter partes* reexamination Office Action results in one or more claims being allowed, the patent owner may decide to drop all claims in the lawsuit, but for those allowed claims. Of course the requester has the opportunity to provide further remarks (but not additional prior art) to rebut the allowance of the claims, but the damage may already be done.

As mentioned above, multiple *ex parte* reexaminations can be filed, with the only thing stopping the requester being that no more substantial new questions of patentability exist, or if the requester files an *inter partes* reexamination request.[51] Therefore, it is often desirable to start filing *ex parte* reexamination requests early and often, and then finish with the filing of an *inter partes* reexamination request.

It may also be beneficial to file an *inter partes* request for reexamination on a related but unasserted patent. Consider the situation where there are two related patents – one filed before November 29, 1999, one filed after – and only the earlier filed patent is being asserted by the patent owner. The accused infringer can only file a request for *ex parte* reexamination on the asserted patent due to its filing date.[52] However, filing a request for *inter partes* reexamination on the latter patent as well may benefit the *ex parte* reexamination. For one, there is a strong possibility that the same examiner will reexamine both patents, so that the third party can make comments that potentially apply to both reexaminations. Even if separate examiners are being used, the third party comments may still be influential on the examiner in the other reexaminations.[53]

## B.    When to File

In the litigation context, requests for reexamination may be filed before the filing date of the lawsuit, at the beginning of the lawsuit, near the end of the lawsuit, after the lawsuit, or at multiple, staggered times throughout the litigation.

1.    Before the lawsuit. This choice is often not available because the accused infringer may not know litigation is imminent. If a threat of infringement is enough to create a case or controversy, the filing of a request for reexamination may be considered in conjunction with the potential filing of a declaratory judgment action. In some cases filing the of reexamination may be sufficient without initiating litigation. Also, filing the request before any litigation provides a strong argument for the court to grant a stay if litigation is subsequently filed.

2.    At the beginning of the lawsuit. This choice is often valuable in an attempt to maximize the possibility that a court will grant a stay of litigation. Also, filing early may bring about an early resolution of the dispute, or minimize the chance of injunction. However, filing a request for reexamination early often means that a first Office Action, or even a final resolution of the reexamination, could occur before trial. If the patent owner obtains a reexamination certificate (with claims in either original or amended form), the requester's arguments for invalidity at trial may be substantially weakened or unavailable.

---

[50]    37 C.F.R. §§ 1.20(c)(1)-(2) (2004).
[51]    In 2004, the Patent Office put into operation a new policy whereby the same prior art may be used to start a second *ex parte* reexamination during the pendency of the first reexamination "only if the prior art cited raises a substantial new question of patentability which is different than that raised in the pending reexamination proceeding." MPEP § 2240.

[52]    37 C.F.R. § 1.913 (2004).
[53]    In July of 2005, a Central Reexamination Unit (CRU) was formed at the Patent Office to handle all reexams. *See*, http://www.uspto.gov/web/offices/pac/dapp/patentlegaladmi nmain.html. This should facilitate communications between examiners, especially those examining related patents.

3.    Near the end of the lawsuit. Filing a request for reexamination near the end of litigation has certain advantages.    For example, the request(s) can be supported by admissions of the patent owner developed during the litigation, such as may be contained in infringement contentions, proposed claim constructions, and so forth. Patent owner admissions can, by themselves, create a substantial new question of patentability.[54]    Also, the mere grant of a reexamination may be influential to the trier of fact. Furthermore, a pending reexamination may be influential in any post-trial actions, including arguing against a potential injunction.    Finally, all prior art searching and analysis has probably been completed, so that an *inter partes* reexamination can be relatively straightforward to prepare.

4.    After the lawsuit. Although this may not be a common time frame to file a request for reexamination, it may be beneficial depending on the prior art identified and any agreements resulting from trial. If an ongoing royalty payment is required for as long as the patent is active, a reexamination may serve to reduce these payments.

5.    Multiple, staggered *ex parte* reexams.    If time permits, it may be beneficial to file multiple reexamination requests over an extended period of time. In this way, each new reexamination request can address shortcomings or inadequacies that the Patent Office has ruled upon in a prior request. This allows the requester to be more involved in the entire reexamination process, because each newly filed reexamination serves as a vehicle by which the requester can attempt to address problems in a prior reexamination.

C.    **What to Include With Your Request(s)**

    The following drafting points may help to increase the probability of success.

1.    Provide detailed claim charts for each reference. 35 U.S.C. § 301 requires that the requester explain "the pertinency and manner of applying such prior art to at least one claim of the patent[.]"    The requester should not assume that only a limited analysis needs to be furnished to the examiner for appreciation of the pertinency of the reference(s). Although the examiner may ultimately furnish significant independent analysis, which may include applying the reference(s) to additional claims or limitations, or crafting uninitiated rejections the requester should not rely on such action by the examiner.

2.    Provide alternative arguments.    It is not unusual to provide alternative arguments of invalidity. For example, a requester can assert that a prior art reference meets all of the claim limitations under 35 U.S.C. § 102, and in the alternative, meets all of the claim limitations under 35 U.S.C. § 103 when combined with a second prior art reference.

3.    Provide strong motivations to combine. It is not unusual for an examiner, upon reading an argument of obviousness under 35 U.S.C. § 103, to reply that the requester has not provided a sufficient motivation to combine or modify the references being asserted. The requester should be attune to the impropriety of hindsight in the combination of references and the importance of establishing a clear record as to the basis for a motivation to combine references, to aid the examiner.

4.    Provide a technology summary.    In hyper-technical cases a technology summary or overview may be helpful to the examiner in understanding the patent under reexamination.

5.    Consider including expert declarations. Expert declarations can provide helpful support for issues arising in reexamination. One common use is to explain the inherent teachings of a prior art reference. This may include test results or results of experimentation.

D.    **Potential Changes That May Affect the Reexamination Process**

    Both the Patent Office and Congress are proposing future statutory changes that, if enacted, will affect the reexamination process.

    When Congress enacted the American Inventors Protection Act of 1999, Congress required the Patent Office to submit, within five years of the enactment, a report evaluating whether *inter partes* reexamination proceedings were "inequitable to any of the parties," and if so, "recommendations for changes."[55]    The Patent Office's Report to Congress recommends an enhanced post-grant review process that is more comprehensive than, and different from, reexamination. It would include "closely controlled discovery and cross-examination."[56]

    Along these lines, the Committee Print of The Patent Act of 2005 (HR 2795) proposes a new post

---

[54]    37 C.F.R. § 1.104(c)(3) (2004).

[55]    *See*, United States Patent And Trademark Office Report To Congress On Inter Partes Reexamination available at http://www.uspto.gov/web/ offices/dcom/olia/reports/reexam_report.htm at 1, and Appendix B.
[56]    *Id.* at 8.

grant review law in the form of an "opposition" procedure that provides a post-grant right to oppose an issued patent within 9 months after the grant.[57] The issues that may be considered in the opposition include invalidity based on double patenting and any of the requirements for patentability under sections 101, 102, 103, 112, and the fourth paragraph of section 251.[58] Requests for reexamination filed by a third party during the nine month period shall be treated as a request for opposition, and no reexamination may be ordered based on such request.[59]

No such legislation has yet been enacted.

## V. CONCLUSION

While reexamination is not appropriate in every case, under the right circumstances it provides substantial benefits in the defense of a patent lawsuit as part of the overall litigation strategy.

---

[57]  *See*, H.R. 2795, 109th Cong. (2005), Section 9 and Appendix C.
[58]  *Id.*
[59]  *Id.*

**Exhibit E**

# Korean Intellectual Property Tribunal

## The 4th Department

## Trial Decision

| | |
|---|---|
| **CASE NO.** | 2007 dang 2296 |
| **DESCRIPTION OF CASE:** | Invalidation of Korean Patent No. 10-0469571-00-00, entitled 'Method and apparatus for reduction of trapezoidal distortion and improvement of image sharpness in an optical image capturing system' |
| **PETITIONER:** | UNION COMMUNITY Co., Ltd., at 44-3, Bangyi Dong, Songpa Gu, Seoul |
| **AGENT: REPRESENTING ATTORNEYS:** | BAE, KIM & LEE LLC In-kee KIM, Sung-hoon CHOI, and Eui-in HWANG at Hankook Tire Bldg., 647-15, Yoksam-Dong, Gangnam-Gu, Seoul |
| **DEFENDANT:** | SecuGen Corporation at 348 Montague Expressway Milipitas, CA 95035 |
| **REPRESENTING ATTORNEY:** | Won-jun KIM at 19th Fl., Trust Tower 275-7, Yangjae-Dong, Seocho-Gu, Seoul (FirstLaw Lee & Ko) |
| **REPRESENTING ATTORNEY:** | Sung-gu CHANG at 19th Fl., Trust Tower 275-7, Yangjae-Dong, Seocho-Gu, Seoul (FirstLaw Lee & Ko) |

1

SUBAGENT:    Hyun-gil RYU at C.P.O. BOX 8735,
18th Fl., Hanjin Main Bldg. 118, 2-Ka,
Namdaemun-Ro, Chung-Gu, Seoul
(Lee & Ko)

SUBAGENT:    Kyeong-su CHA at C.P.O. BOX 8735,
18th Fl., Hanjin Main Bldg. 118, 2-Ka,
Namdaemun-Ro, Chung-Gu, Seoul
(Lee & Ko)

SUBAGENT:    Se-Hwan CHOI at 19th Fl., Trust Tower
275-7, Yangjae-Dong, Seocho-Gu, Seoul
(FirstLaw Lee & Ko)

REPRESENTING ATTORNEY:    Sung-won YU at 19th Fl., Trust Tower
275-7, Yangjae-Dong, Seocho-Gu, Seoul
(FirstLaw Lee & Ko)

## DECISION

1. The amendment is approved.
2. Korean Patent No. 469571 is held to be invalid.
3. The petitioner is awarded trial cost.

## PETITIONER'S REQUESTS

1. Korean Patent No. 469571 is requested to be invalidated.
2. The defendant is requested to pay the trial cost.

## GROUNDS FOR DECISION

### 1. STATEMENT OF THE CASE

### I. PROCEDURAL SUMMERY OF THE SUBJECT PATENT

| | |
|---|---|
| i. Title of the invention: | Method and apparatus for reduction of trapezoidal distortion and improvement of image sharpness in an optical image capturing system |
| ii. Patentee: | Defendant |
| iii. International filing date: | August 4, 2000(Priority date: August 4, 1999) |
| iv. Korean filing date/filing No.: | February 1, 2002/10-2002-7001411 |
| v. Korean patent registration date/registration No.: | |
| | January 24, 2005/469571 |
| vi. Request for trial: | August 20, 2007 |
| vii. Request for amendment: | December 4, 2007 |

### II. CLAIMS OF THE SUBJECT PATENT
### ( Also refer to the drawings of Appendix 1)

Claim 1. A compact apparatus for forming a high contrast, low distortion image of a patterned object including:

a light refractor (310) for reflecting and refracting light, the light refractor including:

an imaging surface (318) against which the patterned object(335) to be imaged is to be placed;

a planar viewing surface through which an image of the object to be imaged is projected, the viewing surface forming a non-vanishing

angle $\gamma$ (342) with the imaging surface excluding 180 degrees; and

a further surface (322) adjacent to the imaging surface

at least one light source adjacent to the viewing surface and joined with the light refractor, for emitting incident light which enters the light refractor and hits the object placed on the imaging surface, to create an image of the patterned object at the viewing surface, and

at least one lens (314) formed outside of the light refractor and adjacent

3

to the viewing surface, and for receiving and focusing the image of the patterned object projected through the viewing surface as the image of the patterned object,

wherein the lens has a lens plane forming an angle δ (343), excluding 180 degrees, with the viewing surface, the lens plane which is perpendicular to an optical axis of the lens which passes through the center of the lens; and

wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane, by refracting the light ray which is irradiated from the light source, collided against the object and scattered off to reach the lens plane ('Subject claim 1').

2. The apparatus of claim 1 wherein the angles γ and δ meet the equation:

$$0.7 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.3 \quad \text{('Subject claim 2')}$$

3. The apparatus of claim 1 wherein the angles γ and δ meet the equation:

$$0.85 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.15 \quad \text{('Subject claim 3')}$$

4. The apparatus of claim 1 wherein the angles γ and δ meet the equation:

$$0.925 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.075 \quad \text{('Subject claim 4')}$$

5. The apparatus of one of claims 1 to 4 wherein the part of the imaging surface on which the image is formed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees (Subject claim 5).

6. (Canceled)

7. The apparatus of claim 1 wherein

the light refractor includes:

    a first edge opposite the imaging surface and adjacent to the viewing surface; and

the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface and adjacent to the first edge ('Subject claim 7).

8. The apparatus of claim 1 wherein: the at least one lens has a diameter; the object to be imaged has a length dimension; and the diameter of the at least one lens is smaller than the length dimension of the object to be imaged ('Subject claim 8).

9. A method of imaging a patterned object comprising:

providing a light refractor (310) having an imaging surface (318), a viewing surface (320) and a further surface (322);

forming an angle $\gamma$ (342), excluding 180 degrees, between a plane defined by the viewing surface and a plane defined by the imaging surface;

placing the patterned object (335) against the imaging surface of the light refractor;

projecting incident light into the light refractor;

providing a lens (314) outside of the light refractor and adjacent to the viewing surface, the lens having a lens plane perpendicular to a light axis passing through the center of the lens;

forming an angle $\delta$ (343), excluding 180 degrees, between the plane defined by the viewing surface and the lens plane of the lens;

scattering the incident light off the imaging surface and patterned object and through the planar viewing surface;

fixing angles $\delta$ and $\gamma$ to equalize a path length of a first light ray traveling from one part of an apparent image of the patterned object in the light refractor to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane, by refracting the light ray which is irradiated from the light

5

source, and collided against the object and scattered off to reach the lens plane ('Subject claim 9).

10. The method of claim 9 wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.7 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.3 \quad \text{('Subject claim 10')}$$

11. The method of claim 9 wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.85 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.15 \quad \text{('Subject claim 11')}$$

12. The method of claim 9 wherein the step of fixing angle δ and angle γ includes relating angle δ and angle γ according to the equation:

$$0.925 \le (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.075 \quad \text{('Subject claim 12')}$$

13. The method of one of claims 9 to 12 wherein the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees ('Subject claim 13).

## III. CITED INVENTIONS

(1) Cited invention 1 [Korean Patent Publication No. 10-1994-7344 (published on August 13, 1994) Refer to the drawings of Appendix 2]

Cited invention 1(presented by the petitioner as the 'Evidence A-3') relates to a fingerprint recognition apparatus, and discloses:

Claim 1
A fingerprint recognition apparatus comprising a light source (1), a triangular prism (8) having an imaging surface (8'), a capturing lens (9), and a charge coupled device (CCD; 10),
the light from the light source – LED array (6) – enters the prism (8) through a dispersing lens (7), the prism (8) fabricated to have a stable

6

angle, experiences reflection at the imaging surface (8') and then touches the semi-transparent surface (8''),

wherein some part of the light touching the semi-transparent surface (8'') passes through and the other part is reflected, and the passing part is used to capture the fingerprint image data by the CCD (10) via a capturing lens (9), and the reflected part escapes from the prism through the bottom (C), is reflected at a mirror (11) provided at a side and then goes through a lens (12) and a window (13) so as to be used to see whether the fingerprint image being captured is good enough or not.

Claim 2.

The fingerprint recognition apparatus of claim 1, wherein the apex angle

($\theta$) – the angle between imaging surface (8') and semi-transparent surface

(8'') -of the prism (9) meets the equation as follows:

$(\sin \theta)/n \approx \sin b \cdot \sin c, \quad d + e - f \approx \theta, \quad 52° < \theta < 72°, \quad c \neq 0$

where, n = refractive index, b = angle between the imaging surface (8') and the light reflected from it, c = angle between the light escaping the prism and the normal to the prism surface, d = angle between the semi-transparent face and the imaging surface (8'), e = angle between the semi-transparent face and the light reflected from the imaging surface (8'), f = angle between the bottom (C) of the prism and the light reflected from the semi-transparent face.

Cited invention 1 also discloses in the specification that:

"This invention aims to resolve the above-mentioned problems occurring in the prior arts, by providing an optical system of a fingerprint recognition apparatus constructed in a manner in which resultant values of specific formulas, which are not subject to the magnifications of lens, are applied as a result of analyzing the light path to cause the formation of the fingerprint at a complete vertical relation

with the light axis, and the apex angle $\theta$ of the top of the prism is set

within a predetermined range so that a complete image is focused on the CCD 4, thereby removing a possibility of having an error, and in

7

which the finger-applying person is allowed to apply his fingerprint at a more perfect position where he can monitor the status of the fingerprint input, that is, monitor the place where the fingerprint is brought into contact, thereby removing an error which may be occurred during the finger-applying process (Object of the invention).

"Fig. 3 shows the optical system of a fingerprint recognition apparatus according to the present invention, in which the light from the source – LED arrays – comes into the prism through a dispersing plate 7, and undergoes reflection at an imaging surface 8' towards the semi-transparent surface 8" so that some part of the light passes through the semi-transparent surface 8" and then the capturing lens 9 and enters the CCD 10 to be converted into electrical signals to recognize and determine the fingerprint. The other part is reflected off from the semi-transparent surface 8", and again reflected from the bottom C of the prism 8 so as to allow the fingerprint-applying person to check the fingerprint through the mirror 11, lens 12 and viewing hole 13 provided at the imaging view 8' The geometry of the prism must meet the conditions as follows: $(\sin\theta)/n \approx \sin b \cdot \sin c$ for the incident light; $d + e - f \approx \theta$ when the light is being reflected then transmitted; the apex angle $\theta$, which is made by the imaging surface and the semi-transparent surface 8" must lie between $52° < \theta < 72°$. The condition of $c \neq 0$ must be kept as well. When the materials used for the prism are changed, $\theta$ must be changed within above the range to meet the equation $(\sin\theta)/n \approx \sin b \cdot \sin c$. That is why $\theta$ is not a fixed value but lies in that range. (Detailed description of the invention)

"By applying appropriate value for the apex angle $\theta$ between the imaging surface and the semi-transparent surface of the prism, and applying appropriate formula for the angle of incidence and refractivity of the prism, the fingerprint image without distortion at almost vertical position is acquired as shown in Fig. 5, without being influenced by the magnifications of lens or refractivity. And when the fingerprint image moves horizontally and vertically, the relative coordinates remain unchanged so that the fingerprint can be focused on a desired location

with a desired size. Therefore, by constructing an image forming optical system based on the resultant values of specific formulas and variable θ, exact image of fingerprint can be acquired without having to increase the size of the optical system." (Effect of the invention)

**(2) Cited invention 2** [Japanese Patent Publication No. Sho 63-301368(Published on December 8, 1988), Refer to the drawings of Appendix 3]

Cited invention 2 (presented by the petitioner as the 'Evidence A-4') relates to a fingerprint recognition apparatus, and discloses that:

"It is an object of the present invention to provide a fingerprint recognition apparatus that can be designed to be small and obtain data of an image having a focused state at any point." (Technical Problem)

"...the "apparent location" means a virtual image location when the fingerprint-contacting surface is viewed from the lens and the light-receiving device. (...) when a real image is formed on the lens, a distance from the lens to the rear image (focal point) located behind the lens constantly remains if a distance from the virtual image to the lens constantly remains. (Detailed description of the invention)

"...a data based on an image having a focused state at every location of the fingerprint-contacting surface can be obtained. Additionally, since the distance from the fingerprint-contacting surface to the lens can be shortened, the apparatus can be minimized." (Effect of the invention)

**(3) Cited invention 3**[UK Patent Publication No. 1520433(Open to public in a periodical on August 8, 1978, Refer to the drawings of Appendix 4]

Cited invention 3 (presented by the petitioner as the 'Evidence A-5') relates to a fingerprint checking apparatus, and discloses in the specification that:

9

"Substantially only light scattered from portions (normally ridge tops) of the fingerprint in actual contact with the input face 4 of the prism 3 forms an effective object at 6 at the focal point of an imaging lens 11. Thus, rays 7, 7a from a representative point on the effective object 6 are focused at a point in the image plane of the lens 11. In the same manner, all points of the effective object 6 are similarly focused to form an image 13 at the input plane of an optical pick-off 12..."

**(4) Cited invention 4**[Korean Patent Publication No. 1998-63863(Published on October 7, 1998), Refer to the drawings of Appendix 5]

Cited invention 4 (presented by the petitioner as the 'Evidence A-6') relates to a fingerprint input apparatus, and discloses in the specification that:

"To realize such a compact fingerprint input apparatus, a surface-mounting type LED is often used as a light source. Fig. 35 shows the main part of a conventional fingerprint input apparatus. Referring to Fig. 35, reference numeral 6 denotes a light source (LED); 11, a substrate having a front surface 11F on which the LED 6 is mounted; 1 a prism; and 3, a light-receiving unit. This apparatus uses the optical path separation method. The substrate 11 having the LED 6 mounted thereon is placed on the right side of the lower surface side of the prism 1, and a black coating (or light-shielding plate) 1-2 is formed on the left-side surface of the prism 1. With this arrangement, light from the LED 6 is irradiated on a fingerprint collection surface A-B through the prism 1. In this arrangement, light reflected by the pattern surface of a finger placed on the fingerprint collection surface A-B and emerging from the prism 1 is formed into an image on an imaging plane (CCD) 3-2 through a lens 3-1 of the light-receiving unit 3.

10

"As shown in Figs. 38A and 38B, after the reflecting film 11-1 is formed on the substrate 11, an LED 6-1 is connected to the LED pads $P1_1$ and $P1_2$ through solder portions F, an LED 6-2 is connected to the LEDs $P2_1$ and $P2_2$ through solder portions F, an LED 6-3 is connected to the LED pads $P3_1$ and $P3_2$ through solder portions F, an LED 6-4 is connected to the LED pads $P4_1$ and $P4_2$ through solder portions F, an LED 6-5 is connected to the LED pads $P5_1$ and $P5_2$ through solder portions F, and an LED 6-6 is connected to the LED pads $P6_1$ and $P6_2$ through solder portions F."

## 2. PETITIONER'S ARGUMENT

I. Regarding Evidence A-1 to A-12, references 1 to 3

(1) In subject claims 1 and 9, the terms "substantially equalize" or "substantially parallel" are not clear enough to distinctively describe the scope sought.

(2) In subject claims 2 to 4, and subject claims 10 to 12, the error range between 7.5 and 30% of the equations indicates that the light rays cannot have substantially the same light path and thus is unclear and lacks support by the detailed description.

(3) In subject claims 5 and 13, the expression that "the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees" is unclear.

(4) In subject claim 8, the expression "the diameter of the at least one lens is smaller than the length dimension of the object to be imaged" is unclear.

(5) The subject patent is an incomplete invention which lacks enablement, and also lacks industrial applicability.

(6) The object of the subject patent is to provide an apparatus to resolve the trapezoidal distortion and acquire high contrast image. However, the object of cited invention 1 is to provide a fingerprint recognition apparatus for removing trapezoidal distortions by causing the pattern of a fingerprint to have a complete perpendicular relation with the optical axis thereby causing a complete image to be focused on a CCD. Therefore, the subject patent substantially has the same object as cited invention 1.

(7) The "light refractor" and "angles γ and δ" correspond to the "prism 8" and "angles θ and c" of cited invention 1.

(8) Cited invention 1 discloses the "LED 6" and "dispersing lens 7" which correspond to the "light source" and "lens" of subject claim 1.

(9) In subject claims 2 to 4 and subject claims 10 to 12, the equations simply provide numeric limitations, without any meaning as thresholds. Therefore, the inventions of subject claims 2 to 4 and subject claims 10 to 12 lose novelty and inventive step over cited invention 1.

(10) Subject claim 5 discloses the limitation in which "the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees". However, cited invention 1 discloses that the viewing surface (semi-transparent surface) and the further surface (bottom) are at an acute angle, which will inevitably cause an angle less than 90 degrees to form at the intersection between the light ray reflected from the fingerprint capturing surface (imaging surface) and the semi-transparent surface (viewing surface).

Therefore, the invention of subject claim 5 loses novelty or inventive step over cited invention 1.

(11) Subject claim 7 discloses the limitation in which "a strip of light emitting diodes (LEDs) adjacent to the first edge". However, cited invention 1 includes the first edge of the prism which is opposite to the imaging surface and adjacent to the viewing surface. Furthermore, cited invention 4 discloses, in the description and Figs. 35, 36, 38A, 38B, the use of LED as a light source, the LED located adjacent to the first edge which opposes the imaging surface and adjacent to the viewing surface, and the LED array (6-1 to 6-6) formed on the substrate 11. Therefore, the invention of subject claim 7 lacks inventive steps over cited inventions 1 and 4.

(12) Subject claim 8 discloses the limitation of the admitted prior art that the diameter of the lens is smaller than that of the fingerprint image. However, considering that the 'scattering' type fingerprint recognition system has generally used the above feature prior to filing of the subject patent, the invention of subject claim 8 loses inventive step over cited invention 1 and the admitted prior art.

(13) The subject patent provides the effects of image with the reduced or almost-removed trapezoidal distortion and a clear and perfect image with accurate focal point, but cited invention 1 provides the effects of accurate image of fingerprint, which is obtained without having to increase the size of the optical system, and also the high contrast image. Therefore, the subject patent has the identical effects as cited invention 1.

(14) The sale of fingerprint recognition mouse ("SMB-800") employing the defendant's fingerprint recognition sensor as a built-in system sometime during

July, 1997 (prior to the priority date of the subject patent, August 4, 1999) was confirmed (Evidence A-11), and the exact fingerprint recognition sensor was obtained (Evidence A-12).

(15) The defendant's product (OPP03A) applies the inventions of subject claims 1, 2, 5, 7 to 10 and 13 (as asserted by the defendant in pages 9, 10 and 12 of the suit which is presented as Evidence A-7). The fingerprint recognition sensor (OPP01) built in the fingerprint recognition mouse (Evidence A-9, A-10, A-12) has the identical structure as OPP03A.

(16) OPP01 built in the fingerprint recognition mouse (Evidence A-12) has the identical structure as the defendant's OPP03A, which corresponds to the inventions of subject claims 1, 2, 5, 7 to 10 and 13. Therefore, the inventions of the above-mentioned subject claims were publicly disclosed prior to filing of the subject patent and lack novelty and held invalid.

(17) The result of examination conducted within one country cannot influence the examination procedure of the other country. Therefore, the citation of the U.S arbitration court decision in support of the inventive step of the subject patent is not a relevant material to take into consideration.

## 3. DEFENDANT'S ARGUMENTS (Evidence B-1 to B-8, References 1 to 3)

(1) The inventions of subject claims 1 and 9 are easily understandable and reproducible by those skilled in the art, so are described within a due scope. Subject claims 2 to 4, and 10 to 12 further clarify the clamed inventions based on the mathematical formulas. The inventions of subject claims 5 and 13 are described clearly, and the invention of subject claim 8 is supported by the detailed description and clear.

(2) The subject patent adopts a 'scattering' system to obtain high contrast image, and by joining adjacently a variety of light sources of a relatively low manufacturing cost and low power consumption to the prism, the subject patent acquires a clear image from which trapezoidal distortion is removed, without compromising any of economics, compactness and image quality. However, cited invention 1 provides a fingerprint recognition apparatus disclosing a technical concept of simply setting the fingerprint image at a vertical relation with the light axis. Therefore, the subject patent provides unique object and different construction, and superior technical advantages.

(3) Cited invention 1 explains that the object is to "set the fingerprint image at a vertical relation to the light axis", which is a mere technical concept, but fails to explain the meaning of the disclosed mathematical formulas or the process of deriving the formulas. Therefore, cited invention 1 does not disclose or suggests any corresponding mathematical formula that contains the technical concept or meaning of the subject patent to "substantially equalize the length of light paths".

(4) The inventions of subject claims 1 to 5, 7 and 8 are not disclosed in any of cited inventions 1 to 4, those skilled in the art would not be able to easily derive the invention based on these cited inventions, and the method inventions of subject claims 9 to 13, which correspond to the inventions of claims 1 to 5, are valid inventions that posses novelty and inventive step over cited invention 1 to 4 on the same grounds.

(5) Subject claim 1 recites that the light source 312 is adjacent to the light refractor 310 that is, adjacent to the prism and joined to it, while in cited invention 1, the light source 6 is not adjacent to the prism 8, nor joined to it.

(6) Subject claim 1 recites "the light ray which is irradiated from the light source, collided against the object and scattered off to reach the lens plane", meaning that the subject patent adopts a scattering system and thus uses the light scattered off from the imaging surface. However, cited invention 1 is distinct since it uses the light undergoing total reflection.

(7) Subject claim 1 does not pose any limitation regarding an angle γ (between the imaging surface and viewing surface), whereas cited invention 1, being an absorption system, limits that the angle θ between the imaging surface and the viewing surface be within $52° < \theta < 72°$.

(8) The constitution of the subject patent enables to achieve multi-purposes, since the lens and light source can be formed adjacent to the prism, and thus achieve compactness, minimum reduction in light intensity, and high contrast, which are the characteristics of the scattering mechanisms. However, cited invention 1 is an absorption system which is impossible to miniaturize, and inherently has serious defect of low contrast which inhibits the commercial use of the disclosed invention.

(9) Subject claims 2 to 4 clarify the technical constitution of the inventions to equalize the length of the apparent light paths, based on ideal mathematical formulas and error ranges to target, so possess inventive step.

(10) Subject claim 7 depends from claim 1 and recites a strip of LED arrays 312 formed along the viewing surface of the prism, which is not found in any of cited inventions 1 to 4.

(11) Cited invention 2 has distinct technical constitutions from the subject

patent since according to cited invention 2, the light source cannot be formed adjacent to the prism and joined to it, the lens is not adjacent to the viewing surface, the lens surface is not vertical to the light axis, total reflection is used instead of scattering, and the lens is simply tilted to set the length from the apparent image to the lens, not by adjusting the angles γ and δ and equalizing the lengths of the light paths.

(12) Cited invention 3 has distinct technical constitutions from the subject patent since according to cited invention 3, the light source cannot be formed adjacent to the prism and joined to it, the lens cannot be adjacent to the viewing surface, the lens surface is not vertical to the light axis, the invention was disclosed in 1975 which was relatively an early stage of the fingerprint recognition apparatus when the scattering or absorption systems were not known yet, and the concept of equalizing the lengths of the light paths are absent.

(13) Cited invention 4 has distinct technical constitutions from the subject patent since according to cited invention 4, the light source is not joined to the light refractor, the lens is not adjacent to the viewing surface, the lens surface is not vertical to the light axis, and the concept of equalizing the lengths of the light paths are absent.

(14) The mouse (Item No. 965-017-2004) presented as Evidence A-12 has different item number from Evidence A-11 (Item No. 965-017-2001) shipped for delivery in July, 1999. There is the record of shipping for delivery of the mouse (Item No. 965-017-2004) in December 1999, i.e., later than the priority date of the subject patent.

(15) Model SMB-800 refers to the mouse excluding the fingerprint recognition

sensor. It is not known whether or not the mouse employed the fingerprint recognition sensor, or which type of the fingerprint recognition sensor was employed. The item number (e.g., 965-017-2001) does not indicate the type of the fingerprint recognition sensor or the date of manufacture.

(16) The production of the scattering fingerprint recognition sensor of Nitgen was only possible around September 9, 1999 which was after the Kuro factory was established (refer to Evidence A-8), and around when Nitgen signed a contract with Sejin Electronics (Evidence B-5). The petitioner's assertion that Sejin developed and sold the fingerprint recognition mouse based on the invention of the subject patent in July, 1999 is practically impossible.

(17) U.S. Patent No. 6,324,010 (Evidence B-1), the priority application of the subject patent, was cited in the examination procedure, but the subject patent was found possessing novelty and inventive step and granted (Evidence B-3).

(18) The US arbitration court considered the invalidation request based on cited invention 1, and opinions of the experts (Dr. Siegman and Dr. Bahuguna) made respectively in January 2003 and December 2003 (references 1 and 2), in January 2004 (Evidence B-4, reference 3), and determined the subject patent to be valid on March 25, 2005 (Evidence B-2).

## 4. INTEREST TO FILE AN INVALIDATION TRIAL

According to Evidence A-2, the petitioner received a letter of January 17, 2007 from SecuGen Corporation, the patentee of the subject patent and defendant, requesting stop infringing on the subject patent. Therefore, the petitioner has direct and actual interest in the validity of the subject patent, and is considered to be an appropriate interested party to request a trial.

## 5. ANALYSIS

### I. ACCEPTABILITY OF THE REQUESTED AMENDMENTS

An amendment filed on December 4, 2007 requested that, in lines 19-22, page 7 of the detailed description, "..., because reflected light 130 strikes the first lens of the lens assembly 114 vertically.." to read "..., because reflected light 130 strikes the first lens of the lens assembly 114 at a predetermined angle normal to the first lens ("subject amendment").

The detailed description of the subject patent explains that:

> "Thus, while tilting lens assembly 114 and the sensor can reduce trapezoidal distortion and increase image sharpness, it also causes greater reflection of reflected light 130 off the surface of lens assembly 114, and the surface of image sensor 116, because reflected light 130 strikes lens assembly 114 at a greater angle of incidence. This reduces the intensity of light entering image sensor 116, making image processing and comparison more difficult."

> "As such, by tilting the lens plane 307 of lens assembly 314, scattered light 330 strikes lens assembly 314 at substantially 90 degrees. Thus, there is little or no loss in image intensity due to undue reflection of scattered light at the surface of lens assembly 314,..."

In view of the fact that excessive reflection due to tilting of the lens assembly with respect to the light axis hinders acquisition of a good image, reflected light 130 is made to strike the lens assembly 113 at a predetermined angle normal to the lens assembly 114, instead of striking at a vertical angle. Given this, the subject amendment applies as the corrections to certain typographical errors, and does not depart from the original scope of the specification and the

drawings as filed. Since the subject amendment does not extend or vary the substance of the claimed scope, the amendment is approved.

## II. DEFICIENCY ISSUES IN THE CLAIM DESCRIPTION

(1) The feature of subject claims 1 and 9 that "a path length of any other light ray substantially parallel to the first light ray" means that among the light rays, which are irradiated from the light source and collided against an object and scattered, some part forms an apparent image and reaches the lens surface in almost parallel relation, if not completely parallel. Given that the object of the abovementioned construction to "remove trapezoidal distortions" is clearly expressed in the detailed description and the description of the drawings, those skilled in the art can not be troubled to understand or reproduce the invention due to the expressions such as "substantially same" or "almost same". Therefore, the inventions of subject claims 1 and 9 are considered to be clearly described.

(2) The following mathematical formulas of subject claims 2 to 4, and 10 to 12,

$$0.7 \leq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leq 1.3$$
$$0.85 \leq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leq 1.15$$
$$0.925 \leq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leq 1.075$$

further clarify the feature of the invention of subject claim 1 or claim 9 to equalize the lengths of the light paths. Therefore, the invention is considered to be described clearly, and since the detailed description discloses the same mathematical formulas, the inventions of subject claims 2 to 4 and 10 to 12 are supported by the detailed description.

(3) Subject claims 5 and 13 disclose that "at least one light ray scattered from the imaging surface form an angle with the viewing surface which is less than 90 degrees." With reference to a Korean language dictionary, the definition of the term corresponding to "scattering of light" reads: "The change of direction and

dispersion of the light in various directions observed as the light collides against the fine particles". According to this, the light rays are reflected from different portions of the surface of incidence in irregular pattern, and accordingly, it is obvious to those skilled in the art that at least one or more light rays of the reflected light rays could form an angle less than 90 degrees to form an image, while it is impossible that all the scattered light rays form an angle less than 90 degrees. Given the above, the inventions of subject claims 5 and 13 are considered to be clearly described.

(4) Subject claim 7 recites that "the light refractor includes a first edge opposite the imaging surface and adjacent to the viewing surface; and the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface and adjacent to the first edge", which is supported by the detailed description. Furthermore, the components of the light refractor and light source and the interconnection of these components are described clearly, and it cannot be considered that only the essential elements are described.

(5) Subject claim 8 recites that "the diameter of the at least one lens is smaller than the length dimension of the object to be imaged", which is clear and supported by the detailed description which discloses that the diameter of the first lens is larger than that of the fingerprint image. Therefore, the invention of subject claim 8 is described clearly, and supported by the detailed description.

(6) As mentioned above, the inventions of subject claims 1 to 5, and 7 to 13 meet the clarity requirements of the claims under Article 42 (4) of the Korean Patent Act, and thus do not contain clarity issue. Furthermore, considering that the subject patent relates to an optical image acquisition apparatus using a light refractor (310) for reflecting and refracting light, the light refractor including an imaging surface, a viewing surface and a further surface, a light source for emitting incident light which enters the light refractor and hits the object placed on the imaging surface, and a lens adjacent to the viewing surface for receiving

and focusing the image of the patterned object projected through the viewing surface as the image of the patterned object, the subject patent is on a high level of technical creativity based on laws of nature, and possess industrial applicability. Therefore, the subject patent is not an incomplete invention that lacks the enablement of the invention, and does not lack industrial applicability.

## III. DETERMINATION AS TO WHETHER OR NOT THE SUBJECT PATENT WAS PUBLICLY DISCLOSED PRIOR TO FILING, IN LIGHT OF EVIDENCE A-9 AND A-10

(1) Although the petitioner asserts that the fingerprint recognition sensor (OPP01), built in the fingerprint recognition mouse [Evidence A-9(mouse photo)] , [Evidence A-10(mouse photo)], and [Evidence A-12(mouse photo)], has the identical structure as OPP03A based on the subject patent, the evidences showing the appearance and interior of the mousse are insufficient to determine the detailed structure and effects of the built-in fingerprint recognition sensor of the fingerprint recognition mouse. Furthermore, reference 3 presented by the petitioner is a schematic view of the fingerprint recognition sensor, which provides insufficient information to determine OPP01 to be identical to OPP03A.

(2) Although the petitioner asserts that "sale of fingerprint recognition mouse ("SMB-800") employing the defendant's fingerprint recognition sensor as a built-in system sometime during July, 1997 (prior to the priority date of the subject patent, August 4, 1999), was confirmed (Evidence A-11), and that SMB-800 employs the fingerprint recognition sensor (OPP01) identical to OPP03A, which corresponds to the inventions of subject claims 1, 2, 5, 7 to 10 and 13, so the inventions of subject claims 1, 2, 5, 7 to 10 and 13 lose novelty", the mere fact that the two fingerprint recognition mouse have the same model name ('SMB-800') does not guarantee that the two models employ the same fingerprint recognition sensors. Furthermore, according to the model serial number of the fingerprint recognition mouse (Evidence A-12), it is unlikely that the fingerprint recognition mouse of Evidence A-12 was sold around July, 1999. Therefore, the petitioner's above assertion is unacceptable.

(3) Therefore, the subject patent is not considered to be publicly disclosed in light of Evidence A-9, A-10, and A-12, prior to its filing date.

22

## IV. NOVELTY AND INVENTIVE STEP OF SUBJECT PATENT OVER CITED INVENTIONS 1 AND 4

### (1) Objects

The object of the subject patent is to "provide a compact image acquisition apparatus which is capable of reducing trapezoidal distortion, providing high contrast image, minimizing apparatus, and requiring relatively low manufacturing cost." The object of cited invention 1 is to provide "a fingerprint recognition apparatus capable of removing trapezoidal distortion and conforming a light axis of the lens to the path of the light, by forming the fingerprint image at a completely vertical relation with the light axis so that the complete image is formed on the CCD". Both the subject patent and cited reference 1 have the same object to prevent the trapezoidal distortions. Furthermore, the subject patent aims to acquire high contrast image, minimize the system, and reduce associated cost, as is aimed by the scattering system of the admitted prior art, U.S. Pat. No. 5233404, or cited invention 4. Therefore, the objects of the subject patent are not considered to be distinct from those of cited references 1 and 4. In this regard, the defendant asserts that "the subject patent relates to resolving trapezoidal distortions associated with the scattering system, whereas cited invention 1 relates to resolving trapezoidal distortions of the absorption system, so the two patents have distinct objects from each other". However, considering that the trapezoidal distortions are caused due to the differences of light rays after the light rays are reflected from the imaging surface, the manner of reflection at the imaging surface (i.e., whether the light rays undergo total reflection or scattering) does not have any relation, and the defendants above assertion is groundless.

### (2) Construction and effects

### A. Inventive step of subject claim 1 over cited invention 1

Subject claim 1 recites:

> "A compact apparatus for forming a high contrast, low distortion image of a patterned object including: a light refractor (310) for reflecting and

refracting light, the light refractor including: an imaging surface (318) against which a patterned object to be imaged is to be placed; a planar viewing surface through which an image of the object to be imaged is projected, the viewing surface forming a non-vanishing angle γ (342)

with the imaging surface excluding 180 degrees; and a further surface

(322) adjacent to the imaging surface" (First feature)

"at least one light source adjacent to the viewing surface and joined with the light refractor, for emitting incident light which enters the light refractor and hits the object placed on the imaging surface, to create an image of the patterned object at the viewing surface" (Second feature)

"at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface," (Third feature)

"wherein the lens has a lens plane forming an angle δ (343), excluding 180 degrees, with the viewing surface, the lens plane which is perpendicular to an optical axis of the lens which passes through the center of the lens" (Fourth feature)

"wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane, by refracting the light ray which is irradiated from the light source, collided against the object and scattered off to reach the lens plane" (Fifth feature)

## 1) First feature
The first feature of the subject patent,

"A compact apparatus for forming a high contrast, low distortion image of a patterned object including: a light refractor (310) for reflecting and refracting light, the light refractor including: an imaging surface (318) against

which a patterned object to be imaged is to be placed; a planar viewing surface through which an image of the object to be imaged is projected, the viewing surface forming a non-vanishing angle γ (342) with the imaging surface excluding 180 degrees; and a further surface (322) adjacent to the imaging surface",

correspond to "prism 8 including fingerprint-contacting surface 8', semi-transparent surface 8" and bottom C" of cited invention 1.

According to the first feature, the light refractor 310 includes an imaging surface 318 against which a patterned object to be imaged is to be placed; a planar viewing surface 320 forming a non-vanishing angle γ (342) with the imaging surface excluding 180 degrees; and a further surface 322 adjacent to the imaging surface, to reflect and refract the light rays irradiated from the light source. The prism 8 of cited invention 1 includes a fingerprint-contacting surface 8' against which an object 335 to be imaged is placed; a planar semi-transparent surface 8" forming an angle θ excluding 180 degrees and through which an image of the object is emerged; and a bottom C adjacent to the fingerprint-contacting surface, so that the light rays irradiated from the LED array 6 enter through the dispersing lens 7 and reflected at the fingerprint-contacting surface 8' towards the semi-transparent surface 8". Therefore, the light refractor 310 including the imaging surface 318, viewing surface 320 and further surface 322 of the first feature of the subject patent has the identical constitution to that of the prism 8 of cited invention 1 which includes fingerprint-contacting surface 8', semi-transparent surface 8" and bottom C. The light refractor 310 of the first feature of the subject patent and the prism 8 of cited invention 1 also have the same effect in that both reflect and refract the light rays irradiated from the light source (LED). Therefore, while the first feature of the subject patent and the corresponding part of cited invention 1 have different names from each other, both share the same constitution and effects.

## 2) Second feature

The second feature of the subject patent,

"at least one light source adjacent to the viewing surface and joined with the light refractor, for emitting incident light which enters the light refractor

and hits the object placed on the imaging surface, to create an image of the patterned object at the viewing surface"

corresponds to the 'light source – LED array 6' of cited invention 1. According to the second feature of the subject patent, at least one light source adjacent to the viewing surface and joined with the light refractor, emits incident light which enters the light refractor and hits the object placed on the imaging surface, to create an image of the patterned object at the viewing surface. According to cited invention 1, at least one LED array 6 is arranged on the bottom C of the prism 8 horizontally with the light dispersing lens 7 to increase the effect of light dispersion, and in order to form an image of object on the semi-transparent surface, the light enters the prism 8 and strikes the object on the fingerprint-contacting surface. Both the light source according to the second feature of the subject patent and the LED array 6 according to cited invention 1 are identical in that both are formed adjacent to the light refractor (prism) and include at least one light source (LED array) to emit light which enters the light refractor (prism) and hits the object placed on the imaging surface (fingerprint-contacting surface). Although the defendant asserts that the light source of cited invention 1 is not adjacent to the prism and also not joined with it, considering that the term "adjacent to" means "nearby" or "having a common border", the light source of the second feature of the subject patent may be located near the light refractor or in contact with the light refractor. Furthermore, the subject patent explains in the detailed description that,

"Light source 312 is preferably an elongated LED array consisting of a single row of light emitting diodes (LEDs) extending the length (into the plane of FIG. 4) of prism 310. If such LEDs are used as light source 312, a diffusive cover can be placed between the LEDs and viewing surface 320 to provide more even illumination of imaging surface 318."

Given the above, the light source according to the second feature of the subject patent may be directly contacted with the light refractor, at a predetermined distance from the light refractor, or at a near position without contact with the intervention of the diffusive cover therebetween. Furthermore, although the subject patent does not specifically mention the same expression as "joined with" used in the second feature, the subject patent explains that:

"To secure the components of image acquisition into the relative positions as shown in FIG. 4, a frame having holding slots for each component can be plastic molded or otherwise fabricated. Light source 312 can be either

placed in a holding slot adjacent to viewing surface 320 or attached directly to viewing surface 320 using adhesive as known in the art."

In view of the above, the expression "joined with" can indicate that the light refractor and the light source are joined with each other as the light source is attached directly to the light refractor by the transparent adhesive, or as the light source and the light refractor are inserted in the holding slots that are adjacent to (in direct contact or at a near distance) the viewing surface. Additionally, cited invention 1 discloses that the LED array is adjacent to the prism, while there is a dispersing lens for even illumination arranged between the LED array and the prism (Fig. 3), and those skilled in the art would not be troubled to join these using appropriate means such as frame having holding slots to accommodate the LED array and the prism. Therefore, the second feature of the subject patent can be easily derived by those skilled in the art in light of cited invention 1.

### 3) Third feature

The third feature of the subject patent,

"at least one lens adjacent to the viewing surface and for receiving and focusing an image of a patterned object projected through the viewing surface,"

corresponds to the "capturing lens 9" of cited invention 1.

According to the third feature of the subject patent, at least one lens, formed outside of the light refractor and adjacent to the viewing surface (Figs. 4, 6 and 8 illustrate the lens 314 formed at a distance from the viewing surface 320), receives and focuses the image of the patterned object projected through the viewing surface as the image of the patterned object. Since the capturing lens 9 of cited invention 1 is formed outside of the prism adjacent to the semi-transparent surface 8", to focus the image projected through the prism, the lens of the third feature and the capturing lens 9 of cited invention 1 have the same constitution and effects in that both receive an image projected through the viewing surface (semi-transparent surface) and from the light refractor (prism) as an image of an object. Regarding this, the defendant asserts that "since the absorption system of cited invention 1 collects parallel rays of light, image quality degradation is unavoidable if the lens is formed adjacent to the viewing surface (semi-transparent surface), and so the two inventions are distinct from each other". However, the subject patent explains in the detailed description

that:

> "…in an absorption type system, if the diameter of the first lens of lens assembly 114 is smaller than the fingerprint on imaging surface 118, then the lens assembly 114 must generally be placed relatively far from viewing surface 122. This allows the image of a fingerprint captured by system 108 to be relatively sharp all the way to the edges of the fingerprint image. That is, if lens assembly 114 is placed too close to viewing surface 122, the edges of a fingerprint image could be lost or distorted near the edges of the image. This is because in an absorption system such as system 108, the light rays which generate the image of the fingerprint must be substantially parallel for the image to be in focus. And, if the first lens in lens assembly 114 is smaller than the fingerprint in imaging surface 118, then the light rays from the edges of the fingerprint image that are parallel to light rays from areas closer to the center of a fingerprint image may not be able to enter lens assembly 114. This can cause the edges of a fingerprint image to be out of focus or lost".

In view of the above, an absorption type system focuses parallel rays of light, so the lens is preferably at a relatively long distance from the viewing surface to prevent the loss of the edge of the fingerprint image, if the first lens of the lens assembly has the diameter smaller than that of the fingerprint. However, the lens can be arranged relatively close to the viewing surface, without having the loss of edge of the fingerprint image, if the first lens has the diameter greater than that of the fingerprint. Subject claim 1 does not mention that the use of the parallel rays is excluded (contrarily, subject claim 1 recites that the light rays from the apparent image of the object to the lens surface are substantially parallel to each other), or that the lens has the diameter smaller than that of the fingerprint. Therefore, the defendant's above assertion is unacceptable, and although the third feature of the subject patent and the corresponding feature of cited invention 1 have different names from each other, both have the same constitutions and effects.

## 4) Fourth feature

The fourth feature of the subject patent,

> "wherein the lens has a lens plane forming an angle δ (343), excluding 180 degrees, with the viewing surface, the lens plane which is perpendicular to

an optical axis of the lens which passes through the center of the lens"

corresponds to the "lens" of cited invention 1 which includes "an angle C between a line vertical to the semi-transparent surface and the light axis passing through the center of the lens, and a lens surface vertical to the light axis passing through the center of the lens".

According to the fourth feature of the subject patent, the lens has a lens plane forming an angle δ (343), excluding 180 degrees, with the viewing surface, the lens plane which is perpendicular to an optical axis of the lens which passes through the center of the lens, but according to cited invention 1, the lens forms an angle, excluding 180 degrees ($c \neq 0$), with the viewing surface, and a lens surface is vertical to the light axis passing through the center of the lens. Given the above, the lens according to the fourth feature and the lens according to cited invention 1 have the same constitutions and effects, in that both have an angle with the viewing surface (semi-transparent surface), excluding 180 degrees, and a lens surface vertical to the light axis passing through the center of the lens.

## 5) Fifth feature

The fifth feature of the subject patent,

"wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the patterned object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the patterned object to the lens plane, by refracting the light ray which is irradiated from the light source, collided against the object and scattered off to reach the lens plane"

corresponds to the feature of cited invention 1 that:

"the lens surface is vertical to the light axis, and angles θ a nd c meet the equation as follows:

$(\sin \theta)/n \approx \sin b \cdot \sin c$, $d + e - f \approx \theta$, $52° < \theta < 72°$, $c \neq 0$

where, n = refractive index, b = angle between the imaging surface (8') and the light reflected from it, c = angle between the light escaping the prism and the normal to the prism surface, d = angle between the semi-transparent face and the imaging surface (8'), e = angle between the semi-transparent face and the light reflected from the imaging surface (8'), f = angle between the

bottom (C) of the prism and the light reflected from the semi-transparent face."

The angles γ and δ of the fifth feature and angles θ and c of cited invention 1 correspond to each other in that these are angles within the light refractor (prism) to remove trapezoidal distortion by substantially equalizing the length of the light paths, where the light paths from the apparent image of the object to the lens surface are parallel, and the angles between the light refractor and the lens (capturing lens). The feature of setting the distance between the apparent image of the object to the lens constant in order to remove trapezoidal distortion is already known in the art prior to filing of the subject patent, and it is also widely known that different lengths of light paths between the apparent image of the object and the lens surface would cause trapezoidal distortion and that the trapezoidal distortion can be resolved by equalizing the lengths of the light paths. Cited invention 1 is distinct in that it limits the range of angle θ (between imaging surface and viewing surface) to $52° < \theta < 72°$, while the fifth feature does not limit the angle γ (between imaging surface and viewing surface). However, such difference falls within the range of simple modification of design which can be easily achieved by those skilled in the art depending on needs. Therefore, those skilled in the art could easily derive the angle γ based on angle θ of cited invention 1.

### 6) Defendant's arguments

The defendant asserts that "since the equation $(n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta = 1$ ("subject equation") is derived from the technical concept different from that of the equation of cited invention 1 and cited invention 1 lacks explanation about the meaning or manner of deriving the disclosed equation, cited invention 1 can not disclose the concept of substantially equalizing the lengths of the light paths". However, the trapezoidal distortion can be solved by eliminating the differences of light paths, regardless of the types of fingerprint recognition systems, cited invention 1 discloses that the equation $(\sin \theta)/n \approx \sin b \cdot \sin c$ is to form the formation of the fingerprint at a completely vertical relation with the light axis, and those skilled in the art would not be troubled to understand that keeping the formation of the fingerprint at a completely vertical relation with the light axis is not different from forming parallel light paths and equal path lengths between the

apparent image of the object and the lens surface. Those skilled in the art also would be easily able to understand the manner of deriving the equation of cited invention 1, or interpret the equation of cited invention 1 as indicating that the length of light paths from the apparent image of the object to the lens surface are equal.

The defendant asserts that "the method of resolving trapezoidal distortion of cited invention 1 is limited to the absorption type fingerprint recognition apparatus". However, the trapezoidal distortion can be solved by eliminating the differences of light paths, regardless of the types of fingerprint recognition systems. Although cited invention 1 exemplifies an absorption type system to explain the cause of trapezoidal distortion and ways to resolve such problem, the equation of cited invention 1 applies only b (angle between the fingerprint-contacting surface and the light reflected from it), θ (angle between the fingerprint-contacting surface and semi-transparent surface), and c (angle of the light escaping the semi-transparent surface) (same as the angle between the lens surface and semi-transparent surface) as the variables, so is irrespective of the light entering the fingerprint-contacting surface, or whether or not the angle of incidence is smaller than a threshold. Therefore, the equation of cited invention 1 is irrespective of the type of the system.

The defendant asserts that "while the equation of cited invention 1 is developed based on a fixed angle 'b' (i.e., that the light paths are parallel), the equation of the subject patent does not include such variable at all, so the two inventions have distinct technical meanings". However, the equations of the subject patent and cited invention 1 have the same meaning, since the equation of the subject patent is also derived from the condition $(\theta_2 = \delta)$ that the light paths from the apparent image to the lens surface are parallel. Furthermore, the variable b of cited invention 1 is a dependent variable determined according to the given angles θ and c by Snell's law ($n = \sin c / \sin(\theta + b - 90°)$), and the equation of the subject patent is obtained by rearranging the equation of cited invention 1 and the equation of Snell's law to remove variable b.

The defendant asserts that "cited invention 1 is an absorption type

system and thus has limited angle θ (between imaging surface and viewing surface) to $52° < \theta < 72°$, but the subject patent is distinct since this has no limit of angles". However, the trapezoidal distortion can be solved by eliminating the differences of light paths, regardless of the types of fingerprint recognition systems, the equation of cited invention 1 has the same optical meaning as that of the equation of the subject patent, and the equation of cited invention 1 is applicable to both the absorption and scattering systems. Therefore, the fact that the angles are limited or not, does not influence the fact that cited invention 1 discloses resolving trapezoidal distortion regardless of the types of system, by

adjusting the angles θ and c to meet the equation of cited invention 1.

The defendant asserts that "cited invention 1 is an absorption type system, so is inferior to the subject patent in terms of economics, compactness and image quality". However, the equation of cited invention 1 to resolve the trapezoidal distortion is irrespective of the types of fingerprint recognition systems, and it was generally recognized in the pertinent field prior to filing of the subject patent that the scattering system is more advantageous than the absorption system in terms of economics, compactness and image quality.

Furthermore, the defendant only partially cited the U.S. arbitration court's decision to assert that the U.S arbitration court extensively reviewed the meaning of the equation of cited invention 1 and supported the inventive step of the subject patent based on that ground. However, the corresponding evidence does not provide sufficient information to verify the reason for affirming the validity of the corresponding US patent of the subject patent (Evidence B-2). Furthermore, determining inventive step varies depending on countries and procedures, according to the inventions found to be material, level of technical advance at the time of filing, applied criteria for determining inventive step, or required procedures. Therefore, the fact that the subject patent was declared to be valid according to the arbitration procedure held outside South Korea does not guarantee the inventive step of the subject patent inside South Korea.

Therefore, the defendant's above arguments are unaccepted.

## 7) Summery

In consideration of the above, while the invention of subject claim 1 does not have an identical constitution to that of cited invention 1, those skilled in the art would be able to easily derive the constitution of subject claim 1 based on that of cited invention 1. Furthermore, subject claim 1 does not provide significant improvement over cited invention 1. Therefore, the invention of subject claim 1 has no inventive step over cited invention 1.

## B. Inventive steps of subject claims 2 to 4 over cited invention 1

The inventions of subject claims 2 to 4 recite that the angles $\gamma$ and $\delta$ meet the following equations:

$$0.7 \le (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2 \delta \le 1.3$$
$$0.85 \le (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2 \delta \le 1.15$$
$$0.925 \le (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2 \delta \le 1.075$$

However, the above corresponds to the feature of cited invention 1 that "angles $\theta$ and c meet the equation of cited invention 1". Cited invention 1 discloses configuring the angles $\theta$ and c to meet the equation, so it means that the ranges of the angles $\theta$ and c are disclosed. Furthermore, since the equation of cited invention 1 corresponds to that of the subject patent, the angles $\theta$ and c to meet the equation of cited invention 1, can also meet the above three equations disclosed in subject claims 2 to 4. Furthermore, while the inventions of subject claims 2 to 4 add further limitations to the equation based on the error ranges of 0.3, 0.15 and 0.075, the corresponding part of the detailed description only explains that "…allowing for a 30% (15%, or 7.5%) manufacturing tolerance is preferably configured in accordance with the equation 6 (7, or 8)", but fails to specify the improvement obtained due to the above error range limitations, so the above limitations are simple numeric limitations which do not provide any meaning as a threshold, and thus fall within the range of simple modification of design applicable by those skilled in the art. Therefore, the inventions of subject claims 2 to 4 would be easily achieved by those skilled in the art based on the corresponding constitution of cited invention 1, and the inventions of subject claims 2 to 4 have no inventive steps over cited invention 1.

## C. Inventive step of subject claim 5 over cited invention 1

The invention of subject claim 5 depends from subject claims 1 to 4, and recites that "the part of the imaging surface on which the image is formed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees". However, the above feature corresponds to that of cited invention 1 that "an angle of light ray reflected from the imaging surface (fingerprint-contacting surface) and crossing the viewing surface (semi-transparent surface), is less than 90 degrees (Figs. 3, 4 and 6)", so the invention of subject claim 5 would be easily achieved by those skilled in the art based on the corresponding constitution of cited invention 1. Therefore, the invention of subject claim 5 has no inventive step over cited invention 1.

### D. Inventive step of subject claim 7 over cited inventions 1 and 4

The invention of subject claim 7 depends from subject claim 1, adding a further limitation that "the light refractor includes: a first edge opposite the imaging surface and adjacent to the viewing surface; and the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface and adjacent to the first edge". However, cited inventions 1 and 4 also disclose that the prism has the first edge opposite the imaging surface and adjacent to the viewing surface. Cited invention 4 discloses, in the detailed description and Figs. 35, 36, 38A and 38B, that the LED is used as a light source, that the LED is formed adjacent to the first edge, parallel to the viewing surface, and facing the viewing surface, and that the LED array (6-1 to 6-6) are arranged on a substrate 11. Given the above, forming an elongate LED array adjacent to the first edge parallel to the viewing surface is considered to fall within a range of simple modification of design, and it is also considered that those skilled in the art would be easily able to derive the feature of subject claim 7 based on the corresponding constitution of cited inventions 1 and 4. Therefore, the invention of subject claim 7 has no inventive step over cited inventions 1 and 4.

### E. Inventive step of subject claim 8 over cited invention 1

The invention of subject claim 8 depends from subject claim 1 and add a further limitation that "the diameter of the at least one lens is smaller than the length dimension of the object to be imaged". However, as also indicated in the background of the subject patent, "…in optical recognition system such as

optical recognition system 108, it can be desirable that the diameter of the first lens in lens assembly 114 be smaller than the image of a fingerprint on viewing surface 122", it was well known prior to filing of the subject patent that the scattering type fingerprint recognition system generally uses a lens of diameter smaller than that of an image of fingerprint. Therefore, the feature of subject claim 8 is well known in the pertinent art, and those skilled in the art would be easily able to achieve the invention of subject claim 8 based on cited invention 1.

### F. Inventive step of subject claim 9 over cited invention 1

Subject claim 9 recites a "method of imaging a patterned object". While the invention of subject claim 9 is in a different category of invention from that of subject claim 1, these two claims have identical technical constitution, so on grounds explained in section **A**, those skilled in the art would be easily able to achieve the invention of subject claim 8 based on cited invention 1.

### G. Inventive steps of subject claims 10 to 12 over cited invention 1

Subject claims 10 to 12 depend from subject claim 9, adding further limitations. While the inventions of subject claims 10 to 12 are in a different category of invention from those of subject claims 2 to 4, these claims have identical technical constitution, so on grounds explained in section **B**, those skilled in the art would be easily able to achieve the inventions of subject claim 10 to 12 based on cited invention 1.

### H. Inventive step of subject claim 13 over cited invention 1

Subject claim 13 depends from claims 9 to 12, adding further limitation that "the step of placing the patterned object against the imaging surface includes placing the patterned object against portions of the imaging surface which are able to have at least one light ray scattered therefrom such that the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees". However, while the invention of subject claim 13 is in a different category of invention from that of subject claim 5, this claim has identical technical constitution, so on grounds explained in section **C**, those skilled in the art would be easily able to achieve the invention of subject

claim 13 based on cited invention 1.

**(3) Summery of comparison**

The subject patent does not provide an object distinct from cited inventions 1 and 4, the constitution according to the inventions of subject claims 1 to 5 and 7 to 13 would be easily achieved based on cited inventions 1 and 4, and the effects of the subject patent are anticipatable in light of cited inventions 1 and 4. Therefore, the inventions of subject claims 1 to 5 and 7 to 13 would be easily achieved by those skilled in the art based on cited inventions 1 and 4, and have no inventive step.

## V. SUB-CONCLUSION

The amendments are approved, and the inventions of subject claims 1 to 5 and 7 to 13 do not contain clarity issue or correspond to known technique, but would be easily achieved by those skilled in the art based on cited inventions 1 and 4, so lack inventive step and are considered to be invalid.

## 6. CONCLUSION

Therefore, the request for trial is approved, the decision of the trial is made as in the DECISION above, and the petitioner is awarded trial cost.

July 15, 2008

Trial-Examiner-In-Chief:          Woo-Taek HWANG
Trial-Examiner:                   Sang-Bae KIM
Trial-Examiner:                   Jun YU

**Appendix 1**

## THE DRAWINGS OF THE SUBJECT PATENT

**Fig. 1**



**Fig. 2**



**Fig. 3**



**Fig. 4**



Fig. 5



Fig. 6



Fig. 7



렌즈부
314

Fig. 8



Fig. 9



Fig. 10



**Appendix 2**

## THE DRAWINGS OF CITED INVENTION 1

Fig. 1




Fig. 2




$a \neq b_o \neq b_i$

Fig. 3



Fig. 4



Fig. 5



$a = b_x = b_i = b_i$

Fig. 6



Fig. 7



**Appendix 3**

## THE DRAWINGS OF CITED INVENTION 2

Fig. 1                                      Fig. 2



**Appendix 4**

## THE DRAWINGS OF CITED INVENTION 3

Fig. 1                                      Fig. 3 of cited invention 2

**Appendix 5**

## THE DRAWINGS OF CITED INVENTION 4

Fig. 23



Fig. 24



Fig. 35



Fig. 36



Fig. 37



Fig. 38



# English Translation of Trial Decision of the Korean

# Intellectual Property Tribunal

## Case No.   2007 dang 2296

This is translated on 24 July 2008, by the translator who is conversant in both English and Korean, and thus the translation is correct to his knowledge.

_(signature)_

Young-Chul, CHO
Translator
Patent Attorney

특  허  심  판  원
제  4  부
심        결

심 판 번 호      2007당2296

사 건 의 표 시      특허 제10-0469571-00-00호 발명 『광학식 영상취득장치에서의

사다리꼴 왜곡감소 및선명도개선 장치와 방법』의 무효

청    구    인      주식회사 유니온커뮤니티

서울 송파구 방이동 44-3

대리인 특허법인태평양

지정된 변리사 김인기, 최성훈, 황의인

서울 강남구 역삼동647-15 한국타이어빌딩


피 청 구 인      세큐젠 코포레이션

미합중국 캘리포니아주 95035 밀피타스 몬테이그 익스프레스웨이

348

대리인 변리사 김원준

서울 서초구 양재동 275-7 트러스트타워19층(제일광장특허

법률사무소)

대리인 변리사 장성구

서울 서초구 양재동 275-7 트러스트타워19층(제일광장특허

법률사무소)

복대리인 변리사 류현길

　　　서울 중구 남대문로2가 118 한진빌딩 본관 18층 C.P.O.

BOX 8735(법무법인광장)

복대리인 변리사 차경수

　　　서울 중구 남대문로2가 118 한진빌딩 본관18층 C.P.O.

BOX 8735(법무법인광장)

복대리인 변리사 최세환

　　　서울 서초구 양재동275-7 트러스트타워(제일광장특허법률사

무소)

대리인 변리사 유성원

　　　서울 서초구 양재동 275-7 트러스트타워19층(제일광장특허

법률사무소)


## 주　　　문

1. 이 건 정정을 인정한다.

2. 특허 제469571호 발명의 특허를 무효로 한다.

3. 심판비용은 피청구인의 부담으로 한다.

## 청구의 취지

1. 특허 제469571호는 이를 무효로 한다.

2. 심판비용은 피청구인의 부담으로 한다.

이　　　유

## 1. 기초사실

### 가. 이 건 특허발명의 개요

① 명칭 : 광학식 영상취득장치에서의 사다리꼴 왜곡감소 및 선명도개선 장치와 방법

② 특허권자 : 피청구인

③ 국제출원일 : 2000. 8. 4(우선권주장일 : 1999. 8. 4)

④ 출원일/출원번호 : 2002. 2. 1./제2002-7001411호

⑤ 등록일/등록번호 : 2005. 1. 24./제469571호

⑥ 심판청구 : 2007. 8. 20.

⑦ 정정청구 : 2007. 12. 4.

### 나. 이 건 특허발명의 특허청구범위(별지 1의 도면 참조)

청구항 1. 광선을 방사하는 광원에서 방사된 광을 반사하고 굴절시키는 광굴절기로서, 영상취득할 물체(335)가 놓이는 면인 영상면(imaging surface)(318); 상기 영상면과 180°가 아닌 각(non-vanishing angle) γ(감마)(342)를 이루도록 설치되며 상기 물체의 영상이 출사되는 평평한 출사면(viewing surface)(320); 상기 영상면에 접한 제3의 면(further surface)(322)을 갖는 광굴절기(310)와, 상기 광굴절기에 인접하게 설치되어 광굴절기와 결합됨으로써 출사면에서 물체의 영상을 형성하기 위하여 광굴절기 내에 빛을 입사하여 상기 영상면의 물체에 조사하는 적어도 하나 이상의 광원과, 상기 광굴절기의 외부에 상기 출사면에 인접한 위치에 설치되고, 출사면을 통해 광굴절기로부터 출사되는 영상을 상기 물체의 영상으로서 결상하는 역할을 하는 적어도 한 개 이상의 렌즈(314)를 포함하는 장치로서, 상기 렌즈는 상기 출사면과 180°가 아닌 각 δ(343)를 이루고 렌즈의 중심을 관통하는 광축과 수직된 렌즈면을 가지며, 상기 각 γ와

δ는, 광원으로부터 방사되어 물체에 부딪혀 산란되어 렌즈면까지 도달하는 광선을 굴절시킴으로써, 물체의 겉보기영상의 일부분에서 렌즈면까지 도달되는 제1광선의 광로길이와, 물체의 겉보기영상의 다른 부분에서 렌즈면까지 도달되는 다른 광선들(상기 제1광선과는 실질적으로 평행함)의 겉보기 광로길이를 실질적으로 동일하게 맞출 수 있는 각도로 설정되는 것을 특징으로 하는, 물체로부터 고콘트라스트 저왜곡의 영상을 형성하는 장치(이하 '이 건 제1항 발명'이라 한다).

청구항 2. 청구항 1에서, 각 γ와 δ는 아래 식을 만족하는 것을 특징으로 하는 장치(이하 '이 건 제2항 발명'이라 한다).

$$0.7 \leq (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3$$

청구항 3. 청구항 1에서, 각 γ와 δ는 아래 식을 만족하는 것을 특징으로 하는 장치(이하 '이 건 제3항 발명'이라 한다).

$$0.85 \leq (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15$$

청구항 4. 청구항 1에서, 각 γ와 δ는 아래 식을 만족하는 것을 특징으로 하는 장치(이하 '이 건 제4항 발명'이라 한다).

$$0.925 \leq (n^2 - \sin^2 \delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075$$

청구항 5. 청구항 1~4중 어느 한 항에서, 영상이 형성되는 면인 상기 영상면의 영역에서는 적어도 하나 이상의 광선이 산란되어 이 산란된 광선과 상기 출사면이 소정 각도로 교차함으로써, 출사면과 영상면이 교차된 지점에, 각도가 90°보다 작은 제1각을 이루는 것을 특징으로 하는 장치(이하 '이 건 제5항 발명'이라 한다).

청구항 6. 삭제

청구항 7. 청구항 1에서, 상기 광굴절기는 영상면에 대항하며 출사면에 접하는

제1모서리를 포함하고, 광원은 출사면을 향하여 출사면에 평행하게 상기 제1모서리에 인접하여 설치되는 긴 LED 어레이인 것을 특징으로 하는 장치(이하 '이 건 제7항 발명'이라 한다).

청구항 8. 청구항 1에서, 상기 적어도 하나의 렌즈의 직경은 영상취득될 물체의 길이보다 작은 것을 특징으로 하는 장치(이하 '이 건 제8항 발명'이라 한다).

청구항 9. 영상면(318), 출사면(320), 제3의 면(322)을 갖는 광굴절기(310)를 제공하는 단계, 상기 출사면에 의해 정의되는 평면과 영상면에 의해 정의되는 평면 사이에 180°가 아닌 각 γ(342)를 형성하는 단계, 상기 광굴절기의 영상면에 물체(335)를 올려놓는 단계, 상기 광굴절기에 광을 입사하는 단계, 렌즈의 중심을 관통하는 광축에 수직한 렌즈면을 갖는 렌즈(314)를 상기 광굴절기의 외부에 출사면에 인접한 위치에 설치하는 단계, 상기 출사면에 의해 정의되는 평면과 상기 렌즈면 사이에 180°가 아닌 각 δ(343)를 형성하는 단계, 입사된 광이 상기 영상면과 상기 물체에서 산란되어 상기 평평한 출사면에서 출사되는 단계로 구성되되, 상기 각 γ와 δ는, 광원으로부터 방사되어 물체에 부딪혀 산란되어 렌즈면까지 도달하는 광선을 굴절시킴으로써, 물체의 겉보기영상의 일부분에서 렌즈면까지 도달되는 제1광선의 광로길이와, 물체의 겉보기영상의 다른 부분에서 렌즈면까지 도달되는 다른 광선들(상기 제1광선과는 실질적으로 평행함)의 겉보기 광로길이가 실질적으로 동일해질 수 있도록 설정되는 것을 특징으로 하는, 패턴화된 물체로부터 영상을 형성하는 방법(이하 '이 건 제9항 발명'이라 한다).

청구항 10. 청구항 9에서, 각 γ와 δ를 설정하는 단계에서, 각 γ와 δ는 아래 식에 의해 설정되는 것을 특징으로 하는 방법(이하 '이 건 제10항 발명'이라 한다).

$$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3$$

청구항 11. 청구항 9에서, 각 γ와 δ를 설정하는 단계에서, 각 γ와 δ는 아래 식에 의해 설정되는 것을 특징으로 하는 방법(이하 '이 건 제11항 발명'이라 한다).

$$0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15$$

청구항 12. 청구항 9에서, 각 γ와 δ를 설정하는 단계에서, 각 γ와 δ는 아래 식에 의해 설정되는 것을 특징으로 하는 방법(이하 '이 건 제12항 발명'이라 한다).

$$0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075$$

청구항 13. 청구항 9~12중 어느 한 항에서, 영상면에 물체를 놓는 단계에서, 물체가 놓여진 상기 영상면의 영역에서는 적어도 하나 이상의 광선이 산란되어 이 산란된 광선과 상기 출사면이 소정 각도로 교차함으로써, 출사면과 영상면이 교차된 지점에, 각도가 90°보다 작은 제1각을 이루는 것을 특징으로 하는 방법(이하 '이 건 제13항 발명'이라 한다).

다. 인용발명들

(1) 인용발명 1[국내 특허공보 제1994-7344호(1994. 8. 13. 공고), 별지 2의 도면 참조]

인용발명 1(청구인이 제출한 '갑 제3호증'을 말함)은 '지문인식장치'에 관한 것으로서, 청구의 범위에 『청구항 1. 광원(1) 및 지문접촉면(8')을 갖는 삼각형의 프리즘(8)과 결상렌즈계(9), CCD(Charge Coupled Device)(10)로 구성된 공지의 지문인식장치에 있어서, 광원인 다이오드군(6)에서 발산된 빛은 분산렌즈(7)를 통해 안정각을 갖도록 제작된 프리즘(8) 내로 입사되어 지문접촉면(8')에서 반투광성면(8μ)으로 반사되며 반투광성면(8")에 도달한 빛은 일부는 통과되며 나머지 일부는 반사되도록 하였으며, 통과된 빛은 결상렌즈계(9)를 통해 CCD(Charge Coupled Device)(10)로 입력되어 지문인식 및 판단하도록 하였으며, 상기 반투광면(8")에서 반사된 빛은 프리즘(8)의 밑면(C)으로

반사되며 다시 일측에 구비된 거울(11)로 반사되어 렌즈(12) 및 투시창(13)을 통해 지문 입력자가 지문을 확인할 수 있도록 한 것을 특징으로 한 지문인식장치. 청구항 2. 제1항에 있어서, 프리즘(8)의 지문접촉면(8')과 반투광성면(8")의 꼭지각 θ의 각도는 하기식의 조건을 만족하도록 구성함을 특징으로 하는 지문인식장치. (sinθ)/n≒sin b·sin c와 d+e-f≒θ이면서(52°<θ<72°c≠0, n=굴절율, b=지문접촉면(8')과 지문접촉면(8')에서 반사 되어지는 빛과 이루는 각도, c=지문접촉면(8')에서 반사되어 반투광성면(8'')을 투과하는 빛과 반투광성면(8'')에서 반사되어지는 빛과 이루는 각도, d=반투거울과 지문접촉면 (8')이 이루는 각도, e=반투거울과 지문접촉면(8')에서 반사되어지는 빛과 이루는 각도, f=프리즘(8)의 밑면(C)과 반투거울에서 반사되어지는 빛과 이루는 각도)」가 기재되어 있고, 발명의 상세한 설명에는 "본 발명은 상기한 종래의 제반 결점을 해결하고자 한 것으로 지문인식장치의 광학계를 구성함에 있어서, 빛의 경로를 분석한 결과 지문의 형 상을 광축과 완전한 수직을 이룰 수 있도록 렌즈의 배율에 영향을 받지 않는 식값을 적용시키고, 프리즘의 상단 꼭지각 θ을 일정한 범위 내의 각도로 구성함으로써 CCD(4) 상에 완전한 상이 결상 되도록 함으로써 에러율을 없애고 더불어 지문입력자로 하여금 자신의 지문입력상태 즉, 손가락의 압압력 지문을 접촉시키는 위치 등을 확인할 수 있도록 하여 보다 완벽한 상태에서 지문을 입력시킬 수 있게 함으로써 지문입력 과정 에서의 에러를 줄일 수 있게 함을 목적으로 하는 것이다."라는 발명의 목적과, "도 3은 이 건 특허발명 지문인식장치 광학계의 구성으로서, 광원인 다이오드군(6)에서 분산렌즈(7)를 통해 프리즘(8) 내로 입사되어 지문접촉면(8')에서 반투광성면(8")으로 반사되고 반투광성 면(8")에서 일부는 투과되어 결상렌즈계(9)를 통해 CCD(Charge Coupled Device)(10) 으로 입력되어 전기적인 신호로 변환하여 지문을 인식, 판단한다. 그리고 반투광성면 (8")에서 일부는 반사되어 프리즘(8)의 밑면(C)에서 다시 반사되어 지문접촉면(8') 측에

있는 거울(11), 렌즈(12) 그리고 투과창(13)을 통해 지문 입력자가 지문을 확인할 수 있음을 특징으로 하는 지문인식장치이다. 상기 프리즘(8)의 제작에 있어서 빛의 투과시는 (sinθ)/n≒sin b·sin c를 반사 후 투과시는 d+e-f≒θ 만족하면서 지문접촉면(8')과 반투광성면(8")의 꼭지각 θ는 52°<θ<72℃와 C≠O의 조건을 만족하도록 한다. 여기서 52°<θ<72라는 범위의 각도는 삼각형을 이룰 수 있는 최소한의 각도 또한 프리즘을 형성하는 유리 재질의 굴절율이 1.5～1.8되는 재질 등이 많이 존재하므로 상기 공식(sinθ)/n≒sin b·sin c에 의해 52°<θ<72°를 결정할 수 있고 이 범위 안에서 재질에 따라 값이 변할 수 있음을 나타낸 것이다. 프리즘(8)의 밑면(C)는 광원인 다이오드군(6) 및 빛 분산 렌즈(7)와 수평으로 설치하여 빛 분산효과를 높이게 되며 거울(11)은 지문입력자가 지문 입력 상태를 상부에서 용이하게 확인할 수 있도록 임의의 각도로 기울어지게 설치한다." 라는 발명의 구성 및, "이 건 특허발명에서는 프리즘의 지문 접촉면과 반투과성면의 꼭지각 θ에 적정조건의 각도와 프리즘 내의 입사각, 굴절률에 적정의 식을 적용시키면 렌즈의 배율이나 굴절률에 거의 영향을 받지 않으면서 지문의 형상을 도 5에 도시된 바와 같이 지문의 형상이 찌그러지지 않으면서 거의 완벽하게 수직으로 얻을 수 있고 지문형상의 수평, 수직이동시 상대적 좌표가 변하지 않으므로 원하는 위치에 원하는 크기로 결상되게 할 수 있어 종래의 프리즘의 구성에 일정한 식값과 변수값 θ를 적용시켜 결상 광학계를 구성함으로써 광학계의 크기를 늘리지 않고서도 정확한 지문의 상을 결상되게 할 수 있으며,"라고 발명의 효과가 기재되어 있다.

　　　(2) 인용발명 2[일본국 공개특허공보 소63-301368호(1988. 12. 8. 공개), 별지 3의 도면 참조]

　　　　　인용발명 2(청구인이 제출한 '갑 제4호증'을 말함)는 '지문독취장치'에 관한 것으로서, 발명이 해결하고자 하는 문제점에서는 "본 발명은 소형으로 만드는 것이 가능

하고, 모든 부분에 대해 초점이 맞는 화상 데이터를 얻는 것이 가능한 지문인식장치를 제공하는 것을 목적으로 한다."라고 발명의 목적이 기재되어 있고, 발명의 작용에서는 "외견상의 위치란 렌즈 및 수광소자 측에서 지문접촉면을 봤을 때 그 허상의 위치를 말하고 그 위치는 투명체의 굴절율에 의존하나 렌즈에서 실상을 형성하는 데에는 그 허상의 위치로부터 렌즈까지의 거리가 일정하다면 렌즈로부터 그 배후의 실상(초점)의 위치까지의 거리가 일정하게 유지된다."라고 기재되어 있으며, 발명의 효과에서는 "지문접촉점의 모든 위치에 대해서 초점이 맞는 화상에 기초한 데이터를 얻을 수 있고 지문접촉점에서 렌즈까지의 거리를 작게 할 수 있어 장치를 소형으로 할 수 있다."라고 기재되어 있다.

　　(3) 인용발명 3[영국 특허공보 제1520433호(1978. 8. 9. 반포된 간행물), 별지 4의 도면 참조]

　　　　인용발명 3(청구인이 제출한 '갑 제5호증'을 말함)은 '지문체크장치'에 관한 것으로서, 명세서에는 『프리즘(3)의 입력면(4)에 실제로 접촉하고 있는 지문의 산 부분으로부터 산란한 빛만이 실질적으로 이미징 렌즈(11)의 초점에서 유효물체(6)를 형성한다. 따라서 유효물체(6)의 대표점으로부터 광선(7,7a)이 렌즈(11)의 이미지 평면에 있는 점에서 초점이 맞춰진다. 동일한 방법으로, 모든 유효물체(6)의 점들은 광학취득기(12)의 입력면에서 이미지(13)를 형성하도록 초점이 맞춰진다.』라고 기재되어 있다.

　　(4) 인용발명 4[국내 공개특허공보 제1998-63863호(1998. 10. 7. 공개), 별지 5의 도면 참조]

　　　　인용발명 4(청구인이 제출한 '갑 제6호증'을 말함)는 '지문입력장치'에 관한 것으로서, 명세서에는 『간단한 지문입력장치를 실현하기 위해 표면에 고정시키는 형태의 LED가 광원으로 자주 사용된다. 도 35는 종래 지문입력장치의 핵심부분을 나타내고 있다.

도 35에서, 부재번호(6)는 광원(LED)을 나타내고, (11)은 앞쪽(11F)에 LED(6)가 고정된 기판, (1)은 프리즘, (3)은 빛수신장치를 나타낸다. 이 장치는 광로 분리방법을 사용한다. LED(6)가 고정된 기판(11)은 프리즘(1)의 아래쪽 우측에 위치하고, 빛차단막(1-2)은 프리즘(1)의 좌측에 설치된다. 이와 같은 배열에서, LED(6)에서 나온 빛은 프리즘(1)을 지나 지문채취면(A-B)을 비춘다. 빛은 지문채취면(A-B) 위에 놓인 손가락의 패턴면에 의해 반사되고, 프리즘(1)을 투과해 빛수신장치(3)의 렌즈(3-1)를 지나 결상면(CCD, 3-2)에 상을 형성한다. 도 38A와 도 38B에서와같이, 반사필름(11-1)는 기판(11) 위에 형성되고, LED(6-1)는 접합지점(F)을 지나 LED패드($P1_1, P1_2$)에 연결되고, LED(6-2)는 접합지점(F)을 지나 LED패드($P2_1, P2_2$)에 연결되고, LED(6-3)는 접합지점(F)을 지나 LED패드($P3_1, P3_2$)에 연결되고, LED(6-4)는 접합지점(F)을 지나 LED패드($P4_1, P4_2$)에 연결되고, LED(6-5)는 접합지점(F)을 지나 LED패드($P5_1, P5_2$)에 연결되고, LED(6-6)는 접합지점(F)을 지나 LED패드($P6_1, P6_2$)에 연결된다.」라고 기재되어 있다.


## 2. 당사자의 주장

### 가. 청구인 주장의 요지(증거발명 갑 제1 내지 12호증, 참고자료 1 내지 3)

(1) 이 건 제1항 및 제9항 발명의 "실질적으로 동일하다거나 실질적으로 평행하다는 것"은 그 권리범위를 특정할 수 없을 정도로 불명확하다.

(2) 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명의 "수학식의 7.5 내지 30% 광로의 오차"는 광선들이 실질적으로 동일한 광로를 가진다고 할 수 없으므로, 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명은 발명이 불명확하고, 발명의 상세한 설명에 의해 뒷받침되지 못하는 것이다.

(3) 이 건 제5항 및 제13항 발명의 "영상면에서 산란된 적어도 하나 이상의 광선

이 출사면과 90°보다 작은 각을 이루는 것"은 그 의미가 불명확하다.

(4) 이 건 제8항 발명의 "적어도 하나의 렌즈의 직경은 영상 취득될 물체의 길이보다 작은 것"은 그 의미가 불명확하다.

(5) 이 건 특허발명은 발명의 성립성이 결여되어 있는 미완성 발명이고, 산업상 이용가능성이 없는 것이다.

(6) 이 건 특허발명의 목적은 사다리꼴 왜곡을 해소하고, 고콘트라스트 영상을 취득할 수 있는 장치를 제공하는 것이고, 인용발명 1의 목적은 지문의 형상을 광축과 완전히 수직으로 이룰 수 있도록 하여 CCD 상에 완전한 상이 결상되게 함으로써 사다리꼴 왜곡을 없애는 지문인식장치를 제공하는 것이므로, 이 건 특허발명은 인용발명 1과 목적이 실질적으로 동일하다.

(7) 이 건 제1항 발명의 "광굴절기"와, "각 γ 및 δ"는 인용발명 1의 "프리즘(8)"과, "각 θ 및 c"와 동일하다.

(8) 이 건 제1항 발명의 "광원"과 "렌즈"에 각각 대응되는 "다이오드군(6)"과 "결상렌즈계(7)"가 인용발명 1에 개시되어 있다.

(9) 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명의 수학식 6 내지 8은 단순한 수치한정으로서 임계적 의미가 없는 한정에 불과하므로, 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명은 인용발명 1에 의해 신규성 및 진보성을 상실한 것이다.

(10) 이 건 제5항 발명의 특징부 구성은 영상면에서 산란된 광선이 출사면과 교차하면서 이루는 각도(출사면과 영상면이 교차된 지점 쪽)가 90°보다 작은 것인데, 인용발명 1은 출사면(반투광성면)과 제3면(밑면)이 이루는 각도가 예각이어서 지문접촉면(영상면)에서 반사된 광선이 반투광성면(출사면)과 교차하면서 이루는 각도(지문접촉면과 반투광성면이 교차된 지점 쪽)가 90°보다 작을 수밖에 없으므로, 이 건 제5항 발명

은 인용발명 1에 의해 신규성 또는 진보성을 상실한 것이다.

(11) 이 건 제7항 발명의 특징부 구성은 "제1모서리의 위치에 인접하도록 긴 LED 어레이를 형성하는 것"인데, 인용발명 1에는 프리즘이 영상면에 대향하고 출사면에 접하는 제1모서리를 포함하고 있고, 또한 인용발명 4의 명세서 및 도 35, 36, 38A, 38B 에는 광원으로 LED가 사용되고, LED가 영상면에 대향하고 출사면에 접하는 제1모서리에 인접하여 출사면을 향하여 설치되고 있으며, 기판(11) 위에 LED 어레이(6-1~6-6)가 개시되어 있으므로, 이 건 제7항 발명은 인용발명 1, 4에 의하여 진보성이 상실된 것이다.

(12) 이 건 제8항 발명의 특징부 구성은 이 건 특허발명의 종래기술로서 이 건 특허의 출원 전에 산란식 지문인식 시스템에서 이미 렌즈의 직경이 지문영상보다 작은 것이 널리 사용되고 있음을 나타내고 있으므로, 이 건 제8항 발명은 인용발명 1 및 이 건 특허발명의 종래기술에 의해 진보성을 상실한 것이다.

(13) 이 건 특허발명은 사다리꼴 왜곡이 감소되거나 거의 제거된 물체 영상을 제공하고 선명하게 초점이 맞는 완전한 영상을 형성할 수 있는 효과가 있고, 인용발명 1은 광학제의 크기를 늘리지 않고서도 정확한 지문의 상을 결상되게 할 수 있고 고콘트라스트 영상을 획득할 수 있는 효과를 가지므로, 이 건 특허발명은 인용발명 1과 효과가 동일하다.

(14) 피청구인의 지문인식센서가 내장된 지문인식마우스(품명 "SMB-800")를 이 건 특허발명의 우선일 1999. 8. 4. 전인 1997. 7. 월경에 판매하였음을 확인하였고(갑 제11호증), 그와 동일한 품명의 제품을 입수하였다(갑 제12호증).

(15) 피청구인 제품(OPP03A)은 이 건 제1항, 제2항, 제5항, 제7항 내지 제10항 및 제13항 발명을 적용한 것(갑 제7호증의 소장 9. 10 및 12면에서 피청구인이 주장

함)인데, 지문인식마우스(갑 제9호증, 갑 제10호증, 갑 제12호증)에 내장된 지문인식센서(OPP01)는 이 건 특허발명이 적용된 피청구인 제품(OPP03A)과 동일한 구조이다.

(16) 지문인식마우스(갑 제12호증)에 내장된 지문인식센서(OPP01)는 피청구인 제품(OPP03A)과 동일한 것이어서 이 건 제1항, 제2항, 제5항, 제7항 내지 제10항 및 제13항 발명에 해당하는 것이므로, 이 건 제1항, 제2항, 제5항, 제7항 내지 제10항 및 제13항 발명은 이 건 특허의 출원 전에 공지된 것이어서 신규성이 결여된 것으로 무효되어야 한다.

(17) 한 국가의 심사 결과는 다른 국가의 심사에 영향을 미치지 아니하는 것이므로, 미국 중재재판의 일부만을 발췌하면서 미국 중재판결이 이 건 특허발명의 진보성을 지지하였다고 주장하는 것은 참고할 가치가 없는 것이다.

나. 피청구인 주장의 요지(증거발명 을 제1호증 내지 제8호증, 참고자료 1 내지 3)

(1) 이 건 제1항 및 제9항 발명은 당업자에 의하여 용이하게 이해되고 재현할 수 있으므로, 적법한 청구범위의 기재이고, 이 건 제2항 내지 제4항, 제10항 내지 제12항 발명은 이 건 제1항 또는 제9항 발명을 수학식으로 명확하게 한정한 것이며, 또한, 이 건 제5항 및 제13항 발명은 발명이 명확하게 기재된 것이고, 이 건 제8항 발명은 상세한 설명에 의해 뒷받침되어 있고 발명이 명확하게 기재된 것이다.

(2) 이 건 특허발명은 산란식 시스템을 채택하여 높은 콘트라스트를 얻을 수 있고, 상대적으로 제조비용이 적게 들고 소모전력이 적은 다양한 형태의 광원을 프리즘에 인접 결합시켜서 설계상의 한계 없이 경제성, 소형화, 영상품질 중 어느 것도 후퇴시키지 않으면서 사다리꼴 왜곡현상을 제거한 선명한 영상을 취득하고자 하는 것인 반면, 인용발명 1은 단순히 지문의 형상이 광축에 수직을 이루도록 한다는 기술사상을 개시하고 있는 지문인식장치를 제공하는 것이므로, 이 건 특허발명은 인용발명 1에 비해 목적이

특이하고 구성에서 차이가 있을 뿐만 아니라 월등한 기술적 효과가 있다.

(3) 인용발명 1은 그 목적으로 "지문의 형상을 광축에 수직으로 한다."라는 사상만을 언급하고 있을 뿐, 인용발명 1의 수학식의 의미나 그 도출과정에 대하여는 아무런 설명이 없다. 따라서 "광로의 길이를 실질적으로 동일하게 한다."라는 이 건 특허발명의 기술사상 및 그 의미를 내포하는 이 건 특허발명의 수학식에 관하여 인용발명 1이 개시하거나 암시조차 하고 있다고 볼 수 없다.

(4) 이 건 제1항 내지 제5항, 제7항 및 제8항 발명은 인용발명 1 내지 4에 모두 개시되어 있지 않고, 그로부터 당업자가 용이하게 도출해 낼 수도 없는 사항이며, 또한, 이 건 제1항 내지 제5항 발명에 대응되는 방법 발명인 이 건 제9항 내지 제13항 발명 역시 같은 이유로 인용발명 1 내지 4에 비하여 신규성, 진보성이 있는 유효한 발명이다.

(5) 이 건 제1항 발명은 광원(312)이 광굴절기(310), 즉 프리즘에 인접하고 결합되어 있는 반면에, 인용발명 1은 광원(6)이 프리즘(8)에 인접하게 설치되지 않고 프리즘과 결합되어 있지도 않다.

(6) 이 건 제1항 발명의 "광원으로부터 방사되어 물체에 부딪혀 산란되어 렌즈면까지 도달하는 광선"은 이 건 특허발명이 산란식 장치이기에 입사면에서 산란되는 빛을 이용하는 반면, 인용발명 1은 흡수식 장치이기에 전반사되는 빛을 이용하는 면에서 상이하다.

(7) 이 건 제1항 발명은 각 γ(영상면과 출사면이 이루는 각)에는 아무런 제한이 없는 구성인데 반하여, 인용발명 1은 흡수식 시스템이므로 θ(영상면과 출사면이 이루는 각)의 각도가 "52° < θ < 72°"로 한정된다는 점에서 차이가 있다.

(8) 이 건 특허발명은 그 구성의 특성상 렌즈와 광원을 프리즘에 인접하게 배치할

수 있어 소형화를 구현할 수 있으며, 또한 광량 감소를 극소화하고 산란식 특유의 높은 콘트라스트를 제공하는 다중의 목적을 동시에 달성하고 있는데 반하여, 인용발명 1은 이 건 특허발명과 본질적으로 다른 흡수식 장치로 소형화가 불가능하고 그 자체로 낮은 콘트라스트라는 심각한 결함을 가지고 있어 상용화되지도 못한 발명에 불과하다.

(9) 이 건 제2항 내지 제4항 발명은 겉보기 광로 길이를 동일하게 하는 기술구성을 실제 구현함에서 목표로 삼아야 할 이상적인 수학식을 근거로 그 허용오차를 표시한 것이므로, 이 건 제2항 내지 제4항 발명은 진보된 발명이다.

(10) 이 건 제7항 발명은 이 건 제1항 발명의 종속항으로서, 프리즘의 출사면을 따라 길게 배치된 LED 어레이(312)는 인용발명 1 내지 4 어느 것에서도 찾아볼 수 없다.

(11) 인용발명 2는 이 건 특허발명과 광원이 프리즘에 근접하고 결합될 수 없다는 점, 렌즈가 출사면에 인접하지 못한다는 점, 렌즈면이 광축에 수직이지 않다는 점, 산란되는 장치가 아닌 전반사광을 이용한다는 점, 단순히 렌즈를 기울여 외견상의 위치에서 렌즈까지의 거리를 일정하게 한다고만 할 뿐 $\gamma(342)$와 $\delta(343)$를 조절하여 광로의 길이를 동일하게 하는 개념이 존재하지 않는다는 점에서 그 구성이 상이하다.

(12) 인용발명 3은 이 건 특허발명과 광원이 프리즘에 근접하고 결합될 수 없다는 점, 렌즈가 출사면에 인접하지 못한다는 점, 렌즈면이 광축에 수직이지 않다는 점, 지문인식장치에 관한 일반적인 아이디어를 제시한 초기 발명(1975)으로서 산란식 또는 흡수식에 관한 인식 자체가 없다는 점, 광로의 길이를 실질적으로 동일하게 하는 개념이 존재하지 않는다는 점에서 그 구성이 상이하다.

(13) 인용발명 4는 구성 2의 면에서 광원이 광굴절기에 결합되어 있지 않다는 점, 렌즈가 출사면에 인접하지 못한다는 점, 렌즈면이 광축에 수직이지 않다는 점, 광로의 길이를 실질적으로 동일하게 하는 개념이 존재하지 않는다는 점에서 그 구성이

상이하다.

(14) 갑 제12호증으로 제출한 품종번호 '965-017-2004'의 마우스 제품은 갑 제11호증에서 1999. 7. 출고되었다고 기재된 마우스 제품과는 품종번호(965-017-2001)가 상이하고, 품종번호 '965-017-2004'의 마우스는 1999. 12. 21.에 출고된 기록이 있을 뿐으로 이 건 특허발명의 우선일 이후에 출고된 것이다.

(15) 품명(모델명) 'SMB-800'은 지문인식센서를 제외한 마우스 규격을 지칭하는 것으로서, 그 마우스에 과연 지문인식센서가 사용되었는지, 나아가 어떠한 지문인식센서가 사용되었는지 전혀 알 수 없고, 품종번호(예 : 965-017-2001)만으로는 내장된 지문인식센서의 종류나 생산시기를 알 수 없다.

(16) 니트젠의 산란식 지문인식센서 생산은 구로공장을 설립한 후인 1999. 9.경에야 가능하였으며(갑 제8호증 참조), 세진전자와 계약을 체결한 것도 이 무렵이다(을 제5호증). 이에 반하여 1999. 7. 이미 세진전자가 이 건 특허발명이 적용된 지문인식 마우스를 개발하여 판매하였다는 청구인의 주장은 상식적으로 불가능한 것이다.

(17) 이 건 특허발명의 우선권 주장 기초가 되는 미국특허 제6,324,020호(을 제1호증)는 심사과정에서 인용발명 1이 선행문헌으로 인용되었으나 신규성 및 진보성이 인정되어 등록되었다(을 제3호증).

(18) 미국 중재재판에서도 "인용발명 1"을 선행기술로서 한 무효주장과, 2003. 1.과 2003. 12.에 각각 작성된 전문가(Dr. Siegman 및 Dr. Bahuguna)의 의견과(참고자료 1, 2), 2004. 1.에 그와 관련한 심리가 있었으며(을 제4호증, 참고자료 3), 2005. 3. 25. 판결에서 특허의 유효성을 선언하였다(을 제2호증).


3. 이해관계

답변서(갑 제2호증)에 의하면, 청구인은 이 건 특허발명의 권리자인 피청구인(세큐젠 코포레이션)으로부터 이 건 특허발명의 침해행위 중지를 요구하는 2007. 1. 17.자 내용 증명을 받은 사실을 알 수 있다. 따라서 청구인은 이 건 특허발명의 권리존속으로 인하여 그 피해를 받을 직접적이고도 현실적인 이해관계가 있으므로, 이 건 심판청구는 이해 관계인에 의한 적법한 심판청구라고 인정된다.


4. 판단

가. 이 건 정정이 적법한 것인지 여부

2007. 12. 4.자 제출한 정정청구서의 정정사항은 상세한 설명(7면 19행 내지 22 행)에 기재된 "..., 반사광(130)이 렌즈부(114)의 첫번째 렌즈에 수직으로 부딪히게 되 므로, ..."를 "반사광(130)이 렌즈부(114)의 첫번째 렌즈의 법선에 일정한 각을 이루 면서 부딪히게 되므로,"로 정정(이하 '이 건 정정'이라 한다.)한 것으로서, 상세한 설명 (제4면 11 내지 14행, 제7면 23행)에 "종래기술에는 렌즈부(114)를 기울임에 의해 사 다리꼴 왜곡을 줄일 수는 있으나, 이는 반사광(130)이 입사각보다 크게 렌즈부(114)에 입사되기 때문에 렌즈부(114)의 표면과 영상센서(116)의 표면에서 반사광(130)의 많은 반사를 일으킨다. 영상센서(116)로 들어가는 빛의 광량의 감소로 인해 이미지 처리와 비교를 더욱 어렵게 만든다." 및 "렌즈부(314)의 렌즈면(307)을 기울이면 산란광(330) 은 거의 90도로 렌즈부(314)에 부딪히게 된다. 따라서, 렌즈부(314) 표면에서 쓸데없 이 반사되는 산란광이 적어지기 때문에 영상의 밝기 손실이 적거나 없게 된다."라고 기 재된 바와 같이 렌즈부가 광축에 대해 기울어진 경우 반사가 많이 일어나 양호한 이미 지 획득이 어렵다는 것을 나타내고 있으므로, 렌즈부(114 : 첫 번째 렌즈)를 기울일 때 반사광(130)이 렌즈부(114)에 수직이 아닌 렌즈부(114)의 법선에 일정한 각을 이루면

서 부딪히게 되는 것을 알 수 있다. 따라서 이 건 정정은 단순한 오기를 정정하는 경우에 해당되고, 특허출원서에 최초로 첨부된 명세서, 도면에 기재된 사항의 범위를 벗어나지 않으며, 특허청구범위를 실질적으로 확장하거나 변경하지도 않은 것이므로, 이 건 정정은 적법하다.

　나. 이 건 특허발명의 특허청구범위가 기재불비인지 여부

　　(1) 이 건 제1항 및 제9항 발명의 "렌즈면까지 도달되는 다른 광선들이 제1광선과 실질적으로 평행하다."라고 하는 구성은 광원에서 방사되어 물체에 부딪혀 여러 방향으로 흩어지는 광선 중에서 물체의 겉보기 영상을 맺으며 렌즈면까지 도달하는 광선들이 서로 완벽하게 평행은 아니더라도 거의 평행한 정도로 진행된다는 것을 의미하는 것으로서, "사다리꼴 왜곡현상을 제거"하는 데 있다는 위 구성의 목적이 발명의 상세한 설명과 도면의 간단한 설명의 기재에 의하여 명확하게 나타나 있고, 실질적으로 동일하다거나 거의 같다는 의미로 표현하였다고 하여 당업자가 발명을 용이하게 이해할 수 없고, 재현할 수 없다고 할 수 없으므로, 이 건 제1항 및 제9항 발명은 그 발명이 명확하게 기재되어 있는 것이다.

　　(2) 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명의 수학식 "$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3$, $0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15$ 및 $0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075$"은 겉보기 광로길이를 실질적으로 동일하게 한다는 이 건 제1항 또는 제9항 발명의 구성을 더욱 구체적으로 한정한 것이므로, 발명이 불명확하게 기재되어 있다고 볼 수 없고, 발명의 상세한 설명에도 같은 수학식이 개시되어 있으므로, 이 건 제2항 내지 제4항 및 제10항 내지 제12항 발명은 발명의 상세한 설명에 의해 뒷받침되는 것이다.

(3) 이 건 제5항 및 제13항 발명의 "영상면에서 산란된 적어도 하나 이상의 광선이 출사면과 90도보다 작은 각을 이루는 것"은 국어사전에서 빛의 산란은 '빛이 미립자에 부딪혔을 때, 방향을 바꾸어 여러 방면으로 흩어지는 현상'을 나타내고 있어 빛이 입사된 면으로부터 불규칙하게 여러 방향으로 반사되어 나오는 것을 뜻하므로, 여러 방향으로 반사되어 나오는 여러 광선 중 이미지를 결상할 수 있는 광선이 적어도 하나 이상 출사면과 90도보다 작은 각을 이루는 것이고, 산란되는 광선이 모두 90도보다 작은 각을 이루는 것은 물리적으로 불가능한 것으로 당업자에게는 자명한 것이며, 또한, 모든 산란된 광선이 출사면과 90도보다 작은 각을 이루어야 한다는 의미로도 볼 수 없으므로, 이 건 제5항 및 제13항 발명은 그 발명이 명확하게 기재되어 있는 것이다.

(4) 이 건 제7항 발명의 "광굴절기는 영상면에 대향하며 출사면에 접하는 제1모서리를 포함하고, 광원은 출사면을 향하여 출사면에 평행하게 상기 제1모서리에 인접하여 설치되는 긴 LED 어레이인 것"은 상세한 설명에 동일한 기술내용이 기재되어 있어서 발명의 상세한 설명에 의해 뒷받침되어 있는 것이고, 광굴절기 및 광원 등 구성 및 구성 간의 유기적 결합관계가 명확하므로 발명이 명확하고 간결하게 기재된 것이며, 발명의 구성에 없어서는 아니 되는 사항만으로 기재되어 있지 않다고도 할 수 없다.

(5) 이 건 제8항 발명의 "여러 렌즈 중 적어도 하나의 렌즈의 직경이 물체의 길이보다 크다."라는 구성은 그 자체 기재 내용이 명확하고, 발명의 상세한 설명에 첫 번째 렌즈의 직경이 지문 영상보다 큰 경우를 기재하고 있으므로, 이 건 제8항 발명은 그 발명이 명확하게 기재되어 있고, 발명의 상세한 설명에 의해 뒷받침되고 있는 것이다.

(6) 위에서 살펴본 바와 같이, 이 건 제1항 내지 5항, 제7항 내지 제13항 발명은 특허법 제42조 제4항 각호의 청구항의 기재요건을 충족하는 것이므로, 이 건 제1항 내지 5항, 제7항 내지 제13항 발명은 기재불비라고 볼 수 없다. 또한, 이 건 특허발명은 "영상

면, 출사면 및 제3의 면으로 이루어져 광원에서 방사된 광을 반사하고 굴절시키는 광굴 절기와, 광굴절기에 인접하게 설치되어 출사면에서 물체의 영상을 형성하기 위하여 광 굴절기 내에 빛을 입사하여 영상면의 물체에 조사하는 광원 및, 출사면에 인접한 위치 에 설치되어 출사면을 통해 광굴절기로부터 출사되는 영상을 상기 물체의 영상으로서 결상하는 역할을 하는 렌즈를 이용하는 광학식 영상취득장치이므로, 자연법칙을 이용한 기술적 사상의 창작으로서 고도한 것이고, 산업상 이용할 수 있는 발명에 해당하는 것 이므로, 이 건 특허발명은 발명의 성립성이 결여되어 있는 미완성 발명이 아니고, 산업상 이용가능성이 없는 발명이 아니다.

　다. 이 건 특허발명이 갑 제9호증 내지 갑 제12호증에 의해 출원 전에 국내에 공지 된 기술에 해당하는지 여부

　　(1) 청구인은 "지문인식마우스[갑 제9호증(마우스 사진), 갑 제10호증(마우스 사 진), 갑 제12호증(마우스 사진)]에 내장된 지문인식센서(OPP01)가 이 건 특허발명이 적용된 피청구인 제품(OPP03A)과 동일한 구조"라고 주장하고 있으나, 제출된 위 서류 는 마우스의 외관 및 해체된 구조를 촬영한 사진들로서 지문인식마우스(갑 제9호증, 갑 제10호증, 갑 제12호증)에 내장된 지문인식센서의 구체적인 구성 및 그에 따른 작용효 과를 알 수 없고, 청구인이 제출한 참고자료 3은 지문인식센서에 대한 개략도일 뿐이 어서 지문인식센서(OPP01)가 피청구인 제품(OPP03A)과 동일한 것이라고 보기에 불충 분하다.

　　(2) 청구인은 "지문인식마우스[갑 제12호증(SMB-800)]"와 동일한 제품이 이 건 특허발명의 1999. 8. 4. 우선일 전인 1999. 7. 월경에 판매한 사실이 있고(갑 제11호 증), 거기에 내장된 센서(OPP01)가 피청구인 제품(OPP03A)과 동일한 것이어서 이 건 제1항, 제2항, 제5항, 제7항 내지 제10항 및 제13항 발명에 해당하는 것이므로, 이 건

제1항, 제2항, 제5항, 제7항 내지 제10항 및 제13항 발명은 이 건 특허의 출원 전에 공지된 것이어서 신규성이 결여 된 것"이라 주장하고 있으나, 지문인식마우스의 물품명 이 'SMB-800'으로 동일하다는 사항만으로는 거기에 내장된 지문인식센서도 동일한 기술의 제품이라고 보기에 불충분하고, 갑 제12호증의 지문인식마우스의 품종번호에 의하면 갑 제12호증의 지문인식마우스는 1999. 7. 월경 판매되었다고 볼 수 없으므로, 청구인의 주장은 받아들일 수 없다.

(3) 따라서 이 건 특허발명은 갑 제9호증, 갑 제10호증 및 갑 제12호증에 의하여 이 건 특허발명의 출원 전에 국내에 공지된 기술이라고 인정되지 아니한다.

라. 이 건 특허발명이 인용발명 1, 4에 의해 신규성 및 진보성이 있는지 여부

(1) 목적 대비

이 건 특허발명의 목적은 "사다리꼴 왜곡을 감소시키며, 높은 콘트라스트 영상 을 제공하고, 장치를 소형화하며, 비교적 저렴한 제조비용이 드는 소형 영상취득장치" 를 제공하기 위한 것이고, 인용발명 1의 목적은 "지문의 형상을 광축과 완전한 수직을 이룰 수 있도록 하여 CCD 상에 완전한 상이 결상되도록 함으로써 사다리꼴 왜곡을 없 애고, 렌즈의 광축과 빛의 이동경로가 일치하도록 하는 지문인식장치"를 제공하기 위한 것이므로, 이 건 특허발명과 인용발명 1은 모두 사다리꼴 왜곡현상을 방지하기 위한 것이라는 점에서 목적이 동일하다. 또한, 이 건 특허발명의 높은 콘트라스트 영상을 얻 고, 장치를 소형화하며, 가격을 저렴하게 한다는 목적은, 이 건 특허발명의 명세서에서 종래기술로서 설명한 미국 특허 제5233404호나 인용발명 4의 산란식 시스템이 가지는 기술적 특징으로 종래기술로서 기재하고 있는 산란식 시스템과 그 목적이 동일하다. 따 라서 이 건 특허발명은 그 목적이 인용발명 1, 4에 의해 특이하다고 볼 수 없다. 이에 대 하여, 피청구인은 "이 건 특허발명은 산란식 특유의 사다리꼴 왜곡 해소방법이고, 인용

발명 1은 흡수식 시스템의 사다리꼴 왜곡 해소방법이어서 그 목적이 서로 다르다."라고 주장하고 있으나, 사다리꼴 왜곡은 영상면에서 일단 반사되어 나온 빛이 광로차를 가지는 것이 원인이 되어 발생하는 것으로서, 영상면에서 반사가 어떻게 이루어졌는가 (전반사 또는 난반사 여부)와는 아무런 관계가 없는 것이므로, 피청구인의 위 주장은 이유 없다.

  (2) 구성 및 효과 대비

   (가) 이 건 제1항 발명이 인용발명 1에 의해 진보성이 있는지 여부

     이 건 제1항 발명을 인용발명 1과 대비하기 위하여 그 구성을 나누어 보면, 이 건 제1항 발명은 『①광선을 방사하는 광원에서 방사된 광을 반사하고 굴절시키는 광굴절기로서, 영상취득할 물체(335)가 놓이는 면인 영상면(imaging surface)(318); 상기 영상면과 180°가 아닌 각(non-vanishing angle) γ(감마)(342)를 이루도록 설치되며 상기 물체의 영상이 출사되는 평평한 출사면(viewing surface)(320); 상기 영상면에 접한 제3의 면(further surface)(322)을 갖는 광굴절기(310)(이하 '구성 1'이라 한다.)와, ②상기 광굴절기에 인접하게 설치되어 광굴절기와 결합됨으로써 출사면에서 물체의 영상을 형성하기 위하여 광굴절기 내에 빛을 입사하여 상기 영상면의 물체에 조사하는 적어도 하나 이상의 광원(이하 '구성 2'라 한다.)과, ③상기 광굴절기의 외부에 상기 출사면에 인접한 위치에 설치되고, 출사면을 통해 광굴절기로부터 출사되는 영상을 상기 물체의 영상으로서 결상하는 역할을 하는 적어도 한 개 이상의 렌즈(314)(이하 '구성 3'이라 한다.)를 포함하는 장치로서, ④상기 렌즈는 상기 출사면과 180°가 아닌 각 δ(343)를 이루고 렌즈의 중심을 관통하는 광축과 수직된 렌즈면을 가지며(이하 '구성 4'라 한다.), ⑤상기 각 γ와 δ는, 광원으로부터 방사되어 물체에 부딪혀 산란되어 렌즈면까지 도달하는 광선을 굴절시킴으로써, 물체의 겉보기영상의 일부분에서 렌즈면까지 도달되는 제1광선의 광로길이와, 물체의 겉보기영상의 다른 부분에서

렌즈면까지 도달되는 다른 광선들(상기 제1광선과는 실질적으로 평행함)의 겉보기 광로길이

를 실질적으로 동일하게 맞출 수 있는 각도로 설정되는 것(이하 '구성 5'라 한다.)을 특징으

로 하는, 물체로부터 고콘트라스트 저왜곡의 영상을 형성하는 장치.」로 이루어져 있다.

    1) 구성 1

           구성 1{광선을 방사하는 광원에서 방사된 광을 반사하고 굴절시키는

광굴절기로서, 영상취득할 물체(335)가 놓이는 면인 영상면(imaging surface)(318); 상기

영상면과 180°가 아닌 각(non-vanishing angle) γ(감마)(342)를 이루도록 설치되며 상기

물체의 영상이 출사되는 평평한 출사면(viewing surface)(320); 상기 영상면에 접한 제3의

면(further surface)(322)을 갖는 광굴절기(310)}은 인용발명 1의 "지문접촉면(8'), 반투

광성면(8") 및 밑면(C)으로 이루어진 프리즘(8)"에 대응되는 구성으로서, 구성 1의 광

굴절기(310)는 영상 취득할 물체(335)가 놓이는 영상면(318), 영상면과 180°가 아닌 각

γ(감마)(342)를 이루도록 설치되고 물체의 영상이 출사되는 평평한 출사면(320) 및, 영상

면에 접한 제3의 면(further surface)(322)으로 이루어져 광선을 방사하는 광원에서 방사

된 광을 반사하고 굴절시키는 것이고, 인용발명 1의 프리즘(8)은 영상 취득할 물체

(335)가 놓이는 지문접촉면(8'), 지문접촉면과 180°가 아닌 각 θ를 이루고 물체의 영상

이 출사되는 평평한 반투광성면(8") 및, 지문접촉면에 접한 밑면(C)으로 이루어져 광원

인 다이오드군(6)에서 방사된 광이 분산렌즈(7)를 통해 입사되어 지문접촉면(8')에서 반

투광성면(8")으로 반사되는 것이므로, 구성 1의 영상면(318), 출사면(320) 및, 제3의 면

(322)으로 이루어진 광굴절기(310)는 인용발명 1의 지문접촉면(8'), 반투광성면(8") 및,

밑면(C)으로 이루어진 프리즘(8)과 그 구성에서 동일하고, 구성 1의 광굴절기(310)와

인용발명 1의 프리즘(8)은 모두 광원(다이오드)에서 방사된 광을 반사하고 굴절시키는

작용효과도 동일하다. 따라서 구성 1과 인용발명 1의 대응구성은 구성 명칭만 상이하

게 표현되어 있을 뿐, 구성 및 작용효과가 실질적으로 동일하다.

　　2) 구성 2

　　　　구성 2{상기 광굴절기에 인접하게 설치되어 광굴절기와 결합됨으로써 출사면에서 물체의 영상을 형성하기 위하여 광굴절기 내에 빛을 입사하여 상기 영상면의 물체에 조사하는 적어도 하나 이상의 광원}는 인용발명 1의 "광원인 다이오드군(6)"에 대응되는 구성으로서, 구성 2의 광원은 적어도 하나 이상이고, 광굴절기(310)에 인접하게 설치되어 광굴절기와 결합되며, 출사면(320)에서 물체의 영상을 형성하기 위하여 광굴절기 내에 빛을 입사하여 영상면(318)의 물체에 조사하는 것이고, 인용발명 1의 다이오드군(6)은 적어도 하나 이상으로서 프리즘(8)의 밑면(C)에서 빛 분산렌즈(7)와 수평으로 설치되어 빛 분산효과를 높이고, 반투광성면에서 물체의 영상을 형성하기 위하여 프리즘(8) 내에 빛을 입사하여 지문접촉면의 물체에 조사하는 것이므로, 구성 2의 광원과 인용발명 1의 다이오드군(6)은 모두 광굴절기(프리즘)에 인접하여 설치되며 출사면(반투광성면)에서 물체의 영상을 형성하기 위하여 광굴절기(프리즘) 내에 빛을 입사하여 영상면(지문접촉면)의 물체에 조사하는 적어도 하나 이상의 광원(다이오드군)이라는 점에서 동일하다. 이에 대하여 피청구인은 인용발명 1은 광원이 프리즘에 인접하여 설치되어 있지 않고 프리즘과 결합되어 있지 않다고 주장하고 있으나, 위 구성 2의 '인접'이라는 용어는 '이웃에 있음' 또는 '옆에 닿아 있음'을 의미하므로 구성 2의 광원은 광굴절기와 직접 접촉되지 않고 가깝게(이웃하게) 설치되거나 직접 접촉되며 설치되는 것을 모두 포함하는 것이고, 이 건 특허발명의 상세한 설명에서도 "광원(312)은 되도록이면 프리즘(310)의 길이(도 4에 표시된 종이의 평면 속으로 연장된) 정도로 길게 연장되어 일렬로 배열된 LED 어레이가 좋다. 만일 이러한 LED 어레이가 광원으로 쓰인다면, 확산 덮개가 영상면(318)의 좀 더 균일한 조명을 위하여 LED들과 출사면(320) 사이에

설치될 수 있다."라고 기재된 것으로 보아, 구성 2의 광원은 광굴절기와의 사이에서 아무런 공간 없이 직접 접촉되어 설치되는 것뿐만 아니라 광굴절기와 사이에 공간을 두거나 확산 덮개를 두어 서로 직접 접촉되지는 않으면서 가깝게 설치되는 것을 포함하는 것이고, 또한 이 건 특허발명의 상세한 설명에는 구성 2의 '결합'이라는 용어와 동일한 용어가 사용되고 있지는 아니하나, 이와 관련하여 "영상취득용 구성요소를 도 4에 도시한 정위치에 위치시키기 위해, 각 구성요소를 수용하는 홀딩슬롯(holding slot)을 갖는 프레임을 플라스틱 몰딩 또는 다른 수단으로 제작할 수 있다. 광원(312)은 출사면(320)에 인접한 홀딩슬롯에 삽입되거나 공지된 투명 접착제에 의해 출사면(320)에 직접 부착될 수 있다."라고 기재된 것으로 보아, 구성 2의 '결합'이라는 것은 광원이 투명 접착제에 의해 광굴절기에 직접 부착되어 결합하는 것뿐만 아니라 광굴절기와 광원이 광굴절기의 출사면에 인접한(직접 접촉하거나 또는 가깝게 위치한) 홀딩슬롯에 각각 삽입되어 결합되는 것을 포함하는 것이다. 이와 더불어, 인용발명 1은 다이오드군과 프리즘 사이에 균일한 조명을 위한 분산렌즈가 설치된 채 다이오드군이 프리즘에 인접하게 설치되어 있고(도 3), 당업자라면 인용발명 1의 다이오드군과 프리즘을 수용하는 홀딩슬롯을 갖는 프레임 등의 적절한 수단에 의해 그들을 결합되도록 구성함에 있어 아무런 어려움이 없다. 따라서 구성 2는 당업자가 인용발명 1의 대응구성에 의해 용이하게 착안, 도출할 수 있는 것이다.

    3) 구성 3

       구성 3{상기 광굴절기의 외부에 상기 출사면에 인접한 위치에 설치되고, 출사면을 통해 광굴절기로부터 출사되는 영상을 상기 물체의 영상으로서 결상하는 역할을 하는 적어도 한 개 이상의 렌즈}은 인용발명 1의 "결상렌즈계(9)"에 대응되는 구성으로서, 구성 3의 렌즈는 광굴절기의 외부에서 출사면에 인접한 위치에 설치(도 4,

도 6 및 도 8에서 렌즈(314)가 출사면(320)과 떨어져서 설치)되고 출사면을 통해 광굴절기로부터 출사되는 영상을 물체의 영상으로서 결상하는 역할을 하는 적어도 한 개 이상이고, 인용발명 1의 결상렌즈계(9)는 프리즘의 외부에 반투광성면(8")에 인접한 위치에 설치되고, 반투광성면을 통해 프리즘으로부터 출사되는 영상을 물체의 영상으로서 결상하는 역할을 하는 것이므로, 구성 3의 렌즈와 인용발명 1의 결상렌즈계(9)는 모두 광굴절기(프리즘)의 외부에서 출사면(반투광성면)에 인접한 위치에 설치되고, 출사면(반투광성면)을 통해 광굴절기(프리즘)로부터 출사되는 영상을 물체의 영상으로 결상하는 것이라는 점에서 그 구성 및 작용효과가 동일하다. 이에 대하여 피청구인은 "인용발명 1의 흡수식 시스템은 평행광선을 집광하기 때문에 렌즈가 출사면(반투광성면)에 인접하여 설치되면 영상품질의 손실이 불가피하므로 실질적으로 동일하지 않다."라고 주장하고 있으나, 이 건 특허발명의 상세한 설명에 "흡수식 시스템에서는, 렌즈부(114)의 첫번째 렌즈의 직경이 영상면(118)에 올려져 있는 지문보다 작은 경우라면, 렌즈부(114)가 출사면(122)으로부터 비교적 멀리 떨어지도록 배치되어야 한다. 이로써 상기 시스템(108)에 의해 취득되는 지문영상이 지문영상의 가장자리로 가면서 선명해 질 수 있다. 즉, 만일에 렌즈부(114)가 출사면(122)과 너무 가깝게 배치되어 있다면 지문영상의 가장자리가 손실 또는 왜곡될 것이다. 이는, 흡수식 시스템에서는 지문영상의 각 부분의 광선이 모두 평행하게 결상되기 때문이다. 그리고 만일 렌즈부(114)의 첫번째 렌즈가 영상면(118)의 지문보다 작다면, 지문영상의 가장자리 부근의 광선(이 광선은 지문영상 중앙부근의 광선과 평행하다)은 렌즈부(114)에 입사되지 못할 수도 있다. 이렇게 되면 지문영상의 가장자리는 초점이 맞지 않는 상태(out of focus)가 되거나 손실될 것이다."라고 기재된 것으로 보아, 흡수식 시스템은 평행광선을 결상하기 때문에 렌즈부의 첫 번째 렌즈의 직경이 지문보다 작은 경우에는 렌즈부가 출사면으로부터 비교적 멀리 떨어져

야 지문영상의 가장자리 손실이 없는 것이므로, 첫 번째 렌즈의 직경이 지문보다 큰 경

우 지문영상의 가장자리 손실 없이 렌즈를 출사면과 비교적 가깝게 배치할 수 있는 것

이고, 또한 이 건 제1항 발명에는 평행광선을 쓰지 않는다거나(오히려 이 건 제1항 발

명에는 물체의 겉보기 영상에서 렌즈면까지 도달되는 광선들이 실질적으로 평행하다고

한정하고 있음) 렌즈의 직경이 지문보다 작다는 한정이 없는 바, 위 피청구인의 주장은

받아들일 수 없다. 따라서 구성 3과 인용발명 1의 대응구성은 표현상 다소의 차이만

있을 뿐, 구성 및 작용효과가 실질적으로 동일하다.

    4) 구성 4

        구성 4{상기 렌즈는 상기 출사면과 180°가 아닌 각 δ(343)를 이루고

렌즈의 중심을 관통하는 광축과 수직된 렌즈면을 가지며}는 인용발명 1의 "반투광성면

과 수직을 이루는 선과 렌즈의 중심을 관통하는 광축이 이루는 각(C)을 형성하고, 렌즈

의 중심을 관통하는 광축과 수직된 렌즈면을 형성하는 렌즈"에 대응되는 구성으로서,

구성 4의 렌즈는 출사면과 180°가 아닌 각 δ(343)를 이루고 렌즈의 중심을 관통하는

광축과 수직된 렌즈면을 가지는 것이고, 인용발명 1의 렌즈는 출사면과 180°가 아닌

각(즉, c≠0)을 이루고 렌즈의 중심을 관통하는 광축과 수직된 렌즈면을 형성 것이므

로, 구성 4의 렌즈와 인용발명 1의 렌즈는 모두 출사면(반투광성면)과 180°가 아닌 각

(δ 또는 C)을 이루고, 렌즈의 중심을 관통하는 광축과 수직된 렌즈면을 가지는 것이라

는 점에서 그 구성 및 작용효과가 동일하다. 따라서 구성 4와 인용발명 1의 대응구성

은 실질적으로 구성 및 작용효과가 동일하다.

    5) 구성 5

        구성 5{상기 각 γ와 δ는, 광원으로부터 방사되어 물체에 부딪혀 산란

되어 렌즈면까지 도달하는 광선을 굴절시킴으로써, 물체의 겉보기영상의 일부분에서 렌

즈면까지 도달되는 제1광선의 광로길이와, 물체의 겉보기영상의 다른 부분에서 렌즈면까지 도달되는 다른 광선들(상기 제1광선과는 실질적으로 평행함)의 겉보기 광로길이를 실질적으로 동일하게 맞출 수 있는 각도로 설정되는 것}는 인용발명 1의 "렌즈면과 광축이 수직을 이루고, 굴절율 n에 대하여 (sinθ)/n≒sin b·sin c와 d+e−f≒θ[52°<Θ<72°, c≠0, n=굴절율, b=지문접촉면(8')과 지문접촉면(8')에서 반사되어지는 빛과 이루는 각도, c=지문접촉면(8')에서 반사되어 반투광성면(8'')을 투과하는 빛과 반투광성면(8'')에서 반사되어지는 빛과 이루는 각도, d=반투거울과 지문접촉면(8')이 이루는 각도, e=반투거울과 지문접촉면(8')에서 반사되어지는 빛과 이루는 각도, f=프리즘(8)의 밑면(C)과 반투거울에서 반사되어지는 빛과 이루는 각도]의 식(이하 '**인용발명 1의 수학식**'이라 한다.)을 만족하는 각 θ와 c"에 대응되는 구성으로서, 구성 5의 각 γ, δ와 인용발명 1의 각 Θ, c는 무두 물체의 겉보기영상에서 렌즈면까지의 광경로가 평행하고, 광선들의 광로길이를 실질적으로 동일하게 하여 사다리꼴 왜곡을 없애기 위한 광굴절기(프리즘) 내의 각 및, 광굴절기와 렌즈(결상렌즈) 사이의 각이라는 점에서 동일하다. 또한, 사다리꼴 왜곡을 없애기 위하여 프리즘의 물체의 외견상의 위치에서 렌즈까지의 거리를 일정하게 해야 한다는 기술적 사상은 인용발명 1에서와 같이 이 건 특허의 출원 전에 이미 당해 기술분야에서 공지된 기술에 불과하고, 물체의 겉보기 영상에서 렌즈면까지 도달하는 광선들의 광로길이가 다르면 사다리꼴 왜곡이 일어나며, 이러한 광로길이를 실질적으로 동일하게 맞추면 사다리꼴 왜곡이 해소된다는 것은 당업계에는 널리 알려진 주지 관용의 기술에 불과하다. 다만, 구성 5의 각 γ(영상면과 출사면이 이루는 각)는 아무런 제한이 없는데 반하여, 인용발명 1의 θ(영상면과 출사면이 이루는 각)는 "52°< Θ < 72°"로 한정된다는 제한이 있다는 점에서 차이가 있으나, 이는 당업자가 발명의 목적 등 필요에 따라 용이하게 설계변경하여 얻을 수 있는 단순 설계변경사항으로, 구성 5의

각 γ는 당업자가 인용발명 1의 각 Θ에 의해 용이하게 착안, 도출할 수 있는 것이다.

6) 한편, 피청구인의 주장을 살펴보면,

피청구인은 "이 건 특허발명의 $(n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta = 1$(이하 '이 건 특허발명의 수학식'이라 한다.)은 인용발명 1의 수학식과 다른 기술적 사상에서 도출된 것이며, 인용발명 1에는 수학식의 의미나 도출과정에 대한 설명이 없으므로, 광로의 길이를 실질적으로 동일하게 한다는 사상은 인용발명 1에 개시된 것이 아니다."라고 주장하고 있으나, 사다리꼴 왜곡의 원인이나 그 해결방법은 광경로의 차이를 없앰으로써 가능한 것으로 지문인식 시스템의 종류와는 무관하고, 인용발명 1에는 식(sinΘ) / n = sin b · sin c가 지문의 형상을 광축과 완전한 수직을 이룰 수 있도록 하는 수식이라는 의미가 명시되어 있으며, 당업자라면 지문의 형상이 광축과 완전한 수직을 이루는 사항이 물체의 겉보기영상면에서 렌즈면까지의 광경로가 평행하고 광로길이가 동일하다는 의미임을 별다른 어려움 없이 알 수 있고, 그러한 조건에 의한 인용발명 1의 수학식의 도출과정을 확인하거나 역으로 인용발명 1의 수학식 자체로부터 겉보기영상면에서 렌즈면까지 광로길이가 동일하다는 사항을 확인하는 정도는 당업자가 용이하게 할 수 있는 것으로 보여진다.

피청구인은 "인용발명 1의 사다리꼴 왜곡 해소방법은 흡수식 지문인식장치에 한정된다."라고 주장하고 있으나, 사다리꼴 왜곡의 원인이나 그 해결방법은 광경로 길이의 차이를 줄이는 것에 의해 달성되는 것으로서 시스템의 종류와는 관계가 없는 것이다. 인용발명 1에서 흡수식 시스템을 예시하여 사다리꼴 왜곡의 원인이나 그 해결방법을 설명하고 있으나, 인용발명 1의 수학식은 지문접촉면과 지문접촉면으로부터의 반사광이 이루는 각(b), 지문접촉면과 반투광성면이 이루는 각(Θ), 반투광성면의 출사각(c; 렌즈

면과 반투광성면이 이루는 각과 동일)만을 변수로 하고 있고, 지문접촉면에 입사하는 빛 자체는 물론 지문접촉면에 입사하는 빛의 각도가 임계각보다 큰지 작은지에 관한 어떠한 의미도 포함되어 있지 아니한 것이어서 인용발명 1의 수학식 역시 시스템의 종류 와는 관계가 없는 것이다.

피청구인은 "인용발명 1의 수학식은 일정한 각 b(즉 광경로가 평행하 다는 것)를 근거로 수식을 전개하는 반면, 이 건 특허발명의 수학식은 그러한 각에 관 한 변수 자체가 존재하지 않으므로 서로 기술적 의미가 다르다."라고 주장하고 있으나, 이 건 특허발명의 수학식 역시 겉보기영상에서 렌즈면까지의 광경로가 평행하다는 전 제 조건($\theta_2=\delta$)으로부터 유도된 것이며, 인용발명 1의 변수 b는 반투광성면에서의 빛의 굴절에 의한 스넬의 법칙에 의한 식 n = sin c / sin ($\theta$+b−90°)에서 주어진 $\theta$와 c의 각도에 의해 결정되는 종속변수에 불과할 뿐이고, 인용발명 1의 수학식과 스넬의 법칙 에 의한 식에서 변수 b를 생략하도록 식을 정리하면 이 건 특허발명의 수학식이 유도 되므로 그 기술적 의미가 동일한 것이다.

피청구인은 "인용발명 1은 흡수식 시스템이므로 $\theta$(지문접촉면과 반투 광성면이 이루는 각)의 각도(52°< $\theta$< 72°)에 제한이 있으나, 이 건 특허발명은 산란식 시스템이므로 γ(영상면과 출사면이 이루는 각)에는 각도 제한이 없어서 다르다."라고 주장하고 있으나, 사다리꼴 왜곡의 원인과 그 해결방법은 시스템의 종류와 무관하고, 인용발명 1의 수학식이 이 건 특허발명의 수학식과 동일한 광학적 의미를 가지는 식이며, 인용발명 1의 수학식이 흡수식 시스템이나 산란식 시스템에 모두 적용 가능한 수식인 이상, 위와 같은 각도 제한 유무의 차이로는 인용발명 1의 수학식을 만족하도록 $\theta$와 c의 각도를 조절하여 시스템의 종류와 관계없이 사다리꼴 왜곡을 해소할 수 있다는 것이 인용발명 1에 개시되어 있다는 사실을 부인할 수 없다.

피청구인은 "인용발명 1은 흡수식 시스템이므로 경제성, 소형화, 영상품질이 이 건 특허발명보다 열등하다."라고 주장하고 있으나, 사다리꼴 왜곡을 해소하고자 한 인용발명 1의 수학식은 시스템의 종류와 무관하며, 산란식 시스템이 경제성, 소형화, 영상품질 면에서 흡수식 시스템보다 유리하다는 것은 이 건 특허발명의 출원 전에 당업계에 널리 알려진 주지관용의 기술이다.

또한, 피청구인은 미국 중재재판의 일부만을 발췌하면서 미국의 중재재판에서도 인용발명 1의 수학식의 의미에 대하여 심도 있게 다루었으며 중재판결이 이를 근거로 이 건 특허발명의 진보성을 지지하였다는 등의 취지를 주장하고 있으나, 해당 증거만으로는 을 제2호증의 중재판결에서 어떠한 근거로 이 건 특허발명과 관련한 미국의 특허가 무효가 아니라고 하였는지 확인할 수 없으며, 나아가 발명의 진보성 여부 판단에 있어서는 대비되는 발명의 유무, 출원 당시의 기술수준, 진보성의 판단 기준, 당해 절차의 특성 등에 따라 나라마다 그리고 절차마다 사정을 달리할 수 있으므로, 당해 발명이 외국에서 중재절차를 거쳐 무효가 아니라고 선언되었다는 사정만으로 국내에서 그 발명의 진보성이 부정될 수 없는 것은 아니라 할 것이다.

따라서 피청구인의 위 주장들은 받아들일 수 없다.

7) 종합정리

위 사항을 종합하여 보면, 이 건 제1항 발명은 그 구성이 인용발명 1의 대응되는 구성과 동일하지는 않으나 당업자가 인용발명 1의 대응되는 구성에 의하여 용이하게 착안, 도출할 수 있으며, 효과에서도 인용발명 이상의 증진된 효과가 있다고도 볼 수 없으므로, 이 건 제1항 발명은 당업자가 인용발명 1에 의하여 용이하게 발명할 수 있는 것이다.

(나) 이 건 제2항 내지 제4항 발명이 인용발명 1에 의해 진보성이 있는지 여부

이 건 제2항 내지 제4항 발명은 이 건 제1항 발명에서 각 γ와 δ가 각각

$$0.7 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.3, \quad 0.85 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.15,$$

$$0.925 \leq (n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta \leq 1.075$$의 수학식을 충족하는 것을 특징으로 하고 있으나,

이는 인용발명 1의 "각 θ와 c가 인용발명 1의 수학식을 만족하도록 이루어진 구성"에 대응

되는 구성으로서, 인용발명 1에는 인용발명 1의 수학식을 충족시키도록 θ와 c의 값을

결정하는 것이 개시되어 있으므로 그 수학식 값을 충족시키는 θ와 c의 값 역시 개시된

것이고, 그 수학식은 이 건 특허발명의 수학식과 동일하므로, 인용발명 1의 수학식 값

을 충족시키는 θ와 c의 값은 이 건 제2항 내지 제4항 발명에 기재된 수학식(위 3개의

수학식을 말함)을 충족시키게 되는 것이며, 또한, 이 건 제2항 내지 제4항 발명은 이 건

특허발명의 수학식에 대해 각각 0.3, 0.15, 0.075의 오차범위 내에 존재하도록 한정한

것으로 이 건 특허발명의 영상시스템은 발명의 상세한 설명에 "수학식 6 내지 8에 따라

각각 "30%, 15%, 7.5%의 제조허용범위를 주는 것이 보다 더 바람직하다."라고만 기

재되어 있고, 수치한정에 따른 증진된 효과 등이 구체적으로 개시되어 있지 아니하여

임계적 의미가 없는 단순한 수치한정에 불과한 것으로 당업자가 선택 적용할 수 있는

설계변경사항이므로, 이 건 제2항 내지 제4항 발명의 위 특징구성은 당업자가 인용발명

1의 대응구성에 의하여 용이하게 착안, 도출할 수 있는 것이다. 따라서 이 건 제2항

내지 제4항 발명은 당업자가 인용발명 1에 의하여 용이하게 발명할 수 있다.

　　(다) 이 건 제5항 발명이 인용발명 1에 의해 진보성이 있는지 여부

이 건 제5항 발명은 이 건 제1항 내지 제4항 발명을 인용하는 종속항 발

명으로서, "영상이 형성되는 먼인 상기 영상면의 영역에서는 적어도 하나 이상의 광선

이 산란되어 이 산란된 광선과 상기 출사면이 소정 각도로 교차함으로써, 출사면과 영

상면이 교차된 지점에, 각도가 90°보다 작은 제1각을 이루는 것"을 특징으로 하고 있으나, 이는 인용발명 1의 "영상면(지문접촉면)에서 반사된 광선이 출사면(반투광성면)과 교차하면서 이루는 각도(지문접촉면과 반투광성면이 교차된 지점 쪽)가 90°보다 작은 것(도면 3, 4 및 6)"에 대응되는 구성으로서, 이 건 제5항 발명의 위 특징구성은 당업자가 인용발명 1 대응구성에 의해 용이하게 착안, 도출할 수 있는 것이다. 따라서 이 건 제5항 발명은 당업자가 인용발명 1에 의하여 용이하게 발명할 수 있다.

(라) 이 건 제7항 발명이 인용발명 1, 4에 의해 진보성이 있는지 여부

이 건 제7항 발명은 이 건 제1항 발명을 더욱 구체적으로 한정한 종속항 발명으로서 "광굴절기는 영상면에 대향하며 출사면에 접하는 제1모서리를 포함하고, 광원은 출사면을 향하여 출사면에 평행하게 상기 제1모서리에 인접하여 설치되는 긴 LED 어레이인 것"을 특징으로 하고 있으나, 인용발명 1과 4에서도 프리즘이 영상면에 대향하고 출사면에 접하는 제1모서리를 포함하고 있고, 인용발명 4의 발명의 상세한 설명 및 도 35, 36, 38A, 38B에는 광원으로 LED가 사용되고, LED가 제1모서리에 인접하여 출사면에 평행하게 출사면을 향하여 설치되며, 기판(11) 위에 LED 어레이(6-1 ~ 6-6)가 배열되는 것이 개시되어 있어, 출사면에 평행하게 제1모서리에 인접하도록 긴 LED 어레이를 설치하는 것은 단순한 설계변경사항에 불과하므로, 이 건 제7항 발명의 위 특징구성은 당업자가 인용발명 1, 4의 구성에 의해 용이하게 착안, 도출할 수 있는 것이고, 그에 따른 작용효과도 예측 가능하다 할 것이다. 따라서 이 건 제7항 발명은 당업자가 인용발명 1, 4에 의하여 용이하게 발명할 수 있다.

(마) 이 건 제8항 발명이 인용발명 1에 의해 진보성이 있는지 여부

이 건 제8항 발명은 이 건 제1항 발명을 더욱 구체적으로 한정한 종속항 발명으로서, "적어도 하나의 렌즈의 직경은 영상취득될 물체의 길이보다 작은 것"을 특

징으로 하는 것이나, 이 건 특허발명의 배경기술에 "광학식 인식 시스템(108)과 같은
인식시스템에서는, 렌즈부(114)에 있는 첫번째 렌즈의 직경이 출사면(122)에서 출사되
는 지문영상의 크기보다 작은 것이 바람직할 수 있다."라고 기재된 바와 같이 종래기술
로서 이 건 특허발명의 출원 전 산란식 지문인식 시스템에서 이미 렌즈의 직경이 지문
영상보다 작은 것이 널리 사용되고 있음을 나타내고 있으므로, 이 건 제8항 발명의 위
특징구성은 널리 알려진 주지의 관용기술에 불과하다. 따라서 이 건 제8항 발명은 당
업자가 인용발명 1에 의하여 용이하게 발명할 수 있다.

　　　(바) 이 건 제9항 발명이 인용발명 1에 의해 진보성이 있는지 여부

　　　　　이 건 제9항 발명은 '패턴화된 물체로부터 영상을 형성하는 방법' 발명으
로서, 이 건 제1항 발명과 발명의 카테고리만 상이할 뿐 그 기술적 구성이 동일하므로,
위 (가)에서 살펴본 바와 같이 이 건 제9항 발명은 당업자가 인용발명 1에 의하여 용이
하게 발명할 수 있다.

　　　(사) 이 건 제10항 내지 제12항 발명이 인용발명 1에 의해 진보성이 있는지 여부

　　　　　이 건 제10항 내지 제12항 발명은 이 건 제9항 발명을 더욱 구체적으로
한정한 종속항 발명으로서, 이 건 제10항 내지 제12항 발명은 각각 이 건 제2항 내지
제4항 발명과 발명의 카테고리만 상이할 뿐 그 기술적 구성이 동일하므로, 위 (나)에서
살펴본 바와 같이 이 건 제10항 내지 제12발명은 당업자가 인용발명 1에 의하여 용이
하게 발명할 수 있다.

　　　(아) 이 건 제13항 발명이 인용발명 1에 의해 진보성이 있는지 여부

　　　　　이 건 제13항 발명은 이 건 제9항 내지 제12항 발명을 더욱 구체적으로
한정한 종속항 발명으로서, "영상면에 물체를 놓는 단계에서, 물체가 놓여진 상기 영상
면의 영역에서는 적어도 하나 이상의 광선이 산란되어 이 산란된 광선과 상기 출사면

이 소정 각도로 교차함으로써, 출사면과 영상면이 교차된 지점에, 각도가 90°보다 작은 제1각을 이루는 것"을 특징으로 하고 있으나, 이 건 제5항 발명과 발명의 카테고리만 상이할 뿐 그 기술적 구성이 동일하므로, 위 (다)에서 살펴본 바와 같이 이 건 제13항 발명은 당업자가 인용발명 1에 의하여 용이하게 발명할 수 있다.

(3) 대비 종합

따라서 이 건 특허발명은 인용발명 1, 4에 비해 목적이 특이하지 않고, 이 건 제1항 내지 제5항 및 제7항 내지 제13항 발명은 그 구성이 인용발명 1, 4에 의해 용이하게 착안, 도출할 수 있으며, 작용효과도 인용발명 1, 4에 의해 예측 가능한 것으로 증진되었다고 볼 수 없으므로, 이 건 제1항 내지 제5항 및 제7항 내지 제13항 발명은 당업자가 인용발명 1, 4에 의해 용이하게 발명할 수 있다.

마. 소결론

위에서 살펴본 바와 같이, 이 건 정정은 인정되고, 이 건 제1항 내지 제5항 및 제7항 내지 제13항 발명은 그 기재가 불비하거나 공지된 기술에 해당하지 아니하나, 당업자가 인용발명 1, 4에 의하여 용이하게 발명할 수 있는 것으로 진보성이 없으므로, 그 특허가 무효되어야 한다.

5. 결론

그러므로 이 건 심판청구를 인용하기로 하고, 심판비용은 피청구인의 부담으로 하여 주문과 같이 심결한다.

2008. 7. 15.

|        |      |     |
|--------|------|-----|
| 심판장  | 심판관 | 황우택 |
| 주  심  | 심판관 | 김상배 |
|        | 심판관 | 유준  |

[별지 1]

이 건 특허발명의 도면

(도 1)



(도 2)



(도 3)　　　　　　　　　(도 4)



- 37 -



(도 5)

(도 6)

(도 7)

(도 8)

(도 9)

(도 10)

[별지 2]

## 인용발명 1의 도면

(도 1)



(도 2)





$a \neq b_0 \neq b_1$

(도 3)



(도 4)



(도 5)



$a = b_1 = b_2 = b_3$

(도 6)



(도 7)



[별지 3]

인용발명 2의 도면

(도 1)                                                                    (도 2)



1 : 指
11 : 光源
21 : プリズム
22 : 指接触面
23,24 : プリズムの面
31 : イメージセンサ
32 : レンズ
41 : 移動距離センサ
51 : 画像メモリ

1 : 指
2 : プリズム
2a : 指接触面
11 : 光源
31 : 受光素子
32 : レンズ

従 来 例

[별지 4]

인용발명 3의 도면

(도 1)                                                    (인용발명 2의 도 3)



FIG.1

MONITOR DISPLAY

DATA PROCESSOR

OPTICAL PICK OFF

22(A-B) : 指接触面
A'-B' : 見かけの像の位置

見かけの像の位置

- 40 -

[별지 5]

인용발명 4의 도면

(도 23)




(도 24)




(도 35)



(도 36)




(도 37)



(도 38)



- 41 -

**Exhibit F**

JP 3877058 B2 2007. 2. 7

(19) The Japan Patent Office (JP)

(12) Patent Gazette (B2)

(11) Patent No.:        P3877058
(45) Date of Issue:    Feb. 7, 2007
(45) Date of Patent:   Nov. 10, 2006

(51) Int. Cl.                          F 1
    G 0 6 T   1/00 (2006.01)          G 0 6 T   1/00   4 0 0 G
                                      G 0 6 T   1/00   4 2 0 C

                                      5 Claims (Total 17 pages)

(21) Appl. No.:                    P2001-516128

(86) (22) Filed:                   Aug. 1, 2000

(65) Pub. No.:                     P2003-506798A

(43) Pub. Date:                    Feb. 18, 2003

(86) International Appl. No.:       PCT/US2000/040530

(87) International Pub. No.:        WO2001/011549

(87) International Pub. Date.:      Feb. 15, 2001
    Filing Date  of Request for Examination: Feb. 4, 2002

(31) Priority No.:                 09/368,442

(32) Priority Date :               Aug. 4, 1999

(33) Priority Country:             U.S.A.

(73)PATENTEE:            SecuGen Corporation (500346556)
            2356 Walsh Avenue Santa Clara, CA 95051 U.S.A.

(74) ATTORNEY:           Yoshio Kawaguti

1

JP 3877058 B2 2007. 2. 7

Patent Attorney, 100062007

(74) ATTORNEY:                    Ono Makoto
                                  Patent Attorney, 100114188

(74) ATTORNEY:                    Watanabe Chihiro
                                  Patent Attorney, 100140523

(74) ATTORNEY:                    Kanayama Masakata
                                  Patent Attorney, 100119253

(74) ATTORNEY:                    Osaki Katsumasa
                                  Patent Attorney, 100103920

Continued on the last page

## (54) Title of the invention

### A COMPACT APPARATUS AND MANUFACTURING METHOD THEREOF

## (57) CLAIMS

1. A compact apparatus for forming a high contrast, low distortion image of a patterned object like a fingerprint including:

a light refractor (310) for reflecting and refracting light, which is a triangular prism (310) and polyhedron with five surfaces and has an index of refraction n, n>1, the light refractor (310) including:

> an imaging surface (318) of a flat rectangle against which the patterned object (335) with its length is to be placed;

> a viewing surface (320) adjacent to the imaging surface, having a flat rectangle through which the image of the object is projected, the viewing surface forming an angle γ (342) with the imaging surface (318) excluding 0 degrees as a light receiving surface for incident light;

> a further surface (322) having an angle (341) with the viewing surface (320) excluding 0 degrees, the further surface (322) reflecting and scattering the incident light to make the imaging surface (318) irradiate with the incident light uniformly and make high a rate of the incident light scattered inside the light refractor (310); and

2

JP 3877058 B2 2007. 2. 7

a first ridgeline (338) adjacent to the viewing surface (320) and against the imaging surface (318);

at least one light source (312) adjacent to the light refractor (310), for emitting the incident light which enters into the light refractor (310) in order to form the image of the object in the viewing surface (320);

a first light blocking shield (350) placed to the a part of viewing surface (320) and having the mirror plane which faces the interior of the light refractor (310), for reducing the amount of stray light from the light source (312) which enter into a lens (314) and interfere with or cloud the image of the object;

a second light blocking shield (352) extended from the viewing surface (320) at an angle to block stray light from the light source (312) from entering the lens (314);

at least one lens (314) formed outside of the light refractor (310) and adjacent to the viewing surface (320), and for receiving and focusing light projected through the viewing surface (320) from the light refractor (310) as the image of the object;

wherein the lens (314) has a lens plane forming an angle δ (343), excluding 0 degrees, with the viewing surface, the lens plane which is perpendicular to an optical axis of system which passes through the center of the lens (314), and the diameter of the lens (314) is smaller than the length of the object;

wherein the light source is a strip of light emitting diodes (LEDs) oriented towards and parallel with the viewing surface (320) and adjacent to the first ridgeline (338); and

wherein the angles γ and δ are formed to substantially equalize a path length of a first light ray traveling from one part of the apparent image of the object to the lens plane with a path length of any other light ray substantially parallel to the first light ray and traveling from another part of the apparent image of the object to the lens plane.

2. The compact apparatus of claim 1 wherein the angles γ and δ meet the equation:
$$0.7 \le (n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.3$$

3. The compact apparatus of claim 1 wherein the angles γ and δ meet the equation:
$$0.85 \le (n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.15$$

4. The compact apparatus of claim 1 wherein the angles γ and δ meet the equation:
$$0.925 \le (n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta \le 1.075$$

5. The apparatus of any one of claims 1 to 4, wherein a part of the imaging surface

3

against which the object to be imaged is to be placed is able to have at least one light ray scattered from each portion thereof such that the intersection of the at least one light ray and the viewing surface form a first angle which is less than 90 degrees and is adjacent to the intersection of the viewing surface and the imaging surface.

# English Translation of Bibliographical Data and Claims of

# Japanese Patent No. 3877058

The attached document was translated on 31 July 2008 by a translator who is conversant in both English and Korean under my supervision and this office, and the translation is accurate according to our knowledge.

*Young-Chul Cho*

Young-Chul, CHO
Translator
Patent Attorney

## NICE  PATENT & LAW FIRM

JP 3877058 B2 2007.2.7

(19)日本国特許庁(JP)　　　(12)特　許　公　報(B2)　　　(11)特許番号

特許第3877058号
(P3877058)

(45)発行日　平成19年2月7日(2007.2.7)　　　(24)登録日　平成18年11月10日(2006.11.10)

| (51)Int.Cl. | | | F I | | | |
|---|---|---|---|---|---|---|
| G06T | 1/00 | (2006.01) | G06T | 1/00 | 400G | |
| | | | G06T | 1/00 | 420C | |

請求項の数 5　（全 17 頁）

| (21)出願番号 | 特願2001-516128(P2001-516128) | (73)特許権者　500346556 |
|---|---|---|
| (86)(22)出願日 | 平成12年8月1日(2000.8.1) | 　　　セキュジェン　コーポレイション |
| (65)公表番号 | 特表2003-506798(P2003-506798A) | 　　　アメリカ合衆国　カリフォルニア　950 |
| (43)公表日 | 平成15年2月18日(2003.2.18) | 　　　51，　サンタ　クララ，　ウォルシュ |
| (86)国際出願番号 | PCT/US2000/040530 | 　　　アベニュー　2356 |
| (87)国際公開番号 | WO2001/011549 | (74)代理人　100062007 |
| (87)国際公開日 | 平成13年2月15日(2001.2.15) | 　　　弁理士　川口　義雄 |
| 　審査請求日 | 平成14年2月4日(2002.2.4) | (74)代理人　100114188 |
| (31)優先権主張番号 | 09/368,442 | 　　　弁理士　小野　誠 |
| (32)優先日 | 平成11年8月4日(1999.8.4) | (74)代理人　100140523 |
| (33)優先権主張国 | 米国(US) | 　　　弁理士　渡邉　千尋 |
| | | (74)代理人　100119253 |
| | | 　　　弁理士　金山　賢教 |
| | | (74)代理人　100103920 |
| | | 　　　弁理士　大崎　勝真 |
| | | 最終頁に続く |

(54)【発明の名称】小型装置およびその製造方法

(57)【特許請求の範囲】
【請求項1】
　指紋のような、模様が形成されている対象物の、ハイ・コントラストで、ロー・歪みの像を形成する小型装置であって、
　　長さを持つ対象物（335）を配置する平坦な矩形の撮像面（318）と、
　　前記撮像面に隣接する面であって前記対象物の像が出射され、前記撮像面（318）に対してゼロにならない角度γ（342）をなし、その一部が光を入射する受光面としての役割も果たす、平坦な矩形の出射面（320）と、
　　照射される入射光のうち光屈折器（310）の内部で散乱する割合を高くするとともに、入射光を前記撮像面（318）に均一に照射させるために、入射光を反射および拡散させる、前記出射面（320）に対してゼロにならない角度（341）をなすさらにもう一つの面（322）と、　　　　　　　　　　　　　　　　　　　　　　　　　　　　　10
　　前記撮像面（318）に対向し、前記出射面（320）に隣接する第一稜線（338）とを含み、
　　光を反射および屈折させ、屈折率nがn＞1であり、5面体の三角プリズム（310）である、光屈折器（310）と、
　　前記光屈折器（310）に隣接して設けられ、前記出射面（320）にて前記対象物の像を形成するために、前記光屈折器（310）に入射する入射光を出射するための、少なくとも一つの光源（312）と、
　　前記出射面（320）の一部に配され、前記光屈折器（310）の内側に対向している　　　　20

鏡面を有することにより、レンズ（３１４）に入射し、前記対象物の像に干渉してぼやけさせてしまう、前記光源（３１２）からの迷い光の量を低減する第１の遮光部（３５０）と、

前記光源（３１２）からの迷い光を遮断してレンズ（３１４）に入射させない角度で前記出射面（３２０）から延びている第２の遮光部（３５２）と、

前記光屈折器（３１０）の外側にあり、前記出射面（３２０）に近接して、当該出射面（３２０）から前記光屈折器（３１０）を通過して出射される光を受け取るとともに、前記対象物の像を形成するための前記光の焦点をあわせる少なくとも一つのレンズ（３１４）とを含み、

前記レンズ（３１４）は、レンズ（３１４）の中心を通るシステムの光軸に対して垂直 10
であって、前記出射面（３２０）に対してゼロにならない角度δ（３４３）をなすレンズ面を有し、撮像される前記対象物の長さよりも小さい直径を有しており、

前記光源は、前記出射面（３２０）に向けられ、前記出射面（３２０）に平行であるとともに、前記第一稜線（３３８）に隣接する発光ダイオード（ＬＥＤ）の列であり、

前記角度γおよび角度δは、見かけ像の一部から前記レンズ面までの第一光線の光路長と、当該第一光線に実質的に平行であり、前記見かけ像の別の部分から前記レンズ面までの別の光線の光路長とが実質的に等しくなるように形成されている小型装置。

【請求項２】
前記角度γおよび角度δの関係において、
$0.7 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.3$ 20
が成り立つ、請求項１記載の小型装置。

【請求項３】
前記角度γおよび角度δの関係において、
$0.85 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.15$
が成り立つ、請求項１記載の小型装置。

【請求項４】
前記角度γおよび角度δの関係において、
$0.925 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.075$
が成り立つ、請求項１記載の小型装置。

【請求項５】 30
少なくとも一つの光線と出射面とが、出射面と撮像面との交差部に近接する側で、９０°未満の第一角度をなして交差し、撮像される対象物を配置する撮像面のどの部分も、少なくとも一つの光線を散乱させることが可能な請求項１～４のいずれか１項に記載の小型装置。

【発明の詳細な説明】
発明の分野
本発明は、像キャプチャー及び認識システムに使用される光学撮像装置に関し、特に、模様が形成されている物体（patterned object、以下ＰＯと称する）の像の台形歪みを軽減あるいは実質的に排除し、該像をより鮮明にする光学撮像装置に関する。

【０００１】 40
従来の技術
ＰＯ認識システムは産業的、商業的に一般化され、例えば、文書、絵、写真をスキャンするスキャナなど、様々な用途に使用されている。近年では、一般消費者向けにパターン認識システムの利用を進めるべく、メーカ側では、そのコストダウンが図られている。そうしたパターン認識システムの一般消費者向け製品への利用例の一つが、指紋の撮像及び認識である。これにより、例えばコンピュータの利用者の指紋を採取して、コンピュータの使用もしくは特定のファイル・機能へのアクセスの権限を持つユーザの指紋と比較することで、セキュリティの向上を図ることが可能である。かかるシステムは、例えばログインネーム及びパスワードによるセキュリティシステムの代替物となりうる。

【０００２】 50

まず第一に、このような指紋認識システムおよび他のパターン認識システムでは、解析のために、指紋や他の模様を正確に撮影することが求められる。パターン情報の取得に関しては既に様々なメカニズムが開発されており、例えば、米国特許３，９７５，７１１号、４，６８１，４３５号、５，０５１，５７６号、５，１７７，４３５号、及び５，２３３，４０４号が、ＰＯ像の撮影に関する装置を開示している。

【０００３】
図１は、このような従来技術の光学的指紋撮影認識システムを示す概略図である。図１において、光学認識システム１０８は、光源１１２、光学三角プリズム１１０、レンズ体１１４、イメージセンサ１１６、格納及び処理ユニット１２５を含んでいる。プリズム１１０は、撮像面（imaging surface）１１８、受光面（light receiving surface）１２０、および出射面（viewing surface）１２２を含んでいる。撮像面１１８は、指紋などのＰＯが撮像のために置かれる面である。光源１１２は、例えばＬＥＤであって、受光面１２０に近接し、光学プリズム１１０に送られる入射光１２４を発する。光学プリズム１１０は直角二等辺三角形になっていて、撮像面１１８と向かい合う角はほぼ９０°であり、他の２つの底角（二等辺三角形の等しい二角）はほぼ４５°となっている。

【０００４】
一般に、入射光１２４は撮像面１１８に、撮像面の法線１１５に対して角度１２６で入射する。角度１２６は臨界角１２８より大きい。一般に臨界角とは入射する光線と面の法線との間の角度のことを指している。入射光が臨界角よりも大きな角度で入射するときは、入射光は表面で内部全反射（total internal reflection off the surface）され、一方臨界角よりも小さな角度で入射するときは、入射光はほぼすべて表面を通り過ぎる。以上のように、入射角１２８とは、入射光が撮像面１１８で完全に内部反射され、反射光１３０として出射面１２２を経由してプリズム１２０から発射される際の、撮像面１１８の法線に対する角度のことである。

【０００５】
反射光１３０は、出射面１２２に近接するレンズ体１１４を通過する。レンズ体１１４は、一つ以上の光学レンズを含んでなっていてもよい。レンズ体１１４からの光はイメージセンサ１１６によって取り込まれる（captured）。レンズ体１１４は、例えば光学的に像を取り込んで電気信号に変換する、電気結合素子（ＣＣＤ：Charged Coupled Device）や相補型ＭＯＳ（ＣＭＯＳ：Complimentary Metal Oxide Semiconductor）素子であってもよい。このようなイメージセンサは当業者には広く知られているものである。電気信号は、次に格納及び処理ユニット１２５に送られる。

【０００６】
格納及び処理ユニット１２５は、メモリユニット、プロセッサ、アナログ／デジタルコンバータを含んでもよい（図示せず）。アナログ／デジタルコンバータは、イメージセンサ１１６からのアナログ電気信号をデジタルデータに変換する。メモリは、デジタルデータと、キャプチャーされた指紋の像を格納された指紋像と比較する際のアルゴリズムと、を格納するために用いられる。プロセッサは、データ比較アルゴリズムに基づいて、取り込まれたデジタルデータと事前にメモリに格納されたデータとを比較する。プロセッサによって、格納されているデータとの比較以外の目的のために、取り込まれたデジタルデータを解析することもできる。かかる格納及び処理ユニットは当業者には広く知られ、必要なソフトを搭載した一般的なパーソナルコンピュータもこれに該当する。画像データの処理及び比較用アルゴリズムの例としては、米国特許４，１３５，１４７号や、同４，６８８，９９５号がある。尚、これらの開示内容は、全て本出願に引例として含まれることとする。

【０００７】
光学プリズムの撮像面１１８に指紋が置かれると、指紋の隆部（ridge）１１１が撮像面１１８に触れ、指紋の谷部（valley）１０９は撮像面１１８に触れない状態を保持する。よって指紋の谷部１０９では、光源１１２から光学プリズム１１０に入る入射光１２４は、入射角が光学プリズム１１０の臨界角よりも大きい場合、撮像面１１８で内部全反射さ

れる。一方指紋の隆部１１１においては、一部の入射光１２４は、指紋の隆部で吸収されるか散乱する。ここで用いられている「散乱」とは、光が不規則な面に当たった後、多方向に放射されるか、不規則に反射されることを指している。

【０００８】
散乱もしくは吸収の結果として、指紋の隆部１１１では、入射光１２４が内部全反射されてしまうことがない。よって指紋の谷部１０９よりプリズム１１０を離れた反射光１３０の強度は、指紋の隆部１１１よりプリズム１１０を離れた反射光１３０よりも大きい。隆部１１１からの強度の小さい反射光１３０は暗く現れ、光線と指紋表面との間の光入射地点に物体が存在することを示す。これに対し、内部全反射されるような強度の高い反射光１３０は明るく現れることで、入射光１２４と撮像面１１８との間に位置する光入射地点に物体が存在しないことを示す。これにより、暗く現れる指紋の隆部１１１と比較的明るく現れる指紋の谷部１０９との区別が可能となる。この理由は、指紋の隆部１１１での入射光の吸収が、指紋撮像の際の最も重要な要素であるためであり、かかるシステム１０８は吸収式撮像システムと呼ばれる。

【０００９】
上記のシステムでは、光学的に指紋像を取り込み、該指紋像を電気的に表現する処理が可能である。しかし、指紋の隆部１１１の部分では、依然として入射光１２４の一部が反射光１３０に平行な方向に内部全反射し、一部が散乱している。このことにより、指紋の谷部１０９からの反射光１３０の強度と、指紋の隆部１１１からの反射光１３０の強度との差が、比較的低くなってしまう可能性がある。つまり、指紋像における指紋の谷部１０９と指紋の隆部１１１との間のコントラストがはっきりしなくなる可能性がある。これにより、撮像、処理、比較が困難になってしまう。

【００１０】
さらに、光学認識システム１０８のような光学認識システムにおいては、レンズ体１１４の第一レンズの直径は、出射面１２２上の指紋像よりも小さいことが望ましい。これにより、光学認識システム１０８を小型化し、製造コストを低減することが可能となる。

【００１１】
しかし、図２に示すように、システム１０８のような吸収式システムでは、レンズ体１１４の第一レンズの直径が撮像面１１８上の指紋よりも小さい場合、レンズ体１１４が撮像面１１８から比較的離れた位置に配置する必要がある。この構成により、システム１０８によって取り込まれた指紋像は、指紋の縁部に至るまで鮮明に表現される。一方で、レンズ体１１４の配置が出射面１２２に近過ぎると、指紋像の縁部が失われたり歪んだりすることがある。これは、システム１０８のような吸収式システムでは、指紋像に焦点を合わせるためには、指紋像を作る光線が略平行でなければならないからである。また、レンズ体１１４の第一レンズが撮像面１１８上の指紋よりも小さい場合、指紋像の中央に近い領域からの光線に対して平行になっている指紋像の縁部からの光線がレンズ体１１４に入らず、よって指紋像の縁部がぼやけたり失われたりする可能性がある。

【００１２】
よって、図２に示すように、光学認識システム１０８のレンズ体が、点線で示されるレンズ体１１４’の位置にある場合、略平行な反射光１３０と１３０’はレンズ体１１４’に入らない。この理由により、レンズ体がレンズ体１１４’の位置に配置される場合、システム１０８では、撮像面１１８のＡ点及びＢ点の指紋像を鮮明に撮影することができない。

【００１３】
こうして、図２に示すように、吸収式システムでは、略平行な光線によって指紋像の全体を撮像するためには、レンズ体１１４を出射面１２２から比較的遠くに配置しなければならず、それゆえ、レンズ体１１４の第一レンズを比較的小さくしてシステムの小型化を図った事が無駄になってしまう可能性がある。このように、光学認識システム１０８の小型化には困難が伴う。さらに、出射面１２２とレンズ体１１４との距離が比較的大きいために、光の干渉によって指紋像のコントラストが失われてしまうことも考えられる。

【００１４】
加えて、レンズ体１１４の第一レンズが出射面１２２上の指紋像より小さい場合、光学認識システム１０８内で、台形歪みと呼ばれる現象が生じる。撮像システムにおける台形歪みとは、システムで形成された正方形の像が台形のような形に変形されて見えることをいう。

【００１５】
図２は、なぜ台形歪みが光学認識システム１０８において生じるかを説明した概略図である。光源１１２からの入射光１２４はプリズム１１０に入り、撮像面１１８で反射して、像ＡＢを形成する。そして反射光１３０は出射面１２２を通過してレンズ体１１４に達し、Ａ′地点及びＢ′地点において像Ａ′Ｂ′を形成する。出射面１２２を通じて見られる像ＡＢは、「見かけ像」（apparent image）として像ａｂに位置しているように見える。具体的には、Ａ地点は出射面１２２より距離ａａ′だけ離れたａ地点にあるように見え、Ｂ地点は出射面１２２より距離ｂｂ′だけ離れたｂ地点にあるように見える。出射面１２２から物体の見かけ像が現れる地点までの距離は、出射面１２２から物体までの実際の距離を、プリズム１１０の屈折率ｎで割った値となる。具体的には、距離ａａ′は次の式で求められる。

【００１６】
ａａ′＝Ａａ′／ｎ
ただし、ｎはプリズム１１０の屈折率である。同様に、次式が得られる。

【００１７】
ｂｂ′＝Ｂｂ′／ｎ
台形歪みは、物体の見かけ像からレンズ体１１４のレンズ面１０７までの光路の長さが像を結んでいる物体の部分によって異なり、レンズ体１１４の対物レンズが出射面１２２を通過する指紋像よりも小さい場合に生じる。具体的にいえば、システム１０８の場合、台形歪みが生じるのは、距離ａＡ′が距離ｂＢ′よりも長く、レンズ体１１４の直径が出射面１２２上の距離ａ′ｂ′よりも短い場合である。

【００１８】
また、距離ａＡ′が距離ｂＢ′よりも長いことから、どの部分においても焦点が合っているような物体の像を得ることが困難になっている。概して、見かけ物体の像からレンズ体のレンズ面までの光路長や、さらに最終的にはイメージセンサまでの光路長が、像を結んでいる物体の部分によって異なる場合には、レンズ面において物体のある部分では焦点が合っており、またある別の部分ではぼやけてしまう。

【００１９】
このような台形歪み及び物体の像の一部がぼやけるという問題を解決すべく、従来技術では、レンズ体１１４のレンズ面１０７とイメージセンサ１１６を傾けて距離ｂＢ′を伸ばす一方で距離ａＡ′を小さくし、これら２つの距離がほぼ同じになるように構成している。しかし、直角二等辺プリズム（即ち、底角がほぼ４５°、底角でない角、つまりは頂角がほぼ９０°である三角プリズム）の特性上、反射光１３０は出射面１２２に実質的に垂直にプリズム１１０を通過する。従って、反射光１３０が出射面１２２を通る際には屈折は生じない。更に、一般には、透明な物体の表面への光の入射角が大きいほど、表面で反射される光の量は多くなる。このようにして、イメージセンサ１１６に入る光の強度が減少し、像の処理および比較がより困難になってしまう。

【００２０】
従って、レンズ体１１４及びセンサを傾けることは、台形ゆがみを低減して像の鮮明さを向上する一方、反射光１３０が大きな入射角にてレンズ体１１４に入射するので、レンズ体１１４表面や、イメージセンサ１１６表面での反射光１３０の反射が大きくなってしまう。これにより、イメージセンサ１１６に入射する光の強度が小さくなり、処理や比較が困難になる。

【００２１】
加えて、光源１１２とレンズ体１１４の相対的な配置によって、光源１１２からの迷い光

（stray　light）１１３がレンズ体１１４に入るようになってしまっている。これにより
、さらに取り込まれた像の質を低下させ、その像の処理を困難にする、余分なバックグラ
ウンドである「ノイズ光」が発生する。
【００２２】
上記のような吸収式撮像システムの問題点を解消すべく、吸収式ではなく「散乱式」によ
る撮像システムが考案されており、その一例が、Ｊ．Ｌｏｕｇｈｅｅｄらの、１９９３年８月３日開
示の米国特許５，２３３，４０４号である。図３は、Ｌｏｕｇｈｅｅｄらによる装置の撮像部を示し
た概略図である。この図３に示すように、従来技術の撮像システム２０８は、台形プリズム
２１０、光源２１２、レンズ体２１４、及びイメージセンサ２１６を備えている。台形
プリズム２１０は、少なくとも撮像面２１８、受光面２２０、出射面２２２を有している
。
【００２３】
撮像面２１８は、指紋など撮像される物体が置かれる面である。光源２１２は、撮像面２
１８と略平行な受光面２２０に近接し、対向するように配置されている。よって光源２１
２からの入射光２２４はプリズム２１０に入り、プリズム２１０の臨界角２２８よりも小
さい角度で撮像面２１８に入射する。従って、指紋の谷部２０９が撮像面２１８に置かれ
ている面、即ち指紋が撮像面に接していない面においては内部全反射が起こらず、入射光
２２４は撮像面２１８を通り抜ける。指紋の隆部２１１が接して置かれている撮像面２１
８では、入射光２２４は指紋の隆部で反射して、散乱光（あるいは不規則反射光）２３０
を生ずる。散乱光２３０は、プリズム２１０内の、入射面２２２に近接するレンズ体２１
４への方向を含めたほぼ全ての方向へと広がってゆく。散乱光は入射面２２２を通りレン
ズ体２１４に入って、上記のようなＣＣＤ、ＣＭＯＳといった検出装置であるイメージセ
ンサ２１６により検出される。
【００２４】
指紋の谷部２０９の領域では、入射光２２４は撮像面２１８を通過する。また、指紋の隆
部２１１の領域では、入射光２２４は撮像面２１８で散乱して、レンズ体２１４及びイ
メージセンサ２１６によって捕捉される。従って、指紋の隆部２１１の像は比較的明るく、
指紋の谷部２０９の像は比較的暗くなる。これは散乱光２３０がイメージセンサ２１６に
よって捕捉されるためであり、このタイプのシステムを「散乱」システムといっている。
【００２５】
散乱システムにより形成された、指紋像の隆部と谷部との間の光の強度の差あるいは強度
の度合いは、図１に示すように、吸収システムにおける、指紋像の隆部と谷部との間の光
の強度の差あるいは強度の度合いよりも大きくなっている。これにより、散乱システムに
よって形成された指紋像の、指紋の隆部と谷部との間のコントラストの方が、吸収システ
ムによるものよりもはっきりしたものになる。こうしてイメージセンサ２１６がより鮮明
な像を捉えられるようになり、該システムによる指紋の比較の精度が向上する。
【００２６】
さらに、散乱システムの特性上、レンズ体２１４に入って指紋の像を形成する光線が平行
でなくても鮮明な像が形成される。よって、レンズ体２１４の第一レンズが入射面２２２
上での指紋の像より小さくても、像の縁部付近での鮮明さを失う事なく、レンズ体２１４
を入射面２２２の比較的近くに配置することが可能になる。
【００２７】
しかし、プリズム２１０のような台形プリズムは、図１に示すプリズム１１０のような三
角プリズムよりも製造コストが高くなる。その一因は、研磨すべき表面が多くなることに
起因する。このような製造コストの増加は撮像システム２０８のようなシステムの高価格
化を招き、一般消費者向け製品への利用をさらに困難にしてしまう。
【００２８】
さらに、プリズム２１０における指紋の見かけ像からレンズ体２１４までの散乱光の光路
長が、像の各部分によって異なることから、撮像システム２０８では、光学認識システム
１０８の場合と同様に、指紋像の一部分がぼやけてしまうことがある。加えて、図３には

示していないが、撮像システム２０８におけるレンズ体１１４の第一レンズが入射面２２
２上の指紋像よりも小さい場合、プリズム２１０における指紋の見かけ像の部分に応じて
、像からレンズ体２１４およびイメージセンサ２１６までの散乱光の光路長の違いにより
、台形歪みも発生する。

【００２９】
これまでの記述によって明らかなように、ＰＯ認識システム用の撮像装置の改良が望まれ
ている。具体的には、像の台形歪みを軽減もしくは略解消した撮像装置が望まれている。
さらに、撮像装置は像のほぼ全ての部分に焦点を合わせられるものが望ましく、また比較
的コンパクトで製造コストが安いものが好ましい。

【００３０】
発明の概要
本発明は、台形の歪みを低減した、もしくは略解消した、ハイ・コントラスト、ロー・歪
みの像を形成する撮像装置を含んでいる。さらに、本発明の撮像システムは比較的低価に
て製造できる。撮像装置は、ＰＯの見かけ像を形成するために、対象物を配置する撮像面
と、さらにもう一つの面と、出射面とを備える光屈折器を有する。出射面は、撮像面に近
接し、撮像面に対して角度γをなす。ＰＯの像は出射面から映し出される。また、撮像装
置は、ＰＯの像を受け取ったり、焦点をあわせるための出射面に近接したレンズを備えて
いる。レンズは光軸に対して垂直になるレンズ面を有し、出射面に対して角度δをなす。
角度γおよび角度δは、ＰＯの見かけ像の一部分からレンズ面までの第一光線の光路長で
あり、最終的にはイメージセンサまでの光路長と、第一光線に略平行でＰＯの見かけ像の
別の部分からレンズ面までの別の光路長の光路長であり、最終的にはイメージセンサまでの
光路長と、を実質的に等しくするためになされる角度である。好ましくは、以下の式が成
り立つように角度γと角度δを設定すればよい。

【００３１】
$0.7 \leqq (n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.30$
本発明は、また、出射面と光線とが、出射面の撮像面との交差部の側にて、９０°未満の
角度をなし、撮像される対象物が置かれる撮像面のどの部分も、少なくとも一つの光線が
散乱される構成を有していることが好ましい。

【００３２】
　本発明の製造方法は、上記小型装置の製造方法であって、光屈折器（３１０）を形成す
るステップと、出射面（３２０）によって定義される平面と、撮像面（３１８）によって
定義される平面との間のゼロにならない角度γ（３４２）を形成するステップと、光源（
３１２）と、第１遮光部（３５０）と、第２遮光部（３５２）とを形成するステップと、
前記レンズ面が、当該レンズの中心を通るシステムの光軸に垂直になるように、前記出射
面に近接してレンズ（３１４）を配置するステップと、前記出射面によって定義される
平面と前記レンズ面との間のゼロにならない角度δ（３４３）を形成するステップと、前記
見かけ像の一部から前記レンズ面までの第一光線の光路長と、当該第一光線に実質的に平
行であり、前記見かけ像の別の部分から前記レンズ面までの別の光線の光路長とが実質的
に等しくなるように、角度γと角度δとを設定するステップとを含むことを特徴としてい
る。好ましくは、角度γと角度δは以下の関係が成り立つように設定される。

【００３３】
$0.7 \leqq (n^2 - \sin^2 \delta)^{1/2}(\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.30$
さらに、光線と出射面の交差部が、出射面の撮像面との交差部から見て、９０°未満
の第一角度が形成され、撮像に使用される撮像面のどの部分も、少なくとも一つの光線が
散乱される構成を有していることが好ましい。

【００３４】
上記の装置および方法により、台形の歪みの少ない、あるいは台形の歪みのない、ＰＯを
撮像することができ、比較的に焦点のはっきりした像を形成することができる。これによ
り、ＰＯのより正確な処理や比較を有効に促進することが可能になる。

【００３５】

発明の詳細な説明

図４および５は本発明に係る模様が形成されている物体（patterned object、以下ＰＯと称する）の像を映しだすシステム３０８を示している。撮像システム３１０は好ましくは、三角プリズム３１０、光源３１２、レンズ体３１４、およびイメージセンサ３１６を備えている。プリズム３１０は、図４を示した紙面に対して垂直な方向に延びる長さを有する、５面体の三角プリズムである。プリズム３１０は、指紋３３５などの像を撮ろうとする対象物を配置する平坦な矩形撮像面３１８を有する。また、プリズム３１０は、撮像面３１８に当てた指紋３３５の像がプリズム３１０から外部に出る、平坦な矩形出射面（viewing surface）３２０を有している。図４および５の実施の形態において、出射面３２０は、プリズム３１０の内部に光を入射する受光面としての役割も果たす。光散乱面３２２は、プリズム３１０の第３またはそれ以上の平坦な矩形面を形成する。以下に詳細する理由で、光散乱面３２２は拡散面であることが好ましい。

【００３６】
光源３１２は、発光ダイオード（ＬＥＤ）をプリズム３１０の（図４の紙面に対して垂直な方向に延びる）長さ程度に一列に並べたＬＥＤアレーであることが好ましい。このＬＥＤアレーを光源３１２として使用すると、拡散益体を該ＬＥＤアレーと出射面３２０との間に設けることができ、撮像面３１８が一層均一に照射される。なお、光源３１２は、プリズム３１０に光を入射させられ得るどんなタイプの光源であってもよく、そのタイプの如何によらず本発明の範囲内である。プリズム３１０の、撮像面３１８の反対に位置するエッジ３３８に沿って光源３１２が設けられることが好ましい。また、撮像システム３０８の光源はこれ以外の構成でもいいし、これ以外の位置に設置してもよく、いずれの場合も本発明の範囲内である。本発明に適用できる光源の例としては、ここに挙げた以外に、同じ譲受人のもとで出願され、現在審査中の米国特許出願０９／１９１，４２８号（出願日１９９８年１１月１２日）、「ハイ・コントラスト、ロー・歪みの映像キャプチャー光学システム」に開示されている。この特許出願の開示内容全体は、本発明に含まれているものとする。一例を挙げると、光源３１２は、エッジ３６５から出射面３２０に降ろした垂線と出射面３２０との交差部に形成される線３６０とエッジ３３８との間であれば、出射面３２０に対してどこに設置してもかまわない。

【００３７】
レンズ体３１４は、指紋３３５からの散乱光３３０を受け、この散乱光３３０をイメージセンサ３１６上で集束させるためのものである。レンズ体３１４は一つのレンズでもよいが、好ましくは、複数のレンズから構成されているのがよい。焦点距離が約１３．４８ｍｍのレンズ体３１４を出射面３２０から約１３．５ｍｍの位置に設けるのが最も好ましい。また、レンズ体３１４の一実施の形態の概略図である図７に示すように、レンズ体は三つのレンズ９０４、９０６、９０８を有し、それぞれの光軸が共通の光軸９０２に重なっていることが最も好ましい。レンズ９０４の直径が約１７．８ｍｍであり、レンズ９０６、９０８の直径は約６ｍｍであることが最も好ましい。レンズ体３１４はいくつのレンズからなっていても構わない。

【００３８】
イメージセンサ３１６は、レンズ体３１４から光学的に形成された像を取り込んで（capture）電気信号に変換する。イメージセンサ３１６は例えば電荷結合素子（ＣＣＤ）であるが、これに限らず、光信号をアナログあるいはデジタル電気信号に変換する手段であればよい。イメージセンサ３１６としてはＣＭＯＳ（complementary metal oxide semiconductor）素子を使用することが好ましい。ＣＣＤ及びＣＭＯＳイメージセンサは当業者によく知られている。イメージセンサ３１６が形成した電気信号は周知の手段を用いて処理可能であり、指紋などの入力模様を比較するのに用いられる。従来の技術にて言及したように、こういった信号処理方法は、例えば米国特許４，１３５，１４７号および４，６８８，９９５号に開示されており、この２件の開示内容全体を本発明は含んでいるものとする。

【００３９】
イメージセンサ３１６上に指紋３３５の像を形成するために、指紋３３５を撮像面３１８

に当てる。光源３１２から入射する光３２４は出射面３２０を通過してプリズム３１０に入る。光源３１２がエッジ３３８に近接した位置にあるので、入射光３２４は散乱面３２２に当たる。前述のように、散乱面３２２は拡散性があるものがよい。これにより、散乱面３２２に照射される入射光３３４のうち、プリズム３１０内で散乱する割合が比較的高くなる。次に、この散乱光が撮像面３１８に当たる。たとえ光散乱面３２２が拡散性を有していなくても、入射光３２４の略全てが、散乱面３２２の臨界角より大きい角度３２３で散乱面３２２に当たることになる。このように、入射光は、散乱面３２２で反射して撮像面３１８に入射する。散乱面３２２での入射光の反射性を高めるために、反射面３８１の鏡面が散乱面３２２に対向するように配置してもよい。

【００４０】
入射光３２４は散乱面３２２で散乱するかあるいは直接反射するので、入射光３２４のうち、プリズム３１０の臨界角３２８より小さい角度３２７で撮像面３１８に入射するものの割合が比較的高くなる。したがって、指紋の谷部３０９で撮像面３１８に当たる入射光３２４は内部に向かって全反射せず、大部分が撮像面３１８を通過することになる。このように、指紋の谷部３０９にて、撮像面３１８に当たる光は、そのほとんどがセンサ３１６に向かって進まない。一方、撮像面３１８に指紋の隆部３１１が触れているところで撮像面３１８に入射した入射光３２４は、大部分が散乱し、散乱光３３０となる。散乱光３３０の一部は出射面３２０を通ってプリズム３１０を出る。プリズム３１０から出射する際に散乱光３３０は屈折する。散乱光３３０はさらにレンズ体３１４に入射し、レンズ体３１４によってイメージセンサ３１６に集束する。

【００４１】
入射光３２４は散乱面３２２で散乱するので、入射光３２４は比較的均一に撮像面３１８を照らし、比較的均一な像ができる。このように均一な像は、処理がしやすく、格納されている他の指紋データと比較しやすいNので理想的である。撮像面３１８の照度をさらに均一にするために、出射面３２０の、光源３１２と対向する部分に、図５に示した複数のエッチングライン３７０で筋を入れてもよい。ライン３７０はプリズム３１０の長さ方向に延び、エッジ先端３３８に平行である。ライン３７０は、光源３１２から出射した光が出射面３２０を通過する際に、該光を拡散させる役割を果たす。

【００４２】
上述の構成に加えて、撮像システム３０８は、受光面の、光源３１２に近接した部分に遮光部３５０が設けられていることが好ましい。遮光部はプリズム３１０の全長（図４の紙面に垂直な方向）にわたって延びていることが好ましい。レンズ体３１４に入射し、指紋の像に干渉してぼやけさせてしまう光源３１２からの迷い光（stray light）の量を、遮光部３５０は低減する。さらに、プリズム３１０に内側に対向している遮光部３５０の表面を鏡面にしてもよい。鏡面にすることによって撮像面３１８に入射する散乱光の強度が高まるので、好都合である。遮光面３５０とともに、あるいはその代わりに、第２遮光面３５２を光源３１２とレンズ体３１４との間に設けてもよい。第２遮光面３５２は、光源３１２からの迷い光を遮断してレンズ体３１４に入射させない角度で出射面３２０から延びているのが好ましい。

【００４３】
光源３１２は比較的幅が狭く、撮像面３１８の反対側のエッジ３３８に近接して設けられているので、撮像面３１８に到達する入射光３２４を略全て反射、あるいは散乱してレンズ体３１４に入射する。つまり、入射光３２４は、撮像面３１８が指紋隆部３１１と接するところで散乱しなければ、イメージセンサ３１６に取り込まれることがほとんどない。指紋の谷部３０９に当たった入射光３２４がレンズ体３１４を通ってイメージセンサ３１６に到達する可能性をさらに低くするには、図５に示すように、光源３１２がライン３６０を超えないようにすることが好ましいが、このライン３６０はプリズム３１０の長さ方向に延びている。また、ライン３６０は、撮像面３１８に近接するエッジ３６５を通って出射面３２０の法線との交差部によって定義される。光源３１２とエッジ先端３３８とがこのライン対して常に同じ側に位置していれば、光源３１２から垂直に出射した入射光

３２４が指紋の隆部３１１にて散乱することなく、イメージセンサ３１６に到達することはほとんどありえない。

【００４４】
光源３１２から撮像面に直接入射する入射光３２４を最小限に抑えることによって、撮像面３１８の指紋の谷部３０９が接する部分では、入射光３２４が内に向かって実質的に反射しなくなる。これは、これらの谷部から出射面３２０に到って出射面３２０を通過し、レンズ体３１４に入射する光がほとんどないことを意味している。一方で、撮像面３１８からレンズ体３１４に入射する光は実質的に全てが撮像面３１８の指紋隆部３１１で散乱した光である。こうすることで、指紋の隆部３１１と谷部３０９との間のコントラストが比較的高い指紋の像が得られる。このようにコントラストが高い指紋の像は処理が比較的簡単で、他の指紋の像との比較がしやすいので、処理精度が上げられるという利点がある。

【００４５】
さらに、撮像のためのこの散乱技術は、上記従来の技術にて述べたように、Lougheedが開示している台形プリズムとは対照的に、三角プリズムを用いて実現している。三角プリズムは台形プリズムに比べて生産効率がよく、撮像システム３０８の方が製造費用が比較的安価であるという利点がある。

【００４６】
また、一般に、散乱光はある物体から略一方向に散乱するのではなく、多くの方向に散乱する。従来の技術で述べたように、レンズ体を用いれば、ピントの合った物体の像を平行ではない散乱光で形成することができる。つまり図６の光学認識システム３１８に示すように、レンズ体３１４の第１のレンズの直径が出射面３２２における指紋３３５の対角線より小さい場合、平行ではない散乱光を使ってピントの合った指紋３３５の像を形成することができる。したがって、レンズ体３１４を出射面３２０の比較的近くに設けても、システム３０８が形成する指紋の像の端部近傍で質を落とさないですむ。ただし、レンズ体３１４を出射面３２０に近接して設けることは必ずしも必要ではない。これらのことから、撮像システム３０８は比較的コンパクトで、レンズ体３１４は製造費用が比較的安いという利点がある。

【００４７】
図６に示すように、レンズ体３１４の第１のレンズの直径は出射面３１８における指紋の大きさに比べて小さいので、形成された像には台形歪みが発生し得る。しかし、本発明の撮像システムは、形成された像の台形歪みを小さくし、全体的に鮮明さの度合いを上げる。上記従来の技術にて述べたように、台形歪みは、像を形成する実際の物体とは異なった、歪んだ形をした像の中に現れる。台形歪みも、部分的な像のピンぼけも、ともに見かけの物体像からレンズ体３１４、さらに最終的にはイメージセンサ３１６に到る光路の長さが、物体のある部分と別のある部分とでは異なることに原因がある。ただし、図６に示すように、撮像システム３０８において、指紋３３５の見かけ像３３５'上の異なる点からレンズ体３１４、さらにイメージセンサ３１６にまで到る散乱光３３０の光路長は略同じである。具体的には、光路ＡＡ'は実質的に光路ＢＢ'と光路ＣＣ'に等しい。このように、台形歪みを小さくすることができる利点があり、さらに、全体的な像の鮮明さを上げることができる。図６に示すように、光路ＡＡ'、ＢＢ'、およびＣＣ'を実質的に等しくすることは、出射面３２０に対してレンズ体３１４を傾けることによって容易に行うことができる。

【００４８】
しかし、光学認識システム１０８とは違い、図１に示すように、レンズ体３１４を傾けてもイメージセンサ３１６に到達する像の強度は大して減少しない。従来の技術にて、光学認識システム１０８について述べたように、レンズ体１１４を傾けると反射光１３０がレンズ体３１４の第１構成要素に法線からずれた角度で当たるようになり、その結果、反射光１３０のレンズ体１１４表面における反射量が大きくなり、イメージセンサ１１６での像の強度が低下してしまって好ましくない。

【００４９】

ただし、プリズム３１０の屈折率は１を超えていることが好ましい。この場合、出射面３２０に当たる散乱光３３０はプリズム３１０から出射する際に屈折し、出射面３２０の法線からずれた方向に進む。つまり、レンズ体３１４のレンズ面３０７を傾けると、散乱光３３０がレンズ体３１４に対して、実質的に９０°に当たるようになる。したがって、イメージセンサ３１６での像の強度を減少させなくても、レンズ体３１４の表面における散乱光の過度な反射による像の強度の低下が発生しなくなるか、あるいは低下してもごくわずかになり、台形歪みは抑えられ、また、全体的な像の鮮明さが向上する。

【００５０】

レンズ体３１４の傾斜角は任意の値に決められる（図８参照）。同図において、光線４１０、４１２は撮像面のエッジ４１４およびその反対側の撮像面エッジ４１６でそれぞれ散乱する。レンズ面３０７は、レンズの厚さがゼロに近づいたときの理論上のレンズ体３１４である。距離Ａａはプリズム３１０内に現れる物体の見かけ像からレンズ面３０７までの光線４１０に沿った距離であり、距離Ｂ'ｂはプリズム３１０内に現れる物体の見かけの像からの光線４１２に沿った距離である。台形歪みを略ゼロにするためには、距離Ａａが距離Ｂ'ｂに実質上等しくなければならない。Ｂ'ｂはプリズム３１０内に現れる物体の見かけの奥行きなので、従来の技術で述べたように次式が成り立つ。

【００５１】

Ｂ'ｂ＝Ｂｂ／ｎ

ここで、Ｂｂはエッジ４１６上の点Ｂからプリズム３１０表面の点ｂまでの距離である。台形歪みを実質上ゼロにし、全体的な像の鮮明さを高めるための条件は以下の式で表わされる。

【００５２】

Ａａ＝Ｂｂ／ｎ    （式１）

光線４１２が出射面３２０に入射する角度、つまり、出射面３２０の法線とプリズム３１０内部の光線４１２との角度を図８では$\theta_1$として表し、光線４１２がプリズム３１０を通って出射する際に屈折する角度は$\theta_2$で表すと、スネルの法則によって次式が成り立つ。

【００５３】

$n = \sin\theta_2 / \sin\theta_1$    （式２）

また、三角関数の基本定理を用いると次式が成立することがわかる。

【００５４】

ＡＢ$\cos\gamma$＋Ｂｂ$\cos\alpha'$＝Ａｂ    （式３）

ここで、ＡＢは点Ａから点Ｂまでのプリズム３１０の撮像面の長さであり、Ａｂは出射面３２０上の線分Ａｂの長さであり、$\alpha'$は光線４１２と出射面３２０との間の角度であって、９０°－$\theta_1$に等しい。また、$\gamma$は撮像面３１８と出射面３２０とがなす角度で、図８では角度３４２として示されている。

【００５５】

最後に、正弦法則を用いると次式が成立することがわかる。

【００５６】

ＡＢ／Ｂｂ＝$\cos\theta_1$／$\sin\gamma$    （式４）

上記の式１、２、３、および４を用いると、台形歪みを実質的にゼロにし、さらに全体的な像の鮮明さを上げるためには、次式に示す、プリズム３１０の角度、およびレンズ面３０７と出射面３２０との角度に関する条件が満たされなければならない。

【００５７】

$(n^2 - \sin^2\delta)^{1/2}(\cot\gamma)(\sin\delta) + \sin^2\delta = 1$    （式５）

ここで、図８に示すように、$\delta$はレンズ体３１４のレンズ面３０７が出射面３２０に対してなす角度である。よって、本発明の撮像システム３０８は、台形歪みを略ゼロにし、全体的な像の鮮明さを上げるためには、式５に基づいて構成するのが好ましい。

【００５８】

(12)                JP 3877058 B2 2007.2.7

ただし、撮像システム３０８を製造する際に角度γと角度δについて正確な公差を達成するのは難しく、またコストが高くなる。よって、本発明の撮像システムに対して、３０％の製造公差を許容することにより、以下に示す式６に基づいて構成することが好ましい。

【００５９】

$0.7 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.3$　　　　　（式６）

さらに好ましくは、本発明の撮像システムの製造公差を１５％まで許容し、以下に示す式７にしたがって構成するとよい。

【００６０】

$0.85 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.15$　　　　（式７）

また、本発明の撮像システムの製造公差を７．５％まで許容し、本発明の撮像システムを以下に示す式８にしたがって構成することが最も好ましい。

【００６１】

$0.925 \leqq (n^2 - \sin^2 \delta)^{1/2} (\cot \gamma)(\sin \delta) + \sin^2 \delta \leqq 1.075$　　　（式８）

上述のように、撮像システム３０８を上記の式５～８のうちの一つの式に基づいて構成することにより、台形歪みを大幅に、あるいはゼロにまで抑えられ、全体的な像の鮮明さを上げることができる。これにより、撮像システムが像を処理、比較する精度を容易に上げることができるという利点がある。

【００６２】

プリズム３１０はガラスやアクリルなど、屈折率が１（空気の屈折率）より大きい透明な材料を用いて作製することができる。好ましい屈折率と角度とを備えたプリズムは、ＬＡＫ－７およびＬＡＫ－８と命名されたガラス製の製品が韓国ソウルのシンクワン社（Shinkwang Ltd.）から入手可能である。

【００６３】

レンズ体３１４などのレンズ体については、韓国ソウルのウーリム光学システム社（Woorim Optical System Ltd.）のガラス製品（商品名ＢＫ７）が好ましい。図６に示すように、レンズ体３１４が複数の構成要素で構成されているのであれば、それぞれの構成要素をプラスチック成形など既知の加工手段を用いて加工した枠の中に収めることで、構成要素を配置し間隔を決定することができる。

【００６４】

光源３１２は回路基板上でまっすぐなアレー状に配置した４つの標準ＬＥＤで構成されるのが好ましい。ＬＥＤの駆動については当業者であれば周知である。イメージセンサ３１６は好ましくはＣＭＯＳ型センサであり、韓国ソウルの現代電子社（Hyundai Electronics）、カリフォルニア・サンホセのＶＬＳＩビジョン社、カリフォルニア・サニーヴェールのオムニビジョン・テクノロジーズ社（Omnivision Technologies Inc.）から入手可能である。

【００６５】

図４で示すように、撮像用部品を相対的な位置に固定するために、個々の部品を保持するためのスロットを備えた枠をプラスチック成形するなどして組み立ててもよい。光源３１２は出射面３２０に近接した保持スロットに配置するか、あるいは従来から知られているように、接着剤を用いて出射面３２０に直接取り付けてもよい。

【００６６】

式５～８は、撮像面３１８の全幅ＡＢを利用して撮像を行うことを前提として導いたが、プリズムの撮像面全体を使わなくても撮像は可能である。一例として、角度が９０°以上の三角プリズムを光屈折器として用いた場合が挙げられる。ただし、プリズムの撮像面全体を対象物の撮像に用いないのであれば、上記式５～８に基づいて構成するという条件に加えて、その撮像システムの構成が別のもう一つの条件を満たすことが好ましい。このもう一つの条件を説明する。図９は角度５４１が鈍角である三角プリズム５１０を示している。三角プリズム５１０は平坦な撮像面５１８、平坦な出射面５２０、および平坦なもう一つの面５２２を有している。図９はさらに光源３１２と実質的に同じ光源５１２と、図示しないレンズ体のレンズ面５０７とを示している。プリズム５１０とともに使用するレ

ンズ体はレンズ体３１４と略同じである。
【００６７】
図９に示すように、光線６１２は撮像面５３８上の点Ｄで散乱し、光線６１０は撮像面５１８から点Ａで散乱する。プリズム５１０とレンズ面５０７とは式５にしたがって構成されている。さらに、線分ａ’ｄ’はレンズ面５０７に対して平行であり、長さｄ’ｄ’は物体の像がプリズム５１０内で撮像面５１８上の点Ｄでの見かけの奥行きである。このように、線分Ａａ’およびＤ’ｄ’の長さは等しい。プリズム５１０の屈折率は１より大きいので、光線６１２はプリズム５１０から点ｄ’で出射する際に屈折してしまい、出射面５２０の法線６２０からずれた方向に進む。

【００６８】
光線６１２と出射面５２０とがなす、出射面と撮像面との交差部の側に位置する角度５４５（図９ではα’と表記）は９０°未満である。したがって、光線６１２がプリズム５１０を通過して法線６２０からずれた方向へ屈折すると、プリズム５１０外部の光線６１０に平行な光路を進む。つまり、線分ａ’ｄ’とｄ’ｄとが等しい。したがって、撮像面５１８上の物体について、プリズム５１０内に現れる見かけの像からレンズ面５０７、さらに最終的には、図示しないイメージセンサに到る光路が点Ａでも点Ｄでも等しいことになる。これにより、全体的な像の鮮明さを上げることができる。

【００６９】
次に、同じくプリズム５１０を示す図１０を参照して説明する。プリズム５１０内に現れる、撮像面５１８上の点Ｅに置いた物体の見かけの像からの光路長と、プリズム５１０内に現れる、プリズム５１０上の点Ａに置いた物体の見かけの像からの光路長とは等しくない。光線６１２は撮像面５１８上に置かれた物体からの散乱光である。上記のように、プリズム５１０の屈折率は１より大きいので、光線６１２は、点ｅ’でプリズム５１０から出射する際に屈折し、出射面５２０の法線６２０からずれた方向へ屈折する。つまり、α’と表記した角度５４５は９０°より大きいので、プリズム５１０外部における光線６１２の光路は、プリズム５１０外部における光線６１０の光路と平行ではない。光線６１０と光線６１２とが平行ではないのであるから、線分ｅ’ｅの長さが線分ａ’ａの長さとは異なることになる。つまり、プリズム５１０内の見かけの像からレンズ面５０７までに到る総光路長は、対象物が撮像面３１８上の点Ｅにある場合と同面上の点Ａにある場合とでは異なることになる。そのため、比較的大きな台形歪みの発生及び／又は比較的ピントのぼけた像が形成される。

【００７０】
上記のような像が形成されるのを避けるには、前述のように、角度が９０°以上のプリズムを本発明の撮像システムにおいて使用する場合、撮像面をその幅の一部に限って使用して対象物を撮像するのが好ましい。上記のように、α’が９０°未満で、撮像システムが上記式５～８にしたがって構成されるので、台形歪みは実質上少ない。また、α’が９０°以上であれば、台形歪みが発生する。したがって、撮像対象物をプリズムの撮像面５１８に当てる際に該撮像面５１８の一部にのみ当てようとするのであれば、少なくとも一本の光線と出射面５２０とが該出射面５２０の撮像面５１８との交差側から見て９０°未満の角度（図９、１０ではα’と表記）で交わるように、撮像に用いる面のどの部分も少なくとも一本の光線を散乱させることができなければならない。この基準を用いれば、上記式５～８にしたがって構成された撮像システムにおいて台形歪みの発生を抑えたり、あるいは略一切発生しないようにしたりすることが容易にできるようになり、また、全体的な像の鮮明さを上げることができるという利点がある。

【００７１】
　プリズム５１０及び光源５１２は、プリズム３１０及び光源３１２について上述した材料及び方法によって同様に製造することができる。なお、ＰＯの撮像方法は、撮像面と、出射面と、さらにもう一つの面とを有する光屈折器を備えて行われる。出射面によって定められる平面と撮像面によって定められる平面との間には角度ｙが形成される。ＰＯは撮像面に対して置かれ、入射光は光屈折器に入射される。入射光は撮像面及びＰＯで散乱し

、出射面を通過する。レンズは出射面に近接して配置され、レンズの焦点面と出射面によって定められる平面との間に角度δをなす。角度γおよび角度δは、光屈折器で形成された、ＰＯの見かけ像の一部からレンズ面までの第一光線の光路長であり、最終的にはイメージセンサまでの光路長と、第一光線に略平行で、ＰＯの見かけ像の別の部分から、レンズ面及びイメージセンサまでの別の光線の光路長とが実質的に等しくなるように設定される。

【００７２】
本発明は、その精神と技術的範囲を逸脱しない範囲にて多種多様な実施形態が可能である。すなわち、本発明は明細書に開示した具体的な実施の形態に限定されない。例えば、上記本発明の実施の形態は指紋の撮像との関連で説明したが、これ以外にも任意のタイプのＰＯの撮像にも本発明は適用できる。    10

【図面の簡単な説明】
【図１】    吸収式撮像技術を用いた、従来の撮像装置の概略図である。
【図２】    図１の撮像装置の台形歪みを説明する概略図である。
【図３】    散乱式撮像技術を用いた第２の従来の撮像装置の概略図である。
【図４】    本発明に係る撮像装置の概略図であり、プリズム、光源、レンズ体、イメージセンサを示している。
【図５】    図４に示すプリズム及び光源の斜視図である。
【図６】    図４に示す撮像システムにて、台形の歪みを低減する方法を示す概略図である。    20
【図７】    図４に示す撮像システムにて使用されるレンズ体を示す概略図である。
【図８】    図４に示す撮像システムにて、プリズム及びレンズ体の好ましい構成を示す概略図である。
【図９】    本発明の撮像装置で使用可能な他の実施形態のプリズムの散乱光路を説明する概略図である。
【図１０】    図９に示すプリズムの他の散乱光路を説明する概略図である。

(15)　　　　　　　JP 3877058 B2 2007.2.7

【図１】



【図２】

【図３】



【図４】



【図５】



FIG._5

(16)                    JP 3877058 B2 2007.2.7

【図６】



システム30↑

【図７】

レンズ体
314





【図８】



FIG._8

【図９】



FIG._9

【図１０】



FIG._10

フロントページの続き

(74)代理人　100124855
　　　　弁理士　坪倉　道明
(72)発明者　テン，ハリー，エイチ．
　　　　アメリカ合衆国，カリフォルニア州　９４１０５，スタンフォード，エスコンディド　ヴィレッジ
　　　　８１エー
(72)発明者　ジョ，ソンーチャン
　　　　アメリカ合衆国，インディアナ州　４７９０６，ウェスト　ラファイエット，イーガー　ロード
　　　　２３５３，アパートメント　＃４


　　　審査官　▲広▼島　明芳


(56)参考文献　特開平１１－１０２４３２（ＪＰ，Ａ）
　　　　　　実開昭６３－０９９９６０（ＪＰ，Ｕ）
　　　　　　実開平０３－００９０５８（ＪＰ，Ｕ）
　　　　　　特開平１０－１７１９６８（ＪＰ，Ａ）


(58)調査した分野(Int.Cl.，ＤＢ名)
　　　　　　Ｇ０６Ｔ　１/００

1

2

3

4

5

6

7

8                UNITED STATES DISTRICT COURT

9

10       NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

| | |
|---|---|
| SecuGen Corporation, a Delaware corporation | Case No. **C08-01306 (JL)** |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION** |
| v. | |
| Union Community Co. Ltd., a Korean corporation, | |
| Defendant. | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1         Upon due consideration of Defendant Union Community Co. Ltd.'s Motion to Stay

2    Proceedings Pending Reexamination and the arguments presented, the Court hereby finds the motion

3    should be GRANTED.

4    IT IS SO ORDERED.

5

6    Dated:    August 6, 2008

7                                                                      By: _____

8                                                                      The Honorable Ronald M. Whyte
                                                                      United States District Court Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, California
92130-3051 USA

1

CASE NO C08-01306 (JL)
[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING REEXAMINATION
SDODMS1/692342.1